## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| AF-SOUTHEAST, LLC, *et al.*, [1] | : Case No. 16-_____ (_____) |
| | : Joint Administration Requested |
| Debtors. | : **Hearing Date: TBD** |
| | : **Objection Deadline: TBD** |

### MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS PURSUANT TO 11 U.S.C. § § 105(A), 364(C) AND 364(D); (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; (C) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (D) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § § 361 AND 363; AND (E) SCHEDULING A FINAL HEARING PURSUANT <u>TO BANKRUPTCY RULE 4001</u>

AF-Southeast, LLC, *et al.* (the "<u>Debtors</u>"), the Debtors and debtors-in-possession in the above captioned cases, by and through their proposed undersigned counsel, hereby submit this motion (the "<u>Motion</u>") pursuant to Sections 105(a), 361, 362, 363, 364, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), for entry of an order, substantially in the form attached hereto as **Exhibit A**, (the "<u>Interim Order</u>") and, after the final hearing, a final order (the "<u>Final Order</u>"): (i) authorizing the Debtors to obtain postpetition financing (the "<u>DIP Financing</u>") pursuant to that certain Senior Secured, Superpriority Debtor-in-Possession Credit Facility (the "<u>DIP Facility</u>") – attached to the Interim Order as **Exhibit B**,

---

[1] The Debtors in theses cases, along with the last four digits of their federal tax identification numbers, are: (i) AF-Southeast, LLC (8002); (ii) Allied Fiber – Florida, LLC (8111); and (iii) Allied Fiber – Georgia, LLC (2935).

together with all other agreements delivered or executed from time to time in connection therewith (as hereafter amended, restated, supplemented or otherwise modified from time to time, together with the DIP Facility, the <u>DIP Loan Documents</u>") and the budget attached hereto as **<u>Exhibit B</u>** (the "<u>Approved Budget</u>")[2]; (ii) authorizing the Debtors to use Cash Collateral (defined herein); (iii) granting liens and providing superpriority administrative expense status to the DIP Lender (defined herein); (iv) modifying the automatic stay to provide immediate relief; and (v) scheduling a final hearing on the relief requested.  In support of this Motion, the Debtors incorporate the statements set forth in the *Declaration of Scott L. Drake in Support of First-Day Motions* (the "<u>First Day Declaration</u>") filed contemporaneously herewith, and further state as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      The Debtors have commenced these Chapter 11 cases to pursue a streamlined sale process of their assets in an attempt to "stop the bleeding" – of heavy capital burn while attempting to maximize recoveries for all stakeholders.  In order to achieve a going-concern sale, however, the Debtors require the immediate use of cash collateral and access to debtor-in-possession financing.  The Debtors have secured commitments for up to $4,467,966 in financing from their Senior Pre-Petition Lender, Strome Mezzanine Fund IV, L.P. (the "<u>Senior Pre-Petition Lender</u>" or  "<u>DIP Lender</u>" as the context so requires).

2.      The Debtors and the DIP Lender have agreed on the terms of a senior secured post-petition financing facility that will satisfy the Debtors' short term liquidity needs and fund an efficient and robust marketing and sales process.  Over the past eighteen (18) months, the

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Agreement or as otherwise noted.

Debtors and their ultimate parent have sought various forms of relief to move the business forward, including equity and/or debt infusions, possible merger partners, a sale/leaseback transaction and other various strategies, but have been unable to do so.  Thus, the Debtors were left with this last option – a sale in bankruptcy -  and believe that the terms of the proposed post-petition financing are fair, reasonable, the best that can be achieved under the circumstances, and will ensure the preservation of valuable estate assets.  Given the Debtors' immediate need for cash, and the lack of alternatives, the Debtors have determined in their business judgment that the DIP Financing is in the best interests of the Debtors' estates.

3.      As set forth in the First Day Declaration, the Debtors require immediate access to the DIP Financing and use of Cash Collateral on an interim basis.  The Debtors and their advisors have determined after an exhaustive review of the Debtors' books and records, absent access to the DIP Financing and use of Cash Collateral, the Debtors will have no choice other than to liquidate assets in a piecemeal fashion at forced liquidation value.  Therefore, the Debtors believe that approval of the DIP Financing on an interim basis is warranted.

## **JURISDICTION**

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are (i) sections 105(a), 361, 362, 363, 364, 506, 507, and 552 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Local Rule 4001-2.

7.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order in connection with this Motion if it is determined that this Court cannot – absent the consent of the parties – enter such final judgment or order consistent with Article III of the United States Constitution.

## BACKGROUND

8.      On the date hereof (the "Petition Date"), each of the Debtors filed a petition with this Court under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. Simultaneous with the filing, the Debtors filed, among other first day motions, a Motion for Joint Administration of their chapter 11 cases.

9.      No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

10.      Allied Fiber, LLC ("Allied Fiber") is the 100% owner of Debtor AF Southeast. AF Southeast is the 100% owner of Debtor operating entities Allied Florida, LLC ("Allied Florida") and Allied Georgia, LLC ("Allied Georgia").

11.      The Debtors are engaged in the business of designing, constructing and operating an open access, physical layer, network-neutral colocation and dark fiber network.  The Debtors' dark fiber network provides long-haul, multi-access points, and short-haul dark fiber network systems, coupled with its owned colocation facilities to lease the use of the underlying physical infrastructure assets to all network operators who subscribe to the Debtors services.  The network is designed to link the international subsea cable landing points in the United States while also providing intermediate access along the route for the inclusion of local networks into the

4

Debtors' network architecture.  Currently, the Debtors' completed dark fiber network runs from Miami, Florida, to Atlanta Georgia, with eleven (11) colocation facilities along the way to propagate a clean and robust fiber optic signal.

12.     A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in detail in the First Day Declaration.

**<u>Summary of Debtors'  Prepetition Secured Indebtedness</u>**:

13.     From inception to date, there has been approximately $93 million of invested capital at the Allied Fiber and Debtor entities, all as more fully set forth in the following paragraphs.

14.     In June 2009 and October 2011, Allied Fiber raised approximately $15 million of equity in both common and preferred shares, respectively from various individuals and entities. The preferred shares were solely owned by Phoenix Fund, LLC ("<u>Phoenix</u>").   In need of additional capital, Phoenix loaned Allied Fiber $5 million secured against Allied Fiber's assets. Subsequently, from March 2013 to August 2014, Allied Fiber raised an additional $44 million of secured debt in two tranches (some with convertible features and others with warrants) from certain individuals, many of who had also participated in the equity offering.  The debt provided by certain individuals and evidenced by promissory notes was secured against Allied Fiber's assets and took priority over the Phoenix debt.   Hereinafter, Phoenix and those certain individuals set forth in the previous sentence shall be referred to as the "<u>Junior Lien Holders</u>".

15.     By September 2014, Allied Fiber had exhausted its capital to complete construction of the Southeast Segment (as defined in the First Day Declaration) including the Colocation Facilities (as defined in the First Day Declaration).  In dire need of additional capital,

Allied Fiber turned to the Senior Pre-Petition Lender for funding to finish the Southeast Segment and otherwise provide operating capital.  As part of this funding, the Debtors were incorporated, Allied Fiber's assets pertaining to the Southeast Segment were transferred to the Debtors, and the Senior Pre-Petition Lender lent the Debtors approximately $23 million (the "Senior Pre-Petition Indebtedness") in exchange for a first priority lien in the Debtors' and Allied Fiber's assets (the "Senior Pre-Petition Lien").  The Senior Pre-Petition Lender and the Junior Lien Holders entered into that certain Intercreditor Agreement in which the Junior Lien Holders subordinated their rights to the Senior Pre-Petition Lender, all as more fully set forth below.

16.     Debtors' Senior Pre-Petition Indebtedness is governed by that certain Loan Agreement dated September 24, 2014 (together with the other documents and agreements executed in connection therewith, including without limitation, various Security Agreements, Promissory Notes and Guarantee and Pledge Agreements, the "Senior Pre-petition Loan Documents"), among AF-Southeast, LLC, Allied Fiber-Florida, LLC, and Allied Fiber-Georgia, LLC, as borrowers,  Allied Fiber, LLC as guarantor, and the Senior Pre-Petition Lender.

17.     The Debtors defaulted on the loan with the Senior Pre-Petition Lender. Thereafter, the Senior Pre-Petition Lender agreed to forebear from taking remedial action against the Debtors and provided additional advances to both the Debtors and Allied Fiber.  Under the terms of the Amendment and Forbearance Agreement, the Senior Pre-Petition Lender provided additional funding through the Senior Pre-petition Loan Documents, bringing the cumulative principal balance of the Senior Pre-petition Indebtedness to $26.8 million (comprised of $23 million initial advance, $2.8 million in PIK interest and $1 million in additional advances).

18.     Shortly thereafter, from September 2015 through February of 2016, Phoenix provided Allied Fiber with certain "forbearance funding" in the amount of $2.6 million.  The

funding from Phoenix abruptly ceased without notice on February 29, 2016.  Since that date, and in order to preserve the Debtors' value as a going concern, the Senior Pre-Petition Lender has funded an additional $2.2 million on an emergency basis along with an additional $2 million of PIK interest that, originally, was contractually obligated to be paid in cash.

19.     The Senior Pre-Petition Lender and the Junior Lien Holders are parties to that certain Intercreditor Lien Subordination Agreement (the "Intercreditor Agreement"), dated as of September 24, 2014, by and among the Debtors, the Senior Pre-Petition Lender, Phoenix, and William Hitchcock as Agent for certain individuals and entities.  Pursuant to the Intercreditor Agreement, while any portion of the Obligations (as defined therein) remain outstanding, the Subordinating Lenders (as defined in the Intercreditor Agreement to mean the Junior Lien Holders) agreed to, among other things, subordinate their rights to repayment – if those rights even exist in the first instance against the Debtors -  for any portion of the obligations due and owing to them, to the Senior Pre-Petition Lender.

20.     Thus, as of the Petition Date, Debtors have first priority secured indebtedness due and owing to the Senior Pre-Petition Lender in the approximate principal amount of $31,537,000 (plus an additional approximately $19,674,757, with accrued but unpaid interest thereon in the amount of $610,000 as provided for in the Make-Whole provision in the Senior Pre-Petition Loan Documents), all of which is secured by a first priority lien in substantially all of the Debtors assets.  The Junior Lien Holders indebtedness due and owing from Allied Fiber – and ostensibly from the Debtors (although the Debtors are not in possession of any instrument evidencing any payment obligations or providing security interests - from Debtors to the Junior Lien Holders) is approximately $51,144,124 plus accrued interest of approximately

$14,110,482[3].    The Senior Pre-petition Indebtedness and Junior Lien Holders' secured indebtedness – to the extent it exists – shall be referred to herein as the "<u>Pre-Petition Secured Debt</u>" and the collateral which secures same shall be referred to as the "<u>Pre-Petition Collateral</u>".

21.    Given the estimated value of the Pre-Petition Collateral as determined by an independent third party, it is a virtual certainty that the Senior Pre-Petition Lender is likely undersecured.

<u>RELIEF REQUESTED</u>

22.    By this Motion, the Debtors seek entry of the Interim Order and Final Order that, among other things:

    a.    authorize the Debtors to obtain senior-secured, superpriority post-petition financing pursuant to the terms and agreements set forth in the proposed Interim Order, Final Order, and DIP Loan Documents;

    b.    grant to DIP Lender, superpriority administrative expense priority claims pursuant to Bankruptcy Code sections 364(c)(1) and 507(b) and first-priority security interests in all of the DIP Collateral pursuant to Bankruptcy Code sections 364(c)(2), 364(c)(3), and 364(d).

    c.    authorize the Debtors to (i) use the Cash Collateral (defined herein) pursuant to section 363 of the Bankruptcy Code, and all other Pre-Petition Collateral, and (ii) provide adequate protection to the Senior Pre-Petition Lender.

    d.    subject to the provisions of the Interim Order and any Final Order, authorize the DIP Lender to exercise remedies under the DIP Loan Documents upon the occurrence and during the continuance of an Event of Default;

    **e.**    authorize interim financing in the amount of $1,163,966 pending entry of the Final Order;

---

[3] The Debtors reserve all rights with respect to the validity, extent, and priority of the Junior Lien Holders' purported liens and claims.  To date, the Debtors cannot establish any instrument evidencing their payment obligations or documents evidencing security interests in favor of the Junior Lien Holders.

8

    f.   modify the automatic stay to the extent set forth in the Interim Order and Final Order and waives the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 4001(a)(3) and 6004(h), thereby providing for the immediate effectiveness of the Interim and Final Order;

    g.   subject to entry of the Final Order, approves the conversion of all outstanding obligations arising under or in connection with the Second Amendment to Loan Agreement, dated as of April 20, 2016, by and among the Strome Mezzanine Fund IV, LP and AF-Southeast, LLC, Allied Fiber – Florida, LLC, and Allied Fiber – Georgia, LLC (the "Second Amendment"), including, without limitation, outstanding principal and accrued interest and fees thereon into DIP Obligations (the "Roll Up")

    h.   set a Final Hearing for entry of the Final Order authorizing the Debtors to enter into the DIP Loan Documents.

## DIP FINANCING AND CASH COLLATERAL

23.    As set forth above, the Pre-Petition Secured Debt is secured by first-priority and ostensibly second-priority liens and security interests in substantially all of the Debtors' assets. Thus, those assets constitute the Pre-Petition Collateral. Moreover, the Debtors' cash, including, without limitation, all cash and other amounts on deposit or maintained by the Debtors in any bank accounts, as well as any cash proceeds derived from the disposition thereof, constitute proceeds of the Pre-Petition Collateral and, therefore, are cash collateral of the Prepetition Secured DIP Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

24.    The Debtors intend to finance continued operations through use of Cash Collateral and the DIP Financing incurred pursuant to section 363, 364(c), and 364(d) of the Bankruptcy Code, up to the principal amount of approximately \$4,467,966. The DIP Facility shall be secured by first-priority, valid, priming, perfected, and enforceable liens (as defined in section 101(37) of the Bankruptcy Code) on property of the Debtors' estates pursuant to sections

364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code (the "DIP Collateral").  Moreover, the

DIP Lender requires, and the Debtors have agreed to provide the DIP Lender with, superpriority

administrative expense claims, senior to all other administrative expenses, as provided in section

364(c)(1) of the Bankruptcy Code, subject in all respects to the terms and conditions contained in

the Interim Order and the Final Order.

        25.      The Debtors have determined in their business judgment after careful evaluation

of all options, that the DIP Loan Documents and use of Cash Collateral subject to the terms and

conditions set forth in the Interim Order and Final Order, is in the best interests of the Debtors'

estates and will allow the Debtors to maintain operations and the necessary level while pursuing

a sale of substantially all of their assets.

**CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001**

        26.      In accordance with Bankruptcy Rules 4001(b), (c), and (d) and Local Rule 4001-

(2), below is a summary of the terms of the proposed use of Cash Collateral and the proposed

DIP Facility[4]

| Summary of the DIP Facility | |
| --- | --- |
| **Borrowers** | AF-Southeast, LLC<br><br>Allied Fiber-Florida, LLC<br><br>Allied Fiber-Georgia, LLC<br><br>(collectively, the "Debtors") |

---

[4] The Summary of the terms and conditions of the DIP Facility as described in this Motion are intended solely for informational purposes and are qualified in their entirety by the Final Order and the DIP Note.  In the event there is any conflict between this Motion and the Final Order or the DIP Note, the Final Order and the DIP Note will control in all respects.

| | |
|---|---|
| **DIP Lender** | Strome Mezzanine Fund IV, L.P. (the "DIP Lender") |
| **Bankruptcy Filing and Appointment of CRO** | As a condition to the DIP Lender's agreement to provide additional financing to the Debtors, within 5 days of finalizing the definitive documentation for the DIP Facility (as defined herein), the Debtors will voluntarily commence a jointly-administered bankruptcy case under Chapter 11 of the Bankruptcy Code (collectively the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") for the purpose of conducting and concluding a sale process for the sale of substantially all of their assets under Section 363 of the Bankruptcy Code (the "Sale") within 90 days of the commencement of the Chapter 11 Case (the "Petition Date"). <br><br> Subject to the entry of appropriate orders from the Bankruptcy Court, the Debtors shall (i) retain Phoenix Management Services, LLC ("PMCM") to provide the Debtors with a CRO (defined below) and certain additional PMCM personnel, and (ii) designate Michael E. Jacoby as the Debtors' Chief Restructuring Officer (the "CRO"). If the Bankruptcy Court does not authorize the retention of PMCM and/or the CRO for any reason, then the Debtors shall retain another financial advisor/chief restructuring officer that is acceptable to the DIP Lender. Subject to the ultimate approval of the Debtors' Manager, the CRO shall have full authority to make all decisions necessary to prosecute the Chapter 11 Case and consummate the Sale. |
| **Amount and Type of Facility** | The DIP Lender will provide to the Debtors a debtor-in-possession loan facility (the "DIP Facility") in the aggregate principal amount of up to $4,467,966. The DIP Facility shall accrue interest at the rate of 12%. The term of the DIP Facility shall be 90 days. The DIP Facility shall be accorded superpriority administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code, and shall be granted first-priority security interests in all of the DIP Collateral (as defined below) pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) . |
| **Documentation** | The DIP Facility shall be provided by the DIP Lender pursuant to the terms of an amendment to, or amendment and restatement of, the existing Senior Pre-petition Loan |

| | |
|---|---|
| | Documents or new loan documents, and any other documents that the DIP Lender determines are necessary, each embodying the terms set forth herein, and containing such other terms and conditions customary in debtor-in-possession financing agreements and that are acceptable to the DIP Lender and the Debtors. |
| **Interim and Final Orders** | The DIP Facility shall be subject to the entry of interim and final orders of the Bankruptcy Court authorizing the Debtors to obtain postpetition indebtedness and approving the DIP Facility. |
| **Approved Budget and Use of Proceeds** | The Debtors shall be permitted to use proceeds of the DIP Facility solely in accordance with the terms of a weekly budget that is acceptable to the DIP Lender, subject to a 15% variance (as amended, restated or modified from time to time, the "Approved Budget") on both the revenue and expense side.  The Approved Budget shall at least cover the period from the Petition Date to the closing of the Sale.<br><br>Proceeds of the DIP Facility shall be used solely for the following purposes (to the extent identified in the Approved Budget):  (a) to fund post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 959; (b) to pay interest, fees and expenses to the DIP Lender in accordance with the DIP Facility (whether or not such amounts are reflected in the Approved Budget); (c) to fund fees and expenses incurred in connection with the Sale; (d) to pay permitted pre-petition claim payments and adequate protection payments, if any; (e) to pay professional fees and expenses; and (f) to pay certain other costs and expenses of administration of the Chapter 11 Case.<br><br>Proceeds of the DIP Facility shall not be used (a) to permit the Debtors, or any other party-in-interest or their representatives, to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests granted in favor of the Senior Pre-Petition Lender under the Senior Pre-Petition Loan or the DIP Lender under the DIP Facility, or (ii) the enforceability of the obligations of the Debtors or any guarantor under the Senior Pre-Petition Loan between the Debtors and the Senior Pre-Petition Lender or the DIP |

| | |
|---|---|
| | Lender in connection with the DIP Loan, (b) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against the Senior Pre-petition Lender and the DIP Lender and their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims relating in any way to the Debtors, the Senior Pre-Petition Loan and/or the DIP Facility, or (c) to fund acquisitions, dividends or distributions, employee or management bonuses, capital expenditures, capital leases, or any other similar expenditure, except as set forth in the Approved Budget. Notwithstanding the forgoing, up to $25,000 in the aggregate of the Carve-Out may be used by the Committee, if one is appointed, to investigate the Senior Pre-Petition Loan Documents (but not the claims and/or liens of the DIP Lenders). |
| **Collateral and Security Interests** | The DIP Facility shall be accorded superpriority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code and be secured by a first-priority security interest in all of the Debtors' assets, including, without limitation, all of Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtors (collectively, the "DIP Collateral") pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code; provided, however, that until entry of the Final Order, the DIP Collateral shall not include any avoidance actions available to the bankruptcy estate of any Debtor pursuant to the Bankruptcy Code or the proceeds thereof. |
| **Use of Cash Collateral** | The Debtors shall be permitted to use cash collateral in accordance with the terms of the Approved Budget. <br><br> As adequate protection for the Debtors' use of cash collateral, the DIP Lender will be granted adequate protection liens in all of the Debtors' assets, junior only to the DIP Lien (the "Adequate Protection Lien"), to the extent of diminution in value of the DIP Lender's collateral under the Prepetition Loan Facility (the "Pre-Petition |

| | |
|---|---|
| | Collateral"). |
| | To the extent the Adequate Protection Lien does not adequately protect against the diminution in value of the DIP Lender's Pre-Petition Collateral, the DIP Lender shall also be given a postpetition superpriority administrative expense claim (the "Adequate Protection Claim") against each Debtor, jointly and severally, with recourse to all pre- and postpetition property and all proceeds thereof pursuant to sections 503 and 507 of the Bankruptcy Code, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter and over all other administrative expenses of any kind, including, without limitation, those specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Case pursuant to Section 1112 (the "Adequate Protection Claim"). |
| **Carve Out** | The DIP Liens shall be subject to a carve-out (the "Carve-Out") for: |
| | (i) unpaid postpetition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930; |
| | (ii) unpaid postpetition fees and expenses of professionals of the Debtors and any committee approved by an order of the Court pursuant to section 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "Professionals") incurred prior to the Termination Date, to the extent such fees and expenses are (a) within the amounts set forth in the Approved Budget, (b) subsequently allowed, or otherwise authorized, by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code, and (c) not otherwise paid from retainers held by any such Professional; and |
| | (iii) postpetition fees and expenses of the Professionals incurred after the occurrence of the Termination Date in an aggregate amount not to exceed $50,000, to the extent such fees and expenses are (a) subsequently allowed, or otherwise authorized, by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code, and (b) not otherwise paid from retainers held by any such |

14

| | |
|---|---|
| | Professional. |
| | The Carve-Out shall not include payment for any fees and expenses, if any, of the Professionals incurred directly or indirectly, in respect of, arising from or relating to: |
| | (i) the initiation, joinder or prosecution of any action contesting the prepetition indebtedness owed to the DIP Lender or the validity of any prepetition liens granted to the Senior Pre-Petition Lender (other than the Committee's investigation rights as set forth above in the "Use of Proceeds Section"); |
| | (ii) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the DIP Lender of any of its rights and remedies under the Interim Order, Final Order, or documents comprising the DIP Facility; |
| | (iii) any other cause of action of the Debtors or their estates against the DIP Lender; or |
| | (iv) any request to borrow money other than pursuant to the terms of the Interim Order, the Final Order, or the documents comprising the DIP Facility. |
| **Roll Up of Prepetition Obligations** | Upon entry of the Final Order, and subject in all respects to the rights provided for during the Challenge Period, approves the conversion of all outstanding obligations arising under or in connection with the Second Amendment to Loan Agreement, dated as of April ___, 2016, by and among the Strome Mezzanine Fund IV, LP and AF-Southeast, LLC, Allied Fiber – Florida, LLC, and Allied Fiber – Georgia, LLC (the "Second Amendment"), including, without limitation, outstanding principal and accrued interest and fees thereon into DIP Obligations (as defined below) (the "Roll Up"). |
| **Superpriority Administrative Claim** | Subject to the Carve-Out, amounts owed by Debtors to DIP Lender pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code (the "DIP Facility |

| | |
|---|---|
| | Claim"). |
| **Lien Validation and Perfection** | All liens authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the DIP Facility or with respect to adequate protection shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.<br><br>The Debtors shall stipulate in the Interim Order and Final Order that (i) the Senior Pre-petition Lender's prepetition liens are valid, perfected and have first priority, and such liens encumber all assets of the Debtors, and (ii) the Debtors possess no claims, offsets or any other type cause of action against the Senior Pre-petition Lender's which would impair, in any manner, the Senior Pre-petition Lender's liens against the Debtors' assets or the obligations of the Debtors to the Senior Pre-petition Lender's arising under the Senior Pre-Prepetition Loan Documents or DIP Financing Documents.  The Debtors' stipulation shall be binding upon all parties in interest in the Chapter 11 Case, including any committee that is appointed, unless (i) an adversary proceeding or contested matters, as the case may be, is filed by any party in interest prior to the expiration of the date that is at least seventy-five (75) days from the entry of the order for relief and at least sixty (60) days for the Committee, if one is formed, from the date of its formation to investigate such matters.   (the "Review Period") against the Senior Pre-Petition Lender challenging the Senior Pre-petition Lender's prepetition liens or claims or otherwise asserting estate claims against the Senior Pre-petition Lender, and (ii) a final judgment is entered against the Senior Pre-petition Lender in such adversary proceeding or contested matter; provided, however, any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against the Senior Pre-petition Lender on behalf of the Debtors' estate, or challenging in any manner the Senior Pre-petition Lender's liens and claims against the Debtors.  Nothing contained herein or in the Interim and/or Final Order shall be deemed to give standing to the Committee or any party in interest to challenge the DIP Liens and/or the Senior Pre-Petition Liens.<br><br>In the Final Order, the Debtors shall waive any right to |

| | |
|---|---|
| | surcharge the Pre-Petition Collateral or DIP Collateral, whether pursuant to Sections 506(c) or 105(a) of the Bankruptcy Code or under any other applicable law. |
| **Sale Process** | The Debtors shall conduct the Sale in accordance with the Case Milestones defined below.<br><br>The Debtors, through PMCM and the CRO, together with the Debtors' other professionals, shall oversee the Sale process on behalf of the Debtors, including all activities of any advisors retained by the Debtors in connection with the Sale, shall at all times be entitled to take any action necessary or appropriate to conduct the Sale process, and shall provide the DIP Lender with access to all potential bidders and other interested parties, and any information provided to the Debtors by such parties.<br><br>The CRO shall provide the DIP Lender with information regarding the status of the marketing and Sale process of the Debtors, and shall be available to provide periodic telephonic updates from time to time (but not less than weekly), as reasonably requested by the DIP Lender.<br><br>The Debtors acknowledge that the DIP Lender or its designated affiliate shall have the right to credit bid the amount of its secured debt in the Sale. |
| **Case Milestones** | The Debtors shall be required to comply with the following timeline in the Chapter 11 Case (the "<u>Case Milestones</u>"):<br><br>(a)   On or before the date that is five (5) days after the Petition Date, or such later date to which the DIP Lender consents in its sole discretion, the Debtors shall file a motion requesting the entry of an order establishing bidding procedures for the Sale (the "<u>Sale Procedures Order</u>").<br><br>(b)   On or before the date that is five (5) days after the Petition Date, or such later date to which the DIP Lender consents in its sole discretion, the Debtors shall file a motion, in form and substance acceptable to Lender, seeking entry of an order of the Bankruptcy Court approving the retention of the Financial Advisor and Chief Restructuring Officer during the Chapter 11 Cases, on terms and conditions acceptable to DIP Lender and such order of the Bankruptcy Court in form and substance |

| | |
|---|---|
| | satisfactory to Agent shall be entered by thirty (30) days after the Petition Date or such later date to which the Lender consents in its sole discretion.<br><br>(c)    On or before the date that is thirty (30) days after the Petition Date, or such later date to which the DIP Lender consents in its sole discretion, the Bankruptcy Court shall have entered the Sale Procedure Order which shall provide, among other things, that the DIP Lender or its designee may credit bid all or any portion of the Obligations in connection with the Sale pursuant to Section 363(k) of the Bankruptcy Code.<br><br>(d)    On or before July 12, 2016, or such later date to which the DIP Lender consents in its sole discretion, the Debtor shall have held an auction for the Sale (the "Auction").<br><br>(d)    On or before July 14, 2016, or such later date to which the DIP Lender consents in writing in its sole discretion, the Bankruptcy Court shall have entered an order approving the results of the Auction and authorizing the Sale (the "Sale Order").<br><br>(e)    On or before July 18, 2016, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h), or such later date to which the DIP Lender consents in writing in its sole discretion, the Sale shall be closed, with proceeds of the Sale paid directly to the DIP Lender to be applied to the obligations under the DIP Facility and the Prepetition Loan Facility. |
| **Court Filings** | As soon as practicable in advance of filing with the Bankruptcy Court, the Debtors shall furnish to the DIP Lender (i) the motion seeking entry of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance satisfactory to the DIP Lender in its sole discretion, (ii) the motion seeking entry of, and proposed forms of, the of the Sale Procedures Order and the Sale Order, (iii) all other proposed orders and pleadings related to the DIP Facility, which orders and pleadings shall be in form and substance satisfactory to the DIP Lender, (iv) any motion seeking approval of any sale of the Debtors' assets and any proposed form of a related bidding procedures order and sale order (other than those related to the Sale), and (v) any motion and proposed form |

| | |
|---|---|
| | of order filed with the Bankruptcy Court relating to the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance reasonably satisfactory to the DIP Lender in its sole discretion). |
| **Conditions Precedent** | The closing of the DIP Facility shall be subject to conditions precedent customary and appropriate for financings of this type, including, but not limited to, (a) satisfaction of all conditions to be set forth in the DIP Financing Documents, (b) the DIP Lender's approval of the Approved Budget, together with all financial information and projections regarding the Debtors requested by the DIP Lender, all in form and substance satisfactory to the DIP Lender, (c) entry of an Interim Order and the Final Order approving the DIP Facility, its superpriority administrative claims and all first priority and other liens securing the DIP Facility, and containing such other orders and findings as the DIP Lender may require, including automatic modification of the automatic stay upon the occurrence of an event of default enabling the DIP Lender to exercise certain rights and remedies against the DIP Collateral, which Interim Order or Final Order, as applicable, shall not have been modified or amended without reasonable approval of the DIP Lender, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to the DIP Lender, (d) the satisfaction of the DIP Lender with respect to all adequate protection payments, critical vendor payments, and all other material motions and orders filed in the Chapter 11 Case requiring the expenditure of cash, (e) continuation of the Debtors' present cash management system, (f) the Debtors' retention and continued employment of the CRO with authority to make all decisions necessary to prosecute the Chapter 11 Case and consummate the Sale, subject to the ultimate approval of the Manager of the Debtors. |
| **Affirmative and Negative Covenants** | The DIP Facility will be subject to affirmative and negative covenants customarily included in debtor-in-possession financing agreements or as otherwise agreed to by the DIP Lender and the Debtor, including, but not limited to, (a) customary and reasonable reporting requirements as reasonably required by the DIP Lender in its sole discretion, (b) compliance with the Approved |

| | |
|---|---|
| | Budget, and (c) compliance with the Case Milestones. |
| **Termination Date** | The earliest to occur of: (a) thirty (30) days after the Petition Date if the Final Order has not been entered; (b) the occurrence of an Event of Default under the DIP Financing Documents or the acceleration of the obligations under the DIP Facility; (c) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility or is otherwise acceptable to the DIP Lender; (d) the date which is the closing date of any sale of all or substantially all of the Debtor's assets; (e) the entry of an order by the Bankruptcy Court granting (i) relief from the automatic stay permitting foreclosure of any assets of any Debtor with a value in excess of $100,000 in the aggregate, (ii) any motion by the DIP Lender to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers, or (iv) a motion the dismissal or conversion of the Chapter 11 Case; (f) the filing or support by any Debtor of a plan of reorganization that (i) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility; or (g) 90 (ninety) days after the Petition Date. The date on which the earliest of clauses (a) through (g) above occurs is referred to hereinafter as the "Termination Date." <br><br> On the Termination Date, the DIP Facility shall be deemed terminated, and the DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility.  All unpaid principal, interest, fees, costs and expenses on the DIP Facility shall be due and payable in full on the Termination Date. |
| **Events of Default** | • Scott Drake, the CRO, PMCM, Fox Rothschild LLP, or such other financial advisor/chief restructuring officer appointed by the Bankruptcy Court cease to be employed by the Debtors or incur a material change in job duties. <br><br> • The Chapter 11 Case is converted to cases under Chapter 7 of the Bankruptcy Code or is dismissed or a |

motion requesting such relief shall have been granted.

- There is filed or the Debtors support a proposed plan of reorganization that does not provide for the indefeasible payment in full and in cash of Debtors' obligations to the DIP Lender on the effective date of the plan.

- Appointment of a trustee under Section 1104 or an examiner under Section 1106 of the Bankruptcy Code without the express written consent of the DIP Lender, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, or the Interim Order or Final Order approving the DIP Facility, without the prior written consent of the DIP Lender or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Any attempt by any Debtors to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment invalidating, reducing, or otherwise impairing the DIP Lender's claims, or to subject any of the DIP Lender's collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- Any Debtor shall apply for an order substituting any assets for all or any portion of the DIP Collateral, except as provided in the instruments evidencing and governing the DIP Facility.

- Any payment on, or application for authority to pay, any pre-petition general unsecured claim owing to terminated employees, lease rejection damages, without prior written consent of the DIP Lender.

- The Debtors shall, without the DIP Lender's prior written consent, take any action that results (or fail to take any action that could reasonably be expected to result) results in the interruption or cessation of the sale process.

| | |
|---|---|
| | • An order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay.<br><br>• Failure to make all payments under the DIP Facility when due.<br><br>• Failure to pay any material, undisputed post-petition indebtedness within 45 days of the date on which such indebtedness becomes due and owing.<br><br>• Breach of any covenant of the DIP Facility.<br><br>• Any representation or warranty by any Debtor is incorrect in any material respect when made.<br><br>• Exclusivity shall have been terminated or the Debtors shall have agreed to any such termination.<br><br>• After entry thereof, either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or which shall have been modified or amended in a manner that materially and adversely affects the DIP Lender's rights with respect to repayment of the DIP Facility.<br><br>• Other customary Events of Default as may be reasonably required by the DIP Lender. |
| **Remedies** | Upon the Termination Date, the DIP Lender shall have customary remedies, including, without limitation, the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court; provided, however, that the DIP Lender shall provide the Debtors, any official committee appointed in the Chapter 11 Case and the Office of the United States Trustee with five (5) days prior written notice of the DIP Lender's intent to exercise such remedies.  Section 362 relief from the stay in favor of the DIP Lender shall be embodied in any order approving the DIP Facility and the use of cash collateral. |
| **Fees and Expenses** | The Debtors shall promptly pay or reimburse the DIP Lender, or its professionals, when invoiced for all reasonable costs and expenses of the counsel (including, |

| | |
|---|---|
| | without limitation, local counsel) and financial advisors for the DIP Lender and including all due-diligence, including but not limited to duplication or printing costs, consultation, travel, and attendance at court hearings, regardless of whether the DIP Facility is consummated. The DIP Lender shall have the right to charge the DIP Facility for any such fees and costs.<br><br>As a condition to reimbursement for professional fee payments, the DIP Lender will provide the Debtor, any official committee appointed in the Chapter 11 Case, and the Office of the United States Trustee with any professional invoice for which the DIP Lender seeks reimbursement, to which such parties shall have ten (10) days to object to the fees set forth in the fee notice. Absent such objection, failure to pay any fees and expenses payable to the DIP Lender within five (5) business days lapse of the objection period (if any) shall be an event of default under the DIP Facility. |
| **Indemnification** | The Debtors shall indemnify and hold the DIP Lender and its officers, directors, employees and agents (including all of their professionals) (each an "<u>Indemnified Party</u>") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |
| **Releases** | In consideration of and as a condition to the DIP Lender providing the DIP Facility, in the Final Order the Debtors will release the DIP Lender, its successors, assigns, affiliates, officers, directors, employees, professionals, attorneys, and other representatives from any and all claims, demands, causes of action, damages, |

| | counterclaims, defenses, setoff rights, and other liabilities, including any objections, challenges, or other claims to the amount, validity, or enforceability of the Debtors' pre- or postpetition obligations to the DIP Lender. |
|---|---|
| **Governing Law** | The DIP Facility shall be governed by New York law, subject to applicable federal bankruptcy law. |

## DISCLOSURES

27.     Pursuant to Bankruptcy Rule 4001(d) and Local Rule 4001-2, a debtor in possession seeking authority to obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the financing.  Also, the debtor(s) must justify the inclusion of such provisions.  Such disclosures are set forth below:

**a.**  Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to prepetition secured creditors in connection with the debtor(s) cash collateral usage or additional financing. **See Roll Up Provision ("d" below).**

**b.**  Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001 (c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters.  **The Debtors have attested to the validity, perfection and amount of the Senior Pre-Petition Lender's claims and indebtedness. The Local Rules on timing for a challenge to the said liens and claims shall control.  Interim Order at ¶ ¶ D and 7.**

**c.**  Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive the debtor's rights without notice under 506(c) of the Bankruptcy Code.  **The proposed Final Order provides for a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code.  Interim Order at ¶ 9.**

**d.**  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548, and

549 of the Bankruptcy Code.  **The DIP Financing provides that the DIP Collateral shall include avoidance actions only upon a Final Order. Interim Order at ¶ 2(h)** .

e.  Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem Pre-Petition Secured Debt be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code).  **The Interim Order provides that upon a Final Order, advances made from September 15, 2015 to the Petition Date will be deemed obligations under the DIP Facility.  Interim Order at ¶ 2(c).**

f.  Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carveout.  **Not applicable**.

g.  Local Rule 4001-2(a)(i)(G) requires disclosures of provisions that provide for the priming of any secured lien without the consent of that lienholder. **Subject to the Carve-out, the DIP Lien primes all secured claims (except the Permitted Encumbrances).  The Junior Pre-Petition Indebtedness, to the extent it exists, is being primed without consent of Junior Lien Holders.**

h.  Local Rule 4001-2(a)(i)(H) requires the disclosure of provisions that affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code.  **Subject to the Final Order, the Debtors have waived the "equities of the case" exception as to both the Senior Pre-Petition Lender and the DIP Lender.  Interim Order at ¶¶ 1, 2(j) and 10**.

i.  Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority claims arising prior to the commencement of the case.  **Not applicable**.

j.  Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay.  **The Proposed Interim Order describes the modification of the automatic stay (a) upon an event of default, (b) the Termination Date, and (c) to the extent necessary to implement the Interim Order and DIP Facility. Interim Order at ¶¶ 4, 5, and 14(a).**

k.  Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the

perfection of a lien on property of the estate.  **The proposed Interim Order and Final Order include provisions that provide for the automatic perfection and validity of postpetition liens in favor of the DIP Lender and replacement liens granted as adequate protection without the necessity of any further filing or recording under the laws of any jurisdiction.  Interim Order at ¶ 4.**

### BASIS FOR RELIEF REQUESTED

28.     Approval of the DIP Facility and the use of Cash Collateral will provide the Debtors with immediate access to funds needed in order to pay their current and ongoing operating expenses, including post-petition wages and salaries, utilities, vendor costs and contract amounts, while preparing for a sale of their businesses as a going concern.  Unless these expenditures are made, the Debtors will be forced to cease operations, which would (i) result in irreparable harm to their businesses, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to maximize value through the sale process.

29.     Moreover, given the Debtors' cash flow is nearly non-existent and the Debtors have lived almost singularly on the generosity of the Senior Pre-Petition Lender, the credit provided under the DIP Facility is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders.  In essence, providing the DIP Facility  - and related protections associated therewith – will ensure that various agreements necessary to sustain the operation of the network, including the operation and maintenance of the colocation facilities – survive and are preserved pending a sale.  Thus, the timely approval of the relief requested herein is imperative.

**A.     Incurrence of Senior-Secured Superpriority Debt Under Bankruptcy Code Sections 364(c) and 364(d)**

30.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that debtors in possession cannot "obtain unsecured credit allowable under Bankruptcy

26

Code § 503(b)(1) as an administrative expense." <u>See Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.</u>, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); <u>In re Klein Sleep Prods., Inc.</u>, 173 B.R. 296, 297-98 (S.D.N.Y. 1994) (same); <u>In re Ames Dept. Stores, Inc.</u>, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)); <u>In re Garland Corp.</u>, 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to section 364(b)).

31.    In addition, Section 364(d)(1), which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A)    the trustee is unable to obtain credit otherwise; and
>
> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. 364(d)(1).

32.    A debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential DIP Lenders by sections 364(c) or 364(d). <u>See In re Mosello</u>, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (citing <u>In re Snowshoe Co.</u>, 789 F.2d 1085, 1088 (4th Cir. 1986)). Thus, "[t]he statute imposes no duty to seek credit from every possible DIP Lender before concluding that such credit is unavailable." <u>Ames</u>, 115

27

B.R. at 40 (holding that debtor made reasonable effort to secure financing when it selected the least onerous financing option from the remaining two DIP Lenders). Moreover, where few DIP Lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

33.    Here, the Debtors selected the DIP Financing provided by the DIP Lender only after carefully examining all available options. In the end, it was not feasible for the Debtors to obtain a loan on equal to or better terms that afforded the Debtors sufficient liquidity to operate their business. In addition, the Debtors were unable to obtain financing on an unsecured basis or obtain an equity investment from any potential strategic partner. Thus, the DIP Lender provided the only viable source of funding. Moreover, all negotiations were conducted in good faith and at arm's length.  Finally, the DIP Lender would not otherwise agree to lend without the protections being afforded it under the DIP Loan Documents.

34.    After fully considering their financing options, and whether other more advantageous financing alternatives would be available to the Debtors, the Debtors exercised their sound business judgment and accepted the DIP Financing with the DIP Lender. The DIP Financing provides significant advantages and favorable terms that the Debtors believe would be unavailable through other DIP Lenders. Further, the Debtors note that the Junior Lien Holders will be primed by the DIP Lien granted to the DIP Lender, however, the Junior Prepetition Second Debt is either non-existent given a lack of payment obligations on Debtors' part – or otherwise entirely unsecured and thus, has no value.

    **B.    Adequate Protection**

35.     In exchange for the Debtors' use of Cash Collateral, the Debtors have agreed to provide certain adequate protection to the Senior Pre-Petition Lender. To that end, the Debtors and the Senior Pre-Petition Lender have negotiated, and the Debtors request that the Court approve, as of the Petition Date, certain protections for the Senior Pre-Petition Lender's interests in the Pre-Petition Collateral from any diminution in value, including from the implementation of the DIP Financing and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

36.     Pursuant to the Interim and Final DIP Orders, as adequate protection for the use of the Pre-Petition Collateral, including the Cash Collateral, the Senior Pre-Petition Lender is granted (1) valid, perfected, postpetition security interests of the same priority as such Senior Pre-petition Lender held prepetition in and replacement liens on all of the Collateral to secure an amount equal to the aggregate diminution in the value of such Senior Pre-petition Lender's interests in the Collateral, and (2) superpriority administrative claim status for any such diminution of value.

37.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or without court approval. Section 363(e) provides that, upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as necessary to provide adequate protection of such interest. Under section 364(d), a debtor may obtain credit secured by a senior or equal lien if an existing secured creditor's interest in the collateral security is adequately protected.

38.     What constitutes adequate protection is decided on a case-by-case basis. See Mosello, 195 B.R. at 289; In re Swedeland Dev. Group, Inc., 16 F.3d 552, 56 (3d Cir. 1994); In

re Realty Southwest Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58

B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re O'Connor, 808 F.2d 1393, 1396 (10th Cir.

1987); In re Martin, 761 F.2d 472 (8th Cir. 1985). By adequate protection, the Bankruptcy Code

seeks to shield a secured creditor from diminution in the value of its interest in the particular

collateral during the period of use. See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631

(Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. at 736; In re Hubbard Power & Light,

202 B.R. 680 (Bankr. E.D.N.Y. 1996). When priming of liens is sought pursuant to section

364(d) of the Bankruptcy Code, courts also examine whether the prepetition secured creditors are

being provided adequate protection for the value of their liens. Beker, 58 B.R. at 737. Because

all of these tests are satisfied here and the Debtor has met all of its obligations under section 364

of the Bankruptcy Code, the Motion should be granted and the DIP Agreement should be

approved.

39.    The Senior Pre-Petition Lender has agreed that the adequate protection described

above is sufficient to allow the Debtors to use the Pre-Petition Collateral, including the Cash

Collateral, in connection with the Chapter 11 Case. Based upon the foregoing, the Debtors

respectfully request that the Court authorize the Debtors to access the Pre-Petition Collateral,

including, without limitation, the Cash Collateral, and to provide adequate protection in

accordance with the terms set forth in the Interim and Final DIP Orders and the DIP Loan

Documents.

40.    With respect to the Junior Lien Holders, the Intercreditor Agreement provides that

while any portion of the Obligations remain outstanding, the Junior Lien Holders have agreed

that the Senior Pre-Petition Lender may "once or any number of times, modify the terms of the

Obligations and the Financing Documents, … or permit the Borrowers to incur additional obligations…" <u>See</u>, Intercreditor Agreement at ¶ 2(d).

41.     Moreover, as set forth above, the Debtors are not aware of any instrument evidencing their obligations to the Junior Lien Holders and as such, any purported liens on the Debtors' assets in favor of the Junior Lien Holders have no value.  If, on the other hand, such instruments exist, the value of the Prepetition First Lien Debt likely exceeds the value of the Pre-Petition Collateral and for this additional reason, no adequate protection need be provided to the Junior Lien Holders.

### C.     Modification of the Automatic Stay

42.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Financing contemplates the modification of the automatic stay to the extent necessary to permit the DIP Lender to perform any act authorized or permitted under, or by virtue of, the DIP Orders or the DIP Loan Documents.

43.     Stay modification provisions of this type are standard features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim and Final DIP Orders and DIP Loan Documents.

### D.     The Challenge Period

44.     The Challenge Period sought by the Debtors and the DIP Lender is in line with the requirements set forth in the Local Rules.

### E.    Interim Approval of the DIP Financing

45.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

46.    The Debtors respectfully request that the Court schedule and conduct a preliminary hearing on the Motion and authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Loan Documents and to utilize Cash Collateral.

### F.    Waiver of Bankruptcy Rules 6004(a) and (h)

47.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).  As set forth above, the DIP Financing is essential to allow the Debtors to maintain operations and the necessary level while pursuing a sale of substantially all of their assets.

## NOTICE

48.    Notice of this Motion has been provided to (i) the Office of the United States Trustee; (ii) counsel for Debtors' secured creditors (if known); (iii) the Debtors' secured creditors; (iv) the United States Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the United States Attorney for the District of Delaware; (vii) the

Debtors' 30 largest unsecured creditors; and (viii) any party requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice need be provided.

WHEREFORE, based upon the foregoing, the Debtors request entry of the Interim Order and the Final Order under 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Federal Rules of Bankruptcy Procedure 2002, 4001, 6003, 6004, and 9014, and Local Rule 4001-2, authorizing the Debtors to (i) obtain financing under the terms of the DIP Facility, (ii) authorizing the Debtors to use Cash Collateral., (iii) granting liens and providing superpriority administrative expense status to the DIP Lender., (iv) modifying the automatic stay to provide immediate relief, (v) scheduling a final hearing, and (vi) granting related relief.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By: */s/  L. John Bird*
        L. John Bird
        Delaware Bar No. 5310
        919 North Market Street, Suite 300
        Wilmington, DE  19801-2323
        Phone (302) 654-7444/Fax (302) 656-8920
        lbird@foxrothschild.com
            -and-
        Michael G. Menkowitz
        Paul J. Labov
        Jason C. Manfrey
        2000 Market Street, 20th  Floor
        Philadelphia, PA  19103-3222
        Phone (215) 299-2000/Fax (215) 299-2150
        mmenkowitz@foxrothschild.com
        plabov@foxrothschild.com
        jmanfrey@foxrothschild.com

Dated: April 20, 2016              Proposed counsel for AF-Southeast, LLC, *et al.*, the
                              Debtors and Debtors-in-Possession