## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

_____

In re:                                                          :     Chapter 11
                                                                :
AF-SOUTHEAST, LLC, *et al.*, [1]                                :     Case No. 16-_____ (_____)
                                                                :
                                        Debtors.                :     Joint Administration Requested
_____:

## DECLARATION OF SCOTT DRAKE
## FILED IN SUPPORT OF FIRST-DAY MOTIONS

Pursuant to 28 U.S.C. §1746, I, Scott L. Drake, hereby declare under penalty of perjury as follows:

1.      On the date hereof, the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

2.      The Debtors continue to operate their businesses and manage their financial affairs as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in these cases.

3.      I am currently the Executive Vice President of the Debtors.  Prior to the chapter 11 filings, I served as the Executive Vice President and Chief Financial Officer of Allied Fiber, LLC, (the non-debtor ultimate parent) until February 29, 2016.   On March 8, 2016, the Board of Managers of Allied Fiber, LLC appointed me as Chief Restructuring Officer ("CRO") granting me authority to manage the business affairs Allied Fiber, LLC and the Debtors.  Thereafter, I

_____

[1]  The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are: (i) AF-Southeast, LLC (8002); (ii) Allied Fiber – Florida, LLC (8111); and (iii) Allied Fiber – Georgia, LLC (2935).

served as the Chief Restructuring Officer of the Debtors until April 19, 2016, at which point I was appointed as the sole Manager of each of the Debtors.

4.    I have access to the Debtors' books and records, including records pertaining to the Debtors' financials, shareholders, employees, insurance, tax, and all other aspects of Debtors' operations.    I make this Declaration, in part, based upon the information contained in the Debtors business records.    The facts contained in this Declaration are true based on my personal knowledge or my review of the pertinent business records, and if called as a witness, I could and would testify competently to the truth of said facts.

5.    I have over thirty-years of experience working as a Chief Financial Officer in the technology industry.    Much of my experience has been in the high-growth and capital intensive telecommunications industry, and specifically, working with debt and equity sourcing.    Also, I have experience in the purchase and sale of distressed telecommunication entities.    I have negotiated and led efforts to restructure and recapitalize a $75 million revenue base managed services communications provider resulting in a successful merger.    Also, I have prior experience liquidating a facilities-based international communications carrier with subsea fiber optic assets and cable-landing station rights.

6.    This Declaration is broken down into four (4) parts.    The first part of the Declaration discusses the Debtors' business, including its corporate structure, operations, and various revenue sources.    Part two of the Declaration illustrates the Debtors' capital structure, including secured debt obligations and amounts currently outstanding.    The third part of the Declaration provides background into the events leading to the chapter 11 filings.    The fourth and final portion of the Declaration briefly describes the "First Day Pleadings" and why each is a necessary and integral part of the chapter 11 filings.

2

**Part 1.**         **The Debtors' Business**

7.        Debtor AF-Southeast, LLC ("Southeast") is 100% owned by its parent, Allied Fiber, LLC ("Allied Fiber").  Allied Fiber is not a debtor in these bankruptcy proceedings but has played a significant role in the Debtors' formation and operation until approximately February, 29, 2016.  Southeast is the 100% owner of Allied Fiber-Florida, LLC ("AF Florida") and Allied Fiber-Georgia, LLC ("AF Georgia"), each of which are Debtors in these proceedings.   An organizational chart is attached hereto as Exhibit "A".

8.        The Debtors are engaged in the business of designing, constructing and operating an open access, physical layer, network-neutral colocation and dark fiber network.  The Debtors' dark fiber network provides long-haul, multi-access points, and short-haul dark fiber network systems, coupled with its owned colocation facilities to provide control of the underlying physical assets to all network operators who subscribe to the Debtors services.  The network is designed to link critical access points (international subsea cables) in the United States while also providing intermediate access points along the route for inclusion of local networks into the Debtors' network.  The combination of long-haul service with the capability to distribute traffic locally are intended to yield high customer demand and volume.

9.        The Debtors' completed network consists of eleven built and owned, network-neutral colocation facilities in Florida and Georgia (the "Colocation Facilities").  The Colocation Facilities are located on land which is either owned by the Debtors or leased by the Debtors from various third parties.   Generally speaking, the Colocation Facilities are spaced approximately every 60 miles along the Debtors' dark fiber network.  The Colocation Facilities are modular buildings, approximately 1200 sq ft in size, with fully redundant power, 24/7 security, fire suppression and direct access to the Debtors' dark fiber network.  The network itself consists of

approximately 708 route miles (362 miles in Georgia and 346 miles in Florida); and 270,672 fiber miles (81,648 miles in Georgia and 189,024 miles in Florida).

10.     Southeast owns the operating entities (AF Florida and AF Georgia) which operate the fiber-optic network and Colocation Facilities.  The fiber optic route extends from Miami, Florida to Atlanta, Georgia ("MIA-ATL").  There are two distinct segments:  from Miami to Jacksonville, Florida ("MIA-JAX"), and from Jacksonville, Florida to Atlanta, Georgia ("JAX-ATL").

11.     Revenue is generated from leasing network dark fiber and related services on the Debtors' dark fiber network and at the Colocation Facilities.  Dark fiber leasing is available either via a long-term (typically twenty-year) indefeasible right-of-use ("IRU") or a lease-to-IRU option.  Colocation leasing offers customers' space in the Debtors' owned, network-neutral colocation facilities.  IRU-related services and revenues are derived from annually recurring payments for operations and maintenance ("O&M").

12.     Dark-fiber IRU leases typically generate one-time, non-recurring revenue payments collected in advance of the start of the IRU, in exchange for services to be provided over the twenty (20) year term of the IRU contract.  In connection with those contracts, annual O&M charges are collected.  Cabinet space at colocation facilities is charged and collected on a monthly basis.  Additional non-recurring revenues may originate through one-time set-up fees for fiber installation, splicing, interconnection or other related services.

13.     AF Florida and AF Georgia are the operating subsidiaries of Southeast.  They each own and maintain the physical assets which generate the revenues described above. Operating contracts and leases in each of these entities correspond to the geographical location of the asset and related revenue sources.   Various taxes, including without limitation sales and use

and real estate taxes, and all other operating and regulatory expenses are incurred by these operating entities.

14.     Since March 1, 2016, Southeast employs a core staff of nine people, including seven full-time employees and two independent contractors.  The majority of these employees are engaged to maintain the operations of the network.  The independent contractors provide both management and back-office financial functions for Southeast.   Prior to March 1, 2016, Allied Fiber employed all of these individuals on a full time basis.  At the end of February, 2016, Allied Fiber terminated all of its employees without notice or warning.

**Part 2.          Debtors' Capital Structure**

15.     From inception to date, there has been approximately $93 million of invested capital at the Allied Fiber and Debtor entities, all as more fully set forth in the following paragraphs.

16.     In June 2009 and October 2011, Allied Fiber raised approximately $15 million of equity in both common and preferred shares, respectively from various individuals and entities. The preferred shares were solely owned by Phoenix Fund, LLC ("Phoenix").   In need of additional capital, Phoenix loaned Allied Fiber $5 million secured against Allied Fiber's assets. Subsequently, from March 2013 to August 2014, Allied Fiber raised an additional $44 million of secured debt in two tranches (some with convertible features and others with warrants) from certain individuals, many of who had also participated in the equity offering.  The debt provided by certain individuals and evidenced by promissory notes was secured against Allied Fiber's assets and took priority over the Phoenix debt.   Hereinafter, Phoenix and those certain individuals set forth in the previous sentence shall be referred to as the "Junior Lien Holders".

17.    By September 2014, Allied Fiber had exhausted its capital to complete construction of the Southeast Segment (defined below) including the Colocation Facilities.   In dire need of additional capital, Allied Fiber turned to Strome Mezzanine Finance, Fund IV, LP, ("Strome" or "Senior Pre-Petition Lender") for funding to finish the Southeast Segment and otherwise provide operating capital.   As part of this funding, the Debtors were incorporated, Allied Fiber's assets pertaining to the Southeast Segment were transferred to the Debtors, and the Senior Pre-Petition Lender lent the Debtors approximately $23 million (the "Senior Pre-Petition Indebtedness") in exchange for a first priority lien in the Debtors' and Allied Fiber's assets (the "Senior Pre-Petition Lien"), as evidenced by that certain Loan Agreement, dated September 24, 2014 (together with the other documents and agreements executed in connection therewith, including without limitation, various Security Agreements, Promissory Notes and Guarantee and Pledge Agreements, the "Senior Pre-Petition Loan Documents"), among Southeast, AF Florida, and AF Georgia, as borrowers, Allied Fiber, as guarantor, and the Senior Pre-Petition Lender (the "Senior Pre-Petition Loan").   The Senior Pre-Petition Lender and the Junior Lien Holders entered into that certain Intercreditor Agreement in which the Junior Lien Holders subordinated their rights to the Senior Pre-Petition Lender, all as more fully set forth below.

18.    The Debtors defaulted on the loan with the Senior Pre-Petition Lender. Thereafter, the Senior Pre-Petition Lender agreed to forebear from taking remedial action against the Debtors and provided additional advances to both the Debtors and Allied Fiber.   Under the terms of the Amendment and Forbearance Agreement, the Senior Pre-Petition Lender provided additional funding through the Senior Pre-Petition Loan Documents, bringing the cumulative principal balance of the note to $26.8 million (comprised of $23 million initial advance, $2.8 million in PIK interest and $1 million in additional advances).

19.     Shortly thereafter, from September 2015 through February of 2016, Phoenix provided Allied Fiber with certain "forbearance funding" in the amount of $2.6 million.  The funding from Phoenix abruptly ceased without notice on February 29, 2016.  Since that date, and in order to preserve the Debtors' value as a going concern, the Senior Pre-Petition Lender has funded an additional $2.2 million on an emergency basis along with an additional $2 million of PIK interest that, originally, was contractually obligated to be paid in cash.

20.     Thus, as of the Petition Date, Debtors have first priority secured indebtedness due and owing to the Senior Pre-Petition Lender in the approximate principal amount of approximately $51 million (which includes the make-whole amount), all of which is secured by a first priority lien in substantially all of the Debtors assets.

21.     The Senior Pre-Petition Lender and the Junior Lien Holders are parties to that certain Intercreditor Lien Subordination Agreement (the "Intercreditor Agreement"), dated as of September 24, 2014, by and among the Debtors, the Senior Pre-Petition Lender, Phoenix, and William Hitchcock as Agent for certain individuals and entities.  Pursuant to the Intercreditor Agreement, while any portion of the Obligations (as defined therein) remain outstanding, the Subordinating Lenders (as defined in the Intercreditor Agreement to mean the Junior Lien Holders) agreed to, among other things, subordinate their rights to repayment  - to the extent there is even an obligation to repay - for any portion of the obligations due and owing to them, to the Senior Pre-Petition Lender.[2]

_____

[2] The Debtors reserve all rights with respect to the validity, extent, and priority of the Junior Lien Holders' purported liens and claims.  To date, the Debtors cannot establish any instrument evidencing their payment obligations or documents evidencing security interests in favor of the Junior Lien Holders.  As of the Petition Date, it appears that Allied Fiber is indebted to the Junior Lien Holders in the approximate amount of $51 million plus approximately $14 million in interest thereon.

**Part 3.**          <u>**Historical Context and Events Leading to Chapter 11 Filings**</u>

22.          Allied Fiber was formed June 18, 2008, with the goal of constructing the first national, open access, integrated, network–neutral colocation and dark fiber network in the United States.  The initial business plan reflected a capital need of approximately $100 million to complete the intended first segment of the network, which was to extend from Ashburn, Virginia to Harrisburg, Pennsylvania and then bi-directionally from Harrisburg, Pennsylvania to New York and Chicago, Illinois (the "<u>Northeast Segment</u>").

23.          In order to eventually build-out a completed network, in June 2009, Allied Fiber purchased an option on two already existing fiber-optic ducts extending along the Norfolk and Southern Railroad right-of-way for an annual cost of $4.9 million (the "<u>Northeast Options</u>"). Allied Fiber's marketing efforts to fund its construction plans for the Northeast Segment continued unsuccessfully from June 2009 until late 2012.

24.          In late 2012, after spending approximately $20.5 million on the Northeast Options - without ever putting a shovel in the ground - Allied Fiber redirected its attention and deployment of capital from its original plans to construct the Northeast Segment to a lower capital cost route extending along railroad right-of-ways from Miami, Florida to Atlanta, Georgia (the "<u>Southeast Segment</u>").

25.          Allied Fiber began planning the construction of the Southeast Segment network deployment in the first quarter of 2013.  Nevertheless, Allied Fiber also made a strategic decision to renegotiate and continue the Northeast Options.

26.          Allied Fiber continued construction activities on the Southeast Segment in 2013 and 2014. Operating losses and capital needs were again funded by the issuance of an additional tranche of high-interest rate notes with warrants and the amendment and extension of prior notes

(both convertible and with warrants) to mostly equity holders and existing debt holders.  By mid-2014, Allied Fiber had constructed a portion of the Southeast Segment in Florida but had exhausted its financial resources.

27.     As set forth above, given Allied Fiber's need for additional capital, in September 2014, Southeast, AF Florida and AF Georgia were incorporated and obtained a $23 million senior secured facility – the Senior Pre-Petition Loan - to own and complete the Southeast Segment.  Allied Fiber's assets were transferred to the Debtors pursuant to this round of funding and the Junior Lien Holders ostensibly received second priority liens behind the Senior Pre-Petition Lender pursuant to the Intercreditor Agreement.

28.     Southeast began marketing efforts to sell dark fiber IRU's and colocation services on the Miami to Jacksonville portion of the Southeast Segment while construction activities continued on the Georgia route extension to Atlanta.  Essentially, Allied Fiber – although by this time all operations were conducted at the Southeast level and below - and its subsidiaries, including the Debtors, were still considered to be a "pre-revenue" company. In its 2014 consolidated US GAAP financial statements, Allied Fiber reported approximately $23k in operating revenues – all of it derived from AF Florida, and consolidated operating expenses of $11.1 million.  For instance, a portion of the operating expenses can be directly attributed to the Northeast Options – which expenses totaled approximately $27 million from their initial purchase until March 1, 2016, when Allied Fiber no longer funded the Northeast Options and they lapsed.

29.     The Southeast Segment was completed in June 2015 with approximately $21 million invested in the dark fiber and $10.5 million for eleven owned colocation facilities constructed along the route.  Thus, after approximately $93 million in invested capital at Allied

Fiber and Debtor entities, the Debtors (who owned all the assets) only operating asset was finally operational.

30.     Despite having a fully completed and functional network, Southeast has failed to develop sufficient revenues from IRU sales and to operate as a going-concern without substantial and continuing financial support.  Over the most recent eighteen (18) months, the Allied Fiber unsuccessfully pursued numerous alternatives to maintain the business as a going-concern, including reviewing possible sale, mergers, increased debt and equity infusions, and sale/leaseback transactions all in an effort to provide needed growth capital and  sufficient working capital to continue its existing business plan.

31.     At present, Southeast has annual recurring revenues of ~$.5 mil with ~$8.5 mil of annual operating costs, which were reduced effective March 1, 2016 through the termination of the Northeast Options and a 50% reduction in SG&A costs.

32.     At the end of February, 2016, despite heavy marketing and extensive efforts to obtain funding (including by Allied' Fiber's Board of Managers and a third party financial advisor, Source Capital), no party was willing to continue to fund capital expenses and operating losses for a business model that seemed dubious to succeed.  As such, Allied Fiber fired all of its employees and in essence, left the patient open on the operating table.  In order to preserve their value as a going concern, the Debtors – where all operations were centered – secured emergency interim financing from the Senior Pre-Petition Lender.  This funding permitted the Debtors to hire a core group of the employees recently terminated from Allied Fiber, resume operations, and attempt to negotiate an exit strategy for the businesses with the Senior Pre-Petition Lender.

33.     After spending months seeking alternatives in an effort to make the business profitable, the Debtors have come to the conclusion that they simply cannot operate without

substantial and drastic changes.  As a going concern, it is my educated and informed belief that the Debtors' value is considerably less than the amount of the Senior Pre-Petition Lender's claim.  These Bankruptcy Proceedings were filed in an attempt to "stop the bleeding" – i.e., the monthly burn necessary to keep the Southeast Segment operational while a sale in bankruptcy could be pursued.

**Part 4.**        **First Day Pleadings**

**A.**        **Motion for Joint Administration of the Chapter 11 Cases**

34.    The Debtors are limited liability companies organized in the State of Delaware. AF-Southeast, LLC is 100% owned by its parent, Allied Fiber, a non-debtor affiliate of the Debtors.  Southeast is the sole member and 100% owner of AF Florida and AF-Georgia, each of which are Debtors in these proceedings.  As such, the Debtors are "affiliates" as that term is defined in Section 101(2) of the Bankruptcy Code.

35.    The Debtors seek, pursuant to Fed. R. Bankr. P. 1015(b) and Del. L.B.R. 1015-1, the joint administration of their chapter 11 cases for procedural purposes only and request that (i) the caption be modified to reflect their joint administration under the lead bankruptcy case of AF-Southeast Solutions, LLC; and (ii) the Court direct the Clerk to make a docket entry reflecting the joint administration of the Debtors' cases.

36.    Joint administration of the Debtors' chapter 11 cases will expedite the administration of these cases and reduce administrative expenses without prejudicing any creditor's substantive rights.

**B.**        **Utilities Procedure Motion**

37.    In connection with the operation of their businesses and management of their property, the Debtors purchase electricity, telephone and similar services (together, the "Utility

Services") from a number of different utility companies (the "Utility Companies").    A non-exhaustive list of the Utility Companies who provide services to the Debtors as of the Petition Date (the "Utility Service List"), and the estimated monthly average of amounts owed to each Utility Company, and the proposed deposit that the Debtors intend to provide to the Utility Companies as adequate assurance of future payment is attached to the motion seeking the establishment of procedures for payment of Utility Services as Exhibit "A".

38.    The Debtors seek the entry of an order (i) prohibiting the Utility Companies from altering, refusing or discontinuing service to the Debtors, (ii) deeming the Utility Companies adequately assured of future payment and (iii) establishing procedures for determining requests for additional adequate assurances of payment.

39.    To provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to deposit (a "Utility Deposit") with the Utility Companies an amount equal to 50% of the Debtors' estimated cost of monthly utility consumption for each such Utility Company.    The aggregate amount of all such deposits for the Utility Companies listed on Exhibit "A" to the motion would be approximately $5,266.80.    The Debtors propose to pay the Utility Deposit to each of the Utility Companies within twenty (20) days of the Petition Date.

40.    Specifically, the Debtors seek to establish reasonable procedures (the "Adequate Assurance Procedures") by which a Utility Company may request additional adequate assurance of future payment, in the event that such Utility Company believes that its respective Utility Deposit is insufficient.    The Adequate Assurance Procedures provide as follows:

       a.    Absent any further order of this Court, the Utility Companies are prohibited from discontinuing, altering, or refusing service on account of any unpaid prepetition charges, or requiring payment of an additional

deposit or receipt of other security in connection with any unpaid prepetition charges;

b.    The Debtors will serve the motion seeking the establishment of the Adequate Assurance Procedures of Utility Services and a copy of the interim order and the final order granting the relief requested therein on the Utility Companies within three (3) business days after entry of such orders;

c.    If a Utility Company is not satisfied with the assurance of future payment provided by the Debtors, the Utility Company must serve a written request (the "Request") upon the Debtors and their counsel (as set forth below) stating the location(s) for which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, and an explanation of why its Utility Deposit is inadequate assurance of payment;

d.    The Request must be delivered to Debtors' counsel, Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA 19103, Attn: Michael Menkowitz, Esq.;

e.    Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Company serving a Request, if the Debtors, in their discretion, determine that such Request is reasonable;

f.    If the Debtors believe that a Request is unreasonable, within thirty (30) days after the receipt of such Request, they shall file a motion pursuant to section 366(c)(2) of the Bankruptcy Code (a "Determination Motion"), seeking a determination from the Court that the Utility Deposit, plus additional consideration offered by the Debtors, if any, constitutes adequate assurance of payment. Pending notice and a hearing on the Determination Motion, the Utility Company that is the subject of the unresolved Request may not alter, refuse, or discontinue services to the Debtors nor recover or setoff against a prepetition deposit; and

g.    Any Utility Company that fails to make a Request shall be deemed to be satisfied that the Utility Deposit provided to it supplies adequate assurance of payment.

41.    The services provided by the Utility Companies are vital to the ongoing operation of the Debtors' businesses. If the Utility Companies are permitted to terminate Utility Services, the Debtors' operations will be irreparably harmed and their ability to reorganize jeopardized.

42.     Historically, the Debtors have paid all amounts owing to the Utility Companies on a timely basis.  To the best of the Debtors' knowledge, the Debtors are current with respect to all of their invoices for Utility Services.  Prior to the Petition Date, the average aggregate monthly cost of Utility Services for the Debtors was approximately $10,533.60.

43.     The Debtors believe that they will have adequate liquidity to pay for all postpetition utility charges on a current basis.  Thus, the Debtors will continue their customary practice of paying their utility bills as they become due.

**C.     Motion to Pay Employee Wages and Business Expenses and Independent Contractor Claims**

44.     In the ordinary course, prior to the Petition Date, the Debtors incurred payroll obligations to its seven (7) employees (collectively, the "Employees") for the performance of their services.  The Debtors seek authority, in their discretion, to pay and/or honor, as the case may be, on the next regularly scheduled payroll date (April 29, 2016) certain prepetition claims for wages and salaries (the "Employee Wages"), and unpaid reimbursable Business Expenses (as defined below, and collectively with the Employee Wages, and certain costs incident to the foregoing, the "Employee Wages and Business Expenses").

45.     The Debtors' Employees are essential in order to preserve the value of the Debtors' estates and enable the Debtors to successfully operate their businesses.  Consequently, it is critical that the Debtors continue to honor their prepetition obligations to the Employees to honor accrued Employee Wages and Business Expenses.

46.     The Employees of the Debtors are semi-monthly, on the 15th and the last day of the month.  The Debtors last payment of pre-petition payroll was on April 15, 2016, which was for Employee Wages and Business Expenses owed to the Debtors' Employees for their services provided during the weeks of April 4, 2016 and April 11, 2016.  The Debtors' total average pay

period obligations are approximately $52,500.  As of the Petition Date, no Employees are owed in excess of the $12,475 statutory cap set forth in section 507(a)(4) of the Bankruptcy Code.  The Employees have not received wages and salaries, and unpaid reimbursable expenses for their services for the week of April 18, 2016 through the Petition Date.  Specifically, the gross amount of wages and salaries that need to be paid to the Employees for the prepetition period is approximately $15,750.

47.    Additionally, the Debtors customarily reimburse its Employees who incur a variety of business expenses in the ordinary course of performing their duties on behalf of the Debtors (the "Business Expenses").  Although the Debtors are unaware of any outstanding Business Expenses as of the Petition Date, it is likely that not all requests for reimbursement were submitted as of the Chapter 11 filings.  Accordingly, the Debtors do not know the precise amount of incurred but unreimbursed Business Expenses, but the Debtors estimate that the amount is less than a total of $5,000.

48.    Furthermore, the Debtors rely upon two (2) independent contractors who are not employees of the Debtors (the "Independent Contractors") to render services to the Debtors.

49.    The Independent Contractors are paid on the 15th day and the last day of each month.  The Debtors' total average pay period obligations are approximately $20,902.05, which varies given the fact that the compensation terms for each Independent Contractor varies depending on the agreement between the Debtors and the Independent Contractor.  Additionally, the Debtors customarily reimburse their Independent Contractors who incur a variety of business expenses in the ordinary course of rendering services to the Debtors.  The gross amount of prepetition compensation and unreimbursed business expenses that need to be paid to the

Independent Contractors for the prepetition period is approximately $8,270.75 (the "<u>Independent</u> <u>Contractor Claims</u>").

50.    The Debtors seek the authority, in their discretion, to pay the Independent Contractor Claims.  The Debtors' Independent Contracts are essential to the success of the businesses.  If the claims of Independent Contractors are not satisfied, the Debtors may lose the ability to use the services of the Independent Contractors, which would deplete the going concern value and jeopardize the Debtors' ability to maximize value through the sale process.

**D.** **Motion To Maintain Cash Management System and Business Forms**

51.    As of the Petition Date, the Debtors, in the ordinary course of their businesses, employed and maintained an integrated, centralized cash-management system (the "<u>Cash-</u> <u>Management System</u>") with JP Morgan Chase, N.A. ("<u>JP Morgan</u>") for the purpose of, among other things, collecting, operating, disbursing funds, and integrating bank accounts across the United States through which the Debtors manage cash receipts and disbursements.

52.    The Cash-Management System allows the Debtors to efficiently (a) identify the Debtors' cash requirements; and (b) transfer cash as needed to respond to cash requirements.

53.    The Cash-Management System is comprised of five (5) bank accounts. The flow of funds among the various Bank Accounts is as follows:

**<u>Southeast Operating and Savings Accounts</u>**

**Southeast Operating Account**

- Southeast maintains an operating account at JP Morgan (Account No. xxxxxx1121) (the "<u>AF-Southeast Operating Account</u>").  Prepetition, the AF-Southeast Operating Account was Southeast's primary Bank Account, which would receive funds from Strome Mezzanine Fund IV, LP ("<u>Strome</u>" or the

"Senior Pre-Petition Lender"), the Debtors' Senior Pre-Petition Lender.  The AF-Southeast Operating Account is also used by Southeast to remit payments for expenses incurred by Southeast, the majority of which historically were debt issuance costs and audit fees.  Since March 1, 2016, the AF-Southeast Operating Account also serves the purpose of paying Southeast's employees, independent contractors, and reimbursing its staff for business expenses (including COBRA).

**Southeast Savings Account**

•      Southeast maintains a savings account at JP Morgan (Account No. xxxxxx8566) (the "AF-Southeast Savings Account").  Prepetition, the AF-Southeast Savings Account held funds from the AF-Southeast Operating Account that were not expected to be used by Southeast in its operational expenditures. When funds in the AF-Southeast Operating Account were in excess of the expected amount of operational expenses, those funds would be routinely swept into the AF-Southeast Savings Account to earn interest.  Funds are routinely transferred to and from the AF-Southeast Savings Account as needed to pay the operational expenses of Southeast.

**Allied Fiber - Florida Operating Account**

•      AF Florida maintains an operating account at JP Morgan (Account No. xxxxxx7871) (the "Allied Fiber – Florida Operating Account").  Prepetition, the Allied Fiber – Florida Operating Account was AF Florida's primary Bank Account, which held payments received from AF Florida's customers, and was used to make payments (*via* wire transfer or paper checks) to vendors of AF Florida.  Payments remitted from customers of AF Florida are processed almost

entirely through lockbox wire transfers, however, at times paper checks are received and deposited at a local JP Morgan branch.

## AF Georgia Operating and Savings Accounts

### Allied Fiber – Georgia Operating Account

• Debtor AF Georgia maintains an operating account at JP Morgan (Account No. xxxxxx9085) (the "Allied Fiber – Georgia Operating Account"). Prepetition, the Allied Fiber – Georgia Operating Account was AF Georgia's primary Bank Account, which held payments received from AF Georgia's customers, and was used to make payments (*via* wire transfer or paper checks) to vendors for direct expenses of AF Georgia. Payments remitted from customers of AF Georgia are processed almost entirely through lockbox wire transfers, however, at times paper checks are remitted and then deposited by AF Georgia at a local JP Morgan branch.

### Allied Fiber – Georgia Savings Account

• AF Georgia maintains a savings account at JP Morgan (Account No. xxxxxx3259) (the "Allied Fiber - Georgia Savings Account"). Prepetition, the Allied Fiber – Georgia Savings Account held funds from the Allied Fiber – Georgia Operating Account that were not expected to be used by AF Georgia in its operational expenditures. When funds in the Allied Fiber – Georgia Operating Account were in excess of the expected amount of operational expenses, those funds would be routinely swept into the Allied Fiber – Georgia Savings Account to earn interest.

54.     The Debtors' ability to maintain and continue to use their existing Cash Management System and Bank Accounts will significantly facilitate the Debtors' operations in these Chapter 11 cases.  To avoid delays in receipt of payments and payment of debts incurred postpetition, the Debtors should be permitted to contain to maintain the existing Bank Accounts, and, if necessary, to open new debtors-in-possession accounts.

55.     Additionally, in the ordinary course of business, the Debtors use numerous varieties of business forms.  To minimize expenses to the estates and to avoid confusion on the part of employees, customers, and vendors, the Debtors respectfully request that the Court authorize the Debtors to continue to use all correspondence and other business forms (including, without limitation, checks, letterhead, purchase orders and invoices (collectively, the "Business Forms") as such forms were in existence immediately before the Petition Date, *provided however*, that upon the exhaustion of their current check supply, the Debtors shall designate "Debtors-in-possession" on any new checks obtained postpetition, and for electronically issued checks, the Debtors shall place the "Debtors-in-possession" label on any such checks issued postpetition. With such authorization, the Debtors will be able to avoid the expense and delay of ordering entirely new business forms and the disruption to the Debtors that such delay would cause.

**E.     Motion to Pay Prepetition Taxes and Fees**

56.     As of the Petition Date, the Debtors incurred various tax and fee obligations, including without limitation, Property Taxes, Sales Taxes, Use Taxes, and Payroll Taxes (all terms as defined below, and collectively with any other types of taxes, fees, or charges, and any penalty, interest, or similar charges, defined herein as the "Taxes and Fees") owing to certain governmental entities including federal, state and local taxing authorities (the "Taxing Authorities"), as described below:

**Property Taxes**

- The Debtors are required to pay taxes on business owned personal property and also for real property (collectively, the "Property Taxes"). The Debtors file Property Taxes in multiple states. Personal property generally includes furniture, fixtures, office and industrial equipment, machinery, tools, supplies, inventory and any other property not classified as real property. As of the Petition Date, the Debtors estimate that they will owe approximately $280,000 in prepetition Property Taxes through the pendency of these chapter 11 cases.

**Sales and Use Taxes**

- The Debtors charge, collect, and remit sales taxes (the "Sales Taxes") on products they sell. In addition, the Debtors are responsible for payment of use taxes (the "Use Taxes" and collectively with the Sales Taxes, the "Sales and Use Taxes"). Use Taxes typically arise when the Debtors ship products to a state in which the Debtors have no business operations. The Debtors file Sales and Use Taxes in multiple states.[3] As of the Petition Date, the Debtors estimate that they will owe approximately $57,000 in prepetition Sales and Use Taxes through the pendency of these chapter 11 cases.

**Payroll Taxes**

- The Debtors are required by law to withhold amounts related to federal, state and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes"), and additional amount for, among other

---

[3] The frequency of payments varies by state, with different jurisdictions requiring payments on a monthly, quarterly, bi-annual or annual basis.

things, state and federal unemployment insurance (collectively, the <u>Employer Payroll Taxes</u>" and together with the Withholding Taxes, the "<u>Payroll Taxes</u>") from their employees wages and to remit the same to the appropriate Taxing Authority.  Prior to the Petition Date, the Debtors withheld and set aside sufficient funds in an escrow account to pay prepetition Payroll Taxes that are due and payable to the Taxing Authorities as of the Petition Date.  As of the Petition Date, the Debtors estimate that approximately $68,000 in prepetition Payroll Taxes are due and payable to the Taxing Authorities.

57.    The Debtors seek authority, in their discretion, to pay any Taxes and Fees owing to the appropriate Taxing Authorities that will become due during the pendency of the Debtors' chapter 11 cases.  On an interim basis, the Debtors only seek authority to pay certain prepetition taxes that are currently due or will become due within 30 days of the Petition Date (the "<u>Upcoming Taxes</u>"), in an aggregate amount not to exceed $405,000.

58.    The Debtors also seek the relief requested in the event and to the extent that: (a) the various Taxes and Fees that accrued prior to the Petition Date: (i) were not paid prepetition, (ii) were not processed prepetition or (iii) were paid in an amount that was less than is actually owed, including amounts subsequently determined upon any audit or otherwise to be owed for periods prior to the Petition Date; (b) any payments made prepetition were rejected, lost or otherwise not received in full by any taxing authority, or (c) any taxes and related obligations accrued or incurred prepetition that will become due during the pendency of these cases in the ordinary course of business.  The Debtors estimate that during the pendency of these cases the amount of such prepetition taxes will not exceed $25,000.

59.     It is the Debtors' business judgment that the failure to pay the Taxes and Fees could have a material adverse impact on the day-to-day operations of their businesses.

**E.      Debtor-in-Possession Financing and Cash Collateral**

60.     Pursuant to the Debtor-in-Possession Financing and Cash Collateral Motion (the "DIP Motion"), the Debtors seek to obtain a loan from the Senior Pre-Petition Lender in order to provide working capital and fund operations pending a sale of substantially all of their assets.  As more fully set forth in the DIP Motion, the Debtors have determined, in their business judgment, that the DIP Facility and superpriority priming liens and claims associated therewith are necessary to preserve the value of the Debtors' assets pending a sale.  Moreover, the Debtors have spent months searching for a business alternative, including additional financing options, and have been unable to do so – quite simply, the DIP Facility and superpriority priming liens and claims associated therewith are the best options available to the Debtors given the Debtors' current financial situation.

61.     Moreover, the Debtors have provided the Senior Pre-Petition Lender with adequate protection and given the circumstances, have determined that either (i) the Junior Lien Holders are not entitled to adequate protection because the Debtors have no obligations to them, or (ii) the value of the Prepetition Collateral is less than the value of the Senior Pre-Petition Lender's claims and thus, the Senior Pre-Petition Lender is undersecured and the Junior Lien Holders are entirely unsecured.

[Remainder of page intentionally left blank]

Executed on this 20th day of April, 2016, at New York, New York.

_____
SCOTT DRAKE

# Exhibit "A"

**Allied Fiber, LLC**

Corporate Structure

