# EXHIBIT A

## Initial Approved Budget

**AF - Southeast, LLC Consolidated**
**DRAFT Operating Cash Requirements from [Date of Filing] to [ July 15, 2016 ]**
Key Assumptions and Comments:
a. Core team only to support/maintain network and customers
b. No marketing, sales, sales support staff
c. Legal expenses reflected outside of operating costs; subject to change and increase

| | 4/18/2016 | 4/25/2016 | 5/2/2016 | 5/9/2016 | 5/16/2016 | 5/23/2016 | 5/30/2016 | 6/6/2016 | 6/13/2016 | 6/20/2016 | 6/27/2016 | 7/4/2016 | 7/11/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Recurring Revenue** | $ - | $ - | $ 34,460 | $ - | $ - | $ - | $ - | $ 34,460 | $ - | $ - | $ - | $ - | $ - | $ 68,920 |
| **COGS** | | | | | | | | | | | | | | |
| RoW Rent (assumes June and July pmts paid in advance as post petition) | $ 46,000 | $ - | $ 110,272 | | | | | | | | | | | $ 156,272 |
| Colo Rent | 20,000 | | 37,800 | | | | | | | | | | | 57,800 |
| Colo Costs | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 308,750 |
| Travel - Ops Team | 5,000 | | 10,000 | | | | 10,000 | | | | 5,000 | | | 30,000 |
| Contingency | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 162,500 |
| **Subtotal - COGS** | 107,250 | 36,250 | 194,322 | 36,250 | 36,250 | 36,250 | 46,250 | 36,250 | 36,250 | 36,250 | 41,250 | 36,250 | 36,250 | 715,322 |
| **SG&A** | | | | | | | | | | | | | | |
| Payroll + Benefits (Core Team Only) | | 90,000 | | 72,000 | | 90,000 | | | 72,000 | | 90,000 | | 72,000 | 486,000 |
| Employee stay-put/incentive plans [TBD] | | | | | | | | | | | | | | |
| Admin & Operations Travel | 7,500 | | 15,000 | | | | 15,000 | | | | 7,500 | | | 45,000 |
| Legal | | | | | | | 12,500 | | | | 12,500 | | | 25,000 |
| Professional Services | | | 5,000 | | | | 15,000 | | | | 15,000 | | 7,500 | 42,500 |
| Office & All Other | 20,000 | | 5,000 | | 10,000 | | 10,000 | | 10,000 | | 10,000 | | 10,000 | 75,000 |
| **Subtotal - SG&A** | 27,500 | 90,000 | 25,000 | 72,000 | 10,000 | 90,000 | 52,500 | | 82,000 | | 135,000 | | 89,500 | 673,500 |
| **Subtotal AF - Southeast LLC Operating Costs only** | 134,750 | 126,250 | 219,322 | 108,250 | 46,250 | 126,250 | 98,750 | 36,250 | 118,250 | 36,250 | 176,250 | 36,250 | 125,750 | 1,388,822 |
| **Post-Petition Vendor Deposits** | | | | | | | | | | | | | | |
| Florida East Coast Railroad (FECR) [ assume no deposit return; obligations paid one year in advance] | | | | | | | | | | | | | | |
| Norfolk Southern/F-Cubed RoW ($110,272 monthly lease costs) assuming June and July pmts due in advance | | | 220,544 | | | | | | | | | | | 220,544 |
| Tower Cloud advance payments requested (three months rent) | | | 138,000 | | | | | | | | | | | 138,000 |
| Other Colocation facilities (2 months under various leases) | | | 75,600 | | | | | | | | | | | 75,600 |
| **Subtotal Post-petition Vendor Deposits** | | | 434,144 | | | | | | | | | | | 434,144 |
| **Capex** | | | | | | | | | | | | | | |
| Corporate capex - replacement computers | 15,000 | | | | | | | | | | | | | 15,000 |
| Customer capex support | | 5,000 | | | 5,000 | | | | 5,000 | | | 5,000 | | 20,000 |
| All Aboard Florida capex | | | 70,000 | | | | 70,000 | | | | 70,000 | | | 210,000 |
| Tower Cloud - exercise of IRU purchase option on GA segment | | | | 2,400,000 | | | | | | | | | | 2,400,000 |
| **Subtotal - Capex** | 15,000 | 5,000 | 70,000 | 2,400,000 | 5,000 | | 70,000 | | 5,000 | | 70,000 | 5,000 | | 2,645,000 |
| **Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| Fees and expenses of the Clerk of the Court and the U.S. Trustee | | | | | | | | | | | | | | |
| Fees and expenses of Creditors Committee | | | | | | | | | | | | | | |
| DIP Lenders Counsel: Milligan Foley | | | | | | | | | | | | | | |
| DIP Lenders Counsel: Bodman PLC | | | | | | | | | | | | | | |
| Debtor's Counsel: Fox Rothchild LLP | | | | | | | | | | | | | | |
| Debtor's Counsel: PMCM | | | | | | | | | | | | | | |
| Debtor's Financial Advisors: PMCM | | | | | | | | | | | | | | |
| **Subtotal - Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| **Debt Service** | | | | | | | | | | | | | | |
| Strome Mezzanine Fund IV, L.P. interest (assumed PIK) | | | | | | | | | | | | | | |
| DIP Loan Interest | | | | | | | | | | | | | | |
| **Subtotal - Debt Service** | | | | | | | | | | | | | | |
| **Total Budget for [90 day ] period** | $ 149,750 | $ 131,250 | $ 723,466 | $ 2,508,250 | $ 51,250 | $ 126,250 | $ 168,750 | $ 36,250 | $ 123,250 | $ 36,250 | $ 246,250 | $ 41,250 | $ 125,750 | $ 4,467,966 |

**AF - Southeast, LLC ONLY**
**DRAFT Operating Cash Requirements from [Date of Filing] to [ July 15, 2016 ]**
**Key Assumptions and Comments:**
a. Core team only to support/maintain network and customers
b. No marketing, sales, sales support staff
c. Legal expenses reflected outside of operating costs; subject to change and increase

| | 4/18/2016 | 4/25/2016 | 5/2/2016 | 5/9/2016 | 5/16/2016 | 5/23/2016 | 5/30/2016 | 6/6/2016 | 6/13/2016 | 6/20/2016 | 6/27/2016 | 7/4/2016 | 7/11/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **COGS** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| RoW Rent (assumes June and July pmts paid in advance as post-petition) | | | | | | | | | | | | | | |
| Colo Rent | | | | | | | | | | | | | | |
| Colo Costs | | | | | | | | | | | | | | |
| Travel - Ops Team | | | | | | | | | | | | | | |
| Contingency | | | | | | | | | | | | | | |
| **Subtotal - COGS** | | | | | | | | | | | | | | |
| **SG&A** | | | | | | | | | | | | | | |
| Payroll + Benefits (Core Team Only) | | 90,000 | | 72,000 | | 90,000 | | | 72,000 | | 90,000 | | 72,000 | 486,000 |
| Employee stay-pay/incentive plans [TBD] | | | | | | | | | | | | | | |
| Admin & Operations Travel | 7,500 | | 15,000 | | | | 15,000 | | | | 7,500 | | | 45,000 |
| Legal | | | | | | | 12,500 | | | | 12,500 | | | 25,000 |
| Professional Services | | | 5,000 | | | | 15,000 | | | | 15,000 | | 7,500 | 42,500 |
| Office & All Other | 20,000 | | 5,000 | | 10,000 | | 10,000 | | 10,000 | | 10,000 | | 10,000 | 75,000 |
| **Subtotal - SG&A** | 27,500 | 90,000 | 25,000 | 72,000 | 10,000 | 90,000 | 52,500 | - | 82,000 | - | 135,000 | - | 89,500 | 673,500 |
| **Subtotal AF - Southeast LLC Operating Costs only** | 27,500 | 90,000 | 25,000 | 72,000 | 10,000 | 90,000 | 52,500 | - | 82,000 | - | 135,000 | - | 89,500 | 673,500 |
| **Post-Petition Vendor Deposits** | | | | | | | | | | | | | | |
| Florida East Coast Railroad (FECR) [ I assume no deposit request, obligations paid one-year in advance] | | | | | | | | | | | | | | |
| Norfolk Southern/F-Cubed RoW ($110,272 monthly lease costs) assuming June and July pmts due in advance | | | | | | | | | | | | | | |
| Tower Cloud advance payments requested (three months rent) | | | | | | | | | | | | | | |
| Other Colocation Facilities (2 months under various leases) | | | | | | | | | | | | | | |
| **Subtotal Post-petition Vendor Deposits** | | | | | | | | | | | | | | |
| **Capex** | | | | | | | | | | | | | | |
| Corporate capex - replacement computers | 15,000 | | | | | | | | | | | | | 15,000 |
| Customer capex support | | | | | | | | | | | | | | |
| All Aboard Florida capex | | | | | | | | | | | | | | |
| Tower Cloud - exercise of IRU purchase option on GA segment | | | | | | | | | | | | | | |
| **Subtotal - Capex** | 15,000 | | | | | | | | | | | | | 15,000 |
| **Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| Fees and expenses of the Clerk of the Court and the U.S. Trustee | | | | | | | | | | | | | | |
| Fees and expenses of Creditors' Committee | | | | | | | | | | | | | | |
| DIP Lenders Counsel: Neligan Foley | | | | | | | | | | | | | | |
| DIP Lenders Counsel: Bodman PLC | | | | | | | | | | | | | | |
| Debtor's Counsel: Fox Rothchild LLP | | | | | | | | | | | | | | |
| Debtor's Financial Advisors: PMCM | | | | | | | | | | | | | | |
| **Subtotal - Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| **Debt Service** | | | | | | | | | | | | | | |
| Stonne Mezzanine Fund IV, L.P. Interest (assumed PIK) | | | | | | | | | | | | | | |
| DIP Loan Interest | | | | | | | | | | | | | | |
| **Subtotal - Debt Service** | | | | | | | | | | | | | | |
| **Total Budget for [ 90 day ] period** | $ 42,500 | $ 90,000 | $ 25,000 | $ 72,000 | $ 10,000 | $ 90,000 | $ 52,500 | $ - | $ 82,000 | $ - | $ 135,000 | $ - | $ 89,500 | $ 688,500 |

**Allied Fiber - Florida, LLC ONLY**
**DRAFT Operating Cash Requirements from [Date of Filing] to [July 15, 2016]**
Key Assumptions and Comments:
a. Core team only to support/maintain network and customers
b. No marketing, sales, sales support staff
c. Legal expenses reflected outside of operating costs; subject to change and increase

| | 4/18/2016 | 4/25/2016 | 5/2/2016 | 5/9/2016 | 5/16/2016 | 5/23/2016 | 5/30/2016 | 6/6/2016 | 6/13/2016 | 6/20/2016 | 6/27/2016 | 7/4/2016 | 7/11/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Recurring Revenue** | $ - | $ 26,020 | | | | | | $ 26,020 | | | | | | $ 52,040 |
| **COGS** | | | | | | | | | | | | | | |
| RoW Rent (assumes June and July pmts paid in advance as post-petition) | 10,700 | | 17,865 | | | | | | | | | | | 28,565 |
| Colo Rent | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 169,813 |
| Colo Costs | | | 5,000 | | | | 5,000 | | | | | | | 15,000 |
| Travel - Ops Team | 2,500 | | | | | | | | | | 2,500 | | | |
| Contingency | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 81,250 |
| **Subtotal - COGS** | 32,513 | 19,313 | 42,178 | 19,313 | 19,313 | 19,313 | 24,313 | 19,313 | 19,313 | 19,313 | 21,813 | 19,313 | 19,313 | 294,628 |
| **SG&A** | | | | | | | | | | | | | | |
| Payroll + Benefits (Core Team Only) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Employee stay pud/incentive plans [TBD] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Admin & Operations Travel | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Legal | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Services | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Office & All Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal - SG&A** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal AF- Southeast LLC Operating Costs only** | 32,513 | 19,313 | 42,178 | 19,313 | 19,313 | 19,313 | 24,313 | 19,313 | 19,313 | 19,313 | 21,813 | 19,313 | 19,313 | 294,628 |
| **Post-Petition Vendor Deposits** | | | | | | | | | | | | | | |
| Florida East Coast Railroad (FECR) ( assume no deposit request, obligations past one year in advance) | | | | | | | | | | | | | | |
| Norfolk Southern/T-cubed RoW ($110,272 monthly lease costs) assuming June and July pmts due in advance | | | | | | | | | | | | | | |
| Tower Cloud advance payments requested (three months rent) | | | 35,700 | | | | | | | | | | | 35,700 |
| Other Colocation Facilities (2 months under various leases) | | | | | | | | | | | | | | |
| **Subtotal Post-petition Vendor Deposits** | | | 35,700 | | | | | | | | | | | 35,700 |
| **Capex** | | | | | | | | | | | | | | |
| Corporate capex - replacement computers | | | | | | | | | | | | | | |
| Customer capex support | | 2,500 | | | 2,500 | | | | 2,500 | | | 2,500 | | 10,000 |
| All Aboard Florida capex | | | | | | | | | | | | | | |
| Tower Cloud - exercise of IRU purchase option on GA segment | | | 70,000 | | | | 70,000 | | | | 70,000 | | | 210,000 |
| **Subtotal - Capex** | | 2,500 | 70,000 | | 2,500 | | 70,000 | | 2,500 | | 70,000 | 2,500 | | 220,000 |
| **Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| Fees and expenses of the Clerk of the Court and the U.S. Trustee | | | | | | | | | | | | | | |
| Fees and expenses of Creditors' Committee | | | | | | | | | | | | | | |
| DIP Lenders Counsel: Neligan Foley | | | | | | | | | | | | | | |
| DIP Lenders Counsel: Bodman PLC | | | | | | | | | | | | | | |
| Debtor's Counsel: Fox Rothchild LLP | | | | | | | | | | | | | | |
| Debtor's Financial Advisors: PMCM | | | | | | | | | | | | | | |
| **Subtotal - Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| **Debt Service** | | | | | | | | | | | | | | |
| Stonne Mezzanine Fund IV, L.P. Interest (assumed PIK) | | | | | | | | | | | | | | |
| DIP Loan Interest | | | | | | | | | | | | | | |
| **Subtotal - Debt Service** | | | | | | | | | | | | | | |
| **Total Budget for [90 day] period** | $ 32,513 | $ 21,813 | $ 147,878 | $ 19,313 | $ 21,813 | $ 19,313 | $ 94,313 | $ 19,313 | $ 21,813 | $ 19,313 | $ 91,813 | $ 21,813 | $ 19,313 | $ 550,328 |

**Allied Fiber - Georgia, LLC ONLY**
**DRAFT Operating Cash Requirements from [Date of Filing] to [July 15, 2016]**
Key Assumptions and Comments:
a. Core team only to support/maintain network and customers
b. No marketing, sales, sales support staff
c. Legal expenses reflected outside of operating costs; subject to change and increase

| | 4/18/2016 | 4/25/2016 | 5/2/2016 | 5/9/2016 | 5/16/2016 | 5/23/2016 | 5/30/2016 | 6/6/2016 | 6/13/2016 | 6/20/2016 | 6/27/2016 | 7/4/2016 | 7/11/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Recurring Revenue | $ - | $ - | $ 8,440 | $ - | $ - | $ - | $ - | $ 8,440 | $ - | $ - | $ - | $ - | $ - | $ 16,880 |
| **COGS** | | | | | | | | | | | | | | |
| ROW Rent (assumes June and July pmts paid in advance as post petition) | $ 46,000 | $ - | $ 110,272 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 156,272 |
| Colo Rent | 9,300 | - | 19,935 | - | - | - | - | - | - | - | - | - | - | 29,235 |
| Colo Costs | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 138,931 |
| Travel - Ops Team | 2,500 | - | 5,000 | - | - | - | 5,000 | - | - | - | - | - | - | 15,000 |
| Contingency | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 81,250 |
| **Subtotal - COGS** | 74,737 | 16,937 | 152,144 | 16,937 | 16,937 | 16,937 | 21,937 | 16,937 | 16,937 | 16,937 | 16,937 | 16,937 | 16,937 | 420,688 |
| **SG&A** | | | | | | | | | | | | | | |
| Payroll + Benefits (Core Team Only) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Employee Stay pmt/Incentive plans [TBD ] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Admin & Operations Travel | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Legal | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Services | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Office & All Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal - SG&A** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal AF- Southeast LLC Operating Costs only** | 74,737 | 16,937 | 152,144 | 16,937 | 16,937 | 16,937 | 21,937 | 16,937 | 16,937 | 16,937 | 16,937 | 16,937 | 16,937 | 420,688 |
| **Post-Petition Vendor Deposits** | | | | | | | | | | | | | | |
| Florida East Coast Railroad (FECR) [ assume no deposit request, obligations paid one-year in advance] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Norfolk Southern/FT-Cubed RoW ($110,272 monthly lease costs) assuming June and July pmts due in advance | - | - | 220,544 | - | - | - | - | - | - | - | - | - | - | 220,544 |
| Tower Cloud advance payments requested (three months rent) | - | - | 138,000 | - | - | - | - | - | - | - | - | - | - | 138,000 |
| Other Colocation Facilities (2 months under various leases) | - | - | 39,900 | - | - | - | - | - | - | - | - | - | - | 39,900 |
| **Subtotal Post-petition Vendor Deposits** | - | - | 398,444 | - | - | - | - | - | - | - | - | - | - | 398,444 |
| **Capex** | | | | | | | | | | | | | | |
| Corporate capex - replacement computers | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Customer capex support | - | 2,500 | - | - | 2,500 | - | - | - | 2,500 | - | - | 2,500 | - | 10,000 |
| All Aboard Florida capex | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tower Cloud - exercise of IRU purchase option on GA segment | - | - | - | 2,400,000 | - | - | - | - | - | - | - | - | - | 2,400,000 |
| **Subtotal - Capex** | - | 2,500 | - | 2,400,000 | 2,500 | - | - | - | 2,500 | - | - | 2,500 | - | 2,410,000 |
| **Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| Fees and expenses of the Clerk of the Court and the U.S. Trustee | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fees and expenses of Creditors' Committee | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Lenders Counsel: Nelligan Foley | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Lenders Counsel: Bodman PLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's Counsel: Fox Rothchild LLP | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's Financial Advisors: PMCM | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal - Bankruptcy Legal and Professional Services** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Debt Service** | | | | | | | | | | | | | | |
| Strome Mezzanine Fund IV, L.P. Interest (assumed PIK) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Loan Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal - Debt Service** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Budget for [90 day] period** | $ 74,737 | $ 19,437 | $ 550,588 | $ 2,416,937 | $ 19,437 | $ 16,937 | $ 21,937 | $ 16,937 | $ 19,437 | $ 16,937 | $ 19,437 | $ 19,437 | $ 16,937 | $ 3,229,132 |

## EXHIBIT B

**DIP Credit Agreement**

SENIOR SECURED SUPER PRIORITY

DEBTOR IN POSSESSION

AMENDED AND RESTATED LOAN AGREEMENT

by and among

STROME MEZZANINE FUND IV, LP,

As Lender

AND

AF–SOUTHEAST, LLC,

ALLIED FIBER - FLORIDA, LLC,

AND

ALLIED FIBER - GEORGIA, LLC,

As Borrowers

Dated as of April [___], 2016

## TABLE OF CONTENTS

**Page**

### ARTICLE I

DEFINITIONS AND RULES OF CONSTRUCTION ................................................................2
Section 1.1.    Definitions. ...................................................................................................2
Section 1.2.    Rules of Construction. ...............................................................................18

### ARTICLE II

REPRESENTATIONS ..............................................................................................................20
Section 2.1.    Representations by Borrowers....................................................................20

### ARTICLE III

LOAN; USE OF PROCEEDS; REPAYMENT; OBLIGATIONS UNCONDITIONAL .............24
Section 3.1.    Loan............................................................................................................24
Section 3.2.    Use of Proceeds. ........................................................................................25
Section 3.3.    Repayment of Loan; Obligations Unconditional........................................26
Section 3.4.    Recordation and Filing. .............................................................................26
Section 3.5.    Conditions Precedent..................................................................................27
Section 3.6.    Additional Costs; Regulatory Change.........................................................28
Section 3.7.    Indemnification for Losses. .......................................................................29
Section 3.8.    Statements by Lender. ................................................................................30

### ARTICLE IV

PAYMENTS ON THE LOAN; TAX COVENANTS SECTION ..............................................31
Section 4.1.    Payment Obligations of the Borrowers. .....................................................31
Section 4.2.    Nature of Borrower's Obligation. ..............................................................31
Section 4.3.    Advances by Lender....................................................................................31

### ARTICLE V

MAINTENANCE, TAXES, INSURANCE AND PROJECT COVENANTS...............................32
Section 5.1.    Maintenance and Modifications of Project. ...............................................32
Section 5.2.    Taxes, Other Governmental Charges and Utility Charges; Mechanics'
                and Other Liens. ........................................................................................32
Section 5.3.    Insurance. ...................................................................................................33
Section 5.4.    General Requirements Applicable to Insurance. ........................................34
Section 5.5.    Advances by Lender....................................................................................34
Section 5.6.    Self-Insurance for Deficiency in Insurance Coverage. ..............................35

### ARTICLE VI

DAMAGE, DESTRUCTION, CONDEMNATION AND OTHER LOSS OF LEASEHOLD
INTEREST...............................................................................................................................36

i

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| Section 6.1. | The Borrowers To Give Notice. | 36 |
| Section 6.2. | Damage, Destruction, Condemnation or Loss of Leasehold Interest. | 36 |

### ARTICLE VII

SPECIAL COVENANTS .................................................................................38

| Section 7.1. | Inspection of Project and Books. | 38 |
|---|---|---|
| Section 7.2. | Maintenance of Existence. | 38 |
| Section 7.3. | Financial Statements and Certificate of No Default. | 38 |
| Section 7.4. | Single Purpose. | 39 |
| Section 7.5. | Indemnification. | 40 |
| Section 7.6. | Additional Indebtedness. | 40 |
| Section 7.7. | Interest Reserve. | 40 |
| Section 7.8. | Financial Covenants. | 41 |
| Section 7.9. | Compliance with Applicable Law. | 41 |
| Section 7.10. | Notice of Litigation. | 41 |
| Section 7.11. | Notice of Other Events. | 42 |
| Section 7.12. | Payment of Taxes and Other Claims. | 42 |
| Section 7.13. | Payment of Indebtedness. | 42 |
| Section 7.14. | Governmental Consents and Approvals. | 42 |
| Section 7.15. | Pension Plans. | 43 |
| Section 7.16. | Further Assurances. | 43 |
| Section 7.17. | Use of Proceeds. | 43 |
| Section 7.18. | Environmental Matters. | 43 |
| Section 7.19. | Acquisition of Margin Securities. | 44 |
| Section 7.20. | Payment of Claims; Encumbrances. | 44 |
| Section 7.21. | Borrowers' Organizational Documents. | 44 |
| Section 7.22. | Prohibition of Assignments, Transfers and Encumbrances. | 44 |
| Section 7.23. | Loans, Acquisitions, Guaranties, Affiliate Transactions. | 45 |
| Section 7.24. | Dividends; Distributions. | 45 |
| Section 7.25. | Expenses; Taxes; Indemnity. | 45 |
| Section 7.26. | Pension or Profit Sharing Plans. | 45 |
| Section 7.27. | Lease and Contract Restrictions. | 46 |
| Section 7.28. | Field Audits. | 46 |
| Section 7.29. | Preference Rights. | 46 |
| Section 7.30. | Super-Priority Nature of Obligations | 46 |
| Section 7.31. | Payment of Obligations. | 47 |
| Section 7.32. | Liens | 47 |
| Section 7.33. | No Discharge; Survival of Claims. | 47 |
| Section 7.34. | Release. | 48 |
| Section 7.35. | Waiver of Priming Rights. | 48 |
| Section 7.36. | Priority of Claim. | 49 |
| Section 7.37. | Approved Budget; Cash Flow Reporting. | 49 |
| Section 7.38. | Reorganization Matters. | 49 |
| Section 7.39. | Secured Party Expenses. | **Error! Bookmark not defined.** |
| Section 7.40. | Chapter 11 Claims. | 51 |

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| Section 7.41. | Approved Budgets. | Error! Bookmark not defined. |
| Section 7.42. | Financial Covenants. | 49 |

## ARTICLE VIII

EVENTS OF DEFAULT AND REMEDIES ......53

| Section 8.1. | Event of Default Defined. | 53 |
|---|---|---|
| Section 8.2. | Remedies on Default. | 55 |
| Section 8.3. | No Remedy Exclusive. | 56 |
| Section 8.4. | Agreement To Pay Attorneys' Fees And Expenses. | 56 |
| Section 8.5. | Waiver. | 57 |
| Section 8.6. | Remedies Subject To Provisions Of Law and Underlying Agreements. | 57 |
| Section 8.7. | Waiver Of Appraisement, Valuation, Stay, And Execution Laws. | 57 |

## ARTICLE IX

PREPAYMENT OF LOAN......58

| Section 9.1. | Option To Prepay Loan. | 58 |
|---|---|---|

## ARTICLE X

MISCELLANEOUS ......59

| Section 10.1. | Term of Loan Agreement. | 59 |
|---|---|---|
| Section 10.2. | Notices. | 59 |
| Section 10.3. | Amendments to Loan Agreement. | 60 |
| Section 10.4. | Successors and Assigns. | 60 |
| Section 10.5. | Severability. | 60 |
| Section 10.6. | Entire Understanding. | 61 |
| Section 10.7. | Counterparts. | 61 |
| Section 10.8. | Cross-Guaranty; Subrogation; Right of Contribution. | 61 |
| Section 10.9. | Governing Law; Venue; Waiver of Trial by Jury. | 63 |
| Section 10.10. | Section 552(b) | 63 |
| Section 10.11. | Consultant. | 64 |
| Section 10.12. | USA Patriot Act. | 64 |
| Section 10.13. | No Novation. | 64 |

TABLE OF CONTENTS

**Page**

**EXHIBIT A**  LIST OF FLORIDA COUNTIES

**EXHIBIT B**  LIST OF GEORGIA COUNTIES

**EXHIBIT C**  FORM OF SENIOR SECURED PROMISSORY NOTE

**EXHIBIT D**  FORM OF BORROWER CERTIFICATE

**EXHIBIT E**  FORM OF COMPLIANCE CERTIFICATE

**EXHIBIT F**  FORM OF INTERIM ORDER

**EXHIBIT G**  SCHEDULE OF ADVANCES

**EXHIBIT H**  FORM OF APPROVED BUDGET

Schedule 2.1 – Subsidiaries

Schedule 3.1 – Bank Accounts

Schedule A-1 - Construction Contracts

Schedule A-2 - Permitted Debt

Schedule A-3 - Permitted Encumbrances

Schedule A-4 - Subordinated Debt

Schedule A-5 - Underlying Agreements

THIS SENIOR SECURED SUPER PRIORITY AMENDED AND RESTATED LOAN AGREEMENT (this "Loan Agreement" or "Agreement"), dated as of April ___, 2016 (the "Effective Date"), is made by and among STROME MEZZANINE FUND IV, LP, a limited partnership formed under the laws of the State of Delaware ("Lender"), AF–SOUTHEAST, LLC, a limited liability company formed under the laws of the State of Delaware ("Allied Southeast"), ALLIED FIBER - FLORIDA, LLC, a limited liability company formed under the laws of the State of Delaware ("Allied Florida"), and ALLIED FIBER – GEORGIA, LLC, a limited liability company formed under the laws of the State of Delaware ("Allied Georgia"). Each of Allied Southeast, Allied Florida and Allied Georgia is sometimes referred to herein as a "Borrower" and collectively as the "Borrowers."

## W I T N E S S E T H:

WHEREAS, on April ___, 2016 (the "Petition Date"), Allied Southeast, Allied Florida and Allied Georgia (each, a "Debtor" and collectively, the "Debtors") commenced Chapter 11 Case Nos. [__-_____ through __-_____] (each a "Chapter 11 Case" or a "Case" and collectively, the "Chapter 11 Cases" or the "Cases") by filing voluntary petitions for reorganization under the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, Lender provided financing to Borrowers pursuant to that certain Loan Agreement, dated as of September 24, 2014, by and among Borrowers and Lender, as amended by the Amendment and Forbearance Agreement, dated as of September 3, 2015 (the "First Amendment"), by and among Borrowers and Pre-Petition Lender, as further amended by the Second Amendment thereto, dated as of April 20, 2016 (the "Second Amendment"), by and among Borrowers and Lender (heretofore amended, modified or otherwise supplemented, the "Pre-Petition Loan Agreement");

WHEREAS, the Pre-Petition Loan (as defined herein) under the Pre-Petition Loan Agreement was for the purpose of financing and reimbursing the costs of the development, acquisition, construction, installation and equipment of certain capital improvements of the Borrowers' combined carrier neutral dark fiber communications network spanning from Miami, Florida to Jacksonville, Florida, and from Jacksonville, Florida to Atlanta, Georgia (the "Project"), paying trade payables, for general corporate purposes and, under certain circumstances described herein, making distributions to Parent (as hereinafter defined), on the terms and conditions hereinafter set forth;

WHEREAS, Borrowers have requested that each of the parties to the Pre-Petition Loan Agreement amend and restate the Pre-Petition Loan Agreement, and each such party is willing to do so upon the terms and subject to the conditions set forth herein, which shall provide for a the senior secured super priority loan to Borrowers to fund the working capital requirements of Borrowers and for other purposes permitted under this Loan Agreement during the pendency of the Chapter 11 Cases;

WHEREAS, Lender is willing to make certain Post-Petition Loan to Borrowers upon the terms and conditions set forth herein;

WHEREAS, each Borrower has agreed to secure the Obligations by granting to Lender a security interest in and Lien upon substantially all its existing and after-acquired personal and real property; and

WHEREAS, each Borrower acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to Borrowers as provided in this Loan Agreement;

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants hereinafter contained, the parties hereto covenant and agree to, as follows and hereby amend and restate the Pre-Petition Loan Agreement:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

**Section 1.1.    Definitions.**

Unless the context otherwise requires, the following terms shall have the following meanings:

"Act" has the meaning set forth in Section 10.12.

"Additional Indebtedness" means all Indebtedness of the Borrowers other than the Loan.

"Adequate Protection Liens" has the meaning ascribed thereto in the Interim Order or the Final Order, as applicable.

"Affairs" means the business, affairs, operations, undertaking, property, assets, liabilities, condition (financial or otherwise), prospects, performance and results of operations of a specified Person.

"Allied Florida Security Agreement" means the Security Agreement, dated as of Pre-Petition Loan Agreement Effective Date, by and between Allied Florida and Lender, as the same may be amended, restated, or otherwise modified from time to time.

"Allied Georgia Security Agreement" means the Security Agreement, dated as of the Pre-Petition Loan Agreement Effective Date, by and between Allied Georgia and Lender, as the same may be amended, restated, or otherwise modified from time to time.

"Allied Southeast Pledge Agreement" means the Pledge Agreement, dated as of the Pre-Petition Loan Agreement Effective Date, of Allied Southeast in favor of Lender, pledging the Capital Securities of Allied Florida and Allied Georgia owned by Allied Southeast to Lender as collateral security for the Loan, as the same may be amended, restated or otherwise modified from time to time.

2

"Allied Southeast Security Agreement" means the Security Agreement, dated as of Pre-Petition Loan Agreement Effective Date, by and between Allied Southeast and Lender, as the same may be amended, restated or otherwise modified from time to time.

"Allocable Amount" has the meaning set forth in Section 10.8.

"Applicable Law" means any international treaty, any domestic or foreign constitution or any supranational, national, regional, federal, provincial, territorial, state, municipal, tribal or local statute, law, ordinance, code, rule, regulation, order (including any consent decree or administrative order), applicable to, or any directive, guideline, policy or Authorization of any Governmental Authority having jurisdiction with respect to any specified Person, property, transaction or event or any of such Person's Affairs, and any order, judgment, award or decree of any Governmental Entity, or arbitrator in any proceeding or action to which the Person in question is a party or by which such Person or any of its Affairs is bound. For purposes of Section 5.2, the term "Applicable Law" includes FATCA.

"Approved Budget" has the meaning assigned to such term in Section 3.5(m).

"Approved Budget Variance Report" has the meaning assigned to such term in Section 7.37(c).

"Asset Coverage Ratio" means, as of any date of determination, the ratio of (i) the fair market value of the consolidated assets of the Borrowers as determined by a valuation firm selected by the Manager of Allied Southeast in good faith, to (ii) the Long-Term Indebtedness of the Borrowers.

"Authorization" means any authorization, approval, consent, certificate, exemption, license, permit, franchise, certification, registration or no-action letter from any Governmental Authority having jurisdiction with respect to any specified Person, property, transaction or event, or any of such Person's Affairs or from any Person in connection with any easements or contractual rights.

"Authorized Representative" means, with respect to a party, such party's Chief Restructuring Officer, Manager or other person authorized by such party's managing body to act on its behalf.

"Avoidance Actions" means any and all claims and causes of action arising under the Bankruptcy Code, including without limitation, sections 544 through 553 thereof, or any similar laws of the United States or any state, territory or possession thereof, or the District of Columbia (including without limitation, any preference or fraudulent conveyance action under such laws).

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy" or any successor statute, and all rules promulgated thereunder.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

"Borrowers" has the meaning set forth in the Preamble.

3

"Business Day" means any day of the year, other than a Saturday, Sunday or any day on which major banks are closed for business in New York, New York.

"Capital Securities" means all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, limited liability company interests, membership interests in a limited liability company, partnership interests, limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

"Carve-Out" means the sum of (a) all allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for statutory fees payable to the Office of the United States Trustee, together with the statutory rate of interest, or by final order of the Bankruptcy Court, and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Court; (b) all fee accruals allowed at any time by the Bankruptcy Court and incurred by professionals retained by the Debtors or the Committee, if any, in accordance with a final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed) under sections 327, 328 or 1103 of the Bankruptcy Code (the "Professionals") through the date of service by the Lender of a notice of event of default under the Loan Agreement (the "Carve-Out Trigger Notice"), up to and as limited by the respective aggregate Approved Budget amounts for each Professional through the date of service of such Carve-Out Trigger Notice, less the amount of prepetition retainers received by such Professionals and not previously applied to the fees and expenses of such Professionals; and (c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Professionals from and after the date of service by the Lender of a Carve-Out Trigger Notice, to the extent allowed at any time by the Bankruptcy Court, in an aggregate amount not to exceed $50,000 (the "Carve-Out Cap"), less the amount of prepetition retainers received by such Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above.  The Carve-Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees, disbursements, costs or expenses of the Professionals made after the date of service by the Lender of the Carve-Out Trigger Notice.  Notwithstanding the foregoing and notwithstanding any other provision of this Agreement, in no event shall the definition of "Carve-Out" include, and the "Carve-Out" hereby expressly excludes any use of the Carve-Out, Cash Collateral (as defined in the Interim Order or the Final Order, as applicable) or proceeds of the DIP Facility in violation of the Interim Order or the Final Order, as applicable.

"Case" has the meaning set forth in the Recitals.

"Chapter 11 Case" has the meaning set forth in the Recitals.

"Chief Restructuring Officer" has the meaning set forth in Section 7.39(b).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all of the collateral subject to the security interests and other Liens granted to Lender by the Borrowers or Parent under the Loan Documents or provided for under the Interim Order or the Final Order.

4

"Collateral Assignment" means the Collateral Assignment executed by the Borrowers in favor of Lender with respect to the assignment of the Construction Contracts, together with any required consent(s) of the counterparties to such Construction Contracts.

"Committee" means any statutory committee appointed in the Chapter 11 Cases.

"Construction Contracts" means the contracts entered into by the Borrowers for construction of the Project which are described on Schedule A-1.

"Consultant" has the meaning set forth in Section 10.11.

"Current Ratio" shall mean, as of any date of determination, the ratio of (i) the current assets of the Borrowers, in the aggregate, to (ii) the current liabilities of the Borrowers, in the aggregate (in each case, other than (without duplication) (x) liabilities with respect to any Indebtedness existing as of the date hereof (other than obligations under the Loan Agreement), and (y) the value of any warrants or similar instruments with respect to the capital stock of any Borrower required to be booked as a liability on the balance sheet of such Borrower), all as determined in accordance with GAAP.

"Debtors" has the meaning set forth in the Recitals.

"DIP Administrative Claim" means an allowed superpriority administrative expense claim under Section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expense claims, adequate protection and other diminution claims, priority claims and unsecured claims, including administrative expenses and other claims of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code.

"DIP Facility" means the Senior Secured Super Priority Debtor In Possession Post-Petition Loan provided by Lender to the Debtors pursuant to Section 3.1(a) and (b) and the other terms and conditions of the Loan Documents.

"DIP Facility Obligations" means all Obligations arising in connection with the DIP Facility.

"DIP Liens" has the meaning set forth in Section 7.30(b).

"Disbursement" has the meaning set forth in Section 3.2(b).

"Disbursement Notice" has the meaning set forth in Section 3.2(b).

"Dividend" means a payment made, liability incurred, or other consideration given by any Person for the purchase, acquisition, redemption or retirement of any Capital Securities of that Person or as a distribution, dividend, return of capital, or other distribution in respect of that Person's Capital Securities.

"Effect of Bankruptcy" means, with respect to any contractual obligation, contract, lease or agreement to which a Debtor is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Cases, as applicable (including the

5

implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under Applicable Law.

"Environmental Laws" means all laws, statutes, ordinances, rules, regulations, orders, and determinations of any Governmental Authority pertaining to health, hazardous substances, natural resources, conservation, wildlife, pollution or the environment.

"FATCA" means Sections 1471 through 1474 of the Code, any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b) of the Code and any applicable intergovernmental agreement with respect thereto and applicable official implementing guidance thereunder.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be substantially in the form of the Interim Order or otherwise satisfactory in form and substance to the Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal has been stayed, dismissed or denied unless the Lender waives such requirement, together with all extensions, modifications and amendments thereto, each in form and substance satisfactory to the Lender. The Final Order (a) shall authorize and approve the transactions contemplated by the Post-Petition Loan Documents, (b) shall find that the Lender is extending credit to the Borrower in good faith within the meaning of Bankruptcy Code section 364(e) and (c) shall set forth provisions (i) approving in all respects the Post-Petition Loan Documents, and authorizing and directing the Debtors to execute and become bound by the Post-Petition Loan Documents; (ii) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the Final Order and the Loan Documents, including to permit the creation and perfection of the Lender's Liens on the Collateral; (iii) providing for the automatic relief of such stay to permit the enforcement of the Lender's remedies under the Loan Documents, subject to the right of the Debtors and/or the Committee to seek to re-impose or continue the automatic stay; and (iv) providing that the Debtors acknowledge and stipulate to (w) the validity and enforceability of the Pre-Petition Obligations, without defense, offset or counterclaim of any kind, (x) the validity, perfection and priority of the Pre-Petition Liens, and that the Debtors waive any right to challenge or contest such claims and liens, (y) that the Debtors have no valid offset rights, claims or causes of action, whether based in contract, tort or otherwise against the Pre-Petition Lender with respect to the Pre-Petition Loan Documents or the related transactions or that otherwise which would impair, in any manner, the Pre-Petition Lender's liens against the Debtors' assets or the obligations of the Debtors to the Pre-Petition Lender arising under the Pre-Petition Loan Documents, and (z) that this Loan Agreement and the transactions contemplated hereby modify the terms of the Obligations (as defined in the Intercreditor Agreement) and the Financing Documents (as defined in the Intercreditor Agreement), that the additional obligations to Lender incurred by the Borrowers hereunder do not affect in any manner the unconditional obligations of the Subordinating Lender (as defined in the Intercreditor Agreement) under the Intercreditor Agreement and that the Agent and Phoenix (each as defined in the Intercreditor Agreement) received notice of this Loan Agreement and the transactions contemplated hereby in accordance with Section 2(d) of the Intercreditor Agreement.

"Financial Advisor" has the meaning set forth in Section 7.39(b).

"Financial Statements" means the consolidated financial statements of the Borrowers.

"First Liens" has the meaning set forth in Section 7.30(b).

"First Amendment" shall have the meaning set forth in the recitals.

"Fiscal Year" means, with respect to the Borrowers, each 12-month period commencing on January 1 of each year and ending on December 31 of such year, or such other 12-month period as certified to Lender by an Authorized Representative of the Borrowers as being the new fiscal year of the Borrowers.

"Florida Counties" means the counties in Florida in which the Project is located, as listed on Exhibit A hereto.

"Florida Leasehold Mortgage" means the Leasehold Mortgage, Security Agreement and Fixture Filing, dated as of the Pre-Petition Loan Agreement Effective Date, of Allied Florida in favor of Lender, as the same may be amended, restated or otherwise modified from time to time together with any required consent(s) of the landlord(s) under the lease(s) described therein.

"GAAP" shall mean U.S. generally accepted accounting principles, consistently applied.

"General Revenues" means all revenues, income, receipts and money (other than proceeds of borrowings or the issuance of equity securities (or securities issuable or exchangeable for, or convertible into, equity securities)) received by or on behalf of a Borrower, including, but not limited to:

(a)    moneys, earnings, revenues, rights to the payment of money and receivables;

(b)    all fees, rents, issues, profits, income, revenues and receipts, including, without limitation, IRU revenues and Recurring Revenues;

(c)    all accounts, chattel paper and instruments, received by the Borrowers and all proceeds from them, whether cash or non-cash;

(d)    all amounts realized upon recourse to any collateral given by any of the Borrowers to secure the Borrowers' obligations with respect to the Loan; and

(e)    all proceeds of business interruption and similar insurance.

"Georgia Counties" means the counties in Georgia in which the Project is located, as listed on Exhibit B hereto.

"Georgia Leasehold Mortgage" means the Leasehold Mortgage, Security Agreement and Fixture Filing, dated as of the Pre-Petition Loan Agreement Effective Date, of Allied Georgia in favor of Lender, as the same may be amended, restated or otherwise modified from time to time together with any required consent(s) of the landlord(s) under the lease(s) described therein.

"Governmental Authority" means, collectively, all Federal, state and local or regional governmental agencies, boards, tribunals, courts or instrumentalities having jurisdiction over the Borrowers or the Project.

"Guaranty" means any obligation of any of the Borrowers guaranteeing in any manner, directly or indirectly, any obligation of any Person which obligation of such other Person would, if such obligation were the obligation of such Borrower, constitute Indebtedness under this Loan Agreement, except for any guaranties set forth in this Loan Agreement, including, without limitation, those set forth in Section 10.8 hereof.  For the purposes of this Loan Agreement, so long as no payments are required to be made under such Guaranty and so long as such Guaranty constitutes a contingent liability under GAAP, the aggregate principal amount of any indebtedness in respect of which such Borrower shall have executed and delivered its Guaranty shall be deemed to be equal to 20% of the principal amount borrowed under such guaranteed indebtedness outstanding at the time any computation is being made, and the aggregate annual principal and interest payments on any indebtedness in respect of which such Borrower shall have executed and delivered its Guaranty shall be deemed to be equal to 20% of the amount which would be payable as principal of and the interest on the indebtedness for which a Guaranty shall have been issued during the Fiscal Year for which any computation is being made; provided that if there shall have occurred a default under the guaranteed obligation of any direct or indirect payment by such Borrower on such Guaranty, then, during the period commencing on the date of such default of payment and ending as the case may be on the day on which such default is cured or on the day which is two years after such other Person resumes making all payments on such guaranteed obligation, 100% of such guaranteed indebtedness shall be taken into account.

"Guarantor" shall mean Parent.

"Guarantor Payment" has the meaning set forth in Section 10.8.

"Hazardous Material" means any substance that is defined or listed as a hazardous, toxic or dangerous substance under any Environmental Law or is otherwise regulated or prohibited or subject to investigation or remediation under any Environmental Law because of its hazardous, toxic or dangerous properties, including (i) any substance that is a "hazardous substance" under applicable Environmental Law, and (ii) asbestos, petroleum, petroleum products and polychlorinated biphenyls.

"Income Available for Debt Service" means, as to any Fiscal Year or other specified period, the excess of General Revenues over Operating Expenses, as determined from the consolidated audited financial statements of the Borrowers, provided that unrealized gains and losses on investments will not be recognized in the calculation of Income Available for Debt Service; provided, however, that no determination thereof shall take into account any gain or loss resulting from either the extinguishment of Indebtedness or the sale, exchange or other disposition of capital assets not made in the ordinary course of business.

"Indebtedness" means (a) all obligations of the Borrowers for borrowed money, including, but not limited to, the Loan, (b) all installment sales, conditional sales and capital lease obligations (other than real estate leases and other rights to use real estate and related facilities that are classified as capital leases) incurred or assumed by a Borrower as purchaser, (c) any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent, and (d) all Guaranties of the Borrowers, whether constituting Long-Term Indebtedness or Short-Term Indebtedness, in each case payable from or secured by the General Revenues, the Project or the Pledged Assets.  Indebtedness shall not include unsecured trade debt.

8

"Intercreditor Agreement" means the Intercreditor Lien Subordination Agreement, dated as of the Pre-Petition Loan Agreement Effective Date, by and among Lender, William M. Hitchcock, as agent for the Allied Fiber Senior Lenders (as defined therein), and Phoenix Fund, LLC, as the same may be amended, restated or otherwise modified from time to time.

"Interest Rate" means, 12% per annum.

"Interest Coverage Ratio" means, as of any date of determination, the ratio of (i) the annualized forward-looking Recurring Revenues of the Borrowers, in the aggregate, as of such date, to (ii) interest paid or required to be paid in cash (net of interest received in cash) by the Borrowers in respect of the Loan for the four fiscal quarters of the Borrowers ending on such date.

"Interest Reserve" means an amount reserved by the Borrowers (and reflected on the consolidated balance sheet of the Borrowers as such) equal to the annual cash interest payable on the outstanding principal balance of the Loan, which amount, subject to Section 7.8(a) hereof, shall decrease each quarter, beginning with the quarter ending December 31, 2014, by the amount of Recurring Revenue for such quarter, as demonstrated by a certificate executed by an Authorized Representative of the Borrowers. The Interest Reserve shall be calculated at the end of each fiscal quarter of the Borrowers beginning with the quarter ending December 31, 2014.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing, substantially in the form attached hereto as Exhibit F or such other form satisfactory to the Lender and together with all extensions, modifications, and amendments thereto that are each satisfactory to the Lender. The Interim Order (a) shall authorize and approve the transactions contemplated by the Post-Petition Loan Documents, (b) shall find that the Lender is extending credit to the Borrower in good faith within the meaning of Bankruptcy Code section 364(e) and (c) shall set forth provisions (i) approving in all respects the Post-Petition Loan Documents, and authorizing and directing the Debtors to execute and become bound by the Post-Petition Loan Documents; (ii) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the Interim Order and the Post-Petition Loan Documents, including to permit the creation and perfection of the Lender's Liens on the Collateral; (iii) providing for the automatic relief of such stay to permit the enforcement of the Lender's remedies under the Loan Documents, subject to the right of the Debtors and/or the Committee to seek to re-impose or continue the automatic stay; and (iv) providing that the Debtors acknowledge and stipulate to (w) the validity and enforceability of the Pre-Petition Obligations, without defense, offset or counterclaim of any kind, (x) the validity, perfection and priority of the Pre-Petition Liens, and that the Debtors waive any right to challenge or contest such claims and liens, (y) that the Debtors have no valid offset rights, claims or causes of action, whether based in contract, tort or otherwise against the Pre-Petition Lender with respect to the Pre-Petition Loan Documents or the related transactions or that otherwise which would impair, in any manner, the Pre-Petition Lender's liens against the Debtors' assets or the obligations of the Debtors to the Pre-Petition Lender arising under the Pre-Petition Loan Documents, and (z) that this Loan Agreement and the transactions contemplated hereby modify the terms of the Obligations (as defined in the Intercreditor Agreement) and the Financing Documents (as defined in the Intercreditor Agreement), that the additional obligations to Lender incurred by the Borrowers hereunder do not affect in any manner the unconditional obligations of the Subordinating Lender (as defined in the Intercreditor Agreement) under the Intercreditor Agreement and that the Agent and Phoenix (each as defined in the Intercreditor Agreement)

9

received notice of this Loan Agreement and the transactions contemplated hereby in accordance with Section 2(d) of the Intercreditor Agreement.

"IRU Revenues" means all fees, rents, issues, profits, income, revenues and receipts received by or on behalf of a Borrower on a non-recurring basis from the grant of Indefeasible Rights of Use (IRUs) or other rights.

"Leasehold Mortgages" means the Florida Leasehold Mortgage and the Georgia Leasehold Mortgage.

"Lien" means any mortgage, deed of trust, lien, pledge, charge, security interest, hypothecation, indenture, preferential right, assignment, option, claim, royalty, production payment, burden on production or other lien, encumbrance or collateral security instrument in, on or to, or any right or interest, or the title of any vendor, lessor, lender or other secured party to, or interest or title of any Person under any conditional sale or other title retention agreement or capital lease with respect to, any property or asset owned or held by such Person, any mortgage, deed of trust, pledge, charge, security agreement, hypothecation, indenture, assignment or similar instrument, or the filing of a financing statement or other similar instrument, which names such Person as debtor, or any security agreement or other similar instrument authorizing any other party as the secured party thereunder to file any financing statement or other similar instrument or any other arrangement, encumbrance or condition that in substance secures payment or performance of an obligation.

"Loan" means the Pre-Petition Loan and the Post-Petition Loan.

"Loan Documents" means, collectively, the Pre-Petition Loan Documents and the Post-Petition Loan Documents.

"Loan Payments" means the payments made or to be made by the Borrowers pursuant to this Loan Agreement for the payment of the principal of, premium, if any, and interest on the Loan, and all other amounts coming due and payable under the Loan Documents, whether by reason of maturity, redemption, acceleration or otherwise, including without limitation, the Make Whole Amount.

"Long-Term Indebtedness" means all Indebtedness having a maturity longer than one year, including, without limitation:

(a)     money borrowed for an original term, or renewable at the option of a Borrower for a period from the date originally incurred, longer than one year, including, without limitation, the Loan;

(b)     leases which are required to be capitalized in accordance with GAAP having an original term, or renewable at the option of the lessee for a period from the date originally incurred, longer than one year (other than real estate leases and other rights to use real estate and related facilities that are classified as capital leases);

(c)     installment sale or conditional sale contracts incurred or assumed by a Borrower as purchaser having an original term in excess of one year;

(d)     Short-Term Indebtedness if a commitment by a financial lender exists to provide financing to retire such Short-Term Indebtedness and such commitment provides for the repayment of principal on terms which would, if such commitment were implemented, constitute Long-Term Indebtedness; and

(e)     the current portion of Long-Term Indebtedness.

"Make Whole Amount" has the meaning set forth in Section 9.1.

"Manager" means, with respect to each Borrower, the "Manager" as such term is defined in the Organizational Documents of such Borrower.

"Material Adverse Effect" means a material, adverse effect on (i) the business, property or financial condition of the Borrowers and their Subsidiaries taken as a whole; (ii) any one of the Borrowers' ability to perform the obligations hereunder or under any other Loan Document in any material respect or (iii) the validity or enforceability of this Loan Agreement or any other Loan Document.

"Maturity Date" means the date which is 90 days from the Petition Date.

"Milestones" means each of the following Milestones and each individually, a "Milestone":

(a)     The Petition Date shall have occurred on or before the date that is five (5) days after the Borrowers and Lender have agreed to the form, terms and conditions of this Loan Agreement.

(b)     On or before the date that is five (5) days after the Petition Date, or such later date to which the Lender consents in its sole discretion, the Debtors shall file a motion requesting the entry of an order establishing bidding procedures for the Sale, which procedures are reasonably likely to result in the consummation of such sale no later than the Maturity Date and are in form and substance acceptable to Lender (the "Sale Procedures Order").

(c)     On or before the date that is five (5) days after the Petition Date, or such later date to which the Lender consents in its sole discretion, Debtors shall file a motion, in form and substance acceptable to Lender, seeking entry of an order of the Bankruptcy Court approving the retention of the Financial Advisor and Chief Restructuring Officer during the Chapter 11 Cases, on terms and conditions acceptable to Lender and such order of the Bankruptcy Court in form and substance satisfactory to Agent shall be entered by thirty (30) days after the Petition Date or such later date to which the Lender consents in its sole discretion.

(d)     On or before the date that is thirty (30) days after the Petition Date, or such later date to which the Lender consents in its sole discretion, the Bankruptcy Court shall have entered the Sale Procedure Order which shall include provide that the Lender or its designee may credit bid all or any portion of the Obligations in connection with Sale pursuant to Section 363(k) of the Bankruptcy Code;

(e)     On or before July 12, 2016, or such later date to which the Lender consents in its sole discretion, the Debtor shall have held an auction for the Sale (the "Auction").

(f)     On or before July 14, 2016, or such later date to which the Lender consents in writing in its sole discretion, the Bankruptcy Court shall have entered an order approving the results of the Auction and authorizing the Sale (the "Sale Order").

(g)     On or before July 18, 2016, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h), or such later date to which the Lender consents in writing in its sole discretion, the Sale shall be closed, with proceeds of the Sale paid directly to the Lender to be applied to the Obligations related to the DIP Facility and the Pre-Petition Loan Obligations.

"Net Proceeds" means the gross proceeds from any insurance recovery, condemnation award or taking by eminent domain remaining after payment of reasonable attorneys' fees, reasonable fees and expenses of Lender and all other reasonable expenses incurred in the collection of such gross proceeds.

"Note" means any and all of Senior Secured Promissory Notes of the Borrowers made in favor of Lender evidencing the Post-Petition Loan or the Pre-Petition Loan, in the form attached as Exhibit C hereto or as Exhibit C to the Pre-Petition Loan Agreement, as applicable.

"Operating Expenses" means all accrued and future expenses of the Borrowers, or Parent, as applicable, consistent with GAAP, and including the following items, without intending to limit the generality of the foregoing:

(a)     expenses for operation (including all utilities and fees payable under management and/or operating agreements), maintenance, repair, insurance and inspection;

(b)     costs and expenses for reasonable and necessary professional, engineering, architectural, legal, financial, auditing and consulting services, and including the fees of and other amounts payable to Lender;

(c)     salaries, bonuses and pension and other benefits payable to employees;

(d)     all taxes or contributions or payments in lieu thereof, assessments and charges, including, without intending to limit the generality of the foregoing, income, profits, sales, use, property, franchise and excise taxes;

(e)     obligations under contracts for supplies and services;

(f)     costs for purchases of merchandise and other inventory items;

(g)     rentals payable under leases not intended by a Borrower or Parent to evidence the acquisition of capital assets, as determined in accordance with GAAP; provided, however, that rentals payable under leases which, under GAAP would be treated as evidencing the acquisition of a capital asset shall be includable within Operating Expenses, if so designated by a Borrower or Parent; provided, further, however, the term "Operating Expenses" shall not be construed to include depreciation, amortization or interest expense; and

(h)    in the case of Parent, payments required to be made under agreements with Norfolk Southern Railroad and its affiliates.

"Obligations" means all duties, covenants, agreements, liabilities, indebtedness and obligations of each of the Debtors with respect to the repayment, payment or performance of all indebtedness, liabilities and obligations (monetary or otherwise) of each of the Debtors, to the Lender of any kind including the Pre-Petition Loan, Term Loan and the Roll Up Loan, whenever arising, whether primary, secondary, direct, contingent, fixed or otherwise and whether joint, several, or joint and several, established by or arising under or in connection with this Loan Agreement, each other Post-Petition Loan Document or the Pre-Petition Loan Documents, including, in each case, the payment of principal, interest, fees, expenses, reimbursements and indemnification obligations.

"Organizational Documents" means the certificate of formation and limited liability company agreement of each Borrower, and similar organizational documents for each Subsidiary governing the Affairs of such Subsidiary, each as amended, restated or otherwise modified prior to the date hereof.

"Parent" means Allied Fiber, LLC, a limited liability company organized under the laws of the State of Delaware, which is the parent of Allied Southeast and the indirect parent of each of Allied Florida and Allied Georgia.

"Parent Guarantee" means the Guarantee Agreement, dated as of the Pre-Petition Loan Agreement Effective Date, of Parent in favor of Lender, guaranteeing the payment obligations of the Borrowers under this Loan Agreement, as the same may be amended from time to time.

"Parent Pledge Agreement" means the Pledge Agreement, dated as of the Pre-Petition Loan Agreement Effective Date, of Parent in favor of Lender, pledging the Capital Securities of Allied Southeast owned by Parent to Lender as collateral security for Parent's obligations under the Parent Guarantee.

"Petition Date" has the meaning set forth in the Recitals.

"Permitted Debt" means (i) indebtedness described on Schedule A-2; (ii) indebtedness to Lender; (iii) unsecured trade payables and accrued liabilities arising in the ordinary course of the Borrowers' business; and (iv) purchase money indebtedness for the acquisition of fixed assets not exceeding $500,000 in the aggregate at any time and that is outstanding as of the Petition Date.

"Permitted Encumbrances" means with respect to the Project, as of any particular time:

(a)    This Loan Agreement and any liens and encumbrances created or permitted thereby;

(b)    The Leasehold Mortgages, the Security Agreements, the Pledge Agreements, and any liens and encumbrances created or permitted thereby;

(c)    Subject to the provisions of the Leasehold Mortgages and the Security Agreements, any mechanic's, laborer's, materialman's, supplier's or vendor's lien or right in respect thereof if payment is not yet due under the contract in question or if such lien is being

13

contested in good faith in accordance with the provisions of any of the Leasehold Mortgages or the Security Agreements and such contract has been entered into prior to the Petition Date;

(d)    (i) Rights reserved to or vested in any municipality or public authority by the terms of any right, power, franchise, grant, license, permit or provision of law; (ii) any liens for taxes, assessments, levies, fees, water and sewer rents or charges and other government and similar charges, which are not due and payable or which are not delinquent or, provided there is no Material Adverse Effect as a result thereof, the amount or validity of which are being contested in good faith and execution thereon is stayed; (iii) easements (including, without limitation, reciprocal easement agreements), rights-of-way, buildings, zoning and similar restrictions, servitudes, restrictions, utility agreements, covenants, reservations, oil, gas or other mineral reservations, encroachments, and charges, other minor defects, encumbrances and irregularities in the title to any property which do not materially and adversely impair the use of such property or materially and adversely affect the value thereof; and (iv) rights reserved to or vested in any municipality or public authority to control or regulate any property or to use such property in any manner;

(e)    Liens under any Underlying Agreement;

(f)    Liens arising by reason of good faith deposits with a Borrower in connection with leases of real estate, deposits from customers relating to the provision of fiber or colocation services pursuant to customer agreements, or bids or contracts (other than contracts for the payment of money), deposits by a Borrower to secure public or statutory obligations, or to secure, or in lieu of, surety, stay or appeal bonds, and deposits as security for the payment of taxes or assessments or other similar charges;

(g)    Liens resulting from a filing by a lessor as a precautionary filing for and/or in connection with any lease to which a Borrower and/or its affiliates is party, and any and all statutory or common law liens to secure sums not yet due to lessors, landlords, sublandlords, licensors or sublicensors under leases or rental agreements;

(h)    Any lien arising by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to enable a Borrower to maintain self-insurance, or to participate in any funds established to cover any insurance risks or in connection with workers' compensation, unemployment insurance, pension or profit sharing plans or other social security, or to share in the privileges or benefits required for companies participating in such arrangements;

(i)    Liens securing Indebtedness incurred and outstanding pursuant to clause (iv) and clause (v) of the definition of "Permitted Debt"; *provided, however*, that any such Lien arising in connection with clause (iv) of the definition of Permitted Debt shall attach only to the asset in respect of which such Indebtedness is incurred and any proceeds thereof;

(j)    Any lien set forth on Schedule A-3, provided that no such lien may be increased, extended, renewed or modified to apply to any personal property of a Borrower not subject to such lien on such date or to secure indebtedness of such Borrower not outstanding as of the date

hereof, unless such lien as so extended, renewed or modified otherwise qualifies as a Permitted Encumbrance;

(k)     Any lien in favor of a creditor or a trustee on the proceeds of indebtedness prior to the application of such proceeds so long as such indebtedness is permitted under this Loan Agreement;

(l)     Any liens subordinate to the liens of Lender under the Loan Documents under a subordination agreement the terms of which are satisfactory to Lender in its sole discretion;

(m)     Liens on assets acquired in a transaction financed by, and granted in order to secure, any indebtedness related to any equipment lease; and

(n)     Adequate Protection Liens.

"Person" means an individual, association, corporation, limited liability company, firm, partnership, trust or other legal entity or group of entities, including a governmental entity or any agency or political subdivision thereof.

"Pledge Agreements" means collectively, the Allied Southeast Pledge Agreement and the Parent Pledge Agreement.

"Pledged Assets" means all assets of the Borrowers pledged and conveyed pursuant to the Leasehold Mortgages, the Security Agreements and the Allied Southeast Pledge Agreement.

"Post-Petition" means the time period beginning immediately upon the filing of the Chapter 11 Cases.

"Post-Petition Loan" means the Term Loan and Roll-Up Loan.

"Post-Petition Loan Documents" means this Loan Agreement, the Leasehold Mortgages, the Parent Guarantee, the Pledge Agreements, the Security Agreements, the Notes entered into in connection with the Post-Petition Loan, the Collateral Assignment, the Intercreditor Agreement, any other document entered into by Lender and any of the Borrowers or Parent in connection with the Post-Petition Loan, the Interim Order and the Final Order

"Post-Petition Obligations" means all Obligations incurred under or in connection with the DIP Facility, including, interest from and after the Petition Date at the applicable rate provided in accordance with Notes entered into after the Petition Date and all fees and expenses payable to the Lender pursuant to the Post-Petition Loan Agreement.

"Pre-Petition" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Pre-Petition Collateral" means all of the collateral subject to the security interests and other Liens granted to Lender by the Borrowers or Parent under Pre-Petition Loan Documents.

"Pre-Petition Defaults" has the meaning as set forth in Section 7.42.

15

"Pre-Petition Lender" has the meaning assigned to the term "Lender" in the Pre-Petition Loan Agreement, which is the Lender hereunder.

"Pre-Petition Loan" means the loan made to Borrowers under the Pre-Petition Loan Agreement"

"Pre-Petition Loan Agreement" has the meaning set forth in the Recitals.

"Pre-Petition Loan Documents" has the meaning assigned to the term "Loan Documents" in the Pre-Petition Loan Agreement.

"Pre-petition Loan Agreement Effective Date" means September 24, 2014.

"Pre-Petition Liens" means Liens securing the Pre-Petition Obligations.

"Pre-Petition Obligations" means all Obligations incurred under or in connection with the Pre-Petition Loan Documents, including, interest from and after the Petition Date at the applicable rate provided in accordance with Notes entered into prior to the Petition Date and all fees and expenses payable to the Pre-Petition Lender pursuant to the Pre-Petition Loan Agreement.

"Priming Liens" has the meaning set forth in Section 7.30(b).

"Project" has the meaning set forth in the Recitals.

"Recurring Revenues" means all fees, rents, issues, profits, income, revenues and receipts received by or on behalf of a Borrower on a recurring basis, including, without limitation, lease-to-IRU revenues, colocation revenues, power revenues and operations and maintenance revenues.

"Released Parties" has the meaning set forth in Section 7.34.

"Roll Up Loan" has the meaning given to such term in Section 3.1(b)(i).

"Sale" means the sale process which Borrowers shall conduct for the sale of substantially all of the their assets under Section 363 of the Bankruptcy Code and which shall be concluded and the consummation of the sale of substantially of Borrowers' assets shall have occurred by the Maturity Date.

"Schedule of Advances" shall mean the Schedule of Advances attached hereto as Exhibit G.

"Second Amendment" has the meaning set forth in the Recitals.

"Section 506(a) Determination" means a determination under Section 506(a) of the Bankruptcy Code.

"Secured Party Expenses" means all reasonable costs and expenses of Lender's counsel (including, without limitation, local counsel), financial advisors or other professionals, including (i) all reasonable out-of-pocket costs and expenses (including but not limited to reasonable fees

16

and expenses of counsel) (a) incurred by Lender arising from or relating to the negotiation, preparation, execution and delivery of this Loan Agreement and the other Loan Documents, (b) incurred by Lender arising from or relative to the administration or performance of this Loan Agreement and the other Loan Documents or any requested amendments, modifications, supplements, waivers or consents (without regard to whether any of the same is ultimately entered into or granted) to this Loan Agreement or any other Loan Document, and (c) incurred by Lender in connection with the enforcement or preservation of rights under this Loan Agreement or any other Loan Document, and (ii) all due-diligence, including but not limited to duplication or printing costs, consultation, travel, and attendance at court hearings (regardless of whether the Loan Agreement is consummated).

"Security Agreements" means collectively, the Allied Southeast Security Agreement, the Allied Florida Security Agreement and the Allied Georgia Security Agreement.

"Separateness Provisions" shall have the meaning set forth in Section 7.4.

"Short-Term Indebtedness" means Indebtedness with a term of less than one year or payable on demand.

"Subsidiaries" means, in respect of any Person, any corporation, association, joint stock company, limited liability company, partnership (whether general, limited or both), or business or statutory trust (in any case, whether now existing or hereafter organized or acquired), of which more than fifty percent (50%) of the outstanding voting Capital Securities or other ownership interest is owned either directly or indirectly by such Person and/or one or more of its Subsidiaries, or the management of which is otherwise controlled either directly or indirectly by such Person and/or one or more of its Subsidiaries. Unless otherwise specified to the contrary herein, the term Subsidiary(ies) shall refer to the Subsidiary(ies) of the Borrowers.

"Subordinated Debt" means any Indebtedness the payment of which is specifically subordinated to the payment of principal and interest under the Loan and any Lien securing same which is specifically subordinated to the Liens granted in the Loan Documents, and evidenced by a writing (including a court order) which contains provisions acceptable to Lender including the Subordinated Debt currently in place as disclosed on Schedule A-4.

"Substantial Completion" means when the Project has been successfully tested and is operational and the issuance of a press release or other communication, and delivery of notice to Lender, stating that the Jacksonville, Florida to Atlanta, Georgia segment of the Project is ready for service.

"Supplemental Advance" has the meaning set forth in Section 3.1(b)(i).

"Termination Date" shall mean the earliest to occur of: (a) twenty-eight (28) days after the Petition Date if the Final Order has not been entered; (b) the occurrence of an Event of Default under the Loan Documents or the acceleration of the obligations under the Loan Agreement; (c) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the Loan Agreement or is otherwise acceptable to the Lender; (d) the date which is the closing date of any Sale; (e) the entry of an order by the Bankruptcy Court granting (i) relief from the automatic stay permitting foreclosure of any assets of any Debtor with a value in excess of $100,000 in the

aggregate, (ii) any motion by the Lender to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers, or (iv) a  motion for the dismissal or conversion of the Chapter 11 Case; (f) the filing or support by any Debtor of a plan of reorganization that (i) does not provide for indefeasible payment in full, in cash of all obligations owing under the Loan Agreement; or (g) Maturity Date.

"Term Loan" has the meaning set forth in Section 3.1.

"Underlying Agreement" means any agreement between a Borrower and/or its affiliates, on the one hand, and owners of real or personal property, grantors of indefeasible rights of use, rights-of-way and other leases and licenses, on the other hand, with respect to all or a portion of the fiber optic cable network of the Borrowers and their affiliates and associated property or assets, including, without limitation, conduit and pole attachment agreements, easements, leases, franchises and other agreements necessary to construct, install, maintain, operate and repair such fiber optic cable network and other equipment and appurtenances thereto.  Such agreements as are currently in effect are set forth on Schedule A-5.

"Updated Budget" has the meaning set forth in Section 7.37(b).

"Variable Rate Indebtedness" means any portion of Indebtedness the interest rate on which has not been established at a fixed or constant rate to maturity.

"Variance Covenant Testing Period" has the meaning set forth in Section 7.37(c).

"Variance Testing Disbursements" means, with respect to any Variance Covenant Testing Period, the aggregate cash disbursements of the Borrowers during such period (other than (i) disbursements on account of professional fees and expenses and (ii) disbursements made with the consent of the Lender pursuant to orders of the Bankruptcy Court.

"Variance Testing Revenue" means, with respect to any Variance Covenant Testing Period, an amount equal to the aggregate cash receipts of the Borrower during such period (excluding proceeds of Loans).

"Weekly Actuals Report" has the meaning set forth in Section 7.37(a)].

**Section 1.2.    Rules of Construction.**

The following rules shall apply to the construction of this Loan Agreement unless the context otherwise requires:

(a)    Singular words shall connote the plural number as well as the singular and vice versa.

(b)    All references herein to particular articles or sections are references to articles or sections of this Loan Agreement unless otherwise indicated.

(c)    The headings and table of contents herein are solely for convenience of reference and shall not constitute a part of this Loan Agreement nor shall they affect its meaning, construction or effect.

(d)    Any accounting terms used in this Loan Agreement which are not specifically defined herein shall have the meanings customarily given them in accordance with GAAP. Calculations and determinations of financial and accounting terms used and not otherwise specifically defined hereunder and the preparation of financial statements to be furnished to Lender pursuant hereto shall be made and prepared, both as to classification of items and as to amount, in accordance with sound accounting practices and GAAP as in effect from time to time.

(e)    All other capitalized words and phrases used in this Loan Agreement and not otherwise specifically defined in this Loan Agreement or the other Loan Documents shall have the respective meanings assigned to such terms in the Uniform Commercial Code of the State of Delaware, or of such other jurisdiction as the context indicates, to the extent the same are used or defined therein.

[End of Article I]

## ARTICLE II
## REPRESENTATIONS

**Section 2.1.    Representations by Borrowers.**

The Borrowers, jointly and severally, make the following representations:

(a)    Each of the Borrowers is a limited liability company formed under the laws of the State of Delaware and has all requisite limited liability company power and authority to enter into, execute and deliver this Loan Agreement, the other Loan Documents to which it is a party, and any other instrument to be executed by it in connection herewith or therewith, to undertake the transactions contemplated hereby and thereby, and to carry out its obligations hereunder and thereunder, and has duly authorized the execution and delivery of this Loan Agreement, the other Loan Documents to which it is a party, and any other instrument to be executed by such Borrower in connection herewith or therewith.

(b)    The execution, delivery and performance by each Borrower of this Loan Agreement, the other Loan Documents to which it is a party, and any other instrument to be executed by it in connection herewith or therewith, and the consummation of the transactions contemplated hereby and thereby are within such Borrower's limited liability company powers, have been duly authorized by such Borrower by all necessary limited liability company action, do not (i) conflict with, contravene or violate any provision of the certificate of formation or operating agreement of such Borrower or, to the knowledge of such Borrower, any material law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to such Borrower, (ii) result in a breach of or constitute a material default under any bond, debenture, note or other evidence of indebtedness, indenture loan or credit agreement or any other material agreement, lease or instrument to which such Borrower is a party other than the Pre-Petition Loan Documents, whether directly or indirectly, or by which it or its properties may be bound or affected, or (iii) except as provided in or permitted by this Loan Agreement and the other Loan Documents to which it is a party, result in or require the creation of any material lien, security interest or other charge or encumbrance upon or with respect to any of such Borrower's properties, which conflict, contravention, violation, breach or lien would have a material adverse effect on such Borrower's ability to perform its obligations under this Loan Agreement or any other Loan Documents to which it is a party.

(c)    No consent of any Person, and no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body, is required for the valid or due execution, delivery and performance by any of the Borrowers of this Loan Agreement, any other Loan Documents to which any of them is a party, and any other instrument to be executed by them in connection herewith or therewith, other than such consents, authorizations, approvals or actions as have already been obtained or which cannot be obtained on the date hereof and are not required to be obtained on the date hereof or which the failure of which to obtain would not have a material adverse effect on any such Borrower's ability to perform its obligations under this Loan Agreement or the other Loan Documents to which it is a party. Each Borrower is in compliance in all material respects with all of the terms and conditions of each such consent, authorization, approval or action already obtained, has applied for each such consent, authorization, approval or action that may be applied for at this time, and has met or has made provisions adequate for meeting all requirements for each such consent, authorization, approval or action not yet obtained, except for those consents, authorizations,

20

approvals or actions which would not have a material adverse effect on such Borrower's ability to perform its obligations under this Loan Agreement or any of the other Loan Documents to which it is a party.

(d)    This Loan Agreement, the other Loan Documents, and any other instrument to be executed in connection herewith or therewith to which any of the Borrowers is a party, when executed and delivered by such Borrower, will be legal, valid and binding obligations of such Borrower enforceable against such Borrower in accordance with its respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and subject to equitable remedies and to the exercise of judicial discretion in appropriate cases.

(e)    There are no actions, suits or proceedings pending, or, to the knowledge of any Borrower, threatened in writing, at law or in equity before or by any court or administrative agency, against any Borrower which if determined adversely to such Borrower would, either individually or in the aggregate, materially adversely affect the transactions or obligations, and the consummation and performance thereof by such Borrower, contemplated by this Loan Agreement or any of the other Loan Documents to which it is a party, and any other instrument to be executed by such Borrower in connection herewith or therewith.

(f)    None of the Borrowers knows of any violation and has no written notice of a violation of any court order or of any law, regulation, ordinance, rule, order, code or requirement of any governmental authority having jurisdiction over all or any portion of the Project that may materially detrimentally affect the development and operation of the Project as planned.

(g)    Each of the Borrowers has obtained or will obtain all necessary material permits and approvals for the operation and maintenance of the Project and has complied and will continue to comply in all material respects with all material lawful requirements of any governmental body regarding the use or condition of the Project. Any Borrower may, however, contest any such requirement by an appropriate proceeding diligently prosecuted.

(h)    No event has occurred and is continuing, and no condition exists, which constitutes (or would, with the provision of notice or the passage of time, or both, constitute) an Event of Default.

(i)    Borrowers have filed or have had filed on their behalf all federal, state and other tax returns required to be filed in respect of all taxing periods prior to the date of this Loan Agreement (or has been granted extensions with respect to same), and have paid or have had paid on their behalf or made reasonable provision, in accordance with applicable laws for the payment of all taxes (if any) which have or may become due and payable pursuant to any such returns (or pursuant to any matters raised by audits). Borrowers have paid or caused to be paid or have had paid on their behalf all real and personal property taxes and assessments and other governmental charges lawfully levied or imposed on or against Borrowers or their property (other than those presently payable without payment of interest or penalty and those which are subject to contests initiated in good faith and diligently prosecuted and as to which adequate reserves have been provided).

(j)    The Borrowers do not intend to, and do not believe that they will, incur debts beyond their ability to pay as they mature, taking into account the timing of and amounts of cash

21

to be received by them and the timing of the amounts of cash to be payable on or in respect of its indebtedness.

(k)     The Loan is intended solely for business purposes, and no proceeds of the Loan shall be used for personal, family or household purposes.

(l)     Except as listed on Schedule 2.1, the Borrowers have no Subsidiaries.

(m)     The Borrowers have no debt (as defined in GAAP) other than Permitted Debt.

(n)     The Borrowers have no obligations under any Guaranty, except for the cross-guaranties provided in Section 10.8 hereof.

(o)     There are no security interests in, or liens, mortgages, or other encumbrances on, any of Borrowers' property or assets, except Permitted Encumbrances.

(p)     None of the Borrowers nor any Subsidiary has used Hazardous Materials on, in, under or otherwise affecting any real or personal property now or at any time owned, occupied or operated by the Borrowers or such Subsidiary or upon which the Borrowers or such Subsidiary has a place of business (collectively and severally the "Property") in any manner which violates any Environmental Law(s), to the extent that any such violation could result in a Material Adverse Effect.  None of the Borrowers nor any Subsidiary has ever received any notice of any violation of any Environmental Law(s), and to the best of the Borrowers' knowledge, there have been no actions commenced or threatened by any party against the Borrowers or any Subsidiary for non-compliance with any Environmental Law(s), which, in any case, could result in a Material Adverse Effect.

(q)     The Underlying Agreements and Construction Contracts are in full force and effect without any material default by the Borrowers.

(r)     Each Borrower hereby acknowledges, confirms and agrees that: (i) each of the Pre-Petition Loan Documents to which it is a party was duly executed and delivered to Lender and each is in full force and effect as of the date hereof, (ii) the agreements and obligations of Borrowers and/or the Parent contained in the Pre-Petition Loan Documents constitute the legal, valid and binding obligations of each Borrower or Parent, as applicable, enforceable against such Person in accordance with the terms thereof, and each Borrower and Parent has no valid defense, offset or counterclaim to the enforcement of such obligations, and (iii) Lender is and shall be entitled to all of the rights, remedies and benefits provided for in the Loan Documents , the Interim Order and the Final Order.

(s)     Each Borrower hereby acknowledges, confirms and agrees that this Loan Agreement and the transactions contemplated hereby modify the terms of the Obligations (as defined in the Intercreditor Agreement) and the Financing Documents (as defined in the Intercreditor Agreement), that the additional obligations to Lender incurred by the Borrowers hereunder do not affect in any manner the unconditional obligations of the Subordinating Lender (as defined in the Intercreditor Agreement) under the Intercreditor Agreement and that the Agent and Phoenix (each as defined in the Intercreditor Agreement) received notice of this Loan Agreement and the transactions contemplated hereby in accordance with Section 2(d) of the Intercreditor Agreement.

22

(t)      **Reorganization Matters.**

(i)      The Chapter 11 Cases were commenced on the Petition Date in accordance with Applicable Law and proper notice thereof and the proper notice was given for (i) the motion seeking approval of the Post-Petition Loan Documents and the Interim Order and Final Order, (ii) the hearing for the approval of the Interim Order, and (iii) the hearing for the approval of the Final Order.

(ii)      After the entry of the Interim Order, and pursuant to and solely to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out.

(iii)      After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien having the priority described in the Orders.

(iv)      The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been modified or amended without the consent of the Lender, or reversed or stayed.

(v)      The Approved Budget has been prepared in good faith by Borrowers, based on assumptions believed by Borrowers to be reasonable at the time such forecasts were prepared.

[End of Article II]

23

## ARTICLE III
## LOAN; USE OF PROCEEDS; REPAYMENT; OBLIGATIONS UNCONDITIONAL

**Section 3.1.    Loan.**

(a)    <u>Term Loan</u>. Upon the terms and conditions of this Loan Agreement, Lender shall lend to the Borrowers the principal amount of up to $4,467,966.00 (the "Term Loan"). The Term Loan shall be made in one or more advances, on a weekly basis, by depositing the proceeds thereof, less costs and expenses of Lender, including, without limitation, reasonable attorney's fees, in accordance with Section 3.5(k) hereof, in the accounts and in the amounts designated by the Borrowers and set forth in Schedule 3.1 hereto (collectively, the "Borrowers' Account"). The Term Loan shall be evidenced by the Note, the terms of which (including, without limitation, the terms relating to ranking, maturity, interest rate, payment, security and default) are incorporated herein by this reference and made a part hereof as if fully set forth herein. The Term Loan shall be repaid as set forth in the Note and shall bear interest at the Interest Rate. Amounts of the Term Loan paid or prepaid may not be reborrowed

(b)    <u>Roll Up Loan</u>.

(i)    On the terms and subject to the conditions contained in this Loan Agreement, the Lender agrees to make a roll up loan (the "Roll Up Loan") in Dollars to the Borrower after the Effective Date. Concurrent with the entry of the Final Order, all Pre-Petition Obligations outstanding as of the date of the first draw under the Term Loan, to the extent pertaining to or arising from amounts advanced to Borrowers under the Second Amendment (the "Supplemental Advance"), including the amounts set forth on the Schedule of Advances attached hereto as Exhibit G,  such amounts being equal to $2,675,611.00 will be converted on a dollar-for-dollar basis into the principal amount of the Roll Up Loan.  The repayment of all or part of a Term Loan will not reduce the amount of the outstanding Roll Up Loan.

(ii)    Upon the conversion of the Supplemental Advance into the Roll Up Loan as provided in the foregoing clause (i), such Supplemental Advance so converted shall be deemed satisfied under the Pre-Petition Loan Agreement.

(iii)    The Roll Up Loan shall have the benefit of Section 364(e) of the Bankruptcy Code.

(iv)    The Roll Up Loan shall be repaid as set forth in the Note and shall bear interest at the Interest Rate.  Amounts of the Roll Up Loan paid or prepaid may not be reborrowed.

(c)    <u>Pre-Petition Loan</u>. Each Borrower hereby acknowledges, confirms and agrees that, as of the date hereof, Borrowers are indebted to Lender in respect of the Pre-Petition Obligations in the aggregate amount of not less than $51,822,394.00, consisting of (i) Loans and other additional indebtedness incurred or monies advanced by Lender pursuant to the Pre-Petition Loan Documents in the aggregate principal amount of not less than $31,537,000.00 plus the Make Whole Amount of $19,674,757.00, together with accrued but unpaid interest thereon in the amount of $610,000.00, and (ii) all costs, expenses, fees (including attorneys' fees and legal expenses) and other charges now or hereafter owed by Borrowers to Lenders, all of which are

24

unconditionally owing by Borrowers to Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever. Amounts of the Pre-Petition Loan paid or prepaid may not be reborrowed.

### Section 3.2.    Use of Proceeds.

(a)    The Borrowers shall use the proceeds of the Loan (i) to finance and reimburse the cost of the development, acquisition, construction, installation and equipment of the Project, (ii) to pay trade payables, (iii) to establish and maintain the Interest Reserve, and (iv) for general corporate and other working capital purposes of the Borrowers. Notwithstanding the foregoing, the proceeds of the Post-Petition Loan shall be used solely for the following purposes (to the extent identified in the Approved Budget): (A) to fund post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 959; (B) to pay interest, fees and expenses to the Lender in accordance with the Loan Agreement (whether or not such amounts are reflected in the Approved Budget); (C) to fund fees and expenses incurred in connection with the Sale; (D) to pay permitted pre-petition claim payments and adequate protection payments, if any; (E) to pay professional fees and expenses; and (F) to pay certain other costs and expenses of administration of the Chapter 11 Case; provided, however, in no event shall the proceeds of the Post-Petition Loan shall be used (I) to permit the Debtors, or any other party-in-interest or their representatives, to challenge or otherwise contest or institute any proceeding to determine (y) the validity, perfection or priority of security interests granted in favor of the Lender under the Pre-Petition Loan Agreement or the Post-Petition Loan Agreement, or (z) the enforceability of the obligations of the Debtors or any guarantor under the Pre-Petition Loan Documents between the Debtors and the Lender or the Post-Petition Loan Documents, (II) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against the Lender and their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims relating in any way to the Debtors, the Pre-Petition Loan Documents and/or the Post-Petition Loan Documents, or (III) to fund acquisitions, dividends or distributions, employee or management bonuses, capital expenditures, capital leases, or any other similar expenditure, except as set forth in the Approved Budget.

(b)    Subject to Section 3.2, Borrowers may effect a disbursement of funds on deposit in the Borrower Account from time to time (each, a "Disbursement"), by delivering to Lender a written notice (each, a "Disbursement Notice") signed by the Borrowers, which shall be delivered to the Lender no later than 2 Business Days (or such shorter period as may be agreed to by Lender) prior to the date of the requested Disbursement. Each Disbursement Notice shall be irrevocable and shall set forth (i) that a Disbursement is requested by the Borrower, (ii) the date of the requested Disbursement (which shall be a Business Day not earlier than 2 Business Days after delivery, or such earlier date as may be agreed by Lender), (iii) the aggregate principal amount of such Disbursement and (iv) a certification by the Borrowers that (A) as of the date of the Disbursement Notice and the date of the Disbursement (before and after giving effect thereto) no Default or Event of Default shall have occurred and be continuing, and (B) the proceeds of the Disbursement are necessary to pay amounts due and owing by the Borrowers within 5 Business Days of such Disbursement and identifying the intended recipient of each payment, all of which amounts are payable in accordance with the Approved Budget (subject to permitted variance).

(c)    There shall be no more than one Disbursement in any calendar week.

(d)     Subject to Section 3.2(c) and the receipt by the Lender of a duly completed Disbursement Notice, the Borrowers shall fund each Disbursement from the Borrowers Account by way of wire transfer or other electronic funds transfer of the applicable funds to the intended recipients specified in the relevant Disbursement Notice, no later than 12:00 p.m. (New York time) on the proposed date of the Disbursement.

**Section 3.3.    Repayment of Loan; Obligations Unconditional.**

The Borrowers unconditionally agree that they will pay to Lender all of the outstanding Obligations on  or before the Maturity Date.  The obligations of the Borrowers to perform and observe their payment obligations and the other agreements on their part contained in this Loan Agreement shall be absolute and unconditional and shall not be subject to diminution by setoff, counterclaim, abatement or otherwise and, until such time as the principal of, interest and premium, if any, on the Loan and any other amounts due and owing hereunder (other than any contingent indemnification obligations not then due and owing) shall have been fully paid or provision for the payment thereof shall have been made, the Borrowers (i) will not suspend or discontinue, or permit the suspension or discontinuance of, any Loan Payments, (ii) will perform and observe all of their other agreements contained in this Loan Agreement, and (iii) will not terminate this Loan Agreement for any cause, including, without limiting the generality of the foregoing, failure to complete the Project, or any portion thereof, any acts or circumstances that may constitute failure of consideration, eviction or constructive eviction, destruction of or damage to the Project, commercial frustration of purpose, or any change in the tax or other laws or administrative rulings of or administrative actions by the United States of America or any State or any political subdivision of either.

**Section 3.4.    Recordation and Filing.**

(a)     Allied Florida or Lender, as determined by Lender, shall (a) record the Florida Leasehold Mortgage in the Official Records of the Florida Counties, and (b) file in the Florida Counties and the Florida Secured Transaction Registry such financing statements and continuation statements evidencing the security interest in the Pledged Assets owned by Allied Florida granted under the Florida Leasehold Mortgage and the Allied Florida Security Agreement in such form or forms required by the Uniform Commercial Code of the State of Florida.

(b)     Allied Georgia or Lender, as determined by Lender, shall (a) record the Georgia Leasehold Mortgage in the Official Records of the Georgia Counties, and (b) file in the Georgia Counties and the Georgia Superior Court Clerks' Cooperative Authority, or similar registry, if applicable, such financing statements and continuation statements evidencing the security interest in the Pledged Assets owned by Allied Georgia granted under the Georgia Leasehold Mortgage and the Allied Georgia Security Agreement in such form or forms required by the Uniform Commercial Code of the State of Georgia.

(c)     The Borrowers hereby authorize Lender to prepare and file any and all financing statements in favor of Lender with respect to such Borrower's Pledged Assets as shall be necessary to comply with applicable law. Allied Florida or Allied Georgia, as the case may be, shall cooperate with Lender in connection with any filing made pursuant to this Section and shall pay all fees, costs and expenses associated with such filings.

**Section 3.5.    Conditions Precedent.**

Lender shall not be required to consummate the transactions contemplated by this Loan Agreement or to disburse the proceeds of the Loan unless the conditions set forth in this Section 3.5 shall have been completed to Lender's satisfaction. Subject to any waivers or any agreement relating to post-closing deliveries between the Borrowers and Lender, the conditions set forth in this Section 3.5 shall be satisfied on or before the date hereof.

(a)    Each of the Borrowers shall have executed the Loan Documents (including any amendments, restatements or modifications to the Security Agreements and the Pledge Agreements prepared in connection with the DIP Facility) to which it is a party and shall have delivered the same to Lender. All of the Loan Documents shall be in full force and effect.

(b)    Each Borrower shall have provided Lender with a certificate from a duly authorized representative of such Borrower:  (i) attaching true and complete copies of such Borrower's Organizational Documents, and certifying that the same are in full force and effect and unmodified; (ii) attaching a resolution authorizing such Borrower's execution and delivery of this Loan Agreement and the other Loan Documents to which such Borrower is a party and its performance of its obligations under this Loan Agreement and the other Loan Documents to which it is a party, and confirming that such resolution is in full force and effect; and (iii) identifying the officers, members or managers of such Borrower who are authorized to execute and deliver this Loan Agreement for and on behalf of such Borrower, and providing specimen signatures for such officers, members or managers;

(c)    Reserved;

(d)    Lender shall have received fully executed originals of all of the Loan Documents.

(e)    Lender shall have received evidence of insurance naming Lender as lender as an additional insured and lender loss payee;

(f)    All Indebtedness of the Borrowers other than Indebtedness owing to Lender shall have been subordinated to Lender on terms and conditions satisfactory to Lender;

(g)    Reserved;

(h)    Lender shall have received certified copies of all Underlying Agreements and Construction Contracts;

(i)    All necessary filings shall have been made with respect to all Pledged Assets, as determined by Lender;

(j)    Lender shall have received an opinion of the counsel of the Borrowers and Guarantor in form satisfactory to Lender;

(k)    Reserved; and

(l)    the Interim Order shall be entered and in full force and effect and shall not have been appealed, stayed, reversed, vacated or otherwise modified without the consent of the Lender;

(m)    the Lender shall have received all financial information and projections regarding the Debtors requested by Lender and a cash forecast for the period from the Petition Date through the Maturity Date setting forth projected cash flows and disbursements, to be in form, scope and substance acceptable to the Lender and in the form attached hereto as Exhibit H (the "**Approved Budget**");

(n)    evidence that all DIP Liens created pursuant to the Security Agreements or the Interim Order have been duly perfected and registered in all Relevant Jurisdictions and any other relevant jurisdiction as required by the Lender; and

(o)    evidence of the entry by the Bankruptcy Court of all "first day orders" entered at or about the time of the commencements of the Chapter 11 Cases each in form and substance reasonably satisfactory to the Lender;

(p)    satisfaction of Lender with respect to (i) all adequate protection payments, critical vendor payments and all other material motions and orders filed in the Chapter 11 Cases that require the expenditure of Debtors' cash, (ii) the continuation of the Debtors' cash management system, and (iii) the Debtors retention of the Financial Advisor and the Chief Restructuring Officer with authority to make all decisions necessary to administer the Chapter 11 Cases and to consummate the Sale (subject to the approval of the Manager of each Debtor); and

(q)    the notice contemplated by Section 2(d) of the Intercreditor Agreement shall have been provided by Lender to Agent and Phoenix (each as defined in the Intercreditor Agreement).

All of the foregoing conditions are imposed for the benefit of Lender. No party other than Lender shall have standing to require the satisfaction of any such conditions, and no party shall be entitled to assume that Lender would refuse to make advances of Loan proceeds if any one or more of such conditions were to remain unfulfilled. No party other than Lender shall be or be deemed to be the beneficiary of any such conditions; any one or more, or all, of such conditions may be waived if Lender shall deem it advisable to do so.

**Section 3.6.    Additional Costs; Regulatory Change.**

(a)    Notwithstanding any conflicting provision of this Loan Agreement to the contrary, if any applicable law or regulation not in effect as of the date hereof shall (i) subject Lender to any tax, levy, impost, duty, charge, fee, deduction or withholding of any nature with respect to the Loan, this Loan Agreement, any Note, or any other Loan Document or the payment by the Borrowers of any amounts payable to Lender with respect to the Loan, this Loan Agreement, any Note, or any other Loan Document; or (ii) materially change the basis of taxation of payments to Lender of the principal of or the interest on the Note or any other amounts payable to Lender under this Loan Agreement or any other Loan Document; or (iii) impose on Lender any other condition or requirement with respect to this Loan Agreement, any Note or any other Loan Document, and if the result of any of the foregoing is (A) to increase the cost to Lender of making, funding or maintaining all or any part of the principal of any of the Loan, or (B) to reduce the amount of principal, interest or any other sum payable by the Borrowers to Lender under this Loan Agreement, the Note or any other Loan Document, or (C) to require Lender to make any payment or to forego any interest or other sum payable by the Borrowers to Lender under this Loan Agreement, the Note or any other Loan Document, the amount of which payment or foregone interest or other sum is measured by or calculated by

reference to the gross amount of any sum receivable or deemed received by Lender from the Borrowers under this Loan Agreement, the Note or any other Loan Document, then, and in each such case, the Borrowers will pay to Lender, within ten (10) days of written notice, such additional amounts as will be sufficient to compensate Lender for such additional cost, reduction, payment or foregone interest or other sum. Anything in this paragraph to the contrary notwithstanding, the foregoing provisions of this paragraph shall not apply in the case of any additional cost, reduction, payment or foregone interest or other sum resulting solely from or arising solely as a consequence of any taxes charged upon or by reference to the overall net income, profits or gains of Lender.

(b)     If any present or future applicable law shall make it unlawful for the Borrowers to perform any of their agreements or obligations under this Loan Agreement, any Note or any other Loan Document, and Lender shall reasonably determine (which determination shall be conclusive and binding on Borrowers) (i) that as a consequence of the effect or operation (whether direct or indirect) of any such applicable law, any of the rights, remedies, powers or privileges of Lender under or in respect of this Loan Agreement, the Note or any other Loan Document shall be or become invalid, unenforceable or materially restricted such that Lender is unable to practically realize the material benefits included therein; and (ii) that as a result thereof Lender is unable to practically realize the material benefits included in the Loan Documents, then Lender may, by giving notice to the Borrowers, declare all of the Indebtedness owing by the Borrowers to it, including, without limitation, the entire unpaid principal of the Note, all of the unpaid interest accrued on the Note and any and all other sums due and payable by the Borrowers to Lender under this Loan Agreement, the Note and any other Loan Document, to be immediately due and payable, and, thereupon, such amounts shall (if not already due and payable) forthwith become and be due and payable without further notice or other formalities of any kind, all of which are hereby expressly waived.

### Section 3.7.    Indemnification for Losses.

Without derogating from any of the other provisions of this Loan Agreement or any other Loan Document, the Borrowers hereby absolutely and unconditionally agree to indemnify Lender and its officers, directors, employees and agents (including all of their professionals), upon demand at any time and as often as the occasion therefor may require, against any and all claims, demands, suits, actions, damages, losses, costs, expenses (including, without limitation, reasonable attorneys' fees) and all other liabilities whatsoever which Lender or any of its directors, officers, employees or agents (including any of such Person's professionals) may sustain or incur as a consequence of or arising out of (a) any failure by the Borrowers to pay any amount payable under this Loan Agreement, the Note or any other Loan Document as and when such amount shall first have become due and payable (giving effect, however, to expiration of the period of grace (if any) applicable thereto), or (b) the acceleration of the maturity of any of the Indebtedness owing by the Borrowers to Lender, (c) any failure by the Borrowers to perform or comply with any of the terms and provisions of this Loan Agreement, the Note or any other Loan Document to which the Borrowers, or any of them, are a party, (d) any investigation, litigation or proceeding arising out of or relating to or in connection with the Loan Documents, (f) any obligation, or any act, event or transaction related or attendant to the Loan Documents or any use or intended use of the proceeds of the Loan Agreement, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Such claims, demands,

suits, actions, damages, losses, costs or expenses shall include, without limitation (a) any costs incurred by Lender in carrying funds to cover any overdue principal, overdue interest or any other overdue sums payable by the Borrowers under this Loan Agreement, the Note, or any other Loan Document; (b) any interest payable by Lender to the lenders of the funds borrowed by Lender in order to carry the funds referred to in clause (a) of this Section; and (b) any losses (but excluding losses of anticipated profit) incurred or sustained by Lender in liquidating or re-employing funds acquired from third parties to make, fund or maintain all or any part of the Loan.

### Section 3.8.    Statements by Lender.

A statement signed by an officer of Lender setting forth any additional amount required to be paid by the Borrowers under Sections 3.6 or 3.7 of this Loan Agreement shall be submitted by Lender to the Borrowers in connection with each demand made at any time by Lender under either such Section.  A claim by Lender for all or any part of any additional amounts required to be paid by the Borrowers under such Sections may be made before or after any payment to which such claim relates.  Each statement shall, in the absence of manifest error, constitute conclusive evidence of the additional amount required to be paid to Lender.

### Section 3.9.    Reserved.

### Section 3.10.  Liquidity Loan.

Lender has advanced to the Borrowers additional Loans on the dates and in the amounts set forth on the Schedule of Advances.  The advances of the Loan under this Section 3.10 are evidenced by a Note dated as of the date of the Second Amendment, the terms of which (including without limitation, the terms relating to ranking, maturity, interest rate, payment security and default) are incorporated herein by this reference and made a part hereof as if fully set forth herein. The Loan shall be repaid as set forth in the Note and in accordance with this Loan Agreement.

[End of Article III]

## ARTICLE IV
## PAYMENTS ON THE LOAN; TAX COVENANTS SECTION

### Section 4.1.   Payment Obligations of the Borrowers.

The Borrowers, jointly and severally, (a) acknowledge and agree that the obligations of the Borrowers hereunder are joint and several general obligations of the Borrowers, and (b) pledge their full faith and credit for the payment of all amounts payable by them hereunder, including, without limitation, the Loan Payments.

### Section 4.2.   Nature of Borrower's Obligation.

Subject to the limitations otherwise contained herein, the obligation of the Borrowers to make the Loan Payments and other payments described in Section 4.1 pursuant to this Loan Agreement, and to observe and perform all other covenants, conditions and agreements hereunder, shall be absolute and unconditional, irrespective of any rights of setoff, recoupment or counterclaim they, or any of them, might otherwise have against Lender or any other Person, and, subject to the prepayment of the Loan as permitted by Article IX hereof, the Borrowers shall not suspend or discontinue any payment hereunder or fail to observe and perform any of their other covenants, conditions or agreements hereunder for any cause, including, without limitation, any acts or circumstances that may constitute an eviction or constructive eviction, failure of consideration, loss of the Borrowers' leasehold interest in any part or all of the Project or commercial frustration of purpose, or any damage to or destruction or condemnation of all or any part of the Project, or any change in the tax or other laws of the United States of America, any State or any political subdivision of either, or any failure of Lender to observe and perform any covenant, condition or agreement, whether express or implied, or any duty, liability or obligation arising out of or in connection with this Loan Agreement.

### Section 4.3.   Advances by Lender.

If the Borrowers fail to make any payment or perform any act required of them hereunder, Lender, in consultation with Borrowers (unless an Event of Default has occurred and is continuing) and without waiving or releasing any obligation or default on the part of the Borrowers hereunder, may (but shall be under no obligation to) make such payment or perform such act. All amounts so paid by Lender and all costs, fees and expenses so incurred shall be payable by the Borrowers on demand as an additional obligation hereunder.

[End of Article IV]

31

## ARTICLE V
## MAINTENANCE, TAXES, INSURANCE AND PROJECT COVENANTS

**Section 5.1.    Maintenance and Modifications of Project.**

(a)    The Borrowers agree that, while any portion of the Loan is outstanding, they will at their own expense, (i) keep the Project or cause the Project to be kept in as reasonably safe condition as its operations shall permit, (ii) make or cause to be made from time to time all necessary repairs thereto and renewals and replacements thereof and otherwise keep the Project in good repair and in good operating condition, normal wear and tear excepted, and (iii) not permit or suffer others to commit a nuisance on or about the Project. The Borrowers shall pay or cause to be paid all costs and expenses of operation and maintenance of the Project.

(b)    The Borrowers may, at their own expense, make from time to time any additions, modifications or improvements to the Project that they may deem desirable for their business purposes and that do not materially impair the effective use or decrease the value of the Project.

(c)    The Borrowers shall (i) comply in all material respects with all laws, rules and regulations of any governmental body applicable to the condition or operation of the Project, whether existing or later enacted or foreseen or unforeseen and whether involving any change in governmental policy or requiring structural or other changes to the Project; and (ii) provide all equipment, furnishings, supplies and other personal property required for the proper use, maintenance and operation of the Project, consistent with standards of operation and administration generally acceptable for comparable facilities.

(d)    Reserved.

(e)    Reserved.

(f)    The Borrowers represent that, as of the date hereof, they have entered into Underlying Agreements and Construction Contracts sufficient to enable them to complete the primary backbone of the Project. Nothing contained herein shall prohibit the Borrowers, or any of them, from entering into such additional or different Underlying Agreements or Construction Contracts as they, or any of them, deem necessary, desirable or appropriate in connection with the operation and maintenance of the Project.

**Section 5.2.    Taxes, Other Governmental Charges and Utility Charges; Mechanics' and Other Liens.**

(a)    The Borrowers shall pay, as the same respectively become due, (i) all taxes, assessments, levies, claims and charges of any kind whatsoever that may at any time be lawfully assessed or levied against or with respect to the Project (including, without limiting the generality of the foregoing, any tax upon or with respect to the income or profits of the Borrowers from the Project and that, if not paid, would become a charge on the payments to be made under this Loan Agreement prior to or on a parity with such payments and including ad valorem, sales and excise taxes, assessments and charges upon the Borrowers' interest in the Project), (ii) all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of the Project, and (iii) all assessments and charges lawfully made by any governmental body for public improvements that may be secured by the Project.

(b)    Any Borrower may, at its expense, contest in good faith any such levy, tax, assessment, claim or other charge, but such Borrower may permit the items so contested to remain undischarged and unsatisfied during the period of such contest and any appeal therefrom only if in the written opinion of counsel to such Borrower by non-payment of any such items, the rights of Lender with respect to this Loan Agreement or any part of the payments to be made under this Loan Agreement will not be materially endangered, nor will the Project or any part thereof be subject to loss or forfeiture or any lien. If such Borrower is unable to deliver such an opinion of counsel, such Borrower shall promptly pay or bond and cause to be satisfied or discharged all such unpaid items or furnish, at the expense of the Borrower, indemnity satisfactory to Lender; but provided further, that any tax, assessment, charge, levy or claim shall be paid forthwith upon the commencement of proceedings to foreclose any lien securing the same. Lender, at the expense of the Borrower, will cooperate fully in any such permitted contest.

(c)    If the Borrowers shall fail to pay any of the items required to be paid by them pursuant to (a) above, Lender may (but shall be under no obligation to) pay the same, and any amounts so advanced therefor by Lender shall become an additional obligation of the Borrowers to Lender. The Borrowers agree to reimburse any such amounts on demand therefor.

(d)    The Borrowers shall furnish Lender, upon request, with proof of payment of any taxes, governmental charges, utility charges, insurance premiums or other charges required to be paid by the Borrowers under this Loan Agreement.

### Section 5.3.    Insurance.

(a)    While any portion of the Loan is outstanding, the Borrowers will keep the Project properly and continuously insured against such risks as are customarily insured against by businesses engaged in the same or similar operations, including, without limiting the generality of the foregoing:

(i)    casualty insurance on the Project in an amount not less than the full insurable value of all property located at, and all improvements to, the Project, against loss or damage by fire and lightning and other hazards ordinarily included under uniform broad form of extended coverage endorsement at the time in use in the State of Florida or Georgia, as applicable;

(ii)    general comprehensive liability insurance against claims for bodily injury, death or property damage occurring on, in or about the Project (such coverage to include provisions waiving subrogation against Lender) in amounts no less than $1,000,000 with respect to bodily injury to any one Person, $1,000,000 with respect to bodily injury to two or more persons in any one accident and $1,000,000 with respect to property damage resulting from any one occurrence; and

(iii)    liability insurance with respect to the Project under the workers' compensation laws of the States of Florida or Georgia, as applicable; provided, however, that the insurance so required may be provided by blanket policies or under a self-insurance program now or hereafter maintained by the Borrowers.

(b)    The insurance required under subsection (a) above may be maintained by (i) Parent on behalf of its subsidiaries, including the Borrowers, and (ii) the maintenance of a self-

insurance plan so long as any such plan provides for (x) the establishment by the Borrowers, or any of them, of a separate segregated self-insurance fund funded in an amount determined (initially and on at least an annual basis) by an insurance or actuarial consultant employing accepted actuarial techniques, and (y) the establishment and maintenance of a claims processing and risk management program.  No later than ninety (90) days after the end of each Fiscal Year of the Borrowers, the Borrowers shall cause an insurance or actuarial consultant to submit a report to Lender to the effect that any such self-insurance plan is maintaining adequate reserves and has been adequately funded.

**Section 5.4.    General Requirements Applicable to Insurance.**

(a)    Each insurance policy obtained in satisfaction of the requirements of Section 5.3 hereof:

(i)    shall be by such insurer (or insurers) as shall be financially responsible, qualified to do business in the State of Florida or Georgia, as applicable, and have an A.M. Best Company, Inc. rating of at least A-/VIII;

(ii)    shall be in such form and have such provisions (including, without limitation, the lenders long-form loss payable clause, the waiver of subrogation clause, the deductible amount, if any, and the standard mortgagee endorsement clause), as are generally considered standard provisions for the type of insurance involved;

(iii)    shall prohibit cancellation or substantial modification, termination or lapse in coverage by the insurer without at least thirty (30) days prior written notice by the insurer or a Borrower to Lender;

(iv)    shall provide that losses thereunder, prior to the occurrence of an Event of Default (or event which, with notice or lapse of time or both, would constitute an Event of Default) hereunder shall be adjusted with the insurer by the applicable Borrower at its expense on behalf of the insured parties and the decision of the Borrower as to any adjustment shall be final and conclusive; and

(v)    without limiting the generality of the foregoing, all insurance policies carried on the Project, except with respect to workers' compensation, shall name the applicable Borrower and Lender as parties insured thereunder as the respective interests of each of such parties may appear on a certificate of insurance adding Lender as an insured party thereunder as its interests may appear, and any loss thereunder shall be made payable and shall be applied as provided in Section 6.2 hereof.

(b)    Prior to expiration of any such policy or upon renewal, the applicable Borrower shall furnish Lender with evidence that the policy or certificate has been renewed or replaced in compliance with this Loan Agreement or is no longer required by this Loan Agreement.

**Section 5.5.    Advances by Lender.**

In the event the Borrowers shall fail to maintain, or cause to be maintained, the full insurance coverage required by this Loan Agreement, Lender may (but shall be under no obligation to), after thirty (30) days written notice to the Borrowers, contract for the required

policies of insurance and pay the premiums on the same; and the Borrowers agree to reimburse Lender to the extent of the amounts so advanced to them, or any of them.   In the event the Borrowers shall fail to keep or cause to be kept the Project in good repair and good operating condition, Lender may (but shall be under no obligation to), after thirty (30) days written notice to the Borrowers (except in the event of an emergency or if necessary to preserve Borrowers' leasehold estate), make any required repairs, renewals and replacements; provided, however, if any repairs, renewals or replacements are not susceptible of being completed within thirty (30) days, if the Borrowers commence such repairs, renewals and replacements within such 30-day period and diligently prosecute such actions to completion thereafter, Lender will not be entitled to make such required repairs, renewals and replacements, unless such actions are necessary in an emergency or to preserve Borrowers' leasehold estate and the Borrowers agree to reimburse Lender to the extent of the amounts so advanced to them, or any of them. Any amounts so advanced by Lender shall become an additional obligation of the Borrowers, shall be payable on demand, and shall be deemed a part of the obligation of the Borrowers.

**Section 5.6.    Self-Insurance for Deficiency in Insurance Coverage.**

The Borrowers agree that, to the extent that subsequent to the date hereof, they are unable to obtain the insurance required by Sections 5.3 and 5.4 hereof, they shall meet the requirements for self-insurance set forth in Section 5.3(b) above.

[End of Article V]

## ARTICLE VI
## DAMAGE, DESTRUCTION, CONDEMNATION AND OTHER LOSS OF LEASEHOLD
## INTEREST

**Section 6.1.    The Borrowers To Give Notice.**

In case of any material damage to or destruction of any part of the Project, the Borrowers shall give prompt notice thereof to Lender. In case of a taking of all or any part of the Project or any right therein under the exercise of the power of eminent domain or any loss thereof because of loss of the Borrowers' leasehold interest therein or the commencement of any proceedings or negotiations that might result in such a taking or loss, the Borrowers shall give prompt notice to Lender. Each such notice shall describe generally the nature and extent of such damage, destruction, taking, loss, proceedings or negotiations.

**Section 6.2.    Damage, Destruction, Condemnation or Loss of Leasehold Interest.**

If all or any part of the Project is destroyed or damaged by fire, flood or other casualty, or if the use of all or any part of the Project is taken under the exercise of the power of eminent domain or lost because of the Borrowers' loss of its leasehold interest therein, the Borrowers shall, at their expense, restore the Project to the condition in which it existed prior to such casualty or condemnation. Notwithstanding the foregoing, provided no Event of Default has occurred or is continuing, after receipt of the written consent of Lender, the Borrowers may apply the Net Proceeds of insurance and any condemnation award received by it on account of any such damage, destruction or loss to one or more of the following:

(a)    The replacement, repair, rebuilding or restoration of property damaged, destroyed or lost so that the Project shall be substantially the same as before such damage, destruction or loss, with such alterations and additions as the Borrowers may determine and as will not impair the capacity or character of the Project for the purpose for which it is then being used or is intended to be used, and so long as this Loan Agreement is in effect, shall comply with such agreement; or

(b)    The acquisition and/or construction by the Borrowers of real and/or personal property that (i) together with any remaining parts of the Project, in the opinion of the Borrowers, will give the Project a revenue producing capability not less than that of the Project prior to such taking or loss, (ii) is suitable for the Borrowers' operations, (iii) is free and clear of all liens and encumbrances of any kind except Permitted Encumbrances, and (iv) is available for use by the Borrowers without the requirement of any payment other than as provided in this Loan Agreement or the Leasehold Mortgages; or

(c)    The prepayment of the Loan in accordance with Section 9.1 hereof; or

(d)    Some combination of the uses set forth in the above clauses.

The Borrowers shall not by reason of the payment of the cost of replacement, repair, rebuilding or restoration be entitled to any reimbursement from Lender or to any abatement or diminution of the Loan Payments or other amounts payable under this Loan Agreement. Real and personal property acquired pursuant to this Section shall become part of the Project, and the

Borrowers shall take all steps necessary to subject such property to the lien of the Leasehold Mortgages and the Security Agreements.

[End of Article VI]

## ARTICLE VII
## SPECIAL COVENANTS

**Section 7.1.    Inspection of Project and Books.**

Provided they abide by all rules and regulations imposed by the owner of any real property comprising part of the Project or by the Borrowers (including, without limitation, rules and regulations pertaining to safety), Lender and its duly authorized agents shall have the right, during normal business hours, and prior to and during the continuance of an Event of Default, upon written notice, and without unreasonable interference with the activities of the Borrowers in the Project, to enter any part of the Project and to examine and inspect the same and to examine the books, records and accounts of the Borrowers.

**Section 7.2.    Maintenance of Existence.**

(a)    The Borrowers shall maintain their existence as limited liability companies under the laws of the State of Delaware, and shall not dissolve or otherwise dispose of all or substantially all of their assets, or consolidate with or merge into another company or corporation or permit one or more other companies or corporations to consolidate with or merge into them without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed.

**Section 7.3.    Financial Statements and Certificate of No Default.**

(a)    The Borrowers shall provide Lender with copies of the following items:

(i)    Within sixty (60) days after the end of each quarter of each Fiscal Year of the Borrowers', unaudited quarterly consolidated financial statements of the Borrowers' operations; and

(ii)    Within one hundred twenty (120) days after the end of each Fiscal Year, the audited consolidated financial statements of Allied Southeast and its subsidiaries (including Allied Florida and Allied Georgia) and an independent certified public accountant's report thereon; provided however, that the audited financial statements for the Fiscal Year ended December 31, 2015 and the independent certified public accountant's report thereon shall be provided by June 30, 2016.

(b)    Concurrently with the delivery of such audited financial statements required pursuant to paragraph (a)(ii) above, the Borrowers shall deliver to Lender a certificate, substantially in the form of Exhibit D hereto, executed by an Authorized Representative of the Borrowers indicating whether or not the Borrowers are aware of any condition, event or act which constitutes an Event of Default hereunder or under any other Loan Document, or which would constitute an Event of Default hereunder or under any other Loan Document with the giving of notice or passage of time, or both.

(c)    Beginning with the fiscal quarter of the Borrowers ended March 31, 2016, concurrently with the delivery of such unaudited financial statements required pursuant to paragraph (a)(i) above, the Borrowers shall deliver to the Lender a Compliance Certificate

38

executed by an Authorized Representative of the Borrowers substantially in the form of Exhibit E hereto.

(d)     Reserved.

**Section 7.4.    Single Purpose.**

The Borrowers shall conduct no activities other than to acquire, develop, construct, own, operate, dispose of and otherwise deal in all respects with the Project, and to engage in such other activities related to the foregoing as may be necessary, advisable or convenient to the promotion or conduct of the business of the Borrowers that are related or incidental to the Project.  Notwithstanding anything to the contrary in the Loan Documents or in any other document governing the formation, management or operation of the Borrowers, none of the Borrowers shall (a) guarantee any obligation of any Person, including any affiliate, or become obligated for the debts of any other Person or hold out its credit as being available to pay the obligations of any other Person (other than the cross-guaranties provided in Section 10.8 hereof); (b) engage, directly or indirectly, in any business other than as required or permitted to be performed under this Section; (c) incur, create or assume any indebtedness or liabilities other than the Loan, unsecured trade payables incurred in the ordinary course of its business or as otherwise expressly permitted under this Loan Agreement (including Section 7.6 hereof); (d) make or permit to remain outstanding any loan or advance to, any Person or entity other than advances to employees for ordinary and necessary business expenses; (e) to the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, sale or other transfer of any of its assets outside the ordinary course of the Borrowers' business (other than the Sale); (f) form, acquire or hold any subsidiary (whether corporate, partnership, limited liability company or other) or own any Capital Securities in any other entity (other than the ownership by Allied Southeast of the Capital Securities in Allied Florida and Allied Georgia); or (g) own any material assets or properties other than the Project and incidental personal property necessary for the ownership or operation of the Project. In order to maintain its status as a separate entity and to avoid any confusion or potential consolidation with any affiliate, each of the Borrowers represents and warrants with respect to itself that in the conduct of its operations, except with respect to any programs designed for marketing or advertising undertaken by Parent on behalf of its affiliates, it will observe the following covenants (collectively, the "**Separateness Provisions**"): (i) maintain books and records and bank accounts separate from those of any other Person; (ii) maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets; (iii) comply with all organizational formalities necessary to maintain its separate existence; (iv) hold itself out to creditors and the public as a legal entity separate and distinct from any other Person; (v) maintain separate financial statements, showing its assets and liabilities separate and apart from those of any other the Person and not have its assets listed on any financial statement of any other Person except that each Borrower's assets may be included in a consolidated financial statement of its affiliates so long as appropriate notation is made on such consolidated financial statements to indicate the separateness of such Borrower from such affiliates and to indicate that the Borrower's assets and credit are not available to satisfy the debts and other obligations of such affiliates or any other Person; (vi) allocate and charge fairly and reasonably any common employee or overhead shared with affiliates; (vii) not enter into any transaction with any affiliate, except on an arm's-length basis on terms which are intrinsically fair and no less favorable than would be available for unaffiliated third parties, (viii) conduct business in its own name; (ix) not commingle its assets or

39

funds with those of any other Person; (x) not assume, guarantee or pay the debts or obligations of any other Person (other than the cross-guarantees provided in Section 10.8 hereof); (xi) correct any known misunderstanding as to its separate identity; (xii) not permit any affiliate to guarantee or pay its obligations (other than guarantees and indemnities set forth in the Loan Documents); (xiii) pay its liabilities and expenses out of and to the extent of its own funds; (xiv) prepare and file its own tax returns separate and apart from those of any Person to the extent required by applicable law; and (xv) maintain adequate capital in light of its contemplated business purpose, transactions and liabilities; provided, however, that the foregoing shall not require any equity owner to make additional capital contributions to the Borrowers.  Nothing in this Section 7.4 is intended to prohibit or restrict the Borrowers from participating in programs provided by Parent or any other affiliate for the benefit of all affiliated entities, including without limitation, marketing and advertising programs, insurance programs, the sharing of employees and overhead expenses and employee benefit programs; provided that the costs of such programs are allocated on a fair and reasonable basis.  The Borrowers covenant and agree to incorporate the provisions contained in this Section into their organizational documents and the Borrowers agree not to amend or modify or otherwise change their organizational documents with respect to the provisions of this Section.  Failure of the Borrowers to comply with any of the covenants contained in this Section or any other covenants contained in this Loan Agreement shall not affect the status of each Borrower as a separate legal entity.

**Section 7.5.    Indemnification.**

The Borrowers hereby agree to reimburse and indemnify Lender and each of its officers and directors (collectively, the "Indemnified Parties") from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened (including the Chapter 11 Cases), whether or not such Indemnified Party shall be designated a party thereto) that may at any time be imposed on, asserted against or incurred by such Indemnified Party as a result of, or arising out of, or in any way related to or by reason of, this Loan Agreement or any other Loan Document or any transaction from time to time contemplated hereby or thereby, but excluding any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements resulting solely from the gross negligence or willful misconduct of such Indemnified Party, as finally determined by a court of competent jurisdiction.

**Section 7.6.    Additional Indebtedness.**

So long as any portion of the Loan remains outstanding, none of the Borrowers shall incur any Additional Indebtedness except for Permitted Debt.

**Section 7.7.    Interest Reserve.**

The Borrowers shall establish and maintain the Interest Reserve in accordance with the requirements of the definition thereof and Section 7.8(a) hereof.

### Section 7.8.    Financial Covenants.

The Borrowers shall not breach or fail to comply with any of the following financial covenants:

(a)    beginning with the fiscal quarter of the Borrowers ended September 30, 2016, the Borrowers shall have on a consolidated basis as of the last day of each such fiscal quarter, an Interest Coverage Ratio of not less than 2.00 to 1.00.  In the event the Interest Coverage Ratio is less than 2.00 to 1.00 as of the end of any such quarter, the Borrowers shall maintain the Interest Reserve until the end of the next quarter such that the sum of the amount held in reserve and the Borrowers' annualized Recurring Revenues as of the determination date equals two times the interest paid or required to be paid in cash (net of interest received in cash) by the Borrowers in respect of the Loan for the four fiscal quarters of the Borrowers ending on such date;

(b)    beginning with the fiscal quarter of the Borrowers ended September 30, 2016, the Borrowers shall have on a consolidated basis as of the last day of each such fiscal quarter, a Current Ratio of not less than 2.00 to 1.00; and

(c)    beginning on the last day of the fiscal year of the Borrowers ended immediately following the date of Substantial Completion of the Project,  the Borrowers shall have on a consolidated basis as of the last day of each such fiscal year, an Asset Coverage Ratio of not less than 2.00 to 1.00.

### Section 7.9.    Compliance with Applicable Law.

Each Borrower shall, and shall cause each of its Subsidiaries to, comply with all Applicable Law, and will promptly notify Lender in the event that such Borrower or any of its Subsidiaries receives any notice, claim or demand from any Governmental Authority asserting the violation of any Applicable Law which could reasonably be expected to have a Material Adverse Effect upon the Borrowers and their Subsidiaries taken as a whole.  Such Borrowers may contest the propriety or the applicability of any Applicable Law, provided (a) that such Borrower shall provide Lender with written notice of such contest; (b) that such contest shall be initiated in good faith in accordance with the appropriate legal or administrative procedure therefor and diligently prosecuted to a timely completion; (c) that such contest shall not, in Lender's judgment, jeopardize the security for the Loans or subject a material portion of such Borrowers' assets to imminent risk of loss or forfeiture; and (d) the Borrowers shall indemnify Lender from and against any and all liability, loss, cost, damage and expense which may be incurred by or asserted against Lender in connection with or arising from such contest.

### Section 7.10.    Notice of Litigation.

The Borrowers shall furnish or cause to be furnished to Lender within 10 business days after any Borrower or any of their Subsidiaries shall have first become aware of the same, a written notice identifying, and describing the Borrowers' or such Subsidiary's proposed response to the commencement or institution of any legal or administrative action, suit, proceeding or investigation by or against such Borrower or such Subsidiary in or before any court, governmental or regulatory body, agency, commission or official, board of arbitration or arbitrator which could reasonably be expected to have a Material Adverse Effect on the Borrowers and their Subsidiaries taken as a whole.  For the purposes of this Loan Agreement,

any such litigation or other matter in which the sum in dispute is $100,000 or more will be deemed to be material.

### Section 7.11.  Notice of Other Events.

(a)    If (and on each occasion that) any Event of Default shall occur, the Borrowers shall, promptly after becoming aware of the same, furnish Lender with a written notice specifying the nature of such Event of Default and describing the Borrowers' proposed response thereto.

(b)    Immediately upon the Borrowers first becoming aware of any of the following occurrences, the Borrowers will notify Lender in writing of: (i) the insolvency or bankruptcy of any Borrower, any Subsidiary or Parent; (ii) the rescission, cancellation or termination of, or the occurrence of a breach, default or event of default, under or with respect to any agreement or contract to which any of the Borrowers or any of their Subsidiaries is a party, which is material to the Borrowers and their Subsidiaries taken as a whole; (iii) any events of default under any Underlying Agreement or Construction Contract; or (iv) any events of default under any agreement to which any of the Borrowers and any of their Subsidiaries is a party which is material to the Borrowers and their Subsidiaries taken as a whole or any violations of any laws, regulations, rules or ordinances of any governmental or regulatory body, the violation of which would have a Material Adverse Effect.

### Section 7.12.  Payment of Taxes and Other Claims.

The Borrowers shall, and shall cause each of their Subsidiaries to, pay and discharge promptly before interest and penalties accrue, all taxes, assessments and other governmental charges or levies at any time imposed upon them or upon their income, revenues or property, as well as all claims of any kind (including claims for labor, material or supplies) which, if unpaid, might by law become a lien or charge upon all or any part of their income, revenues or property.

### Section 7.13.  Payment of Indebtedness.

The Borrowers will duly and punctually pay or cause to be paid the principal and interest on the Loan and all fees and other amounts payable hereunder or under the Loan Documents as and when required by this Loan Agreement and the other Loan Documents.

### Section 7.14.  Governmental Consents and Approvals.

(a)    The Borrowers will obtain, and will cause each of their Subsidiaries to obtain, all such approvals, consents, orders, authorizations and licenses from, give all such notices promptly to, register, enroll or file all such agreements, instruments or documents promptly with, and promptly take all such other action with respect to, any Governmental Authority, regulatory agency or official or any central bank or other fiscal or monetary authority, agency or official, as may be required from time to time under any provision of any applicable law:

(i)    for the performance by the Borrowers of any of their agreements or obligations under the Note, this Loan Agreement or any other Loan Document, or for the payment by the Borrowers to Lender of any sums which shall become due and payable by the Borrower thereunder;

42

(ii)    to ensure the continuing legality, validity, binding effect or enforceability of the Note or any other Loan Document; or

(iii)    to continue the proper operation of the business and operations of the Borrowers.

### Section 7.15.  Pension Plans.

The Borrowers have no pension or other benefit plans for their employees separate from the pension or other benefit plans of Parent.

### Section 7.16.  Further Assurances.

The Borrowers will execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all documents reasonably requested by Lender from time to time in order to give full effect to any of the Loan Documents.

### Section 7.17.  Use of Proceeds.

The Borrowers shall use all Loan proceeds only for the uses and purposes permitted by this Loan Agreement (including under Section 3.2) and for no other purpose.

### Section 7.18.  Environmental Matters.

(a)    The Borrowers shall timely comply in all material respects with all applicable Environmental Laws.

(b)    The Borrowers shall provide to Lender, immediately upon receipt, copies of any correspondence, notice, pleading, citation, indictment, complaint, order, decree, or other document from any source asserting or alleging a circumstance or condition which requires or may require a financial contribution by the Borrowers or any of their Subsidiaries or a cleanup, removal, remedial action, or other response by or on the part of the Borrowers or any of their Subsidiaries under applicable Environmental Laws or which seeks damages or civil, criminal or punitive penalties from the Borrowers or any of their Subsidiaries for an alleged violation of Environmental Laws.

(c)    The Borrowers shall promptly notify Lender in writing as soon as they become aware of any condition or circumstance which makes the environmental representations in Section 2.1 hereof incomplete or inaccurate in any material respect.

(d)    The Borrowers hereby indemnify, save and hold Lender and each of its past, present and future officers, directors, shareholders, employees, representatives and consultants harmless from any and all loss, damages, suits, penalties, costs, liabilities and expenses (including, but not limited to, reasonable investigation, environmental audit(s), and legal expenses) arising out of any claim, loss or damage of any property, injuries to or death of persons, contamination of or adverse effects on the environment, or any violation of any applicable Environmental Laws, caused by or in any way related to any property owned, leased or operated by the Borrowers, or due to any acts of the Borrowers or any of their Subsidiaries or any of their officers, directors, shareholders, employees, consultants and/or representatives. In no event shall the Borrowers be liable hereunder for any loss, damages, suits, penalties, costs,

liabilities or expenses (i) arising from any act of gross negligence or willful misconduct of Lender or its agents or employees or (ii) arising from any action taken by Lender while it is in sole possession of any such property.

(e)    The Borrowers and their Subsidiaries have and shall maintain all permits, licenses and approvals required under applicable Environmental Laws.

(f)    The provisions of this Section 7.18 shall survive the payment of the Loan and the termination, expiration or satisfaction of this Loan Agreement and shall not be affected by Lender's acquisition of any interest in any of the assets of the Borrowers, whether by foreclosure or otherwise.

### Section 7.19.  Acquisition of Margin Securities.

The Borrowers shall not own, purchase or acquire (or enter into any contract to purchase or acquire) any "margin security" as defined by any regulation of the Federal Reserve Board as now in effect or as the same may hereafter be in effect.

### Section 7.20.  Payment of Claims; Encumbrances.

The Borrowers shall, and shall cause their Subsidiaries to, (i) keep their assets, whether now owned or hereafter acquired, free of any lien, charge or claim (other than the Permitted Encumbrances and except for the liens and encumbrances arising under the Loan Documents); and (ii) not encumber their assets, whether now owned or hereafter acquired, or any portion thereof or interest therein, permit any lien, levy, attachment or restraint to be made or filed against its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein or permit any receiver or assignee for the benefit of creditors to be appointed to take possession of its assets, whether now owned or hereafter acquired, or any portion thereof (other than the Permitted Encumbrances and except for the liens and encumbrances arising under the Loan Documents).

### Section 7.21.  Borrowers' Organizational Documents.

The Borrowers shall not, and shall cause each of its Subsidiaries not to, modify, amend or terminate any of the Borrowers' or any of their Subsidiaries' Organizational Documents, or permit any of Borrowers' or any of their Subsidiaries' Organizational Documents to be modified, amended or terminated, without the prior written consent of Lender.  Lender's consent to any such modification, amendment or termination shall not be unreasonably withheld, provided (a) that there shall be no Event of Default at the time of the Borrowers' request for such consent, and (b) the proposed modification, amendment or termination does not (with the provision of notice or the passage of time, or both) violate any provision of this Loan Agreement.

### Section 7.22.  Prohibition of Assignments, Transfers and Encumbrances.

The Borrowers shall not, directly or indirectly (i) except in the ordinary course of business or in connection with consummating the Sale, sell, transfer, lease or otherwise dispose of all or any portion of their assets or any interest therein; (ii) except for Permitted Encumbrances, encumber, hypothecate, create a security interest or create or permit any lien upon or affecting their assets or any portion thereof or interest therein; (iii) assign, transfer or

44

encumber any interest of Borrowers or any of their Subsidiaries under this Loan Agreement or under any other Loan Document, or delegate any of the Borrowers' or any of their Subsidiaries' duties or obligations hereunder or thereunder; (iv) purchase, acquire, issue or redeem any of its capital securities or make any material change in its capital structure; (v) change its name, consolidate with or merge into any other Person or permit any other Person to merge into it; or (vi) enter into any sale-leaseback transaction.

### Section 7.23.  Loans, Acquisitions, Guaranties, Affiliate Transactions.

The Borrowers shall not, directly or indirectly, (i) make any loan, investment, advance or extension of credit to any Person, (ii) purchase, create or acquire all or substantially all of the properties or assets of any other Person or any capital securities of any other entity, (iii) incur any obligation as surety or guarantor, other than in the ordinary course of business, (iv) enter into any transaction with an affiliate that in not on terms and conditions as favorable to the Borrowers as would be obtainable in a transaction with a Person that is not an affiliate or (v) subordinate any indebtedness due it from any Person to indebtedness of other creditors of such Person.

### Section 7.24.  Dividends; Distributions.

The Borrowers shall not, and shall cause each of their Subsidiaries not to, pay any Dividends on its Capital Securities or make other distributions.

### Section 7.25.  Expenses; Taxes; Indemnity.

(a)    The Borrowers agree to pay or cause to be paid, and to save Lender harmless against liability for the payment of, all Secured Party Expenses.  The Borrower shall pay all Secured Party Expenses promptly (and in any event within five (5) Business Days of demand). Lender may charge the DIP Facility for any Secured Party Expenses (provided, professional fees and expenses exceeding $10,000 per month shall only be paid after the expiration of the objection period described below).  As a condition to reimbursement for professional fee payments exceeding ten thousand dollars ($10,000) per month, the Lender will provide the Debtors, any official committee appointed in the Chapter 11 Cases, and the Office of the United States Trustee with any professional invoice for which the Lender seeks reimbursement in an amount exceeding ten thousand dollars ($10,000) per month, to which such parties shall have ten (10) days to object to the Secured Party Expenses set forth in the fee notice.  Absent such objection, failure to pay any Secured Party Expenses payable to the Lender within five (5) Business Days lapse of the objection period (if any) shall be an Event of Default under this Loan Agreement.

(b)    The Borrowers hereby agree to pay all stamp, document, transfer, recording, filing, registration, search, sales and excise fees and taxes and all similar impositions (excluding taxes on the overall net income or gross receipts of Lender) now or hereafter determined by Lender to be payable in connection with this Loan Agreement or any other Loan Document or any other documents, instruments or transactions pursuant to or in connection herewith or therewith, and the Borrowers agree to save Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such fees, taxes or impositions.

### Section 7.26.  Pension or Profit Sharing Plans.

The Borrowers shall not, allow any fact, condition or event to occur or exist with respect to any employee pension or profit sharing plan established or maintained by the Borrowers or any of their Subsidiaries which might constitute grounds for termination of any such plan or for the court appointment of a trustee to administer any such plan; or permit any such plan to be the subject of termination proceedings (whether voluntary or involuntary) which may result in a liability of the Borrowers which, in the opinion of Lender, could have a Material Adverse Effect.

### Section 7.27.  Lease and Contract Restrictions.

The Borrowers shall not lease or sublease any real property occupied by the Project to any unaffiliated third party, except to a party who has contracted to provide services to the Borrowers, or any of them, or to any Customer of a Borrower in connection with the operation and maintenance of the Project.  Nothing herein shall prohibit, restrict or limit the Borrowers, or any of them, from selling, leasing or otherwise granting rights to use, fiber optic cable or space or racks within Borrowers' colocation facilities in connection with the operation of the Project. Subject to the terms of any post-closing agreement, all Underlying Agreements and service orders under Master Service Agreements with third parties granting rights to use all or any portion of the Project must be in the name of the applicable Borrower (but not Parent or Allied Southeast), or have been assigned to such Borrower, as applicable, unless otherwise approved by Lender.

### Section 7.28.  Field Audits.

Borrowers agree that Lender may conduct audits of the Borrowers, its Subsidiaries and their operations, the results of which shall be reasonably satisfactory to Lender, and the costs of which shall be paid by Borrowers, which shall be limited to 12 audits per calendar year except upon and during the continuance of an Event of Default.

### Section 7.29.  Preference Rights.

While the Loan is outstanding, Lender will be provided a right of first offer to future debt or equity financing rounds of the Borrowers.

### Section 7.30.  Super-Priority Nature of Obligations. All DIP Facility Obligations shall constitute administrative expenses of the Debtors in the Chapter 11 Cases, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code. Subject to the Carve-Out, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of the Debtors, the estates of the Debtors, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code.

(b)     All DIP Facility Obligations shall at all times, subject to the Carve-Out, (i) subject to Section 364(d)(1) of the Bankruptcy Code, be secured by fully perfected first priority, valid, binding, enforceable, non-avoidable and automatically perfected priming security interest in and Liens upon (the "**Priming Liens**") the Pre-Petition Collateral and (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by fully perfected first priority, valid, binding, enforceable, non-avoidable and automatically perfected security interest in and liens

46

upon the Collateral (other than Collateral referenced in clause (i)) whether created, existing or acquired prior or subsequent to the commencement of the Cases (the "**First Liens**" and, together with the Priming Liens, the "**DIP Liens**"). The DIP Liens, and the priorities accorded to the DIP Facility Obligations, shall have the priority and senior secured status afforded by Sections 364(c) and 364(d)(l) of the Bankruptcy Code, all as more fully set forth in the Interim Order and Final Order, provided, however, until the entry of the Final Order, the DIP Liens shall not attach to the Avoidance Actions.

(c)     The DIP Liens under Sections 364(c)(2),(c)(3) and (d) of the Bankruptcy Code, and the administrative claims under Section 364(c)(1) of the Bankruptcy Code, in each case afforded the DIP Facility Obligations, shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to the Carve-Out.

### Section 7.31.  Payment of Obligations.

On the Termination Date, the Lender shall be entitled to immediate payment of all outstanding Obligations, including all unpaid principal, interest, fees, costs and expenses incurred by Lender in connection with the Loan Agreement, shall be due and payable in full on the Termination Date without further application to or order of the Bankruptcy Court.

### Section 7.32.  Liens.

(a) Borrowers covenant and agree that the DIP Facility and all DIP Facility Obligations will at all times be secured by the DIP Liens as set forth in the Interim Order and the Final Order, as applicable.

(b) The DIP Liens on the Collateral will not be subject to challenge and will attach and become valid and perfected upon entry of the Interim Order without any requirement of any further action by Lender.  Other than the DIP Liens, the Collateral will be free and clear of all Liens, claims and encumbrances other than Permitted Encumbrances.

(c) The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to this Loan Agreement, the Interim Order and/or the Final Order (specifically, including, but not limited to, the existence, perfection and priority of the Liens provided herein and therein and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Borrower (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.

(d) Each Borrower hereby acknowledges, confirms and agrees that Lender, has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Lender pursuant to the Pre-Petition Loan Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, junior only to the Priming Liens and any other liens or encumbrances expressly permitted by the Interim Order or the Final Order that may have priority over the liens in favor of Lender.

### Section 7.33.  No Discharge; Survival of Claims.

47

Borrowers agree that (i) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and the Debtors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (ii) the super-priority administrative claim granted pursuant to the Interim Order and Final Order and described in Section 7.30 and the Liens granted to the Lender pursuant to the Interim Order and Final Order and described in Section 7.30 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

### Section 7.34.  Release.

Borrowers hereby acknowledge, effective upon entry of the Final Order and subject to the terms thereof, that Borrowers have no defense, counterclaim, offset, recoupment, cross complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Borrowers liability to repay Lender as provided in this Loan Agreement or any other Loan Document or to seek affirmative relief or damages of any kind or nature from Lender.  Subject to the Final Order, Borrowers, each in their own right on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge Lender, its successors and assigns, its Affiliates, and any of their respective past and present officers, directors, servants, agents, attorneys, other professionals or representatives, employees, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past and present actions, causes of action, demands, suits, claims, counterclaims, defenses, liabilities, objections, challenges, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages, including, without limitation, those payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the Effective Date in any way, directly or indirectly arising out of, connected with or relating to this Loan Agreement, any other Loan Document, the Interim Order, the Final Order or the transactions contemplated hereby, including any claims as to the amount, validity or enforceability of the Debtors' Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.  Notwithstanding anything in this Section 7.34 to the contrary, nothing herein shall be deemed to be a release of the Lender from its obligations under this Loan Agreement or any other Loan Document, and nothing in this Loan Agreement shall be deemed to limit or modify any rights granted to third parties under the Orders.

### Section 7.35.  Waiver of Priming Rights.

Upon the Effective Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrowers hereby irrevocably waive any right, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or

greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, other than with respect to the Adequate Protection Liens approved in the Interim Order or the Final Order.

### Section 7.36.  Priority of Claim.

Borrowers covenant and agree that the DIP Facility Obligations at all times will constitute DIP Administrative Claims, subject only to the Carve-Out.

### Section 7.37.  Approved Budget; Cash Flow Reporting.

(a)    Commencing with the first Tuesday after the Petition Date, the Borrower will furnish to the Lender and to the Committee on each Tuesday (or, if such day is not a Business Day, the next succeeding Business Day) of each week, a report (the "**Weekly Actuals Report**"), in form and detail acceptable to the Lender, setting forth (x) actual cash receipts and disbursements for the one week period ended on the previous Saturday and (y) a calculation of each of Variance Testing Revenue and Variance Testing Disbursements for the period from the Sunday prior to the Petition Date through the previous Saturday.

(b)    Within two Business Days of delivery of (x) the Weekly Actuals Report for the calendar week ended April 22, 2016 and (y) each fourth Weekly Actuals Report thereafter, the Borrower will furnish to the Lender and to the Committee an updated cash forecast (each, an "**Updated Budget**") for the period from the previous Sunday through the end of the term of the Approved Budget, setting forth projected cash receipts and disbursements, in form and scope similar to the Approved Budget;

(c)    Together with (x) the Weekly Actuals Report for the calendar week ended April 22, 2016 and (y) each fourth Weekly Actuals Report thereafter, the Borrower will furnish to the Lender and to the Committee (A) a variance report (each, an "**Approved Budget Variance Report**") showing the difference between actual cash receipts and disbursements for the period from the date of the previous Approved Budget Variance Report through the previous Saturday (each such period, a "**Variance Covenant Testing Period**") and projected cash receipts and disbursements for such period set forth in the Approved Budget and (B) a variance report showing the difference between actual cash receipts and disbursements for the period from the date of the previous Approved Budget Variance Report through the previous Saturday and projected cash receipts and disbursements for such period set forth in the Updated Budget.

(d)    The Borrower shall not make any change in the Approved Budget without the prior written consent of the Lender.

### Section 7.38.  Reorganization Financial Covenants.

The covenants of the Borrowers contained in this Section 7.38 shall be the only Financial Covenants under this Loan Agreement that will be in effect from the Petition Date through the Maturity Date.

(a)    Borrowers shall not permit professional fees (other than the fees and expenses of the advisors and consultants working on behalf of the Lender) in any period of time measured from the Petition Date to exceed the amounts set forth in the Approved Budget.

49

(b)      Borrowers will not permit actual Variance Testing Revenue for any Variance Covenant Testing Period to be lower than 85% of the projected Variance Testing Revenue for such period set forth in the Approved Budget.

(c)      Borrowers will not permit actual Variance Testing Disbursements for any Variance Covenant Testing Period to exceed 115% of the projected Variance Testing Disbursements for such period set forth in the Approved Budget.

### Section 7.39.  Additional Reorganization Matters.

(a)      **Notices and Pleadings**.  The Debtors shall give on a timely basis all notices required to be given to all parties specified in the Interim Order or Final Order.  The Debtors shall provide to the Lender copies of all pleadings, motions, proposed forms of order, applications and other documents or information (i) filed by or on behalf of any Debtor with the Bankruptcy Court or (ii) provided to any Committee appointed in the Chapter 11 Cases.  The Debtors shall provide the Lender with drafts of all pleadings, motions, forms of order and applications to be filed by or on behalf of any Debtor at least three (3) Business Days in advance of such filing; provided that if such advance delivery is not practicable under the circumstances, the applicable Debtor or Debtors shall immediately advise the Lender of the substance of any relief that will be sought and shall, in any event, provide copies of such material prior to filing with the Bankruptcy Court.

(b)      **Retention of Financial Advisor**.  Borrowers will continue to retain, at all times during which the Obligations remain outstanding, PMCM, LLC, as Debtors' financial advisor, or such other Person acceptable to Lender (the "Financial Advisor"), and appoint Michael Jacoby as the Debtors' Chief Restructuring Officer or such other Person that is acceptable to Lender as its Chief Restructuring Officer (the "Chief Restructuring Officer"), at the sole cost and expense of Borrowers, for purposes acceptable to Lender, including to (i) assist Borrowers with the marketing of the Sale and the Sale, (ii) identify potential purchasers of substantially all of the assets of Borrowers, and (iii) review and analyze all bids submitted for the purchase of such assets.  Borrowers will not amend, modify or terminate the retention agreement with the Financial Advisor or the Chief Restructuring Officer without the prior written consent of Lender.  If the Financial Advisor or the Chief Restructuring Officer resigns, Borrowers shall immediately notify Lender in writing and provide Lender with a copy of any notice of resignation immediately upon the sending of such notice by the Financial Advisor or the Chief Restructuring Officer.  Any replacement or successor Financial Advisor or the Chief Restructuring Officer must be acceptable to Lender and must be retained pursuant to a new retention agreement on terms and conditions acceptable to Lender within five (5) Business Days immediately following the notice of resignation of the resigning Financial Advisor or the Chief Restructuring Officer, as applicable.

(c)      **Cooperation with Financial Advisor**.  Borrowers will and will cause its other advisors and professionals to, assist and cooperate with the Financial Advisor and the Chief Restructuring Officer in connection with the work contemplated by the retention agreement with the Financial Advisor and Borrowers.  Borrowers will cause the Financial Advisor to communicate and fully cooperate with Lender and share with Lender all information with respect to Borrowers and the Sale, including providing Lender with access to all information provided to the Debtors by potential bidders and interests parties.  Borrowers acknowledge and agree that Borrowers will cause the Financial Advisor to (i) keep Lender fully informed of the progress of

50

the Sale, including providing Lender with any information provided to the Debtors by potential bidders and other interested parties, (ii) respond fully to any inquiries of Lender regarding the Affairs of the Borrowers and the Sale, and (iii) communicate and fully cooperate with Lender and share all information with Lender regarding the Affairs of Borrowers and the Sale.

(d)    **Professional Fees**.  Promptly following receipt thereof, the Debtors shall deliver to the Lender all monthly fee statements detailing the fees of all its professionals (including counsel and financial advisors) for such month delivered in accordance with the interim compensation procedures approved by the Bankruptcy Court.

(e)    **Weekly Meetings**.  At least once per calendar week, upon request of the Lender, at mutually acceptable times (and with telephonic conferences being acceptable), the Debtors shall, and shall procure that representatives of the Debtors' professionals (including counsel and the Financial Advisor) as may be requested by the Lender, meet together with the Lender to update the Lender on the status of the Cases and to discuss any other issues in connection therewith as may be requested by the Lender, including any matters related to the Sale.

### Section 7.40.  Chapter 11 Claims.

Except for the Carve-Out, no Debtor shall incur, create, assume, suffer to exist or permit any super-priority administrative claim against such Debtor which is *pari passu* with or senior to the claims of the Lender against the Debtors, except as set forth in Section 7.30.

### Section 7.41.  Adoption and Ratification of Pre-Petition Loan Documents.

(a)    Each Borrower (i) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Loan Documents to which it is a party and (ii) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Pre-Petition Loan Documents, as amended by this Loan Agreement, and in accordance with the Interim Order and the Final Order.  Each Borrower hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Pre-Petition Loan Documents, as amended and supplemented pursuant hereto, the Interim Order and the Final Order, and each Borrower agrees to be fully bound, including as Debtors and Debtor-in-Possession, by the terms of the Loan Documents.

(b)    As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), each Borrower, as Debtor and Debtor-in-Possession, each hereby confirms and ratifies the prior grant to Lender of the continuing security interests in and liens upon all of the Collateral.

### Section 7.42.  Acknowledgment and Waivers of Lender.

(a)    Lender hereby acknowledges that prior to the Effective Date, certain Events of Defaults (as defined in the Pre-Petition Loan Agreement), including the Designated Defaults (as defined in the First Amendment), under the Loan Documents have occurred (collectively, the "Pre-Petition Defaults").  Subject to the terms and conditions hereof, solely until the occurrence of the Termination Date, Lender hereby agrees to forbear from the exercise of any and all rights or remedies it may have with respect to the Borrowers under the Pre-Petition Loan Documents in connection with the Pre-Petition Defaults.  Upon the occurrence of the Termination Date, the

provisions of this Section 7.42(a) shall immediately and automatically terminate and thereafter this Section 7.42(a) shall have no force or effect.

(b)      Notwithstanding any provision contained in this Loan Agreement, solely until the occurrence of the Termination Date, Lender hereby waives the following covenants or requirements set forth herein, or agrees not to enforce the following Events of Defaults, as applicable:

(i)      the covenants or requirements set forth in Section 2.1(g), solely as it relates to the Borrowers' relationship with Tower Cloud, Inc.; Section 2.1(h), solely as set forth in this Section 7.42; and Section 2.1(i), solely as it relates to 2015 taxes;

(ii)      the covenants or requirements set forth in Section 7.3(a)(ii), Section 7.3(b), Section 7.7, Section 7.8;

(iii)      the Event of Default identified in Section 8.1(h) solely as it relates to the Guarantor or Phoenix Fund, LLC; and

(iv)      the Event of Default identified in Section 8.1(k) solely as it relates to the Parent.

[End of Article VII]

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.1.    Event of Default Defined.**

Each of the following events shall be an Event of Default:

(a)    Non-payment when due of the principal on the Loan when the same becomes due and payable, whether at maturity, redemption, acceleration or otherwise pursuant to the terms of this Loan Agreement.

(b)    Non-payment when due of any interest, fees or other amounts payable (other than principal) hereunder or under any Loan Documents.

(c)    failure to satisfy any of the Milestones.

(d)    Failure of the Borrowers to observe or perform any of their covenants, conditions or agreements hereunder or in the Loan Documents.

(e)    There shall be a material default by the Borrowers under any material Underlying Agreement or Construction Contract where all required notices have been given and all applicable cure periods have expired.

(f)    Any representation or warranty made by the Borrowers herein or in any Loan Document is untrue in a material way when made or deemed made.

(g)    Default in the payment of any other obligation of the Borrowers for borrowed money in an aggregate amount in excess of $100,000 individually or in the aggregate when due (whether by acceleration or otherwise) and continuance thereof beyond any applicable period of cure, or in the observance or performance of any conditions, covenants or agreements related or given with respect to any obligation for borrowed money in an aggregate amount in excess of $100,000 individually or in the aggregate when due (whether by acceleration or otherwise) which continues beyond any applicable period of cure and which is sufficient to permit the holder thereof to accelerate the maturity of such obligations.

(h)    Guarantor shall fail to own, directly or indirectly, one hundred percent (100%) by value and by voting of the aggregate Capital Securities of Allied Southeast, or Allied Southeast shall fail to own, directly or indirectly, one hundred percent (100%) by value and by voting of the aggregate Capital Securities of Allied Georgia and Allied Florida, or Phoenix Fund, LLC shall fail to own directly or indirectly a majority of the voting power of the Guarantor.

(i)    A judgment or judgments for the payment of money in excess of the sum of $100,000 in the aggregate shall be rendered against the Borrowers and such judgments shall remain unpaid, unvacated, unbounded or unstayed by appeal or otherwise for a period of 21 consecutive days from the date of its entry and such judgment is not covered by insurance from a solvent insurer who is defending such action without reservation of rights.

(j)    (i) Any material provision of any Loan Document shall at any time for any reason cease to be valid, binding and enforceable against the Borrowers, Guarantor or any party to a Subordination Agreement, (ii) the validity, binding effect or enforceability thereof shall be

contested by a Borrower, Guarantor or any party to a Subordination Agreement, or (iii) any Borrower, Guarantor, or any party to the Subordination Agreement shall deny that it has any or further liability or obligation under any Loan Document, or Subordination Agreement, or any such Loan Document or Subordination Agreement shall be terminated, invalidated, revoked, set aside or in any way cease, such that the Lender is unable to practically realize the material benefits included therein.

(k)    An Event of Default by the applicable Borrower or Parent under the provisions of the applicable Leasehold Mortgage, Security Agreement or Pledge Agreement.

(l)    Other than the Chapter 11 Cases, (i) Commencement by any Borrower of a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, (ii) consent by any Borrower to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official for such Borrower or any substantial part of its property, or to the taking possession by any such official of any substantial part of the property of such Borrower, (iii) making by any Borrower of any assignment for the benefit of creditors, or (iv) taking of limited liability company action by any Borrower in furtherance of any of the foregoing.

(m)    Other than the Chapter 11 Cases, the (i) entry of any decree or order for relief by a court having jurisdiction over any Borrower or its property in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, (ii) appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator or similar official for any Borrower or any substantial part of its property, or (iii) order for the termination or liquidation of any Borrower or its affairs.

(n)    Other than the Chapter 11 Cases, failure of any Borrower within sixty (60) days after the commencement of any proceedings against it under the federal bankruptcy laws or any other applicable federal or state bankruptcy, insolvency or similar law, to have such proceedings dismissed or stayed.

(o)    Scott Drake, the Chief Restructuring Officer, the Financial Advisor, Fox Rothschild LLP, or such other financial advisor/chief restructuring officer appointed by the Bankruptcy Court cease to be employed or retained by the Debtors, as applicable, or incur a material change in job or engagement duties, as applicable.

(p)    Any of the Chapter 11 Cases is converted to a case under Chapter 7 of the Bankruptcy Code or is dismissed or a motion requesting such relief shall have been granted.

(q)    There is filed or the Debtors support a proposed plan of reorganization in the Chapter 11 Cases that does not provide for the indefeasible payment in full and in cash of all of Debtors' obligations to the Lender under the Loan Documents on the effective date of the plan.

(r)    Appointment of a trustee under Section 1104 or an examiner under Section 1106 of the Bankruptcy Code without the express written consent of the Lender, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.

(s)    Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying this Loan Agreement, the Interim Order or Final Order approving

this Loan Agreement, without the prior written consent of the Lender or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

(t)    Any attempt by any Debtors to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment invalidating, reducing, or otherwise impairing the Lender's claims, or to subject any of the Lender's Collateral securing the Obligations to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.

(u)    Any Debtor shall apply for an order substituting any assets for all or any portion of the Collateral, except as permitted by the Post-Petition Loan Documents.

(v)    Any payment on, or application for authority to pay, any pre-petition general unsecured claim owing to terminated employees, lease rejection damages, without prior written consent of the Lender.

(w)    The Debtors, without the Lender's prior written consent, take any action that results (or fail to take any action that could reasonably be expected to result) results in the interruption or cessation of the Sale and the process related thereto.

(x)    An order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay.

(y)    Debtors' failure to pay any material, undisputed Indebtedness incurred Post-Petition within forty-five (45) days of the date on which such Indebtedness becomes due.

(z)    Exclusivity in the Chapter 11 Cases shall have been terminated or the Debtors shall have agreed to any such termination.

(aa)    After entry thereof, either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or which shall have been modified or amended in a manner that materially and adversely affects the Lender's rights with respect to repayment of the Loan.

**Section 8.2.    Remedies on Default.**

Whenever any Event of Default referred to in Section 8.1 hereof shall have occurred, Lender may take any one or more of the following remedial steps:

(a)    Lender may declare the Loan Payments payable hereunder for the remainder of the term of this Loan Agreement and the Make Whole Amount to be immediately due and payable, whereupon the same shall become due and payable;

(b)    Lender may foreclose on all or any collateral granted by the Leasehold Mortgages or any interest of the Borrowers therein as and to the extent permitted of a mortgagee by the laws of the State of Florida or the State of Georgia, as applicable, and exercise all of the rights and remedies of a secured party under the Uniform Commercial Code of the State of Florida or the State of Georgia, as applicable, with respect thereto and to the tangible personal property, furniture, machinery, equipment and other personal property and assets of the Borrowers;

55

(c)     Lender may realize upon the security interests granted to Lender pursuant to the Security Agreements and the Pledge Agreements and exercise all of the rights and remedies of a secured party under the Uniform Commercial Code of the State of Delaware, the State of Florida or the State of Georgia, as applicable, with respect thereto; and

(d)     Lender may take whatever action at law or in equity as may appear necessary or desirable to collect the amounts then due and thereafter to become due, or to enforce performance or observance of any obligations, agreements or covenants of the Borrowers under this Loan Agreement.

In the event that the Borrowers fail to make any payment required hereby, the payment so in default shall continue as an obligation of the Borrowers until the amount in default shall have been fully paid. Any proceeds received by Lender from the exercise of any of the above remedies, after reimbursement of any costs incurred by Lender in connection therewith, shall be applied by Lender first to the payment of all expenses and reimbursement obligations due the Lender under this Loan Agreement or any of the Loan Documents, next to accrued and unpaid interest under the Loan, then to the payment of premium, if any, and finally to the payment of principal.

### Section 8.3.    No Remedy Exclusive.

No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Loan Agreement or now or hereafter existing at law or in equity or by statute. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient. In order to entitle Lender to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than notice required herein or by Applicable Law.  In furtherance of the foregoing, prior to Lender exercising its remedies hereunder, Lender shall (i) not be required to obtain any relief from stay under Section 362 of the Bankruptcy other than the relief from stay granted under the Interim Order or the Final Order and (ii) provide the Debtors, any official committee appointed in the Chapter 11 Cases and the Office of the United States Trustee with five (5) days prior written notice of the Lender's intent to exercise such remedies.

### Section 8.4.    Agreement To Pay Attorneys' Fees And Expenses.

In the event the Borrowers should default under any of the provisions of this Loan Agreement or any other Loan Document, or Lender should employ attorneys or incur other expenses for the collection of Loan Payments or the enforcement of performance or observance of any obligation or agreement on the part of the Borrowers herein or in any other Loan Document, the Borrowers agree that they will, within thirty (30) days of a request therefor, pay to Lender the reasonable and documented fees of such attorneys and such other reasonable expenses incurred by Lender.   This Section shall continue in full force and effect, notwithstanding the full payment of all obligations under this Loan Agreement or the termination of this Loan Agreement for any reason.

### Section 8.5.    Waiver.

No Event of Default may be waived except in a writing signed by an officer of the Lender. No single or partial exercise of any right, power or privilege hereunder, nor any delay in the exercise thereof, shall preclude other or future exercise of its rights by the Lender. No Waiver of any Event of Default shall extend to any other or further Event of Default. No forbearance on the part of the Lender in enforcing any of its rights shall constitute a waiver of any of its rights. Borrowers expressly agree that this Section 8.5 may not be waived or modified by Lender by course of performance, estoppel or otherwise.

### Section 8.6.    Remedies Subject To Provisions Of Law and Underlying Agreements.

All rights, remedies and powers provided by this Article may be exercised only to the extent that the exercise thereof does not violate any applicable and unwaived provision of law, and all the provisions of this Article are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this instrument or the provisions hereof invalid or unenforceable under the provisions of any applicable law. Lender further acknowledges and agrees that the Borrowers' rights to occupy the land upon which the Project is constructed and to operate the Project are subject to the Underlying Agreements and all rules, regulations, restrictions and requirements imposed by the lessor or other grantor of rights to the Borrowers thereunder. Lender further acknowledges and agrees that any rights granted to it pursuant to this Article VIII shall be subject to such Underlying Agreements and such rules, regulations, restrictions and requirements as if they were the Borrowers.

### Section 8.7.    Waiver Of Appraisement, Valuation, Stay, And Execution Laws.

The Borrowers agree, to the extent permitted by law, that in the case of the occurrence and continuation of an Event of Default, neither the Borrowers nor anyone claiming through or under them shall or will set up, claim or seek to take advantage of any appraisement, valuation, stay or execution, extension or redemption laws now or hereafter in force in order to prevent or hinder the enforcement or foreclosure of the lien of this Loan Agreement, or the absolute sale of the Project, or any interest of the Borrowers therein, or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereof, and the Borrowers for themselves and all who may at any time claim through or under them, hereby waive, to the full extent that they may lawfully do so, the benefit of all such laws, and any and all right to have the estates comprising the security intended to be hereby created marshaled upon any foreclosure of the lien hereof and agree that Lender or any court having jurisdiction to foreclose such lien may sell the Project, or any interest of the Borrowers therein, as an entirety or in such parcels or parts as Lender may deem appropriate.

[End of Article VIII]

## ARTICLE IX
## PREPAYMENT OF LOAN

**Section 9.1.    Option To Prepay Loan.**

The Borrowers shall have the option, in their sole discretion, to prepay the Loan Payments in whole (and concurrently therewith terminate this Loan Agreement) or in part at any time prior to the Maturity Date, with any prepayment of the Loan Payments with respect to Loan Payments for the Pre-Petition Loan at a price (the "Make Whole Amount") equal to the greater of:

(i)    100% of the principal amount of the Loan to be prepaid; or

(ii)    the sum of the present value of the remaining scheduled payments of principal and interest on the Loan to the Maturity Date to be prepaid, not including any portion of those payments of interest accrued and unpaid as of the date on which the Loan is to be prepaid, discounted to the date on which the Loan is to be prepaid on a semi-annual basis, assuming a 360-day year consisting of twelve 30-day months, at the Treasury Rate, plus 25 basis points;

plus, in each case, accrued interest on the Loan to the date of prepayment.  For any prepayment of the Loan Payments for the Post-Petition Loan, the Make Whole Amount shall not apply.

As used in this Section 9.1, "Treasury Rate" means the rate set forth below, corresponding to the period during which the prepayment occurs:

| | |
|---|---|
| 0-6 months from the date hereof: | **2.600%** |
| 7-12 months from the date hereof: | **2.555%** |
| 13-18 months from the date hereof: | **2.490%** |
| 19-24 months from the date hereof: | **2.420%** |
| 25-30 months from the date hereof: | **2.370%** |
| 31-36 months from the date hereof: | **2.315%** |
| 37-42 months from the date hereof: | **2.260%** |
| 43-48 months from the date hereof: | **2.140%** |
| 49-54 months from the date hereof: | **2.020%** |
| 55-60 months from the date hereof: | **1.900%** |
| 61-66 months from the date hereof: | **1.780%** |
| 67-72 months from the date hereof: | **1.575%** |
| 73-78 months from the date hereof: | **1.370%** |
| 79-84 months from the date hereof: | **1.205%** |
| 85-90 months from the date hereof: | **1.040%** |
| 91-96 months from the date hereof: | **0.795%** |
| 97-102 months from the date hereof: | **0.550%** |
| 103-108 months from the date hereof: | **0.340%** |
| 109-114 months from the date hereof: | **0.235%** |
| 115-120 months from the date hereof: | **0.130%** |

[End of Article IX]

**ARTICLE X**
**MISCELLANEOUS**

Section 10.1.  Occurrence of Termination Date.

This Loan Agreement shall be effective upon its execution and delivery and all obligations of Lender hereunder shall expire on the Termination Date; provided, however, occurrence of the Termination Date shall not affect Borrowers' obligations or covenants hereunder or the other Loan Documents or Lender's ability to enforce its rights or remedies hereunder or under any of the other Loan Documents.    The parties hereby expressly agree that all such obligations, covenants, rights and remedies shall survive the Termination Date until the indefeasible payment in full and in cash of all of the Obligations.

Section 10.2.  Notices.

Unless otherwise provided herein, all demands, notices, approvals, consents, requests and other communications hereunder shall be in writing and shall be deemed to have been given at the earliest of (a) personal delivery, (b) transmission by email or facsimile which the sender's equipment indicates has been sent (in the case of an addressee whose facsimile number or email address, as applicable, is supplied, and only if a copy of the same is also delivered, sent or mailed, as applicable, as described in clause (a), clause (c) or clause (d), within one (1) calendar day of said facsimile or email), (c) the first (1st) business day following deposit with Federal Express or a similar overnight courier, charges prepaid, or (d) the fifth (5th) Business Day following deposit with the United States Postal Service for first class registered or certified mail, return receipt requested, postage prepaid, addressed to the addressee at the address that shall most recently have been designated, by effective notice hereunder from the addressee to the sender, as the addressee's desired address for notices hereunder (or, prior to any such notice, at the address for the addressee set forth below):

(a)

If to the Borrowers:    AF-Southeast, LLC
Allied Fiber - Florida, LLC
Allied Fiber - Georgia, LLC
c/o  PMCM, LLC
110 Chadds Ford Commons
Chadds Ford, PA  19317
Attn: Michael Jacoby
(484) 841-6808 – direct
(603) 297-4464 – fax
mjacoby@phoenixmanagement.com – email

With a copy to (which shall not constitute notice):

Fox Rothschild LLP
2000 Market Street
20th Floor
Philadelphia, PA 19103-3222
(215) 299-2756 - direct

59

(215) 299-2150- fax
Attn:  Michael Menkowitz

(b)

If to the Lender:                    Strome Mezzanine Fund IV, LP
                                     100 Wilshire Blvd., Suite 1750

                                     Santa Monica, California  90401
                                     Attention: Mark Strome
                                     Telephone: (310) 917-6600
                                     Facsimile:  (310) 752-1483

                                     With a copy to (which shall not constitute notice):

                                     Neligan Foley LLP
                                     325 N. St. Paul, Suite 3600
                                     Dallas, TX 75201
                                     Attention:  Patrick J. Neligan, Jr., Esq.
                                     Telephone: (214) 840-5300
                                     Facsimile: (214) 840-5301

                                     Richards, Layton & Finger, P.A.
                                     One Rodney Square
                                     920 North King Street
                                     Wilmington, DE 19801
                                     Attention:  Mark Collins, Esq.
                                     Phone: (302) 651-7700
                                     Facsimile:  (302) 651-7701

**Section 10.3.  Amendments to Loan Agreement.**

This Loan Agreement may be amended only by a writing signed by all parties hereto.

**Section 10.4.  Successors and Assigns.**

This Loan Agreement shall be binding on, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.  Each of the Borrowers, on the one hand, and the Lender, on the other hand, may not assign any rights or obligations with respect to the Loan Agreement or any other Loan Document (including the Loan or any Note) without the prior written consent of the other party; provided, however, that Lender may assign its rights hereunder to any affiliate of Lender without the consent of the Borrowers.

**Section 10.5.  Severability.**

If any term or other provision of this Loan Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Loan Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party

hereto. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Loan Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions hereby are consummated as originally contemplated to the greatest extent possible.

### Section 10.6.  Entire Understanding.

The Loan Documents express the entire understanding and all agreements between the parties and may not be modified except in writing signed by the respective parties thereto.

### Section 10.7.  Counterparts.

This Loan Agreement may be executed in several counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument, except that to the extent, if any, that this Loan Agreement shall constitute personal property under the Uniform Commercial Code of Delaware, Florida or Georgia, as applicable, no security interest in this Loan Agreement may be created or perfected through the transfer or possession of any counterpart of this Loan Agreement other than the original counterpart delivered to Lender.

### Section 10.8.  Cross-Guaranty; Subrogation; Right of Contribution.

Each Borrower hereby agrees that such Borrower is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to Lender, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all obligations owed or hereafter owing to the Lender by each other Borrower. Each Borrower agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, and that its obligations under this Section 10.8 shall be absolute and unconditional, irrespective of, and unaffected by (a) the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Loan Agreement, any other Loan Document or any other agreement, document or instrument to which any Borrower is or may become a party; (b) the absence of any action to enforce this Loan Agreement or any other Loan Document or the waiver or consent by the Lender with respect to any of the provisions thereof; (c) the existence, value or condition of, or failure to perfect its lien against, any security for the obligations hereunder or any action, or the absence of any action, by the Lender in respect thereof (including the release of any such security); (d) the insolvency of any Borrower; or (d) any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

Each Borrower expressly waives all rights it may have now or in the future under any statute, or at common law, or pursuant to any other laws or in equity, or otherwise, to compel the Lender to marshal assets or to proceed in respect of the obligations guaranteed hereunder against any other Borrower, any other party or against any security for the payment and performance of the obligations hereunder before proceeding against, or as a condition to proceeding against, such Borrower.

Each Borrower agrees that the provisions of this Section 10.8 are for the benefit of the Lender and nothing herein contained shall impair, as between Borrowers, on the one hand, and

the Lender, on the other hand, the obligations of such other Borrower under the Loan Documents.

Notwithstanding anything to the contrary in this Loan Agreement or in any other Loan Document, and except as set forth herein, each Borrower hereby expressly and irrevocably subordinates to the prior payment in full, in cash, of the obligations hereunder (other than contingent indemnification obligations not then due and owing) any and all rights pursuant to any laws or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor until the payment in full, in cash, of the obligations hereunder (other than contingent indemnification obligations not then due and owing). Each Borrower acknowledges and agrees that this subordination is intended to benefit the Lender and shall not limit or otherwise affect such Borrower's liability hereunder or the enforceability of this Section 10.8, and that the Lender is an intended third party beneficiary of the waivers and agreements set forth in this Section 10.8.

Notwithstanding any provision herein contained to the contrary, each Borrower's liability under this Section 10.8 shall be limited to an amount not to exceed as of any date of determination the greater of (a) the net amount of the Loan (plus all other obligations owing in connection therewith) advanced to any other Borrower under this Loan Agreement and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower; and (b) the amount which could be claimed by the Lender from such Borrower under this Section 10.8 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from each other Borrower under this Section 10.8. The provisions of this Section 10.8 shall be implemented automatically without the need for any modification of the Loan Agreement.

To the extent that any Borrower shall make a payment under this Section 10.8 of all or any of the obligations hereunder (a "Guarantor Payment") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Borrower, exceeds the amount which such Borrower would otherwise have paid if each Borrower had paid the aggregate obligations hereunder satisfied by such Guarantor Payment in the same proportion that such Borrower's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Borrowers as determined immediately prior to the making of such Guarantor Payment, then, following the occurrence of the payment in full of the obligations hereunder (other than contingent indemnification obligations not then due and owing), such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment. As of any date of determination, the "Allocable Amount" of any Borrower shall be equal to the maximum amount of the claim which could then be recovered from such Borrower under this Section 10.8 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law. This Section 10.8 is intended only to define the relative rights of Borrowers and nothing set forth in this Section 10.8 is intended to or shall impair the obligations of Borrowers, jointly and severally, to pay any amounts as and when the same shall become due and payable in

accordance with the terms of this Loan Agreement.  The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Borrowers to which such contribution and indemnification is owing.  The rights of the indemnifying Borrowers against other Borrowers under this Section 10.8 shall be exercisable upon and after the payment in full of the obligations hereunder (other than contingent indemnification obligations not then due and owing).

### Section 10.9.  Governing Law; Venue; Waiver of Trial by Jury.

THIS LOAN AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, INCLUDING THE BANKRUPTCY CODE.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR THE BORROWERS ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND EACH OF LENDER, ON THE ONE HAND, AND THE BORROWERS, ON THE OTHER HAND, WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH OF LENDER, ON THE ONE HAND, AND THE BORROWERS, ON THE OTHER HAND, HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. NOTWITHSTANDING THE FORGOING, EACH BORROWER IRREVOCABLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT.

LENDER AND THE BORROWERS HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION  OR CAUSE OF ACTION (I) ARISING UNDER THIS LOAN AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION HEREOF, OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF BORROWERS AND LENDER OR ANY OF THEM WITH RESPECT TO THIS LOAN AGREEMENT (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH OF LENDER, ON THE ONE HAND, AND THE BORROWERS, ON THE OTHER HAND, HEREBY AGREES AND CONSENTS THAT THE OTHER PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE BORROWERS OR LENDER, AS APPLICABLE, TO THE WAIVER OF ANY RIGHT SUCH PARTY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

### Section 10.10. Section 552(b).  The Lender shall be entitled to all of the rights and
benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Lender with respect to proceeds, products, offspring or profits of any of the Collateral.

### Section 10.11. Consultant.

Borrowers hereby acknowledge and agree that the Lender shall have the unfettered right to appoint an engineer, technical consultant, auditor, agent and/or advisor retained by the Lender from time to time (each a "**Consultant**") (at usual and customary hourly rates) to analyze the operational status of any Project and the other operations of the Borrowers. The Borrowers shall be responsible for all reasonable and documented costs and expenses of any Consultant.

### Section 10.12. USA Patriot Act.

Lender hereby notifies Borrowers that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies Borrowers which information includes the name and address of Borrowers and other information that will allow the Lender to identify such Borrower in accordance with the Act.

### Section 10.13. No Novation.

The terms and conditions of the Pre-Petition Loan Agreement are amended as set forth in, and restated in their entirety and superseded by, this Loan Agreement. Nothing in this Loan Agreement shall be deemed to work a novation of any obligation under the Pre-Petition Loan Agreement or the other Pre-Petition Loan Documents. Notwithstanding any provision of this Loan Agreement, the Loan Documents, or any other document or instrument executed in connection herewith, the execution and delivery of this Loan Agreement and the incurrence of obligations hereunder shall not be in payment of the obligations owing to the Lender under the Pre-Petition Loan Agreement or the other Pre-Petition Loan Documents.

**IN WITNESS WHEREOF**, the each of the parties have caused this Loan Agreement to be executed in its name and on its behalf by an Authorized Representative or a duly authorized officer, all as of the day and year first above written.

**STROME MEZZANINE FUND IV, LP,**
a Delaware limited partnership

By: Strome Investment Management, L.P.
Its: General Partner

    By: Strome Group, Inc.
    Its: General Partner

    By: _____
       Mark E. Strome, CEO/President


**AF-SOUTHEAST, LLC**


By: _____
   Name:
   Title:


**ALLIED FIBER - FLORIDA, LLC**


By: _____
   Name:
   Title:


**ALLIED FIBER - GEORGIA, LLC**


By: _____
   Name:
   Title:

65

**EXHIBIT A**

<u>LIST OF FLORIDA COUNTIES</u>

- Baker County, Florida

- Brevard County, Florida

- Broward County, Florida

- Duval County, Florida

- Flagler County, Florida

- Indian River County, Florida

- Martin County, Florida

- Miami-Dade County, Florida

- Nassau County, Florida

- Palm Beach County, Florida

- St. Johns County, Florida

- St. Lucie County, Florida

- Volusia County, Florida

**EXHIBIT B**

<u>LIST OF GEORGIA COUNTIES</u>

- Charlton County, Georgia
- Clinch County, Georgia
- Echols County, Georgia
- Lowndes County, Georgia
- Cook County, Georgia
- Tift County, Georgia
- Turner County, Georgia
- Crisp County, Georgia
- Dooly County, Georgia
- Houston County, Georgia
- Bibb County, Georgia
- Monroe County, Georgia
- Lamar County, Georgia
- Spalding County, Georgia
- Henry County, Georgia
- Clayton County, Georgia
- Fulton County, Georgia

**EXHIBIT C**

[FORM OF SENIOR SECURED PROMISSORY NOTE]

**EXHIBIT D**

FORM OF BORROWER CERTIFICATE

This certificate is given by an Authorized Officer of each of AF-Southeast, LLC, a Delaware limited liability company ("Allied Southeast"), Allied Fiber – Florida, LLC, a Delaware limited liability company ("Allied Florida"), and Allied Fiber – Georgia, LLC, a Delaware limited liability company ("Allied Georgia"), pursuant to Section 7.3(b) of that certain Senior Secured Super Priority Amended and Restated Loan Agreement (the "Loan Agreement"), dated as of April [___], 2016, by and among Strome Mezzanine Fund IV, LP, a Delaware limited partnership (the "Lender"), and Allied Southeast, Allied Florida and Allied Georgia (together, the "Borrowers").  Capitalized terms used herein without definition shall have the meanings assigned thereto in the Loan Agreement.

The undersigned Authorized Officer of each of the Borrowers hereby certifies to the Lender in his capacity as an Authorized Officer and not in an individual capacity, as follows:

I have no knowledge of the existence of any condition, event or act which constitutes an Event of Default under the Loan Agreement or under any other Loan Document, or which would constitute an Event of Default under the Loan Agreement or under any other Loan Document with the giving of notice or passage of time, or both, except as specified in Schedule 1 hereto.

[signature on next page]

IN WITNESS WHEREOF, the undersigned Authorized Officer of each of the Borrowers has executed this Certificate of Borrowers as of this ____ day of _____, _____.

**AF-SOUTHEAST, LLC**

By: _____

    Name:

    Title:

**ALLIED FIBER - FLORIDA, LLC**

By: _____

    Name:

    Title:

**ALLIED FIBER - GEORGIA, LLC**

By: _____

    Name:

    Title:

**EXHIBIT E**

FORM OF COMPLIANCE CERTIFICATE

This certificate is given by an Authorized Officer of each of AF-Southeast, LLC, a Delaware limited liability company ("Allied Southeast"), Allied Fiber – Florida, LLC, a Delaware limited liability company ("Allied Florida"), and Allied Fiber – Georgia, LLC, a Delaware limited liability company ("Allied Georgia"), pursuant to Section 7.3[(c)][(d)] of that certain Senior Secured Super Priority Amended and Restated Loan Agreement (the "Loan Agreement"), dated as of April [__], 2016, by and among Strome Mezzanine Fund IV, LP, a Delaware limited partnership (the "Lender"), and Allied Southeast, Allied Florida and Allied Georgia (together, the "Borrowers"). Capitalized terms used herein without definition shall have the meanings assigned thereto in the Loan Agreement.

The undersigned Authorized Officer of each of the Borrowers hereby certifies to the Lender in his capacity as an Authorized Officer and not in an individual capacity, as follows:

[1.    As of the last day of the fiscal quarter of the Borrowers ended [_____ ____, _____], the Borrowers [have][do not have] on a consolidated basis an Interest Coverage Ratio of not less than 2.00 to 1.00, as demonstrated in the calculations set forth on Schedule 1 hereto.

2.    As of the last day of the fiscal quarter of the Borrowers ended [_____ ____, _____], the Borrowers [have] [do not have] on a consolidated basis a Current Ratio of not less than 2.00 to 1.00 as demonstrated in the calculations set forth on Schedule 1 hereto.]

[3.    As of the last day of the fiscal year ended [_____ ____, ____], the Borrowers [have] [do not have] on a consolidated basis an Asset Coverage Ratio of not less than 2.00 to 1.00 as demonstrated in the calculations set forth on Schedule 1 hereto.]

The Borrowers further certify that [other than as set forth on Schedule 2 hereto] no Event of Default has occurred and is continuing on the date of this report.

[signatures on next page]

IN WITNESS WHEREOF, the undersigned Authorized Officer of each of the Borrowers has executed this Compliance Certificate as of this _____ day of _____, _____.

**AF-SOUTHEAST, LLC**

By: _____

    Name:

    Title:

**ALLIED FIBER - FLORIDA, LLC**

By: _____

    Name:

    Title:

**ALLIED FIBER - GEORGIA, LLC**

By: _____

    Name:

    Title:

**EXHIBIT F**

FORM OF INTERIM ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| AF-SOUTHEAST, LLC, *et al.*,[1] | : Case No. 16-11008 (KG) |
| | : (Jointly Administered) |
| Debtors. | : |
| | : **Related D.I.: 7** |

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS, INCLUDING PRIMING LIENS, AND SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Upon consideration of the motion (the "<u>DIP Motion</u>"), dated April 20, 2016 (the "<u>Petition Date</u>"), of the debtors and debtors in possession (collectively, the "<u>Debtors</u>"), in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), seeking entry of an interim order (this "<u>Interim Order</u>") pursuant to sections 105, 361, 362, 363, 364, 506, 507, and 552 of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), that, among other things:

    i.    authorizes the Debtors (each a "<u>Borrower</u>") to obtain senior secured priming and superpriority post-petition financing, which if approved on a final basis would consist of post-petition financing in a total amount of $4,467,966.00 (the "<u>DIP Facility</u>"), provided pursuant to the terms of (x) this Interim Order and, on a final basis, the Final Order (as defined below), (y) that certain Senior Secured Priority Debtor In Possession Amended and Restated Loan Agreement, dated as of April 20, 2016 (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "<u>DIP Credit</u>

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are: (i) AF-Southeast, LLC (8002); (ii) Allied Fiber – Florida, LLC (8111); and (iii) Allied Fiber – Georgia, LLC (2935).

Agreement"), a true and correct copy of which is attached hereto as **Exhibit B**,[2] by and among the Borrowers and Strome Mezzanine Fund IV, LP, as lender under the DIP Credit Agreement (in such capacity, the "DIP Lender"), and (z) any and all other agreements and documents executed or delivered in connection therewith (together with the DIP Credit Agreement, collectively, the "DIP Loan Documents");

ii.       authorizes the use of the proceeds of the DIP Facility to, among other things, make payments, as permitted by the Approved Budget, for operating expenses, general and ordinary purposes of the Debtors, and for other administrative expenses, including budgeted professional fees, all subject to the conditions set forth in the final DIP Loan Documents and in this Interim Order;

iii.      approves borrowings between the entry of this Interim Order and the entry of the Final Order (as defined below) in an aggregate principal amount not more than $1,163,966.00, (the "Interim Amount");

iv.      subject to entry of the Final Order (as defined below), approves the conversion of all outstanding obligations arising under or in connection with the Second Amendment to Loan Agreement, dated as of April 20, 2016, by and among the Strome Mezzanine Fund IV, LP and AF-Southeast, LLC, Allied Fiber – Florida, LLC, and Allied Fiber – Georgia, LLC (the "Second Amendment"), including, without limitation, outstanding principal and accrued interest and fees thereon into DIP Obligations (as defined below) (the "Roll Up");

v.       approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Loan Documents and authorizes and directs the Debtors to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Interim Order;

---

[2] Unless otherwise specified in this Interim Order, all capitalized terms used but not defined herein shall have the meanings given to such terms in the DIP Credit Agreement.

2

vi.     grants to the DIP Lender (x) the DIP Liens (as defined below) on all of the DIP
Collateral (as defined below) pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3)
and 364(d)(1) of the Bankruptcy Code, which DIP Liens are senior to and prime
all liens other than liens that, as of the Petition Date, were valid, perfected, non-
avoidable and senior to the Senior Pre-Petition Liens (the "Permitted
Encumbrances"), and (y) pursuant to section 364(c)(1) of the Bankruptcy Code,
superpriority administrative claims having recourse to all pre-petition and post-
petition property of the Debtors' estates, now owned or hereafter acquired and the
proceeds of each of the foregoing, including,[3] upon entry of this Interim Order,
any Debtor's rights under section 549 of the Bankruptcy Code and the proceeds
thereof, and upon entry of the Final Order, the proceeds of Avoidance Actions (as
defined below);

vii.    authorizes the Debtors to use "cash collateral," as such term is defined in section
363 of the Bankruptcy Code (the "Cash Collateral"), including Cash Collateral in
which the DIP Lender and the Senior Pre-Petition Lender (as defined below) have
a lien or other interest, in each case whether existing on the Petition Date, arising
pursuant to this Interim Order or otherwise;

viii.   vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely
to the extent necessary to implement and effectuate the terms and provisions of
the DIP Loan Documents and this Interim Order;

ix.     grants the Senior Pre-Petition Lender,[4] as of the Petition Date and in accordance
with the relative priorities set forth herein, the Adequate Protection Lien and the
Adequate Protection Priority Claim (each as defined below);

x.      schedules a final hearing on the DIP Motion (the "Final Hearing") to be held no
later than thirty (30) calendar days after the entry of this Interim Order to consider
entry of a final order that grants all of the relief requested in the DIP Motion on a
final basis and which final order shall be in form and substance (including with
respect to any subsequent modifications to the form or substance made in
response to objections of other creditors or this Court) acceptable to the DIP
Lender (the "Final Order");

xi.     waives, upon entry of the Final Order, the rights of the Debtors to surcharge the
DIP Lender's and the Senior Pre-Petition Lender's collateral pursuant to section
506(c) of the Bankruptcy Code; and

xii.    provides for the immediate effectiveness of this Interim Order and waives any
applicable stay (including under Bankruptcy Rule 6004) to permit such immediate
effectiveness.

---

[3] As used herein, the words "including" or "include" and variations thereof shall not be deemed to be terms of
limitation, and shall be deemed to be followed by the words "without limitation."

[4] Strome Mezzanine Fund IV, LP, in its capacity as provider of the Senior Pre-Petition Indebtedness, is referred to
herein as the "Senior Pre-Petition Lender."

3

Having considered the DIP Motion, the DIP Credit Agreement, the other DIP Loan Documents, the *Declaration of Scott L. Drake in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), and the evidence submitted or proffered at the hearing on this Interim Order (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(c), and 4001(d), 6004(c) and 9014 and all applicable Local Rules, due and sufficient notice of the DIP Motion and the Interim Hearing having been provided pursuant to Bankruptcy Rule 4001(b)(1)(C); the Interim Hearing having been held and concluded on April 22, 2016; this Court having considered all the pleadings, motions and other papers filed in connection therewith; this Court having overruled all unresolved objections to the interim relief requested in the Motion; this Court having considered the record made by the Debtors at the Interim Hearing; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[5]

A.    **Petition Date**.  On the Petition Date, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

---

[5] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

4

Court for the District of Delaware (this "Court").  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (to the extent such committee is appointed, the "Committee"), trustee, or examiner has been appointed in these Chapter 11 Cases.

B. **Jurisdiction and Venue**.  This Court has core jurisdiction over these Chapter 11 Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and other predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 and the Local Rules.

C. **Notice**.  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (ii) those entities or individuals included on the Debtors' List of Creditors Holding Twenty Largest Unsecured Claims on a Consolidated Basis, (iii) counsel to the Senior Pre-Petition Lender, (iv) counsel to the DIP Lender, and (v) the Junior Lien Holders (as defined below).  Under the circumstances, such notice of the DIP Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rules 4001(b), (c) and (d), and the Local Rules, and no other notice need be

5

provided for entry of this Interim Order.

D.    **Debtors' Stipulations Regarding the Senior Pre-Petition Indebtedness**.

Subject only to the rights of parties in interest that are specifically set forth in paragraph 7 below,

the Debtors admit, stipulate, acknowledge, and agree (collectively, the "Debtors' Stipulations")

as follows:

(i)    *Senior Pre-Petition Indebtedness*.  As of the Petition Date, each of the Debtors were truly and justly indebted to the Senior Pre-Petition Lender (I) in the aggregate principal amount of $51,822,394.00, *plus* accrued and unpaid interest and any additional fees, costs and expenses pursuant to that certain Loan Agreement, dated as of September 24, 2014, by and among Strome Mezzanine Fund IV, LP, as lender, and AF-Southeast, LLC, Allied Fiber – Florida, LLC, and Allied Fiber – Georgia, LLC (collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Senior Pre-Petition Credit Documents"), without defense, counterclaim, reduction or offset of any kind, which amount is guaranteed by Allied Fiber, LLC, pursuant to that certain Guarantee Agreement, dated as of  September 24, 2014, by and among Allied Fiber, LLC and Strome Mezzanine Fund IV, LP.[6]

(ii)    The first priority liens and security interests granted to the Senior Pre-Petition Lender in all of the Debtors' assets (the "Senior Pre-Petition Collateral" and the liens securing the Senior Pre-Petition Collateral, the "Senior Pre-Petition Liens") (a) are legal, valid, binding, enforceable, and perfected liens, (b) were granted to, or for the benefit of, the Senior Pre-Petition Lender for fair consideration and reasonably equivalent value, and (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii)    The obligations under the Senior Pre-Petition Indebtedness constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the Senior Pre-Petition Credit Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Senior Pre-Petition Indebtedness exist, (y) no portion of the Senior Pre-Petition Indebtedness or any payments made to the Senior Pre-Petition Lender are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of

---

[6] All obligations of the Debtors arising under the Senior Pre-Petition Credit Documents are referred to herein as the "Senior Pre-Petition Indebtedness."

any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) each of the guarantees provided in the Senior Pre-Petition Credit Documents shall continue in full force and effect to unconditionally guaranty the Senior Pre-Petition Indebtedness notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Lender to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.

(iv)    *Subordination of Junior Pre-Petition Liens, if any, to Senior Pre-Petition Liens*.  Subject to the entry of a Final Order, the Junior Pre-Petition Liens, if any, are inferior, junior and subordinate to the Senior Pre-Petition Liens pursuant to the Intercreditor Agreement.[7]  The DIP Loan Documents and the transactions contemplated thereby modify the terms of the Obligations (as defined in the Intercreditor Agreement) and the Financing Documents (as defined in the Intercreditor Agreement).  The additional obligations to the DIP Lender incurred by the Debtors under the DIP Loan Documents and this Interim Order do not affect in any manner the unconditional obligations of the Subordinating Lender (as defined in the Intercreditor Agreement) under the Intercreditor Agreement.  The Agent and Phoenix (each as defined in the Intercreditor Agreement) received notice of this Loan Agreement and the transactions contemplated hereby in accordance with Section 2(d) of the Intercreditor Agreement.

E.    **Cash Collateral**.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Senior Pre-Petition Lender.

F.    **Findings Regarding the DIP Facility**.

(i)    Need for Post-Petition Financing.  The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of their businesses, to make payroll, to satisfy other working capital and operational needs, to complete the Debtors' marketing and sale process and to otherwise preserve the value of the Debtors' estates.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to a successful sale

---

[7] The Subordinating Lenders, as that term is defined in the that certain Intercreditor Lien Subordination Agreement, dated as of September 24, 2014, by and among the Senior Pre-Petition Lender, William H. Hitchcock, as Agent for certain lenders to Allied Fiber, LLC, and Phoenix Fund, LLC (the "Intercreditor Agreement"), are collectively referred to herein as the "Junior Lien Holders."  The Junior Lien Holders' pre-petition liens and interests, if any, are referred to herein as the "Junior Pre-Petition Liens").

7

and/or to otherwise preserve the value of the Debtors' estates. If immediate financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Interim Order and the DIP Loan Documents, the Debtors and their estates will incur immediate and irreparable harm.

(ii)    <u>No Credit Available on More Favorable Terms</u>.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Documents and this Interim Order. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Lender the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claims (as defined below), (b) allowing the DIP Lender to provide the loans and other financial accommodations under the DIP Facility (including the Roll Up) on the terms set forth herein and in the DIP Loan Documents, and (c) granting to the Senior Pre-Petition Lender the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the Senior Adequate Protection Liens and the Senior Adequate Protection Priority Claims (all of the foregoing described in clauses (a), (b), and (c) above, collectively, the "<u>DIP Protections</u>").

G.    **Interim Financing**.  During the Interim Period (as defined below), the DIP Lender and the Senior Pre-Petition Lender are willing to provide financing to the Debtors and/or consent to the use of Cash Collateral by the Debtors, subject to (i) the entry of this Interim Order, and (ii) the terms and conditions of the DIP Loan Documents; <u>provided</u>, <u>however</u>, that the

8

consent of the Senior Pre-Petition Lender is limited to the present DIP Facility and shall not be applicable to any other debtor in possession loan facility even if such debtor in possession loan facility contains economic terms which are substantially similar to the economic terms of the DIP Facility.

        H.      **Adequate Protection**.  The Senior Pre-Petition Lender has agreed to permit the Debtors' use of the Senior Pre-Petition Collateral, including the Cash Collateral, during the Interim Period, subject to the terms and conditions set forth herein.  In addition, the DIP Facility contemplated hereby provides for a priming of the Senior Pre-Petition Liens pursuant to section 364(d) of the Bankruptcy Code.  The Senior Pre-Petition Lender is entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to this Court at the Interim Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, consistent with the Bankruptcy Code, including upon entry of the Final Order, section 506(b) thereof, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and are reasonable to protect the interests of the Senior Pre-Petition Lender.  If the Junior Lien Holders have not expressly consented to the entry of this Interim Order, the Junior Pre-Petition Liens, if any, and security interests of the Junior Lien Holders, if any, are not entitled to adequate protection pursuant to the terms of this Interim Order.

        I.      **Section 552**.  In light of the subordination of its liens and claims to the DIP Liens, and the imposition of the Carve-Out, the Senior Pre-Petition Lender is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of

ACTIVE 40015592v1 04/25/2016

the Final Order, the "equities of the case" exception shall not apply.

J.    **Initial Approved Budget**.    Attached hereto as **Exhibit A** is an initial Approved Budget (the "Initial Approved Budget").  The Initial Approved Budget conforms to the form attached to the DIP Credit Agreement as Exhibit H.  The Initial Approved Budget is an integral part of this Interim Order and has been relied upon by the DIP Lender and the Senior Pre-Petition Lender in consenting to this Interim Order, to provide the DIP Facility and to permit the use of the Cash Collateral.

K.    **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)    The terms and conditions of the DIP Facility (including the Roll Up) as set forth in the DIP Loan Documents and this Interim Order, and the fees, expenses and other charges paid and to be paid thereunder or in connection therewith, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

(ii)    The DIP Facility was negotiated in good faith and at arms' length among the Debtors, the DIP Lender and the Senior Pre-Petition Lender.

(iii)    Use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender and the Senior Pre-Petition Lender are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.  The DIP Liens, DIP Superpriority Claims and other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code.

L.    **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2)

and 4001(c)(2), and the Local Rules. Absent granting the relief set forth in this Interim Order, the Debtors' estates, their businesses and properties and their ability to successfully sell their assets or otherwise preserve the value of their estates will be immediately and irreparably harmed. The Court concludes that immediate entry of this Interim Order is therefore in the best interests of the Debtors' estates and creditors and will allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

**NOW, THEREFORE**, based on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Senior Pre-Petition Lender and the DIP Lender to the form and entry of this Interim Order, and good and sufficient cause appearing therefor:

**IT IS ORDERED** that:

1.     **Motion Granted**.  The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Interim Order and the Debtors are hereby authorized to enter into the DIP Loan Documents. Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled. This Interim Order shall become effective immediately upon its entry.

2.     **DIP Loan Documents and DIP Protections**.

(a)     Approval of DIP Loan Documents.  The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Interim Order, to incur the DIP Obligations[8], in accordance with, and

---

[8] For purposes of this Interim Order, the term "DIP Obligations" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement, the other DIP Loan Documents (including, without limitation, all "Obligations" as defined in the DIP Credit Agreement, and, subject to entry of the Final Order, the Roll Up) and to the DIP Lender or the Senior Pre-Petition Lender under this Interim Order.

11

subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents that may be required or necessary for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for by, this Interim Order and the DIP Loan Documents. The Debtors are hereby authorized to do and perform all acts and, subject to ten days (10) notice to the U.S. Trustee and counsel to any official committee appointed in the Debtors' Chapter 11 Cases, pay the principal, interest, fees, including all professional fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, and disbursements arising under the DIP Loan Documents and this Interim Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect. Upon their execution and delivery, the DIP Loan Documents shall represent the legal, valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms. No obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim. Each officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

(b)    <u>Authorization to Incur DIP Obligations and Use Cash Collateral</u>. To enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, during the period from the entry of this Interim Order through and including the earliest

12

to occur of (i) the entry of the Final Order, or (ii) a Termination Event (as defined below), in each case unless extended by written agreement of the DIP Lender and the Senior Pre-Petition Lender (the period from the entry of this Interim Order through and including such earliest date, the "Interim Period"), the Debtors are hereby authorized (x) to use Cash Collateral and (y) to borrow under the DIP Facility; provided that (i) during the Interim Period, the aggregate outstanding amount for all such borrowings shall not exceed the Interim Amount; and (ii) any proposed use of the proceeds of the DIP Facility or use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved Budget.

(c)     Roll Up of Pre-Petition Obligations.  Subject to entry of the Final Order, all outstanding obligations arising under or in connection with the Second Amendment, including, without limitation, outstanding principal and accrued interest and fees thereon shall immediately, automatically, and, subject to paragraph 7 of this Interim Order, irrevocably be deemed to have been converted into DIP Obligations under the DIP Loan Documents and shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under this Interim Order and the DIP Loan Documents.

(d)     Perfection in Cash.  Subject to the Carve-Out and other provisions of this Interim Order, all financial institutions in which the Debtors' deposit accounts are located shall comply with any request of the DIP Lender to turn over to the DIP Lender all funds therein without offset or deduction of any kind, and the Debtors are authorized to enter into such blocked account agreements with cash dominion with the DIP Lender and such financial institutions as the DIP Lender may require.  Alternatively, the DIP Lender shall be entitled to enjoy the benefit of all control agreements to which the Senior Pre-Petition Lender is a party without the need to

13

enter into new blocked account agreements.  Notwithstanding the foregoing, nothing herein is intended to prime any security interests held by the depository institutions at which the Debtors' maintain depository accounts, absent their consent.

(e)    Approved Budget; Cash Flow Reporting.  The Debtors shall timely furnish the DIP Lender with all financial information, budgets, forecasts, projections, reports and other calculations as reasonably requested by the DIP Lender and/or required by, and in accordance with, Section 7.37 of the DIP Credit Agreement.

(f)    Interest, Fees, Costs and Expenses.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court.  The Debtors shall pay all fees, costs, indemnities, expenses (including reasonable out-of-pocket legal and other professional fees and expenses of the DIP Lender within ten (10) days following receipt of such invoice, copies of which invoice shall also be delivered to the U.S. Trustee and counsel to any official committee appointed in the Chapter 11 Cases) and other charges payable under the terms of the DIP Loan Documents.   All such fees, costs, indemnities, expenses and disbursements, whether incurred, paid or required to be paid pre-petition or post-petition and whether or not budgeted in the Approved Budget,[9] are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Lender and/or its professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Loan Documents, and shall be non-

---

[9] As set out in paragraph 2(g), in the case of the costs and expenses of the DIP Lender, in accordance with the DIP Loan Documents and this Interim Order without being limited by the Approved Budget; provided, however, that costs and expenses of the DIP Lender shall not be included in the calculation of the variances permitted in the DIP Credit Agreement.

14

refundable and not subject to challenge in any respect. All such unpaid fees, costs, expenses, indemnities and disbursements that are payable under the terms of the DIP Loan Documents shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order.

(g)    Use of DIP Facility and Proceeds of DIP Collateral. The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral proceeds solely in accordance with this Interim Order and the DIP Loan Documents, and for the specific purposes, and at the specific time periods, set forth in the Approved Budget, subject to variances permitted in the DIP Credit Agreement (and in the case of the costs and expenses of the DIP Lender, in accordance with the DIP Loan Documents and this Interim Order without being limited by the Approved Budget; provided, however, that costs and expenses of the DIP Lender shall not be included in the calculation of the variances permitted in the DIP Credit Agreement). Without limiting the foregoing, the Debtors shall not be permitted to make any payments (from the DIP Collateral, the DIP Facility, or otherwise) on account of any pre-petition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except (a) with respect to the Senior Pre-Petition Indebtedness as set forth in this Interim Order and a Final Order; (b) as provided in the "first day orders" (as such term is used in the DIP Credit Agreement) and as expressly agreed to by the DIP Lender; or (c) as expressly provided in other motions, orders, and requests for relief, each in form and substance acceptable to the DIP Lender prior to such motion, order, or request for such relief being filed.

(h)    DIP Liens. As security for the DIP Obligations, effective as of the Petition Date, the following security interests and liens, which shall immediately and without any further action by any Person be valid, binding, permanent, perfected, continuing, enforceable, and non-

15

avoidable upon the entry of this Interim Order, are hereby granted by each Debtor to the DIP

Lender (all such security interests and liens granted to the DIP Lender pursuant to this Interim

Order and the DIP Loan Documents, the "DIP Liens"), on all of its right, title and interest in, to

and under all property and assets, whether now owned by or owing to, or hereafter acquired by

or arising in favor of such Debtor, whether owned by or to, or leased from or to, such Debtor,

and regardless of where located, including, without limitation, all of the Debtors' assets,

including all "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any

kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired

or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and

non-cash proceeds of all of the foregoing, in each case wherever located (all of the foregoing

collateral collectively referred to as the "DIP Collateral"):

> (I)     pursuant to section 364(c)(2) of the Bankruptcy Code, a fully
> perfected, binding, continuing, enforceable, and non-avoidable first
> priority lien on all unencumbered DIP Collateral, including, subject to the
> entry of the Final Order, the proceeds of the Debtors' claims and causes of
> action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the
> Bankruptcy Code and any other avoidance or similar action under the
> Bankruptcy Code or similar state or municipal law (collectively, the
> "Avoidance Actions", which for avoidance of doubt, excludes Debtors'
> claims and causes of action under section 549 of the Bankruptcy Code or
> similar state or municipal law and the proceeds of each of the foregoing),
> whether received by judgment, settlement, or otherwise;

> (II) pursuant to section 364(c)(3) of the Bankruptcy Code, a fully
> perfected, binding, continuing, enforceable and non-avoidable first prior
> lien on all DIP Collateral that is subject only to Permitted Encumbrances
> and  the Carve-Out.

> (III)    pursuant to section 364(d)(1) of the Bankruptcy Code, a fully
> perfected, binding, continuing, enforceable and non-avoidable first
> priority, senior priming lien on all other DIP Collateral (including Cash
> Collateral), which DIP Lien (x) shall be senior to the Adequate Protection
> Liens and (y) shall be senior to and prime any and all valid, perfected,
> enforceable and non-avoidable pre-petition and post-petition liens, tax
> liens or other non-consensual liens in existence as of the Petition Date and
> properly perfected prior to the Petition Date other than Permitted

16

Encumbrances (the liens referenced in clauses (x) and (y), collectively, the "Primed Liens") and shall be subject only to the Carve-Out; provided however, such DIP Lien shall not be senior to any allowed, perfected, non-avoidable lien whose holder or agent of such holder did not consent or who otherwise did not receive notice of the Motion.

(i)    Superpriority Administrative Claim Status.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the Carve-Out in accordance with this Interim Order, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Priority Claims (as defined below)), priority claims and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the Final Order), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order, Avoidance Actions and the proceeds thereof.  Other than as expressly provided in the DIP Credit Agreement and/or this Interim Order with respect to the Carve-Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these

17

proceedings, or in any Successor Cases (as defined below), and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Lender arising under the DIP Loan Documents and/or this Interim Order.

(j)    Priority of DIP Liens and DIP Superpriority Claims.  The DIP Liens and the DIP Superpriority Claims:  (A) subject to the entry of the Final Order, shall not be subject to sections 506, 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any liens or claims of any Debtor or any direct or indirect parent or subsidiary thereof against any Debtor or any of such Debtor's property, and (C) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the dismissal of any of the Chapter 11 Cases.

3.    **Adequate Protection for the Senior Pre-Petition Lender**.  In consideration for the use of the Senior Pre-Petition Collateral (including Cash Collateral), and solely to the extent that the Debtors have value in the DIP Collateral, the Senior Pre-Petition Lender shall receive, as applicable, the following adequate protection (collectively referred to as the "Pre-Petition Adequate Protection"):

(a)    Senior Adequate Protection Liens.  To the extent there is a diminution in value of the Senior Pre-Petition Lender's interests in the Senior Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date, resulting from the use, sale, or lease by the Debtors

18

of the applicable Senior Pre-Petition Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the imposition of the Carve-Out, or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code (a "Diminution in Senior Pre-Petition Collateral Value"), the Senior Pre-Petition Lender is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement security interests in and liens and mortgages upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "Senior Adequate Protection Liens"), which Senior Adequate Protection Liens on such DIP Collateral shall be junior and subordinate only to the DIP Liens and the Senior Pre-Petition Liens and subject to the Carve-Out.

(b)     Senior Adequate Protection Priority Claims.   To the extent of Diminution in Senior Pre-Petition Collateral Value, the Senior Pre-Petition Lender is hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "Senior Adequate Protection Priority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority over other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 9), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and subject to the Carve-Out, and payable from and having recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (including, subject to entry of

19

the Final Order, all proceeds of Avoidance Actions); provided, however, that the Senior Pre-Petition Lender shall not receive or retain any payments, property, or other amounts in respect of the Senior Adequate Protection Priority Claims unless and until all DIP Obligations have been paid in full.  Subject to the relative priorities set forth above, the Senior Adequate Protection Priority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.

(c)    Priority of Senior Adequate Protection Liens and Senior Adequate Protection Priority Claims.  The Senior Adequate Protection Liens and the Senior Adequate Protection Priority Claims (A) subject to paragraph 7 below and the entry of the Final Order, shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, and (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases or any Successor Cases, and/or upon the dismissal of any of the Chapter 11 Cases.  The Senior Adequate Protection Liens shall be junior to the DIP Liens and the Senior Pre-Petition Liens arising under any Senior Pre-Petition Credit Documents, and, subject to the entry of the Final Order, senior to any other liens, including, without limitation, to any other adequate protection replacement liens.

(d)    Interest and Professional Fees.  Without limiting any rights of the Senior Pre-Petition Lender under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a requirement, for obtaining the Senior Pre-Petition Lender's

20

consent to the entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein and as additional adequate protection, (i) subject to the entry of the Final Order, the Senior Pre-Petition Lender's fees, costs, expenses, and charges (including the reasonable fees, costs, and expenses of counsel and financial advisors for the Senior Pre-Petition Lender) to the extent, and at the times, payable under the Senior Pre-Petition Credit Documents, including any unpaid fees, costs and expenses accrued prior to the Petition Date, and (ii) all of the interest accruing under the Senior Pre-Petition Credit Documents at the default rate(s) set forth therein, in the case of each of sub-clauses (i) and (ii) above, whether or not budgeted in the Approved Budget, and without further notice, motion, or application to, order of, or hearing before, this Court, shall accrue during these Chapter 11 Cases, and shall be deemed to be included in the Senior Pre-Petition Indebtedness.

(e)     <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Senior Pre-Petition Lender to seek additional or alternative forms of adequate protection at any time; <u>provided</u> that any such additional or alternative adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Lender granted under this Interim Order and the DIP Loan Documents.

4.     **Automatic Post-Petition Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the Senior Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect

21

(in accordance with applicable law) such liens, or to entitle the DIP Lender or the Senior Pre-Petition Lender to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed or recorded as of the Petition Date. The applicable Debtors shall execute and deliver to the DIP Lender all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection and priority of the DIP Liens and the Senior Adequate Protection Liens, as applicable, granted pursuant hereto. Without limiting the foregoing, the DIP Lender may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

5. **Automatic Stay**. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and/or modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the Senior Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Lender, under the DIP Loan Documents, the DIP Facility, and this Interim Order, (ii) authorize the DIP Lender and the Senior Pre-Petition Lender to retain and apply payments made in accordance with the DIP Loan Documents and the Senior Pre-Petition Credit Documents, (iii) to permit each of

22

the DIP Lender and the Senior Pre-Petition Lender to perform any act authorized under this Interim Order and the DIP Loan Documents, and (iv) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Loan Documents.

6.    **Release of Claims**.   Subject only to the rights of parties in interest that are specifically set forth in paragraph 7 below, the releases provided in Section 7.34 of the DIP Credit Agreement are expressly incorporated herein by reference and are effective as of the date of entry of this Interim Order.

7.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.   The Debtors' Stipulations and waivers shall be binding upon the Debtors in all circumstances upon entry of this Interim Order.  Nothing in this Interim Order or the DIP Loan Documents shall prejudice whatever rights any official committee(s) or any other party in interest (other than the Debtors), including any trustee subsequently appointed under chapter 7 or chapter 11 of the Bankruptcy Code, may have (a) to object to or challenge the findings herein, including, but not limited to, those in relation to (i) the validity, extent, perfection or priority of the mortgages, security interests and liens of the Senior Pre-Petition Lender in and to the Senior Pre-Petition Collateral, or (ii) the validity, allowability, priority, status or amount of the Senior Pre-Petition Indebtedness, or (b) to bring suit against the Senior Pre-Petition Lender in connection with or related to the Senior Pre-Petition Indebtedness, or the actions or inactions of the Senior Pre-Petition Lender arising out of or related to the Senior Pre-Petition Indebtedness, or otherwise; provided, however, that, unless any official committee(s) or any other party in interest obtains the requisite standing to commence, and commences, a contested matter or adversary proceeding raising such objection or challenge, including without limitation any claim against the Senior Pre-Petition Lender in the nature of a setoff, counterclaim or defense to the

23

Senior Pre-Petition Indebtedness (including but not limited to, those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Senior Pre-Petition Lender), by the later of (a) with respect to any Committee, sixty (60) calendar days following the appointment of any Committee, or (b) with respect to other parties in interest with requisite standing other than the Debtors or any Committee, seventy-five (75) calendar days after the Petition Date (collectively, (a) and (b) shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "Challenge Period Termination Date"),[10] upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, any official creditors' committee(s), any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party in interest) shall be deemed to be forever waived and barred, and all of the obligations under the Senior Pre-Petition Credit Documents shall be allowed secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Chapter 11 Cases and the Debtors' Stipulations and waivers shall be binding on the Debtors' estates, all creditors, interest holders and parties in interest.  To the extent any such objection or complaint is filed, the findings herein shall nonetheless remain binding and preclusive on the Committee, any other official committee and on any other person or entity, except to the extent that such assertions were challenged in such objection or complaint.  In the event of a timely and successful challenge, this Court shall fashion the appropriate remedy with respect to the Senior

---

[10] If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) days after the date on which such trustee is appointed or elected.  If a chapter 7 trustee or a chapter 11 trustee is appointed after a Challenge is commenced, such trustee shall be substituted as a party-in-interest in the Challenge, subject to his discretion.

24

Pre-Petition Lender after hearing from all parties. Notwithstanding anything to the contrary contained herein, the Committee, if appointed, shall have standing to bring such a challenge.

8.    **Carve-Out**. Subject to the terms and conditions contained in this paragraph, each of the DIP Liens, the DIP Superpriority Claims, the Senior Pre-Petition Liens, the Senior Adequate Protection Liens, and the Senior Adequate Protection Claims shall be subject to payment of the Carve-Out in accordance with the terms of this Interim Order:

(a)    Carve-Out. As used in this Interim Order, the "Carve-Out" means, collectively, the sum of:  (a) all allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for statutory fees payable to the Office of the United States Trustee, together with the statutory rate of interest, as agreed to by the U.S. Trustee or by final order of the Court, and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Court; (b) all fee accruals allowed at any time by the Court and incurred by professionals retained by the Debtors or the Committee, if any, in accordance with a final order of the Court (which order has not been reversed, vacated or stayed) under sections 327, 328 or 1103 of the Bankruptcy Code (the "Professionals") through the date of service by the DIP Lender of a notice of event of default under the DIP Credit Agreement (the "Carve-Out Trigger Notice"), up to and as limited by the respective aggregate Budget amounts for each Professional through the date of service of such Carve-Out Trigger Notice, less the amount of prepetition retainers received by such Professionals and not previously applied to the fees and expenses of such Professionals; and (c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the  Professionals from and after the date of service by the DIP Agent of a Carve-Out Trigger Notice, to the extent allowed at any time by the Court, in an aggregate amount not to exceed $50,000 (the "Carve-Out Cap"), less the amount of prepetition retainers received by such Professionals and not applied to the fees, disbursements, costs and

25

expenses set forth in clause (b) above. The Carve-Out Cap shall not be reduced on a dollar-for-dollar basis by any payments of fees, disbursements, costs or expenses of the Professionals incurred prior to the date of service by the DIP Lender of the Carve-Out Trigger Notice. No portion of the Carve-Out, nor any Cash Collateral or proceeds of the DIP Facility may be used in violation of this Interim Order. Any unused portion of the Carve-Out shall at all times remain Cash Collateral as provided herein and shall be applied in accordance with paragraph 12 of this Interim Order. The DIP Liens are hereby deemed to attach to the Debtors' residual interest in such excess.

(b)     <u>No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees</u>. None of the DIP Lender or the Senior Pre-Petition Lender shall be responsible for the direct payment or reimbursement of any fees, costs, expenses or disbursements of any of the Professionals. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Professionals, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases or shall affect the right of the DIP Lender or the Senior Pre-Petition Lender to object to the allowance and payment of such fees.

(c)     <u>Payment of Allowed Professional Fees and Expenses Prior to a Termination Event</u>. Prior to the occurrence of a Termination Event (defined below), the Debtors shall be permitted to pay allowed fees and expenses of the Professionals, or the members of the Committee (only to the extent such fees and expenses were incurred in accordance with the Approved Budget), subject to this Interim Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any interim compensation procedures order entered by this Court.

9.      **Waiver of 506(c) Claims/Marshalling**. Subject to the entry of the Final Order: (i) no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that

26

may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Senior Pre-Petition Collateral, including Cash Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the DIP Lender or the Senior Pre-Petition Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Senior Pre-Petition Lender; and (ii) in no event shall the DIP Lender or the Senior Pre-Petition Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Senior Pre-Petition Collateral, as applicable.

10.    **Section 552(b)**.  The DIP Lender and the Senior Pre-Petition Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Subject to the entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or the Senior Pre-Petition with respect to proceeds, products, offspring or profits of any of the Senior Pre-Petition Collateral.

11.    **Protection of DIP Lender's and the Senior Pre-Petition Lender's Rights**. Unless the DIP Lender and the Senior Pre-Petition Lender shall have provided their prior written consent, or all DIP Obligations and obligations under the Senior Pre-Petition Credit Documents have been paid in full, it shall constitute an Event of Default under the DIP Loan Documents if there is entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral, the Senior Pre-Petition Collateral and/or that is entitled to administrative priority status, in each

27

case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Senior Pre-Petition Liens, the Senior Adequate Protection Liens, the Senior Adequate Protection Priority Claims and/or the other DIP Protections; (ii) the use of Cash Collateral for any purpose other than to pay in full the DIP Obligations and the obligations under the Senior Pre-Petition Credit Documents, or as otherwise permitted in the DIP Loan Documents and this Interim Order, or (iii) any modification of either of the DIP Lender's or the Senior Pre-Petition Lender's rights under this Interim Order, the DIP Loan Documents or the Senior Pre-Petition Credit Documents.

12.    **Cash Collection and Borrower Account**.  From and after the date of the entry of this Interim Order, the proceeds of the DIP Facility, and all collections and proceeds of any DIP Collateral, Senior Pre-Petition Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in (i) the Debtors' debtor-in-possession bank account (the "DIP Account"), provided however, no proceeds of avoidance actions shall be deposited into the DIP Account until entry of the Final Order.  No funds shall be disbursed from the DIP Account or any such other account other than in accordance with the DIP Credit Agreement and the Approved Budget.  Upon an Event of Default, no amounts (other than the Carve-Out) shall be disbursed from the DIP Account. Subject to the entry of the Final Order, upon the direction of the DIP Lender, at any time after the occurrence of a Termination Event and subject to the provisions of paragraph 14, all proceeds in the DIP Account shall be remitted to the DIP Lender for application to the DIP Obligations until payment in full, and then to the Senior Pre-Petition Lender for application to the Senior Pre-Petition Indebtedness until payment in full, and the DIP Lender and the Senior Pre-Petition Lender shall be entitled to take all action that is necessary or appropriate to effectuate the

28

foregoing.  Unless otherwise agreed to in writing by the DIP Lender, the Debtors shall maintain no accounts except those identified in the *Order (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts; and (II) Authorizing Continuation of Use of Existing Business Forms* (the "Cash Management Order").  The Debtors and the financial institutions where the bank accounts authorized in the Cash Management Order are maintained are authorized and directed to remit funds in such accounts upon receipt of any direction to that effect from the DIP Lender or, following payment in full of the DIP Obligations, the Senior Pre-Petition Lender.

     13.    **Disposition of DIP Collateral; Credit Bid**.

     (a)    Unless the DIP Obligations and subject to the Final Order, the obligations under the Senior Pre-Petition Indebtedness are paid in full upon the closing of a sale or other disposition of the DIP Collateral or the Senior Pre-Petition Collateral, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or any portion of the Senior Pre-Petition Collateral (or enter into any binding agreement to do so) without the prior written consent of the DIP Lender and the Senior Pre-Petition Lender (and no such consent shall be implied from any other action, inaction, or acquiescence by either of the DIP Lender or the Senior Pre-Petition Lender, or any order of this Court), except as permitted in the DIP Loan Documents and/or the Senior Pre-Petition Credit Documents, as applicable, and this Interim Order.  Except to the extent otherwise expressly provided in the DIP Loan Documents, subject to the entry of the Final Order, all proceeds from the sale, transfer, lease, encumbrance or other disposition of any DIP Collateral shall be remitted to the DIP Lender for application to repayment of the DIP Obligations, and then for application to repayment of any remaining Senior Pre-Petition Indebtedness, in each case, in accordance with the terms of this

Interim Order, the DIP Loan Documents and/ or the Senior Pre-Petition Credit Documents, as the case may be.

(b)    The DIP Lender (or one or more of its designees, affiliates or assignees) shall have the unqualified right to credit bid up to the full amount of any DIP Obligations in any sale of the DIP Collateral (or any DIP Collateral subject to any Senior Adequate Protection Liens) under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code.

(c)    Subject to entry of the Final Order, and without prejudice to any successful challenge brought prior to the Challenge Deadline, the Senior Pre-Petition Lender shall have the right to credit bid up to the full amount of the Senior Pre-Petition Indebtedness in any sale of the DIP Collateral (or any part thereof) or Senior Pre-Petition Collateral (or any part thereof), as applicable, without the need for further Court order authorizing same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise

14.    **Termination; Rights and Remedies Upon Termination Event.**

(a)    The DIP Facility shall terminate the earliest of (i) the Maturity Date; (ii) the acceleration of all or any portion of the Obligations; (iii) thirty (30) days after the entry by the Bankruptcy Court of this Interim Order, unless the Final Order shall have been entered and become effective prior thereto; (iv) the conversion of any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Lender; (v) the dismissal of any of these Chapter 11 Cases unless otherwise consented to in writing by the DIP Lender; (vi) the effective date of any Debtor's plan of reorganization

30

confirmed in these Chapter 11 Cases; (vii) the closing of a sale of substantially all the assets of

the Debtors, (viii) the filing of a plan of reorganization in these Chapter 11 Cases by any party

that does not provide for payment in full of all of the DIP Obligations upon the effective date of

such plan; (ix) the Debtors seek or propose to sell all or substantially all the assets of the Debtors

and such sale does not provide for payment in full of all the DIP Obligations without the consent

of the DIP Lender; (x) entry of an order granting a motion or other pleading requesting (or entry

of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with

special powers; (xi) subject to the entry of the Final Order, the commencement of an action

seeking to invalidate, reduce, or otherwise impair the claims or liens of the DIP Lender or the

Senior Pre-Petition Lender; and (xii) the occurrence of an "Event of Default" under the DIP

Credit Agreement (each a "Termination Event" and such date of termination, the "Termination

Date").   For the avoidance of doubt, the occurrence of an "Event of Default" under the DIP

Credit Agreement (one event of which is the occurrence of the Termination Date), as set forth

therein, or any other material breach, default or other violation by any of the Debtors of the terms

and provisions of this Interim Order shall constitute a Termination Event unless waived in

writing by the DIP Lender.   Upon the occurrence of a Termination Event, and subject to

providing five (5) business days prior written notice and opportunity to be heard (within such

five (5) business days) thereof to the Debtors, counsel to the Committee and the U.S. Trustee of

such Termination Event, any automatic stay otherwise applicable to the DIP Lender is hereby

modified, without requiring further authorization of this Court, to the extent necessary to permit

the DIP Lender to exercise any and all rights and remedies available to it under the DIP Credit

Agreement and applicable law.

31

(b)      Subject to the entry of the Final Order, upon the effectiveness of any relief from the automatic stay with respect to the DIP Facility pursuant to paragraph 14(a) hereof, the Senior Pre-Petition Lender shall have relief from the automatic stay to the same extent as the DIP Lender, and without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on its Pre-Petition Liens and the Senior Adequate Protection Liens or otherwise exercise remedies against the DIP Collateral or Senior Pre-Petition Collateral permitted by this Interim Order, the Senior Pre-Petition Credit Documents and/or applicable non-bankruptcy law; provided, however, that any such foreclosure, enforcement or exercise of remedies by the Senior Pre-Petition Lender shall not interfere with or otherwise be inconsistent with any foreclosure or other enforcement by the DIP Lender of any DIP Liens or other DIP Protections or any other exercise of remedies by the DIP Lender.

(c)      Subject to the provisions of paragraph 7 hereof, all proceeds realized in connection with the exercise of the rights and remedies of the DIP Lender or the Senior Pre-Petition Lender shall be turned over first to the DIP Lender for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents and this Interim Order until payment in full of all of the DIP Obligations and then, subject to the entry of the Final Order, to the Senior Pre-Petition Lender for application to the obligations under the Senior Pre-Petition Credit Documents.

15.      **Restriction on Use of Proceeds**.  Notwithstanding anything herein to the contrary, no loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Senior Pre-Petition Collateral, or any portion of the Carve-Out may be used by (a) any Debtor, Committee or trustee or other estate representative appointed in these Chapter 11 Cases or any Successor

32

Cases, or any other person, party, or entity (including any of the Professionals or the members of the Committee) to investigate or prosecute any challenge (including any litigation or other action) in connection with the value of the Senior Pre-Petition Collateral or the DIP Collateral (or to pay any professional fees and disbursements incurred in connection therewith) at any time; or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in these Chapter 11 Cases or any Successor Cases, or any other person, party, or entity (including any of the Professionals or the members of the Committee) to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lender, or to seek any modification to this Interim Order not approved by the DIP Lender and, to the extent such modification would affect the rights of the Senior Pre-Petition Lender; (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Lender, the Senior Pre-Petition Lender, their respective affiliates, assigns or successors and the respective officers, directors, employees, agents, attorneys, representatives and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including (A) any challenges raised during the Challenge Period and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations, the obligations under the Senior Pre-Petition Credit Documents, or the validity, extent, and priority of the DIP Liens, the

33

Senior Pre-Petition Liens, or the Senior Adequate Protection Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Senior Pre-Petition Liens, the Senior Adequate Protection Liens, or the other Pre-Petition Adequate Protection; (D) any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Lender's or the Senior Pre-Petition Lender's assertion, enforcement, or realization on the Cash Collateral, the DIP Collateral, the Senior Pre-Petition Collateral in accordance with the DIP Loan Documents, the Senior Pre-Petition Credit Documents, as applicable, or this Interim Order; and/or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender, the Senior Pre-Petition Lender hereunder or under the DIP Loan Documents, the Senior Pre-Petition Credit Documents, as applicable, or any payments made thereunder or in respect thereof; provided, however, up to $25,000 in the aggregate of the Carve-Out, any DIP Collateral, any Senior Pre-Petition Collateral, including any Cash Collateral, and proceeds of the DIP Facility may be used by the Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the claims and/or liens of the Senior Pre-Petition Lender under the Senior Pre-Petition Credit Documents (but not the claims and/or liens of the DIP Lender) so long as such investigation occurs within the Challenge Period; (iii) pay any fees or similar amounts to any person (other than the Senior Pre-Petition Lender) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Lender and the Senior Pre-Petition Lender; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral or Senior Pre-Petition Collateral unless otherwise permitted hereby, without the prior written consent of the DIP Lender and the Senior Pre-Petition Lender.

34

16.    **Proofs of Claim**.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or Successor Cases to the contrary, the DIP Lender and the Senior Pre-Petition Lender will not be required (but are authorized) to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.

17.    **Preservation of Rights Granted Under the Interim Order**.

(a)    No Non-Consensual Modification or Extension of Interim Order.  The Debtors shall not seek any amendment, modification, or extension of this Interim Order (including through any chapter 11 plan of reorganization) without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Lender.  In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash authorized or made hereby or pursuant to the DIP Loan Documents, or lien, claim, priority or other DIP Protections authorized or created hereby or pursuant to the DIP Loan Documents.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Lender and the Senior Pre-Petition Lender shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or any DIP Protections (including the Pre-Petition Adequate Protection)

35

incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Lender

of the effective date of such reversal, modification, vacatur, or stay shall remain in full force and

effect and be binding on all parties in interest and be governed in all respects by the original

provisions of this Interim Order (and shall maintain their respective priorities as provided by this

Interim Order), and the DIP Lender and the Senior Pre-Petition Lender shall be entitled to all of

the DIP Protections (including the Pre-Petition Adequate Protection) and all other rights,

remedies, liens, priorities, privileges, protections, and benefits granted pursuant to section 364(e)

of the Bankruptcy Code, this Interim Order, or the DIP Loan Documents.

(b)    Survival of Interim Order. The provisions of this Interim Order and the DIP Loan

Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections

(including the Pre-Petition Adequate Protection), and all other rights, remedies, liens, priorities,

privileges, protections, and benefits granted to any or all of the DIP Lender or the Senior Pre-

Petition Lender, respectively, shall survive, and shall not be modified, impaired, or discharged

by, the entry of any order confirming any plan of reorganization in any Chapter 11 Case or

Successor Case, converting any Chapter 11 Case to a case under chapter 7, dismissing any of the

Chapter 11 Cases, withdrawing of the reference of any of the Chapter 11 Cases or any Successor

Cases or providing for abstention from handling or retaining of jurisdiction of any of the Chapter

11 Cases or any Successor Case in this Court, or terminating the joint administration of these

Chapter 11 Cases or any Successor Case or by any other act or omission. The terms and

provisions of this Interim Order, including all of the DIP Protections (including the Pre-Petition

Adequate Protection) and all other rights, remedies, liens, priorities, privileges, protections, and

benefits granted to any or all of the DIP Lender or the Senior Pre-Petition Lender, respectively,

shall continue in full force and effect and be binding on all parties in interest notwithstanding the

36

entry of any such order, and such DIP Protections (including the Pre-Petition Adequate Protection), and such other rights, remedies, liens priorities, privileges, protections and benefits, shall continue in full force and effect in these Chapter 11 Cases and in any Successor Cases and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order. The DIP Obligations shall not be discharged by the entry of an order confirming any chapter 11 plan of reorganization, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

18.    **Insurance Policies**.  Upon entry of this Interim Order, the DIP Lender and the Senior Pre-Petition Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, and the Debtors shall take such actions as are reasonably requested by the DIP Lender or the Senior Pre-Petition Lender from time to time to evidence or effectuate the foregoing.

19.    **Other Rights and Obligations**.

(a)    Expenses.  As provided in the DIP Loan Documents (and without limiting the Debtors' respective obligations thereunder) and this Interim Order, the applicable Debtors will pay all reasonable expenses incurred by the DIP Lender (including the reasonable fees and disbursements of the DIP Lender's professionals, including professionals engaged by counsel to the DIP Lender) in connection with the preparation, execution, delivery, and administration of the DIP Loan Documents, this Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

ACTIVE 40015592v1 04/25/2016

(b)    <u>Binding Effect</u>.    The provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Chapter 11 Cases, in any Successor Cases, and following dismissal of any such Chapter 11 Case or Successor Case, including the DIP Lender, the Senior Pre-Petition Lender, any Committee, and the Debtors and their respective estates, successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors); <u>provided</u>, <u>however</u>, that the DIP Lender and the Senior Pre-Petition Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Chapter 11 Case or Successor Case.

(c)    <u>No Waiver</u>.   The failure of the DIP Lender or the Senior Pre-Petition Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Senior Pre-Petition Credit Documents, the DIP Loan Documents or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.   Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, any right or ability of the DIP Lender and the Senior Pre-Petition Lender under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of these Chapter 11 Cases or any Successor Cases to cases under chapter 7, dismissal of these Chapter 11 Cases or any Successor Cases, or the appointment of a trustee or examiner in these Chapter 11 Cases or any Successor Cases, or to oppose the use of Cash Collateral in any Successor Case, (ii) propose,

38

subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors or seek early termination of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (iii) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender or the Senior Pre-Petition Lender.

(d)    No Third Party Rights.    Except as explicitly provided for herein or in any DIP Loan Document, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

(e)    Amendments.    The Debtors and the DIP Lender are authorized and empowered, without further notice and hearing or approval of this Court, to make any non-material modifications to the DIP Loan Documents, in accordance with Section 10.3 of the DIP Credit Agreement.

(f)    Inconsistency.    In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(g)    Enforceability.    This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

ACTIVE 40015592v1 04/25/2016

(h)    <u>Reservation of Rights</u>.    Nothing in this Interim Order shall be deemed to constitute the consent of the DIP Lender or the Senior Pre-Petition Lender, and each of the foregoing expressly reserve the right to object, to entry of any order of the Bankruptcy Court that provides for the sale or other disposition of all or substantially all of the assets of the Debtors (or any other sale or other disposition of assets of any of the Debtors outside the ordinary course of business) to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to pay in full the DIP Obligations, the Senior Pre-Petition Indebtedness and the Senior Adequate Protection Priority Claims and all of the foregoing are paid in full on the closing date of such sale.

(i)    <u>Headings</u>.    Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

20.    **Final Hearing**

(a)    The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for May 13, 2016, at 10:00 A.M. (ET) at the United States Bankruptcy Court for the District of Delaware.  <u>Final Hearing Notice</u>.  Within three (3) days of the date of entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (i) notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>") and (ii) a copy of this Interim Order on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court **by no later than May 6,**

**2016 at 4:00 p.m. (ET)**, which objections shall be served so that the same are **actually received on or before such date** by:  the Debtors, counsel to the DIP Lender, counsel to the Senior Pre-Petition Lender and the U.S. Trustee.

21.    **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: _____, 2016                    _____

                                              THE HONORABLE KEVIN GROSS
                                              UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT G**

SCHEDULE OF ADVANCES

**AF Southeast, LLC**
**Exhibit G**

| Date | |
|---|---|
| 03/17/16 | $ 312,366 |
| 03/17/16 | 88,000 |
| 03/18/16 | 81,000 |
| 03/25/16 | 1,050,000 |
| 03/25/16 | 20,600 |
| 03/25/16 | 14,592 |
| 03/30/16 | 63,495 |
| 03/30/16 | 7,714 |
| 03/30/16 | 926 |
| 03/30/16 | 2,085 |
| 03/30/16 | 106,747 |
| 03/30/16 | 14,253 |
| 04/14/16 | 203,992 |
| 04/14/16 | 926 |
| 04/14/16 | 2,805 |
| 04/14/16 | 206,111 |
| 04/18/16 | 250,000 |
| 04/18/16 | 250,000 |
| | $ 2,675,611 |

# EXHIBIT H

FORM OF APPROVED BUDGET

**AF - Southeast, LLC Consolidated**
**DRAFT Operating Cash Requirements from [Date of Filing] to [ July 15, 2016 ]**
Key Assumptions and Comments:
a. Core team only to support/maintain network and customers
b. No marketing, sales, sales support staff
c. Legal expenses reflected outside of operating costs; subject to change and increase

| | 4/18/2016 | 4/25/2016 | 5/2/2016 | 5/9/2016 | 5/16/2016 | 5/23/2016 | 5/30/2016 | 6/6/2016 | 6/13/2016 | 6/20/2016 | 6/27/2016 | 7/4/2016 | 7/11/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Recurring Revenue | | | 34,460 | | | | | 34,460 | | | | | | 68,920 |
| **COGS** | | | | | | | | | | | | | | |
| RoW Rent (assumes June and July pmts paid in advance as post-petition) | 46,000 | | 110,272 | | | | | | | | | | | 156,272 |
| Colo Rent | 20,000 | | 37,800 | | | | | | | | | | | 57,800 |
| Colo Costs | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 23,750 | 308,750 |
| Travel - Ops Team | 5,000 | | 10,000 | | | | 10,000 | | | | 5,000 | | | 30,000 |
| Contingency | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 162,500 |
| Subtotal - COGS | 107,250 | 36,250 | 194,322 | 36,250 | 36,250 | 36,250 | 46,250 | 36,250 | 36,250 | 36,250 | 41,250 | 36,250 | 36,250 | 715,322 |
| **SG&A** | | | | | | | | | | | | | | |
| Payroll + Benefits (Core Team Only) | | 90,000 | | 72,000 | | 90,000 | | | 72,000 | | 90,000 | | 72,000 | 486,000 |
| Employee stay pmt/incentive plans [TBD] | 7,500 | | 15,000 | | | | 15,000 | | | | 7,500 | | 7,500 | 52,500 |
| Admin & Operations Travel | | | | | | | 12,500 | | | | 12,500 | | | 25,000 |
| Legal | | | | | 10,000 | | 10,000 | | 10,000 | | 10,000 | | 10,000 | 50,000 |
| Professional Services | 20,000 | | 5,000 | | | | 15,000 | | | | 15,000 | | | 55,000 |
| Office & All Other | | | 5,000 | | | | | | | | | | | 5,000 |
| Subtotal - SG&A | 27,500 | 90,000 | 25,000 | 72,000 | 10,000 | 90,000 | 52,500 | - | 82,000 | - | 135,000 | - | 89,500 | 673,500 |
| Subtotal AF- Southeast LLC Operating Costs only | 134,750 | 126,250 | 219,322 | 108,250 | 46,250 | 126,250 | 98,750 | 36,250 | 118,250 | 36,250 | 176,250 | 36,250 | 125,750 | 1,388,822 |
| **Post-Petition Vendor Deposits** | | | | | | | | | | | | | | |
| Florida East Coast Railroad (FECR) [ assume no deposit request, obligations paid one year in advance] | | | | | | | | | | | | | | |
| Norfolk Southern/YT-Cubed RoW ($110,272 monthly lease costs) assuming June and July pmts due in advance | | | 220,544 | | | | | | | | | | | 220,544 |
| Tower Cloud advance payments requested (three months rent) | | | 138,000 | | | | | | | | | | | 138,000 |
| Other Colocation Facilities (2 months under various leases) | | | 75,600 | | | | | | | | | | | 75,600 |
| Subtotal Post-petition Vendor Deposits | | | 434,144 | | | | | | | | | | | 434,144 |
| **Capex** | | | | | | | | | | | | | | |
| Corporate capex - replacement computers | 15,000 | | | | | | | | | | | | | 15,000 |
| Customer capex support | | 5,000 | | | 5,000 | | | | 5,000 | | | 5,000 | | 20,000 |
| All Aboard Florida capex | | | 70,000 | | | | 70,000 | | | | 70,000 | | | 210,000 |
| Tower Cloud - exercise of IRU purchase option on GA segment | | | 2,400,000 | | | | | | | | | | | 2,400,000 |
| Subtotal - Capex | 15,000 | 5,000 | 2,470,000 | - | 5,000 | - | 70,000 | - | 5,000 | - | 70,000 | 5,000 | - | 2,645,000 |
| **Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| Fees and expenses of the Clerk of the Court and the U.S. Trustee | | | | | | | | | | | | | | |
| Fees and expenses of Creditors' Committee | | | | | | | | | | | | | | |
| DIP Lenders Counsel: Neligan Foley | | | | | | | | | | | | | | |
| DIP Lenders Counsel: Bodman PLC | | | | | | | | | | | | | | |
| Debtor's Counsel: Fox Rothschild LLP | | | | | | | | | | | | | | |
| Debtor's Financial Advisors: FMCM | | | | | | | | | | | | | | |
| Subtotal - Bankruptcy Legal and Professional Services | | | | | | | | | | | | | | |
| **Debt Service** | | | | | | | | | | | | | | |
| Storme Mezzanine Fund IV, L.P. Interest (assumed PIK) | | | | | | | | | | | | | | |
| DIP Loan Interest | | | | | | | | | | | | | | |
| Subtotal - Debt Service | | | | | | | | | | | | | | |
| Total Budget for [ 90 day ] period | 149,750 | 131,250 | 3,123,466 | 108,250 | 51,250 | 126,250 | 168,750 | 36,250 | 123,250 | 36,250 | 246,250 | 41,250 | 125,750 | 4,467,966 |

**AF - Southeast, LLC ONLY**
**DRAFT Operating Cash Requirements from [Date of Filing] to [ July 15, 2016 ]**
Key Assumptions and Comments:
a. Core team only to support/maintain network and customers
b. No marketing, sales, sales support staff
c. Legal expenses reflected outside of operating costs; subject to change and increase

| | 4/18/2016 | 4/25/2016 | 5/2/2016 | 5/9/2016 | 5/16/2016 | 5/23/2016 | 5/30/2016 | 6/6/2016 | 6/13/2016 | 6/20/2016 | 6/27/2016 | 7/4/2016 | 7/11/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **COGS** | | | | | | | | | | | | | | |
| RoW Rent (assumes June and July pmts paid in advance as post-petition) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Colo Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Colo Costs | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Travel - Ops Team | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contingency | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal - COGS** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **SG&A** | | | | | | | | | | | | | | |
| Payroll + Benefits (Core Team Only) | | 90,000 | | 72,000 | | 90,000 | | | 72,000 | | 90,000 | | 72,000 | 486,000 |
| Employee stay-put/incentive plans [TBD] | 7,500 | | 15,000 | | | | 15,000 | | | | 7,500 | | | 45,000 |
| Admin & Operations Travel | | | | | | | 12,500 | | | | 12,500 | | | 25,000 |
| Legal | | | 5,000 | | | | 15,000 | | | | 15,000 | | 7,500 | 42,500 |
| Professional Services | 20,000 | | 5,000 | | | | | | | | | | | 25,000 |
| Office & All Other | | | | | 10,000 | | 10,000 | | 10,000 | | 10,000 | | 10,000 | 50,000 |
| **Subtotal - SG&A** | 27,500 | 90,000 | 25,000 | 72,000 | 10,000 | 90,000 | 52,500 | - | 82,000 | - | 135,000 | - | 89,500 | 673,500 |
| **Subtotal AF- Southeast LLC Operating Costs only** | 27,500 | 90,000 | 25,000 | 72,000 | 10,000 | 90,000 | 52,500 | - | 82,000 | - | 135,000 | - | 89,500 | 673,500 |
| **Post-Petition Vendor Deposits** | | | | | | | | | | | | | | |
| Florida East Coast Railroad (FECR) [ assume no deposit request, obligations paid one-year in advance] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Norfolk Southern/T-Cubed RoW ($110,272 monthly lease costs) assuming June and July pmts due in advance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tower Cloud advance payments requested (three months rent) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Colocation Facilities (2 months under various leases) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal Post-petition Vendor Deposits** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Capex** | | | | | | | | | | | | | | |
| Corporate capex - replacement computers | 15,000 | | | | | | | | | | | | | 15,000 |
| Customer capex support | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| All Aboard Florida capex | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tower Cloud - exercise of IRU purchase option on GA segment | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal - Capex** | 15,000 | - | - | - | - | - | - | - | - | - | - | - | - | 15,000 |
| **Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| Fees and expenses of the Clerk of the Court and the U.S. Trustee | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fees and expenses of Creditors' Committee | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Lenders Counsel: Nelligan Foley | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Lenders Counsel: Rodman PLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's Counsel: Fox Rothchild LLP | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's Financial Advisors: PKCM | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal - Bankruptcy Legal and Professional Services** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Debt Service** | | | | | | | | | | | | | | |
| Strome Mezzanine Fund IV, L.P. interest (assumed PIK) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Loan Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal - Debt Service** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Budget for [ 90 day ] period** | 42,500 | 90,000 | 25,000 | 72,000 | 10,000 | 90,000 | 52,500 | - | 82,000 | - | 135,000 | - | 89,500 | 688,500 |

**Allied Fiber - Florida, LLC ONLY**
**DRAFT Operating Cash Requirements from [Date of Filing] to [July 15, 2016]**
Key Assumptions and Comments:
a. Core team only to support/maintain network and customers
b. No marketing, sales, support staff
c. Legal expenses reflected outside of operating costs; subject to change and increase

| | 4/18/2016 | 4/25/2016 | 5/2/2016 | 5/9/2016 | 5/16/2016 | 5/23/2016 | 5/30/2016 | 6/6/2016 | 6/13/2016 | 6/20/2016 | 6/27/2016 | 7/4/2016 | 7/11/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Recurring Revenue | - | - | 26,020 | - | - | - | - | 26,020 | - | - | - | - | - | 52,040 |
| **COGS** | | | | | | | | | | | | | | |
| RoW Rent (assumes June and July pmts paid in advance as post-petition) | 10,700 | | 17,865 | | | | | | | | | | | 28,565 |
| Colo Rent | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 13,063 | 169,813 |
| Colo Costs | 2,500 | | 5,000 | | | | 5,000 | | | | 2,500 | | | 15,000 |
| Travel - Ops Team | | | | | | | | | | | | | | - |
| Contingency | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 81,250 |
| **Subtotal - COGS** | 32,513 | 19,313 | 42,178 | 19,313 | 19,313 | 19,313 | 24,313 | 19,313 | 19,313 | 19,313 | 21,813 | 19,313 | 19,313 | 294,628 |
| **SG&A** | | | | | | | | | | | | | | |
| Payroll + Benefits (Core Team Only) | | | | | | | | | | | | | | - |
| Employee stay pod/incentive plans [TBD] | | | | | | | | | | | | | | - |
| Admin & Operations Travel | | | | | | | | | | | | | | - |
| Legal | | | | | | | | | | | | | | - |
| Professional Services | | | | | | | | | | | | | | - |
| Office & All Other | | | | | | | | | | | | | | - |
| **Subtotal - SG&A** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal AF- Southeast LLC Operating Costs only** | 32,513 | 19,313 | 42,178 | 19,313 | 19,313 | 19,313 | 24,313 | 19,313 | 19,313 | 19,313 | 21,813 | 19,313 | 19,313 | 294,628 |
| **Post Petition Vendor Deposits** | | | | | | | | | | | | | | |
| Florida East Coast Railroad (FECR) [ assume no deposit request, obligations paid one-year in advance] | | | | | | | | | | | | | | - |
| Norfolk Southern/T-Cubed RoW ($110,272 monthly lease costs) assuming June and July pmts due in advance | | | | | | | | | | | | | | - |
| Tower Cloud advance payments requested (three months rent) | | | 35,700 | | | | | | | | | | | 35,700 |
| Other Colocation Facilities (2 months under various leases) | | | | | | | | | | | | | | - |
| **Subtotal Post-petition Vendor Deposits** | - | - | 35,700 | - | - | - | - | - | - | - | - | - | - | 35,700 |
| **Capex** | | | | | | | | | | | | | | |
| Corporate capex - replacement computers | | | | | | | | | | | | | | - |
| Customer capex support | | 2,500 | | | 2,500 | | | | 2,500 | | | 2,500 | | 10,000 |
| All Aboard Florida capex | | | | | | | | | | | | | | - |
| Tower Cloud - exercise of IRU purchase option on GA segment | | | 70,000 | | | | 70,000 | | | | 70,000 | | | 210,000 |
| **Subtotal - Capex** | - | 2,500 | 70,000 | - | 2,500 | - | 70,000 | - | 2,500 | - | 70,000 | 2,500 | - | 220,000 |
| **Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| Fees and expenses of the Clerk of the Court and the U.S. Trustee | | | | | | | | | | | | | | - |
| Fees and expenses of Creditors' Committee | | | | | | | | | | | | | | - |
| DIP Lenders Counsel: Neligan Foley | | | | | | | | | | | | | | - |
| DIP Lenders Counsel: Bodman PLC | | | | | | | | | | | | | | - |
| Debtor's Counsel: Fox Rothschild LLP | | | | | | | | | | | | | | - |
| Debtor's Counsel: PMCM | | | | | | | | | | | | | | - |
| Debtor's Financial Advisors: PMCM | | | | | | | | | | | | | | - |
| **Subtotal - Bankruptcy Legal and Professional Services** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Debt Service** | | | | | | | | | | | | | | |
| Strome Mezzanine Fund IV, L.P. Interest (assumed PIK) | | | | | | | | | | | | | | - |
| DIP Loan Interest | | | | | | | | | | | | | | - |
| **Subtotal - Debt Service** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Budget for [90 day] period** | 32,513 | 21,813 | 147,878 | 19,313 | 21,813 | 19,313 | 94,313 | 19,313 | 21,813 | 19,313 | 91,813 | 21,813 | 19,313 | 550,328 |

**Allied Fiber - Georgia, LLC ONLY**
**DRAFT Operating Cash Requirements from [Date of Filing] to [July 15, 2016]**
Key Assumptions and Comments:
a. Core team only to support/maintain network and customers
b. No marketing, sales, sales support staff
c. Legal expenses reflected outside of operating costs; subject to change and increase

| | 4/18/2016 | 4/25/2016 | 5/2/2016 | 5/9/2016 | 5/16/2016 | 5/23/2016 | 5/30/2016 | 6/6/2016 | 6/13/2016 | 6/20/2016 | 6/27/2016 | 7/4/2016 | 7/11/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Recurring Revenue** | $ - | $ - | $ 8,440 | $ - | $ - | $ - | $ - | $ 8,440 | $ - | $ - | $ - | $ - | $ - | $ 16,880 |
| **COGS** | | | | | | | | | | | | | | |
| RoW Rent (assumes June and July pmts paid in advance as post petition) | $ 46,000 | | $ 110,272 | | | | | | | | | | | $ 156,272 |
| Colo Rent | 9,300 | | 19,935 | | | | | | | | | | | 29,235 |
| Colo Costs | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 10,687 | 138,931 |
| Travel - Ops Team | 2,500 | | 5,000 | | | | 5,000 | | | | 2,500 | | | 15,000 |
| Contingency | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 81,250 |
| **Subtotal - COGS** | 74,737 | 16,937 | 152,144 | 16,937 | 16,937 | 16,937 | 21,937 | 16,937 | 16,937 | 16,937 | 19,437 | 16,937 | 16,937 | 420,688 |
| **SGBA** | | | | | | | | | | | | | | |
| Payroll + benefits (Core Team Only) | | | | | | | | | | | | | | |
| Employee stay-pay/incentive plans [TBD] | | | | | | | | | | | | | | |
| Admin & Operations Travel | | | | | | | | | | | | | | |
| Legal | | | | | | | | | | | | | | |
| Professional Services | | | | | | | | | | | | | | |
| Office & All Other | | | | | | | | | | | | | | |
| **Subtotal - SGBA** | | | | | | | | | | | | | | |
| **Subtotal AF- Southeast LLC Operating Costs only** | 74,737 | 16,937 | 152,144 | 16,937 | 16,937 | 16,937 | 21,937 | 16,937 | 16,937 | 16,937 | 19,437 | 16,937 | 16,937 | 420,688 |
| **Post-Petition Vendor Deposits** | | | | | | | | | | | | | | |
| Florida East Coast Railroad (FECR) [ assume no deposit request, obligations past one-year in advance] | | | | | | | | | | | | | | |
| Norfolk Southern/T-Cubed RoW ($110,272 monthly lease cost) [assuming June and July pmts due in advance] | | | 220,544 | | | | | | | | | | | 220,544 |
| Tower Cloud advance payments requested (three months rent) | | | 138,000 | | | | | | | | | | | 138,000 |
| Other Colocation Facilities (2 months under various leases) | | | 39,900 | | | | | | | | | | | 39,900 |
| **Subtotal Post-petition Vendor Deposits** | | | 398,444 | | | | | | | | | | | 398,444 |
| **Capex** | | | | | | | | | | | | | | |
| Corporate capex - replacement computers | | | | | | | | | | | | | | |
| Customer capex support | | 2,500 | | | 2,500 | | | | 2,500 | | | 2,500 | | 10,000 |
| All Aboard Florida capex | | | | | | | | | | | | | | |
| Tower Cloud - exercise of IRU purchase option on GA segment | | | | 2,400,000 | | | | | | | | | | 2,400,000 |
| **Subtotal - Capex** | | 2,500 | | 2,400,000 | 2,500 | | | | 2,500 | | | 2,500 | | 2,410,000 |
| **Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| Fees and expenses of the Clerk of the Court and the U.S. Trustee | | | | | | | | | | | | | | |
| Fees and expenses of Creditors' Committee | | | | | | | | | | | | | | |
| DIP Lenders Counsel: Neligan Foley | | | | | | | | | | | | | | |
| DIP Lenders Counsel: Bodman PLC | | | | | | | | | | | | | | |
| Debtor's Counsel: Fox Rothchild LLP | | | | | | | | | | | | | | |
| Debtor's Counsel: PMCM | | | | | | | | | | | | | | |
| Debtor's Financial Advisors: PMCM | | | | | | | | | | | | | | |
| **Subtotal - Bankruptcy Legal and Professional Services** | | | | | | | | | | | | | | |
| **Debt Service** | | | | | | | | | | | | | | |
| Strome Mezzanine Fund IV, L.P. Interest (assumed PIK) | | | | | | | | | | | | | | |
| DIP Loan Interest | | | | | | | | | | | | | | |
| **Subtotal - Debt Service** | | | | | | | | | | | | | | |
| **Total Budget for [90 day] period** | $ 74,737 | $ 19,437 | $ 550,588 | $ 2,416,937 | $ 19,437 | $ 16,937 | $ 21,937 | $ 16,937 | $ 19,437 | $ 16,937 | $ 19,437 | $ 19,437 | $ 16,937 | $ 3,229,112 |

## SCHEDULE 2.1

### SUBSIDIARIES

Allied Fiber – Georgia, LLC, a Delaware limited liability company, and Allied Fiber – Florida, LLC, a Delaware limited liability company, are subsidiaries of AF–Southeast, LLC, a Delaware limited liability company.

**SCHEDULE 3.1**

<u>BANK ACCOUNTS</u>

| <u>Bank Name</u> | <u>Account Number</u> | <u>Entity</u> |
|---|---|---|
| JP Morgan Chase | XXXXXX1121 | AF–Southeast, LLC |
| JP Morgan Chase | XXXXXX8566 | AF–Southeast, LLC |
| JP Morgan Chase | XXXXXX7871 | AF–Southeast, LLC |
| JP Morgan Chase | XXXXXX9085 | AF–Southeast, LLC |
| JP Morgan Chase | XXXXXX3259 | AF–Southeast, LLC |

## SCHEDULE A-1

### CONSTRUCTION CONTRACTS

- Master Purchase Agreement between Allied Fiber, LLC and Corning Cable Systems, LLC dated April 12, 2013

- Agreement between Allied Fiber, LLC and Hypower, Inc., dated January 30, 2013

- Agreement between Allied Fiber, LLC and Integrated Modular Colocation, LLC, dated June 24, 2013

- Master Purchase Agreement between Allied Fiber, LLC and Cyan, Inc., dated October 18, 2013

**SCHEDULE A-2**

<u>PERMITTED DEBT</u>

None.

**SCHEDULE A-3**

<u>PERMITTED ENCUMBRANCES</u>

None.

## SCHEDULE A-4

### SUBORDINATED DEBT

None.

## SCHEDULE A-5

### UNDERLYING AGREEMENTS

- Lease Agreement between FDG Flagler Station II LLC, as lessor, and Allied Fiber, LLC, as lessee, for Right-Of-Way Assets from Jacksonville, Florida to Miami, Florida, dated as of February 27, 2013, as amended.

- Real Estate Lease between FDG Rail Holdings 3 LLC and Allied Fiber, LLC, dated as of March 21, 2014.

- Real Estate Lease between Florida East Coast Railway, L.L.C. and Allied Fiber, LLC, dated as of September 30, 2013.

- Lease between EMUS1, LLC and Allied Fiber – Florida, LLC, dated as of December 12, 2013.

- Right-of-Way Sublease and Co-Occupancy Agreement between Thoroughbred Technology and Telecommunications, LLC and Allied Fiber - Georgia, LLC, dated as of December 1, 2013.

- Duct Lease Agreement between Thoroughbred Technology and Telecommunications, LLC and Allied Fiber - Georgia, LLC, dated as of December 1, 2013.

- Non-Disturbance Agreement among Norfolk Southern Railway Company, Norfolk Southern Properties, Inc., Thoroughbred Technology and Telecommunications, LLC and Allied Fiber - Georgia, LLC, dated as of December 1, 2013.

- Ancillary Parcel Lease among Norfolk Southern Railway Company, Norfolk Southern Properties, Inc., and Allied Fiber - Georgia, LLC, dated as of December 1, 2013.

- Dark Fiber Co-Construct and Option Agreement between Tower Cloud, Inc. and Allied Fiber, LLC, dated as of October 12, 2011, as amended by the First Amendment to the Dark Fiber Co-Construct and Option Agreement between Tower Cloud, Inc. and Allied Fiber, LLC, dated as of October 1, 2013.

- Services Agreement between Terremark North America LLC and Allied Fiber, LLC, dated as of July 29, 2013.

- Master Country Agreement by and between Equinix Operating Co. Inc. and Allied Fiber, LLC, dated November 5, 2013.

- Agreement between Telefonica International Wholesale Services USA Inc. and Allied Fiber, LLC, dated as of January 9, 2014.

- Master Services Agreement, between Cologix US, Inc. and Allied Fiber, LLC, dated as of June 12, 2014, and Colocation Services Schedule between Cologix US, Inc. and Allied Fiber, LLC, dated as of June 12, 2014.

- Agreement between Dedicated Fiber Systems, Inc. and Allied Fiber – Florida, LLC, dated as of March 17, 2014.