# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AF-SOUTHEAST, LLC, *et al.*, [1] | : | Case No. 16-11008 (KG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | **Objection Date: TBD** |
| | : | **Hearing Date: TBD** |
| | : | |
| | : | |

**MOTION OF THE DEBTORS FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES; (B) SCHEDULING BID DEADLINE, AUCTION DATE, AND SALE HEARING AND APPROVING NOTICE THEREOF; AND (C) APPROVING PROCEDURES TO FIX CURE AMOUNTS RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND APPROVING NOTICE THEREOF; AND (II) AN ORDER APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND LIABILITIES AND (B) THE ASSUMPTION, SALE AND ASSIGNMENT TO BUYER OF CERTAIN CONTRACTS OF DEBTORS**

AF-Southeast, LLC, *et al.* (collectively, the "Debtors"), the Debtors and debtors-in-possession in the above captioned cases ("Cases"), hereby files this motion (the "Motion") for

(1) entry of an order, in substantially the form attached as Exhibit 1 hereto (the "Bidding Procedures Order"), (a) approving bidding procedures (the "Bidding Procedures"), to be used for the sale (the "Sale") of certain of substantially all of the Debtors' assets and related personal property (the "Purchased Assets"),[2] and the proposed Asset Purchase Agreement (the "Purchase Agreement")[3] in conjunction therewith (b) scheduling the bid deadline, auction date, and sale hearing and approving the form and manner of notice thereof, (c) approving procedures to fix cure amounts related to the

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are: (i) AF-Southeast, LLC (8002); (ii) Allied Fiber – Florida, LLC (8111); and (iii) Allied Fiber – Georgia, LLC (2935).
[2] Any capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.

assumption, sale and assignment of certain executory contracts and unexpired leases and approving notice thereof, and

(2) following a subsequent hearing (the "Sale Hearing"), entry of an order (the "Sale Order") approving (a) the sale of the Purchased Assets under the Purchase Agreement to the prevailing bidder (the "Prevailing Bidder") to be determined at the Auction, free and clear of liens, claims and interests, except for Assumed Liabilities and Permitted Encumbrances, (b) the Purchase Agreement and the obligations incurred by the Debtors and the Prevailing Bidder thereunder, (c) the assumption, sale and assignment to the Prevailing Bidder, of certain contracts of the Company and (d) granting related relief. In support of the Motion, the Debtors' respectfully states as follows:

## I.

## JURISDICTION & VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested in this Motion are 11 U.S.C. §§ 105(a), 363(b), 363(f), 363(k), 363(m), 365, 503 and 507, Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 6004, 6006 and 9014 and Rule 6004 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").[4]

---

[3] The proposed Purchase Agreement will be filed by the Debtors' in advance of the Bidding Procedures Hearing.
[4] Pursuant to Local Rule 9013-1(f), the Debtors hereby confirm their consent to the entry of final orders by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

## II.

## BACKGROUND

4.    On April 20, 2016 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").  The Debtors continue to operate and manage their businesses as debtors-in-possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or creditors' committee has been appointed in the Cases.

5.    The factual background relating to the commencement of the Cases is set forth in detail in the *Declaration of Scott L. Drake in Support of First-Day Motions*, filed on the Petition Date [D.I. 10] (the "Drake Declaration"), which is fully incorporated herein by reference.

6.    As set forth more fully in the Drake Declaration, the Debtors are limited liability companies organized in the State of Delaware.  AF-Southeast, LLC is 100% owned by its parent, Allied Fiber, LLC ("Allied Fiber"), a non-debtor affiliate of the Debtors.  AF-Southeast, LLC is the sole member and 100% owner of Allied Fiber – Florida, LLC and Allied Fiber – Georgia, LLC, each of which are Debtors in these proceedings.

7.    The Debtors are engaged in the business of designing, constructing and operating an open access, physical layer, network-neutral colocation and dark fiber network.  The Debtors' dark fiber network provides long-haul, multi-access points, and short-haul dark fiber network systems, coupled with its owned colocation facilities to provide control of the underlying physical assets to all network operators who subscribe to the Debtors' services.  The network is designed to link critical access points (international subsea cables) in the United States while also providing intermediate access points along the route for inclusion of local networks into the

Debtors' network.  The combination of long-haul service with the capability to distribute traffic locally is intended to yield high customer demand and volume.

8.      From inception to date, there has been approximately $93 million of invested capital at the Allied Fiber and Debtor entities, all as more fully set forth in the following paragraphs.

9.      In June 2009 and October 2011, Allied Fiber raised approximately $15 million of equity in both common and preferred shares, respectively from various individuals and entities. The preferred shares were solely owned by Phoenix Fund, LLC ("Phoenix").    In need of additional capital, Phoenix loaned Allied Fiber $5 million secured against Allied Fiber's assets. Subsequently, from March 2013 to August 2014, Allied Fiber raised an additional $44 million of secured debt in two tranches (some with convertible features and others with warrants) from certain individuals, many of who had also participated in the equity offering.  The debt provided by certain individuals and evidenced by promissory notes was secured against Allied Fiber's assets and took priority over the Phoenix debt.   Hereinafter, Phoenix and those certain individuals set forth in the previous sentence shall be referred to as the "Junior Lien Holders".

10.      By September 2014, Allied Fiber had exhausted its capital to complete construction of the Southeast Segment (defined below) including the Colocation Facilities.  In dire need of additional capital, Allied Fiber turned to Strome Mezzanine Fund IV, LP, (the "Senior Pre-Petition Lender" or the "DIP Lender") for funding to finish the Southeast Segment and otherwise provide operating capital.  As part of this funding, the Debtors were incorporated, Allied Fiber's assets pertaining to the Southeast Segment were transferred to the Debtors, and the Senior Pre-Petition Lender lent the Debtors approximately $23 million (the "Senior Pre-Petition Indebtedness") in exchange for a first priority lien in the Debtors' and Allied Fiber's assets (the

"Senior Pre-Petition Lien"), as evidenced by that certain Loan Agreement, dated September 24, 2014 (together with the other documents and agreements executed in connection therewith, including without limitation, various Security Agreements, Promissory Notes and Guarantee and Pledge Agreements, the "Senior Pre-Petition Loan Documents"), among Southeast, AF Florida, and AF Georgia, as borrowers, Allied Fiber, as guarantor, and the Senior Pre-Petition Lender (the "Senior Pre-Petition Loan").  The Senior Pre-Petition Lender and the Junior Lien Holders entered into that certain Intercreditor Agreement in which the Junior Lien Holders subordinated their rights to the Senior Pre-Petition Lender, all as more fully set forth below.

11.    The Debtors defaulted on the loan with the Senior Pre-Petition Lender. Thereafter, the Senior Pre-Petition Lender agreed to forebear from taking remedial action against the Debtors and provided additional advances to both the Debtors and Allied Fiber.  Under the terms of the Amendment and Forbearance Agreement, the Senior Pre-Petition Lender provided additional funding through the Senior Pre-Petition Loan Documents, bringing the cumulative principal balance of the note to $26.8 million (comprised of $23 million initial advance, $2.8 million in PIK interest and $1 million in additional advances).

12.    Shortly thereafter, from September 2015 through February of 2016, Phoenix provided Allied Fiber with certain "forbearance funding" in the amount of $2.6 million.  The funding from Phoenix abruptly ceased without notice on February 29, 2016.  Since that date, and in order to preserve the Debtors' value as a going concern, the Senior Pre-Petition Lender has funded an additional $2.2 million on an emergency basis under the terms of a Second Amendment to the Senior Pre-Petition Loan Documents, along with an additional $2 million of PIK interest that, originally, was contractually obligated to be paid in cash.

13.    Thus, as of the Petition Date, Debtors have first priority secured indebtedness due and owing to the Senior Pre-Petition Lender in the approximate principal amount of approximately $51 million (which includes the make-whole amount), all of which is secured by a first priority lien in substantially all of the Debtors' assets.

14.    The Senior Pre-Petition Lender and the Junior Lien Holders are parties to that certain Intercreditor Lien Subordination Agreement (the "Intercreditor Agreement"), dated as of September 24, 2014, by and among the Debtors, the Senior Pre-Petition Lender, Phoenix, and William Hitchcock as Agent for certain individuals and entities.  Pursuant to the Intercreditor Agreement, while any portion of the Debtors' Obligations (as defined therein) to the Senior Pre-Petition Lender remain outstanding, the Subordinating Lenders (as defined in the Intercreditor Agreement to mean the Junior Lien Holders) agreed to, among other things, subordinate their rights to repayment - to the extent there is even an obligation to repay - for any portion of the obligations due and owing to them, to the Senior Pre-Petition Lender.[5]

15.    The Debtors commenced these chapter 11 cases for the sole purpose of marketing their valuable assets, while preparing for a going-concern sale that will maximize value to all of the Debtors' shareholders.  As part of this strategy, the Debtors filed a number of "first-day motions" that seek, *inter alia,* to preserve the value of the Debtors' assets as a going concern.  To this end, importantly, on April 22, 2016, the Court entered the *Interim Order (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens, Including Priming Liens, and Superpriority Claims, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [D.I. 39] (the

---

[5] The Debtors reserve all rights with respect to the validity, extent, and priority of the Junior Lien Holders' purported liens and claims.  To date, the Debtors cannot establish any instrument evidencing their payment obligations or documents evidencing security interests in favor of the Junior Lien Holders.  As of the Petition Date, it appears that

"Interim DIP Financing Order").    Among other things, the Interim DIP Financing Order,

approves on an interim basis the DIP Financing under the DIP Facility (as those terms are

defined in the Interim DIP Financing Order), which will provide the Debtors with sufficient

liquidity to carry out the Sale process set forth herein.

16.    As the Court and parties-in-interest may be aware, the Debtors have been engaged

in a marketing process for the sale of certain of their assets as a going concern for approximately

eighteen (18) months.

17.    Despite the Debtors' robust marketing process, to date, none of the interested

potential bidders has come forward to serve as a stalking horse for the Sale process.  So, in the

interests of time, and in order to maintain maximum flexibility with respect to the Sale, the

Debtors have opted not to engage in lengthy discussions and negotiations with prospective

purchasers in an effort to select a stalking horse bid for the Purchased Assets.  Rather, the

Debtors are soliciting one or more Qualified Bids for the Purchased Assets without having

provided any bid protections or other form of strategic advantage to any particular prospective

bidder.  It should also be noted that, as part of the Debtors' prepetition negotiations with the Pre-

Petition Lender and the Junior Lien Lenders, and in conjunction with the Debtors' chapter 11

filings, the Debtors have retained the services of PMCM, LLC ("PMCM") to provide the Debtors

with an independent CRO and certain Additional PMCM Personnel pursuant to the engagement

letter executed on April 20, 2016, and designated Michael E. Jacoby as the Debtors' CRO,

effective as of the Petition Date.  PMCM will assist the Debtors and their other professionals

with the marketing and Sale, which shall include establishing, populating and maintaining a

virtual data room ("VDR") for Sale due diligence, as well as preparing a mass marketing and call

---

Allied Fiber is indebted to the Junior Lien Holders in the approximate amount of $51 million plus approximately
$14 million in interest thereon.

list for direct contact with parties in the Debtors' industry as well as potential financial buyers that are active in the Debtors' market space.

18.    Accordingly, the Debtors are seeking to offer for purchase substantially all of the Purchased Assets.  The Debtors propose to sell the Purchased Assets to the highest or otherwise best bidder at Auction (the "Prevailing Bidder").

19.    The Sale of the Purchased Assets contemplated herein is subject to a competitive Auction process that will assure that the maximum value for the Purchased Assets will be realized for the Debtors' estates and their creditors. Accordingly, the Debtors have filed this Motion seeking the approval of the Bidding Procedures and, following a subsequent hearing (*i.e.,* the Sale Hearing), approval of the Sale of the Purchased Assets.

20.    The Bidding Procedures are integral to this process and seek to provide a focal point for the ongoing efforts to attract Qualified Bidders, provide direction to the parties interested in presenting a competing bid, and bring the process to a fair, orderly and expeditious conclusion.  Pursuant to the procedures described below, among other things, potential bidders will receive notice of the Bidding Procedures for qualifying as a Qualified Bidder and for submitting a Qualified Bid.  In addition, creditors and other parties in interest will receive reasonable notice of a hearing to consider the proposed Sale and have an opportunity to object to the proposed Sale, and parties will have reasonable notice and opportunity to object to the assumption and assignment of executory contracts, if any.

21.    The Debtors believe that an immediate going concern sale of the Debtors' assets is essential to maximize asset value and recoveries by stakeholders.  Prompt court approval of the Bidding Procedures for the Sale contemplated herein will provide for and assure the

continuity of the Debtors' business, thereby preserving value, and the opportunity for bids to maximize prospects for recoveries to the Debtors' stakeholders.

### III.

### RELIEF REQUESTED

22.     This Motion seeks relief in two parts.  First, the Motion seeks approval of various procedures relating to the proposed sale and the scheduling of a second hearing.  Second, the Motion seeks approval of the proposed sale and related transactions following the conclusion of the second hearing.

### A.     Bidding Procedures & Purchase Agreement

23.     The hearing to seek approval of the order approving the Bidding Procedures is intended to, among other things, establish the form and manner of notice of the Sale and establish the Bidding Procedures by which parties may participate in the Auction.  A copy of the proposed Bidding Procedures the Debtors' seek to have approved is set forth in Exhibit A to the Bidding Procedures Order, which is attached hereto as Exhibit 1.

24.     The proposed Sale to the Prevailing Bidder shall be under the Purchase Agreement, which will be filed by the Debtors with the Court in advance of the Bidding Procedures Hearing and attached to the Bidding Procedures Order as Exhibit B, will set forth the terms and conditions Sale transaction shall be consummated, and the form that Potential Bidders will use to submit Qualified Bids.  Accordingly, utilizing the proposed Purchase Agreement will provide a uniform basis for Potential Bidders to bid and the Debtors to analyze Qualified Bids.

### B.     Proposed Notice Procedures

25.     The Debtors will cause to be served, within five (5) business days after issuance of the Bidding Procedures Order, by first-class mail, postage prepaid, (i) notice of the Bid

Deadline, Auction, and Sale Hearing substantially in the form annexed to the Bidding Procedures Order as <u>Exhibit C</u> (the "<u>Notice of Bid Deadline, Auction, and Sale Hearing</u>"), (ii) the Bidding Procedures Order including the Bidding Procedures attached thereto and (iii) the Motion (the Notice of Bid Deadline, Auction and Sale Hearing, this Order and the Bidding Procedures, the Motion, collectively, the "<u>Sale Package</u>"), upon: (a) all potential buyers previously identified or solicited by the Debtors and/or PMCM and any additional parties who have previously expressed an interest in potentially acquiring the Purchased Assets, (b) all other potentially interested parties identified by the Debtors or their professionals; (c) the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"), (d) each non-Debtor counter-party to the Debtors' executory contracts and unexpired leases (collectively, the "<u>Contracts</u>"), (e) all parties in interest who have requested notice in the Cases under Bankruptcy Rule 2002, (f) all parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Purchased Assets, including but not limited to the DIP Lender and counsel for the DIP Lender, and the Junior Lien Holders (service upon which shall be made to the agent for the Junior Lien Holders as identified in the Intercreditor Agreement, if known), (g) counsel for the Official Committee of Unsecured Creditors, if one is appointed, (h) the Internal Revenue Service, (i) the Attorney General for the State of Florida, Attorney General for the State of Georgia and the Attorney General for the State of Delaware, (j) the United States Attorney's office, (k) all applicable federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested in the Motion and (l) the Securities and Exchange Commission. Due to the size and complexity of the Cases, the Debtors' known creditors (other than if included in (a) – (l)) will receive only the Notice of Bid Deadline, Auction and Sale Hearing.

26.     In addition, the Debtors will publish the Notice of Bid Deadline, Auction, and Sale Hearing in *The Wall Street Journal* (National Edition) within five (5) business days after issuance of this Bidding Procedures Order.

27.     In addition, the Debtors also seek approval of the following procedures with respect to the assumption and assignment of Contracts:

a.      The Debtor shall send notice within five (5) business days of the date of the issuance of the Bidding Procedures Order substantially in the form annexed to the Bidding Procedures Order as Exhibit D (the "Notice of Assumption and Assignment") to all non-Debtor counter-parties to the Contracts.  The Notice of Assumption and Assignment shall set forth (i) that such Contract may be assumed by the Debtor and assigned to the Prevailing Bidder under the Bidding Procedures and (ii) the Cure Amount (as defined in the Notice of Assumption and Assignment) associated with the assumption and assignment of such Contract.  Upon receipt of any Qualified Bid submitted by a Qualified Bidder, the Debtors shall promptly determine whether a Notice of Assumption and Assignment needs to be given to any additional non-Debtor parties to Contracts, which are listed on any schedule to such Prevailing Bidder's version of the Purchase Agreement to be assumed and assigned to such Qualified Bidder (the "Assigned Contracts"), and shall mail, or otherwise serve by overnight courier service or other prompt method of service, within three (3) business days of receipt of such Qualified Bid, such additional Notices of Assumption and Assignment as may be required.  A counterparty to a Contract which later receives a notice that a Qualified Bidder

has designated that Contract for assumption and assignment may object as set forth in subparagraphs b. and e., below.

b.      All objections to the assumption, sale and assignment of any Assigned Contract or to any Cure Amount (each, an "Assumption and/or Cure Objection") must be filed with the Court and served upon the Objection Notice Parties (defined below) so as to be actually received no later than the Sale Objection Deadline.  All Assumption and/or Cure Objections must state with specificity the nature of such objection and may be heard by the Court at the Sale Hearing or such other date and time as the Debtors may schedule with the Court.

c.      If an objection timely filed and served in accordance with sub-paragraph b. above challenges a Cure Amount, such objection must set forth the amount of cure being claimed by the objecting party (the "Claimed Cure Amount") with appropriate documentation in support thereof.  Upon receipt of a timely filed and served objection to a Cure Amount, the Prevailing Bidder shall include in the Post-Closing Cure Reserve Amount an amount equal to the Claimed Cure Amount, which amount may be released and paid to such counterparty by the Debtors after the Cure Amount is fixed by the Court or agreed upon by the Debtors and the objecting party as the Claimed Cure Amount.  So long as the Claimed Cure Amount shall have been set aside in the Escrow Account, the Debtors shall be authorized, without further delay, to assume, sell and assign the Assigned Contract that is the subject of such Claimed Cure Amount objection to the Prevailing Bidder.

d.      If no objection to the Cure Amount or the proposed assumption, sale and assignment in respect of an Assigned Contract is timely filed and served:  (i) the Debtors may assume, sell and assign to the Prevailing Bidder such Assigned Contracts (ii) the Cure Amount set forth in the Notice of Assumption and Assignment shall be binding upon the respective non-Debtor party to the Assigned Contract for all purposes in these Cases, and (iii) the respective non-Debtor party shall be forever barred from objecting to the assumption, sale and assignment of the relevant Assigned Contract and/or Cure Amount, and from asserting against the Debtors or the Prevailing Bidder any right of setoff, condition to assignment and/or any additional cure or other amount with respect to such Assigned Contract.

e.      However, due to the timing and nature of the Sale process set forth in the Bidding Procedures and the Bidding Procedures Order, non-Debtor parties to Assigned Contracts may raise objections to adequate assurance of future performance under the Assigned Contracts at the Sale Hearing.

f.      The effective date of any assumption, sale and assignment of any Assigned Contract shall be the Closing (as defined in the Purchase Agreement). Accordingly, any Cure Amounts to be paid under any Assigned Contract shall be paid in accordance with the Purchase Agreement of the Prevailing Bidder upon or as soon as reasonably practicable after the Closing Date or as soon thereafter as the Cure Amount is fixed by the Court or agreed upon by the Debtors, the Prevailing Bidder and the objecting party.

28.     To be considered by the Court, any objections to either (x) the Sale of the Purchased Assets to the Prevailing Bidder or to the Purchase Agreement submitted by the Prevailing Bidder or (y) the assumption and assignment of contracts or the proposed cure amount shall (a) be in writing, (b) conform to the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objecting party, the nature and amount of any claims or interest held or asserted against the Debtors' estates or their properties, the basis for the objection and the specific grounds therefor and (d) be filed with the Court and served on the following (collectively, the "Objection Notice Parties") (i) the U.S. Trustee, J. Caleb Boggs Federal Building, 844 King Street, Room 2207, Wilmington, DE 19801, Attention: Linda J. Casey, Esq.; (ii) proposed counsel for the Debtors, Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, Pennsylvania 19103, Attention: Michael Menkowitz, Esq., Joshua T. Klein, Esq., and Jason C. Manfrey, Esq.; (iii) co-counsel for the DIP Lender, Neligan Foley LLP, 325 N. St. Paul, Suite 3600, Dallas, TX 75201, Attention: Patrick J. Neligan, Jr., Esq. and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attention: Mark D. Collins, Esq. and Jason M. Madron, Esq., (iv) counsel for the Official Committee of Unsecured Creditors, if one is appointed, and (v) counsel for the Prevailing Bidder.

29.     The Debtors request that any party failing to timely file and serve an objection on the Objection Notice Parties shall be barred from asserting an objection to the Motion, the Sale to the Prevailing Bidder (including any objection to the Debtors' ability to transfer the Purchased Assets free and clear of all liens, claims, encumbrances and interests ("Liabilities") (other than any Liabilities assumed under the Purchase Agreement submitted by the Prevailing Bidder) the proposed Cure Amount and the assumption, sale and assignment of any Assigned Contract to the Prevailing Bidder.

### C.    Approval of Sale

30.     The Debtors request that at the conclusion of the Sale Hearing, that the Court enter the Sale Order approving the proposed sale of the Purchased Assets, free and clear of Liabilities (except for Liabilities assumed by the Prevailing Bidder) in accordance with the terms and conditions contained in the Purchase Agreement to the Prevailing Bidder,[6] authorizing the assumption and assignment of certain executory contracts and unexpired leases in accordance with the Purchase Agreement, and granting such other relief as is necessary to effectuate the transactions contemplated by the Purchase Agreement.

31.     The Debtors also request that the Court waive the fourteen (14) day stay that otherwise may be applicable under Bankruptcy Rules 6004(h) and 6006(d), so that each of the Bidding Procedures Order and the Sale Order is effective immediately upon entry.

### IV.

### BASIS FOR RELIEF REQUESTED

32.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtors have determined that a sale of the Purchased Assets to the Prevailing Bidder pursuant to the Purchase Agreement submitted by the Prevailing Bidder, which will be the result of a process in which parties may make qualifying bids and participate in an open auction, will enable the Debtors to obtain the most consideration possible for the Debtors' assets, for the benefit of their stakeholders.  The proposed Bidding Procedures will facilitate that objective.

---

[6] The term "Prevailing Bidder", as defined in the Bidding Procedures, is used in the singular throughout this Motion, the Bidding Procedures Order and the Bidding Procedures.  However, it should be noted that the Bidding Procedures contemplate the possibility of bids on subsets of the Purchased Assets.  Thus, there is the potential that there could be multiple Prevailing Bidders, in which case it is the Debtors' intention and the relief requested herein shall apply to all Prevailing Bidders.

### A.   The Proposed Bidding Procedures And Proposed Purchase Agreement Are Reasonable And Appropriate

33.    Courts have made clear that a trustee or debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See, e.g., In re Integrated Resources, Inc.,* 147 B.R, 650, 656-57 (Bankr. S.D.N.Y. 1992).   The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *In re Food Barn Stores, Inc.,* 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand."); *Integrated Resources,* 147 B.R. at 659 (same); *In re Atlanta Packaging Products, Inc.,* 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988) (same).   In that regard, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re Montgomery Ward Holding Corp.,* Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); *In re Fruehauf Trailer Corp.,* Case No. 96-1563 (PJW) (Bankr. D. Del. Feb. 26, 1997); *Integrated Resources,* 147 B.R. at 659.

34.    The proposed Bidding Procedures will allow the Debtors to consider Qualified Bids for the Purchased Assets and, if the Debtors receive such Qualified Bids, to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially able bidders who demonstrate the ability to close a transaction.  This will increase the likelihood that the Debtors will receive the greatest possible consideration for the Purchased Assets.  The Bidding Procedures also set forth a schedule for achieving these objectives in an expeditious matter, balancing the Debtors' desire to maximize recovery for the benefit of the Debtors' estates, with the need to move quickly to preserve the value of the Debtors' business as a going

concern.  Moreover, the proposed Purchase Agreement will also promote these objectives by providing a uniform basis for Potential Bidders to bid and the Debtors to analyze Qualified Bids.

35.    For these reasons, the Debtors request that the Court authorize the Bidding Procedures and the proposed Purchase Agreement.

**B.     The Sale of Assets Pursuant To The Purchase Agreement is Authorized By Section 363(b) Of The Bankruptcy Code.**

36.    Section 363(b)(1) of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  *See* 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this District have required that such use, sale or lease be based upon a debtor's sound business judgment of the debtor.  *See, e.g., In re Decora Indus., Inc.,* 2002 WL 32332749, *2 (D. Del. May 20, 2002); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (Bankr. D. Del. 1999).  Courts in other circuits are in accord.  *See, e.g., In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983).

37.    The business judgment rule shields a trustee or debtor's management from judicial second-guessing.  *See In re Johns-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").  Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  *Integrated Resources,* 147 B.R. at 656 (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)).

38.     Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.  When applying the "business judgment" standard, courts show great deference to a debtor's or trustee's business decisions.  *See In re First Wellington Canyon Assocs.,* 1989 U.S. Dist. LEXIS 10687 at *8-*9 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment ... must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion."); *In re Trans World Airlines, Inc.,* 2001 Bankr. LEXIS 267 at *45-*50 (Bankr. D. Del. Mar. 12, 2001) (describing business judgment rule as "very deferential standard").

39.     The Debtors will have amply demonstrated at the Sale Hearing sound business judgment in entering into the Purchase Agreement with the Prevailing Bidder, which provides for a sale of the Debtors' assets as a going concern.  The prompt sale of the Purchased Assets the best opportunity to maximize the value for the Debtors' estates.  Pursuant to the Purchase Agreement that will be submitted by the Prevailing Bidder, the Prevailing Bidder will provide substantial consideration to the Debtors' estates.  Namely, the consideration to be paid by the Prevailing Bidder for the Purchased Assets.  The proposed Purchase Agreement will provide for payment of the Purchase Price by the Prevailing Bidder plus payment of other obligations, most importantly, Cure Amounts for any Assigned Contracts (thereby reducing claims against the Debtors' estates).  Accordingly, the value to be obtained for the Debtors' estates through this process is significant and should bring about a meaningful result for the Debtors' creditors.  The Debtors submit that the proposed Sale will satisfy the business judgment test.

40.     In addition, based on the Debtors' extensive marketing efforts prior to the Petition Date and the Debtors' and its professionals' robust marketing efforts since the Petition Date, the

Debtors submit that the consideration to be paid by the Prevailing Bidder under the Purchase Agreement with such bidder will be fair and reasonable.  The fairness and reasonableness of the consideration to be paid for the Debtors' assets by the Prevailing Bidder, will be conclusively demonstrated by the exposure of the opportunity to the marketplace.  As noted above, the Debtors actively marketed this opportunity for approximately eighteen (18) months and will continue with the active marketing of the opportunity, with the assistance of their professionals, after approval of the Bidding Procedures.  Accordingly, as a result of the Auction process it will be clear that the consideration being paid by the Prevailing Bidder is the best available.  The Debtors have proposed a fair and open process for achieving these objectives, irrespective of which entity ultimately acquires the Purchased Assets.

41.     Thus, the market check to be provided through the Auction process will demonstrate the fairness and reasonableness of the consideration being received.  Further, the sale of the Purchased Assets as a going concern will likely save numerous jobs and inure to the benefit of the Debtors' employees, suppliers, customers and vendors.

42.     For all of these reasons, the Debtors have determined that the best if not only viable opportunity to maximize value for the Debtors' estates is to sell the Purchased Assets as set forth in this Motion.  Accordingly, it is a valid exercise of the Debtors business judgment to seek approval of the Bidding Procedures and the Sale.

C.     **Approval of Sale Free and Clear of All Liens, Claims, Interests, Encumbrances & Liabilities**

43.     The Debtors respectfully submit that it is appropriate to sell the Purchased Assets free and clear of Liabilities (except for Liabilities assumed by the Prevailing Bidder) pursuant to section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances or interests attaching to the net sale proceeds of the Purchased Assets to the extent applicable.  Section

363(f) of the Bankruptcy Code authorizes a trustee or debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

    A.    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

    B.    such entity consents;

    C.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

    D.    such interest is in bona fide dispute; or

    E.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

44.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of liens and interests.  *In re Dundee Equity Corp.,* 1992 Bankr. LEXIS 436, *12 (Bankr. S.D.N.Y. Mar. 6,1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Wolverine Radio Co.,* 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met).

45.    The Debtors are aware of multiple lienholders and parties that have asserted a lien on any of the Debtors' assets, including, most significantly, the liens and security interests of the

DIP Lender, as well as the liens and security interests of the Junior Lien Parties. The Debtors believe that for any known or unknown lienholders that exist, one or more of the tests of section 363(f) will be satisfied with respect to the transfer of the Purchased Assets pursuant to the Purchase Agreement submitted by the Prevailing Bidder. In particular, any and all lienholders will be adequately protected by having their liens against the Debtors or their estates, attach to the cash proceeds of the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the sale, subject to any claims and defenses the Debtors and the Debtors' estates may possess with respect thereto.[7] Accordingly, section 363(f) of the Bankruptcy Code authorizes the transfer and conveyance of the Purchased Assets free and clear of any such Liabilities.

46.    The Debtors also satisfy section 363(f)(2) of the Bankruptcy Code because the Debtors expect that all parties entitled to assert Liabilities will consent to the Sale. The Debtors also satisfy section 363(f)(5) of the Bankruptcy Code because all parties entitled to assert Liabilities can be compelled under state law to accept a money satisfaction of their interests. Accordingly, the Debtors request that the Purchased Assets be transferred to the Prevailing Bidder free and clear of all Liabilities (other than Liabilities assumed by the Prevailing Bidder).

**D.    The Purchased Assets Should Be Sold Free And Clear Of Successor Liability**

47.    Under the Purchase Agreement, the Prevailing Bidder will be assuming only those Liabilities expressly assumed and set forth therein. The Prevailing Bidder, therefore, should not be liable for any of the Debtors' liabilities in connection with the sale of the Purchased Assets as a successor to the Debtors' business or otherwise, unless expressly assumed. Extensive case law

---

[7] Except with respect to any claims and defenses the Debtors and the Debtors' estates may possess with respect to liens and security interests of the DIP Lender, which have been waived pursuant to the Interim DIP Financing Order with respect to the DIP Financing.

exists providing that claims against the winning bidder are directed to the proceeds of a free and clear sale of property and may not be asserted against a buyer subsequently.

48.  Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 of the Bankruptcy Code sale takes free from successor liability resulting from pre-existing claims.  *See Ninth Ave. Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D. R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Sys. V. Bonapfel* (*In re All Am. Of Ashburn, Inc.*), 56 B.R. 186, 190 (Bankr. N.D. GA 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Med. Assistance Servs.* (*In re WBQ P'ship*), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[8]

---

[8] Even courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority.  *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

49.    The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the Prevailing Bidder arising from the Debtors' pre-Sale conduct.  Under section 363(f) of the Bankruptcy Code, the Prevailing Bidder is entitled to know that the Purchased Assets are not infected with latent claims that will be asserted against the Prevailing Bidder after the proposed transaction is completed.

50.    ***Accordingly, consistent with the above-cited case law, the order approving the sale of the Purchased Assets should state that the Prevailing Bidder is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Purchased Assets (except for Liabilities assumed by the Prevailing Bidder).***

### E.    The Prevailing Bidder Is A Good Faith Purchaser And Is Entitled To The Full Protections Of Section 363(m) Of The Bankruptcy Code

51.    The Debtors request that the Court find that the Prevailing Bidder is entitled to the full protections of section 363(m) of the Bankruptcy Code.  Courts have indicated that a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith.  *See In re Colony Hill Assocs.,* 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *See also In re Angelika Films 57th, Inc.,* 1997 U.S. Dist. LEXIS 7463 at *19-*28 (S.D.N.Y. May 29, 1997).

52.    Courts repeatedly have concluded that the sale of a debtor's principal assets and/or substantially all of its assets is appropriate where there are sound business reasons and no evidence of fraud or collusion.  *See In re Abbotts Dairies of Penn., Inc.,* 788 F.2d 143 (3rd Cir. 1986) (sale of all assets appropriate where purchaser acted in good faith, and there was no fraud,

collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders); *In re Trans World Airlines, Inc.* 2001 Bankr. LEXIS 980 (Bankr. D Del. 2001) (citing *Abbotts Dairies*); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 178-79 (D. Del. 1991). [9]   As discussed, there is ample business justification for the proposed Sale of the Debtors' assets, the sale and the Purchase Agreement will have been pursued in good faith, and there will have been no fraud or collusion between the Debtors, the Prevailing Bidder or any other bidder.   In addition, the Purchase Agreement will be the product of extensive, arm's length negotiations between the Debtors and the Prevailing Bidder.

53.     Further, the Prevailing Bidder will have recognized that the Debtors are free to deal with any other party interested in acquiring the Purchased Assets.   In fact, the Bidding Procedures and Auction process contemplated by this Motion make this point abundantly clear. At the Sale Hearing, the Debtors will be able to demonstrate that the Prevailing Bidder has also complied with the Bidding Procedures Order and agreed to subject its bid to the competitive Bidding Procedures.   Additionally, all payments to be made to the Prevailing Bidder and other agreements or arrangements entered into by the Prevailing Bidder in connection with the Sale will have been disclosed.

54.     In this case, the Debtors will be able to show to the Court at the Sale Hearing that

---

[9] *See also In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983) (sale of estate's most significant asset justified where supported by sound business reasons); *Stephens Industries, Inc. v. McClung,* 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"); *In re Coastal Industries, Inc.,* 63 B.R. 361 (Banks. N.D. Ohio 1986); *In re Apex Oil Comp.,* 92 B.R. 847 (Bankr. E.D. Mo. 1988) (applying the "fair and reasonable" test to the sale of substantially all assets under section 363 and finding that the debtor articulated sufficient business reasons for approval of sale); *In re Charlesbank Laundry Co.,* 37 B.R. 20 (Bankr. D. Mass. 1983) ("A sale of all assets in Chapter 11 *is* appropriate if the provisions of 11 U.S.C. Section 363 are followed, the bid is fair and reasonable and the sale is in the best interests of the estate and creditors"); *In re Ancor Exploration Comp.,* 30 B.R. 802 (Bankr. N.D. Okla. 1983) ("conclud[ing] the bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under §363(b). However, each such proposed sale must be examined from its own facts to determine whether approval is justified").

55.     the terms and conditions of the Purchase Agreement with the Prevailing Bidder were negotiated by the Debtors and the Prevailing Bidder at arm's length and in good faith.   In this regard, the Debtors intend to offer evidence at the Sale Hearing to show that such Prevailing Bidder is entitled to the protection of section 363(m) of the Bankruptcy Code.

**F.      The Court Should Approve The Assumption, Assignment And Sale Of The Executory Contracts And Unexpired Leases Identified In The Purchase Agreement**

56.     Section 365(a) of the Bankruptcy Code provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." *See* 11 U.S.C. § 365(a).   Although the Bankruptcy Code does not itself set forth guidelines for courts to apply in determining whether to approve the decision of a trustee or debtor in possession to assume or reject an executory contract or unexpired lease, the overwhelming majority of courts have consistently applied the well-established "business judgment" test.   *See, e.g., Group of Institutional Investors v. Chicago M. St. P. & Pac. R.R.,* 318 U.S. 523, 550; 63 S. Ct. 727, 742-43 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.),* 872 F.2d 36, 39-40 (3d Cir. 1989); *Robertson v. Pierce (In re Chi-Feng Huang),* 23 B.R. 798, 800 (B.A.P. 9th Cir. 1982); *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1309 (5th Cir. 1985); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1046-47 (4th Cir. 1985), *cert. denied,* 475 U.S. 1057 (1986); *Control Data Corp. v. Zelman (In re Minges),* 602 F.2d 38, 43 (2d Cir. 1979); *Carey v. Mobil Oil Corp. (In re Tilco, Inc.),* 558 F.2d 1369, 1372 (10th Cir. 1977).

57.     In applying the business judgment standard, courts show great deference to the debtor's or trustee's decisions to assume or reject.   *See, e.g., NRLB v. Bildisco & Bildisco,* 465 U.S. at 513 (1984); *In re Federal Mogul Global, Inc.,* 293 B.R. 124, 126 (D. Del. 2003).   A

trustee or debtor in possession satisfies the "business judgment" test when it decides, in good faith, that assumption or rejection may benefit the estate. *In re Federal Mogul Global, Inc.,* 293 B.R. at 126; In re FCX, Inc., 60 B.R. 405, 411 (E.D.N.C. 1986); *In re Chipwich, Inc.,* 54 B.R. 427, 430¬31 (Bankr. S.D.N.Y. 1985); *Commercial Fin. Ltd. v. Hawaii Dimensions (In re Hawaii Dimensions),* 47 B.R. 425, 427 (Bankr. D. Haw. 1985). Bankruptcy courts thus generally approve a debtor's decision to assume or reject unless there is: (i) a showing of bad faith or abuse of discretion; or (ii) a clear demonstration that assumption or rejection will not benefit the estate or creditors. *In re Federal Mogul Global, Inc.,* at 126 (D. Del. 2003) (court should approve a debtor's or trustee's decision to reject a contract unless that decision is the product of bad faith or a gross abuse of discretion); *In re FCX, Inc.,* 60 B.R. at 411; *In re Chipwich, Inc.,* 54 B.R. at 430-31.

58.     In *Summit Land Co. v. Allen (In re Summit Land Co.),* 13 B.R. 310 (Bankr. D. Utah 1981), the bankruptcy court explained why such deference is given to the debtor in possession's assumption or rejection decisions:

> [C]ourt approval under section 365(a), if required, except in extraordinary situations, should be granted as a matter of course. To begin, this rule places responsibility for administering the estate with the trustee, not the court, and therefore furthers the policy of judicial independence considered vital by the authors of the Code. Second, this rule expedites the administration of estates, another goal of the Bankruptcy Reform Act. Third, the rule encourages rehabilitation by permitting the replacement of marginal with profitable business arrangements. Fourth, the rule is supported by pre-Code cases in this Circuit.

*Id.* at 315.

59.     Here, the Debtors will have amply demonstrated sound business judgment in entering into the Purchase Agreement with the Prevailing Bidder, which will provide for the assumption and assignment of certain Assigned Contracts. As discussed above, the Assigned

Contracts will be assigned in conjunction with the sale of certain of the Debtors' assets, pursuant to a transaction that will provide significant consideration to the Debtors' estates.

60.     Where any of the contracts may be in default, the Debtors must cure, or provide adequate assurance of a prompt cure, of any defaults thereunder and provide adequate assurance of future performance under the contract.  11 U.S.C. § 365(b)(1).  The requirements of section 365(b)(1) of the Bankruptcy Code will be fully satisfied in this case.  As set forth in the proposed procedures above, the Debtors will provide notice to the non-Debtor parties to the Contracts of the Debtors' calculation of the Cure Amounts owing thereunder, if any, and the non-Debtor parties will have an opportunity to object.  Under the proposed Purchase Agreement (and the Purchase Agreement with the Prevailing Bidder), any Cure Amounts owed to non-Debtor counterparties will be paid either at closing by the Prevailing Bidder (in accordance with the Purchase Agreement) or, to the extent that the Debtors and a Contract counterparty do not agree on the amount necessary to cure defaults prior to closing (so long as such counterparty shall have filed a written objection prior to the deadline setting forth the amount it believes is owed to cure any defaults), from an escrow account to be funded as of the Closing Date as a reserve for disputed Cure Amounts.  Amounts will be released from the escrow account to the Debtors and paid to the non-Debtor counterparty when any such dispute over the cure amount is resolved, either by the Court or settlement, in accordance with any Court order or settlement, as applicable, and any excess amounts remaining in the escrow account after all cure amounts have been resolved will be released and paid back to the Prevailing Bidder.

**1.      The Assignment Of The Assigned Contracts Is Reasonable And Appropriate**

61.     Pursuant to this Motion, the Debtors seek authority to assign and sell to the Prevailing Bidder all of the Assigned Contracts, pursuant to the Purchase Agreement with the

Prevailing Bidder.  Section 365(f)(2) of the Bankruptcy Code provides the authority for the Debtors to do so:

> The trustee may assign an executory contract or executory lease of the debtor only if -
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section [section 365(b)(1)]; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

*See* 11 U.S.C. § 365(f)(1).

62.    Whether an assignee has provided "adequate assurance of future performance" depends upon the facts and circumstances presented.  *See, e.g., In re Evelyn Burns, Inc.,* 32 B.R. 825, 829 (Bank. S.D.N.Y. 1983). In this case, the Debtors believe that the Prevailing Bidder will be able to demonstrate adequate assurance of future performance.  In order to be considered a Qualified Bidder, the Prevailing Bidder will have already had to demonstrate the financial wherewithal, credibility, willingness and ability to perform under any contract assumed and assigned to it.

### 2.    Assignment Permitted Under Section 365(f), Notwithstanding Anti-Assignment Provisions

63.    To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtors also request that the Court enter an order providing that anti-assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

64.    Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).

65.    Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.)*, 127 F.3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), *cert denied*, 522 U.S. 1148 (1998). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

66.    Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Centers, Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.") Similarly, in *In re Mr. Grocer, Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in

> determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).   Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

### G.    Additional Disclosures Under Local Rule 6004-1(b)(iv) [10]

67.    It is anticipated that the Purchase Agreement that will be filed with the Court prior to the Bidding Procedures Hearing will contain certain standard provisions that are required to be highlighted to parties and the Court pursuant to Local Rule 6004.   These provisions will include deadlines, good faith deposit provisions and a mutual release.   *The mutual release, the deadlines and the good faith deposit, and the circumstances in which the deposit is paid, will be crucial components of the Purchase Agreement and will be typical provisions for a transaction contemplated by the proposed Purchase Agreement.*

### H.    Relief Under Bankruptcy Rules 6004(h) And 6006(d) Is Appropriate

68.    Bankruptcy Rule 6004(h) provides that an order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Fed. R. Bankr. P. 6004(h).   Also, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

---

[10] Under Local Rule 6004-1(b)(iv) and (c)(1), the Debtors are required to highlight certain provisions of this Motion. The Debtors have formatted (using bold and italics) every such required instance.

Fed. R. Bankr. P. 6006(d).  The Debtors requests that any order approving the proposed Purchase Agreement (or the Bidding Procedures in connection with the sale proposed thereunder) be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

69.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Lawrence P. King, *Collier on Bankruptcy,* 6004.10 (16th Ed. 2011).  Collier further provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay, unless the court determines that the need to proceed sooner outweighs the interests of the objecting party.  *Id.*

70.     ***To maximize the value received for the Purchased Assets, the Debtors seek to implement the Bidding Procedures and Auction process as quickly as possible after the Bidding Procedures Hearing, as well as close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to seek a stay pending appeal.***

**V.**

## NOTICE

71.     The Debtors are serving this Motion in accordance with paragraph 25, above. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order attached hereto as Exhibit 1 and, following the subsequent Sale Hearing, enter the Sale Order in substantially the form attached hereto as Exhibit 2, and grant such other relief as this Court deems proper and just.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By: _/s/  L. John Bird_____
         L. John Bird
         Delaware Bar No. 5310
         919 North Market Street, Suite 300
         Wilmington, DE  19801-2323
         Phone (302) 654-7444/Fax (302) 656-8920
         lbird@foxrothschild.com
                    -and-
         Michael G. Menkowitz
         Joshua T. Klein
         Jason C. Manfrey
         2000 Market Street, 20th  Floor
         Philadelphia, PA  19103-3222
         Phone (215) 299-2000/Fax (215) 299-2150
         mmenkowitz@foxrothschild.com
         jklein@foxrothschild.com
         jmanfrey@foxrothschild.com

Dated: April 27, 2016               Proposed counsel for AF-Southeast, LLC, *et al.*, the
                                             Debtors and Debtors-in-Possession