## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **AF-SOUTHEAST, LLC, *et al.,*[1]** | : | **Case No. 16-11008 (KG)** |
| | : | **(Jointly Administered)** |
| | : | |
| **Debtors** | : | **Re: D.I. 7, 39, 69** |
| | : | |

### DIP LENDER'S REPLY TO OBJECTION OF THE HOLDERS OF CERTAIN ALLIED FIBER, LLC 16% SENIOR SECURED CONVERTIBLE PROMISSORY NOTES ISSUED BETWEEN OCTOBER 2012 AND MAY 2013 AND KNOWN AS ALLIED FIBER NOTE NUMBERS 2012-008, 2013-001, 002, 004, 005, 006, 041, 042

Strome Mezzanine Fund IV, L.P. ("Strome"), in its capacity as the senior secured prepetition lender and the postpetition DIP lender to the above-captioned debtors and debtors in possession (collectively the "Debtors"), files this reply to the objection [D.I. 69] (the "Objection") filed by the holders of certain promissory notes issued by Allied Fiber, LLC (the "Objecting Noteholders") to the Debtors' request for DIP financing [D.I. 7] (the "DIP Motion"), and in support states as follows:

### I. PRELIMINARY STATEMENT

1.      As the Debtors will establish at the final hearing on the DIP Motion, the Objecting Noteholders have never loaned any money to the Debtors and are not creditors of the Debtors' estates. Indeed, the Objecting Noteholders readily admit that they loaned money to Allied Fiber, LLC, the Debtors' ultimate parent, which is not a debtor in these jointly-administered cases. The Objecting Noteholders also acknowledge that *their loans were made to Allied Fiber, LLC at least a year before the Debtors were even formed*. As a result, the Objecting Noteholders have no claim against the Debtors, secured or unsecured, and have no

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are: (i) AF-Southeast, LLC (8002); (ii) Allied Fiber – Florida, LLC (8111); and (iii) Allied Fiber – Georgia, LLC (2935).

standing to object to the DIP Motion.  Put differently, the Objecting Noteholders have no allowable secured claim against the Debtors' estates and are not being primed.  Because the Objecting Noteholders cannot demonstrate that they are creditors of the Debtors' estates, the Objection should be overruled.

2.     Despite having no claim against the Debtors, the Objecting Noteholders contend that they have a security interest in the Debtors' assets.  They do not.  A simple lien search reveals that the Objecting Noteholders have never taken any action to perfect their alleged liens on any of the Debtors' assets or, for that matter, the assets of Allied Fiber, LLC.  Further, any unperfected lien the Objecting Noteholders might assert is subject to avoidance under section 544(a) of the Bankruptcy Code.  Put simply, the Objecting Noteholders have no basis in law or equity to assert a lien against the Debtors' assets and therefore are not entitled to adequate protection.  Lacking any claim or interest in the Debtors' assets, there is no basis for the Objecting Noteholders' objection to the proposed DIP financing.

3.     The Objecting Noteholders, which represent less than 1% of the approximately $49,000,000 in secured promissory notes issued by Allied Fiber, LLC prior to the time the Debtors were formed, assert that they did not consent to the transfer of Allied Fiber, LLC's assets to the Debtors in 2014.  However, the Objecting Noteholders' own evidence reveals that they agreed Allied Fiber, LLC could transfer its assets to third-parties with the "prior consent of [the noteholders] representing at least a majority of the principal amount outstanding under [the notes]."  Objection at Exhibit A, ¶ 1(d).  As the Debtors will demonstrate at the final hearing on the DIP Motion, the 2014 transfer was consented to and authorized by the overwhelming majority of Allied Fiber, LLC's noteholders.  The Objecting Noteholders admit that they had actual knowledge of the transfer and did not object (likely because they had no basis for an

objection).    This also likely explains why the remaining 99% of the Allied Fiber, LLC noteholders have not objected to the proposed DIP financing.

4.        The proposed roll-up of approximately $2,600,000 of Strome's $51,000,000 in senior secured prepetition indebtedness is also reasonable and proper.  The $2,600,000 to be rolled into the DIP loan reflects new money loaned by Strome on an emergency basis immediately prior to the Debtors' petition date to ensure the Debtors' continued operations. Absent that bridge financing, the Debtors would have ceased operations, employees would not have been paid, valuable leases would have lapsed, and the Debtors' assets would have become worthless.  Strome has also agreed to provide more than $4,400,000 in new money DIP financing to ensure the Debtors' continued operations, fund an orderly sale process, and guarantee the payment of allowed unsecured trade claims up to an aggregate amount of $200,000, which the Debtors believe is sufficient to pay all allowed claims in full.

5.        In summary, Strome has agreed to provide sufficient financing to the Debtors to enable them to run a robust marketing and sale process in order to maximize the value of the Debtors' estates.  The proposed DIP financing was heavily negotiated, in good faith and at arms' length, between Strome and the Debtors.    Strome has agreed to guarantee payment of administrative expenses and allowed unsecured trade claims, and the protections afforded in the final DIP order are, including stipulations regarding the validity the lenders' liens and claims subject to a finite challenge period, are reasonable, standard protections afforded to nearly all DIP lenders.  Absent the relief requested in the DIP Motion, the Debtors will be ceased to force operations and abruptly liquidate, eliminating employees' jobs and ensuring that trade creditors remain unpaid.  Under the circumstances, the proposed DIP financing is reasonable, necessary, and in the best interests of the Debtors' estates and all creditors.  The Objecting Noteholders, who are not creditors of the Debtors' estates, should not be permitted to impede the Debtors' sale

process and destroy the value that will otherwise be delivered to the Debtors' other stakeholders. The Objection should therefore be overruled.

## II. RELEVANT FACTUAL BACKGROUND

6.      The Objecting Noteholders do not allege that they have ever loaned any money to the Debtors.  Instead, the Objecting Noteholders purportedly loaned Allied Fiber, LLC the aggregate amount of $450,000 in 2012 and 2013 pursuant to certain promissory notes issued by Allied Fiber, LLC (the "Allied Fiber Notes").  Objection at ¶ 1.  These Allied Fiber Notes were purportedly secured by a lien on the assets of Allied Fiber, LLC.  Objection at ¶ 3, Exhibit A at ¶ 1(a).  However, the Objecting Noteholders did not file a UCC-1 financing statement or take any other action to perfect their purported security interest in Allied Fiber, LLC's assets.  As a result, the Objecting Noteholders' security interest in Allied Fiber, LLC's assets remained unperfected as of the Debtors' chapter 11 filings.  Lien searches reflecting the financing statements filed against Allied Fiber, LLC and the Debtors through February 26, 2016 are attached hereto as **Exhibits A and B**, respectively.[2]

7.      In 2014, out of money and unable to complete its fiber-optic network without additional financing, Allied Fiber, LLC turned to Strome, which agreed to provide an additional $23,000,000 on a senior secured basis to complete the fiber-optic network and fund working capital requirements.  In order to receive the financing, the holders of the purportedly secured notes issued by Allied Fiber, LLC would have to agree subordinate their interests to Strome's lien.  The Allied Fiber Notes expressly provide that Allied Fiber, LLC could transfer its assets

---

[2] As discussed below, William M. Hitchcock filed UCC financing statements on behalf of various Allied Fiber, LLC noteholders.  However, there is no evidence that Mr. Hitchcock is the agent for the Objecting Noteholders.  In fact, the Objecting Noteholders argue in the Objection that he is *not* their agent.  Their contention that their liens are senior to Strome's forecloses any argument that Mr. Hitchcock is their agent because, as the Objecting Noteholders acknowledge, Mr. Hitchcock agreed to the subordination of his constituency's liens to those of Strome.

(*i.e.*, the Objecting Noteholders' purported collateral) with the consent of "the majority of principal amount outstanding under all" Allied Fiber, LLC notes.  Objection at Exhibit A, ¶ 1(d). Recognizing that their purported collateral would be worthless unless and until the fiber-optic network was complete, the overwhelming majority of the Allied Fiber, LLC's noteholders consented to the financing and the subordination of their interests to Strome (the "Non-Objecting Noteholders").[3]  The Non-Objecting Noteholders' authorization and consent to the transfer of Allied Fiber, LLC's assets and the subordination of their liens is attached hereto **Exhibit C**. Although the Objecting Noteholders contend that they did not consent to the Strome funding and the transfer of the Allied Fiber, LLC's assets to the Debtors, they admit that they had actual knowledge of the financing and transfer and failed to object.

8.     As part of the Strome financing in September 2014, (i) Allied Fiber, LLC formed the Debtor entities and contributed its operating assets to the Debtors, retaining the equity interest in the Debtors in exchange, (ii) the Debtors borrowed $23,000,000 from Strome under the terms of a loan agreement, promissory note, and related loan documents, (iii) the Debtors granted Strome a first-priority security interest in all of the Debtors' assets, (iv) Allied Fiber, LLC guaranteed the Strome loan and granted Strome a first-priority security interest in its equity interests in the Debtors, and (v) the Non-Objecting Noteholders and various other parties agreed to subordinate their interests in the Debtors' assets to Strome under the terms of an Intercreditor Lien Subordination Agreement.  Strome duly perfected its security interests by, *inter alia*, contemporaneously filing UCC-1 financing statements at the closing of the financing.  *See*

---

[3] Strome believes that Allied Fiber, LLC ultimately issued approximately $50,000,000 in promissory notes.  Thus, the Objecting Noteholders represent less than 1% of the debt issued by Allied Fiber, LLC.  Put differently, Strome believes that over 99% of the holders of notes issued by Allied Fiber, LLC consented to the 2014 financing.

**Exhibit B**.  The Objecting Noteholders' purported security interest remained unperfected at the time Strome filed UCC-1 financing statements perfecting his interests.  *See* **Exhibits A and B**.

9.       After the Strome financing, the Allied Fiber Notes remained obligations of Allied Fiber, LLC.  The Allied Fiber notes were never assigned to, transferred to, or guaranteed by any of the Debtors.  Indeed, there is no agreement whatsoever evidencing a payment obligation between the Debtors and the Objecting Noteholders.  As a result, the Objecting Noteholders are not creditors of the Debtors' estates.[4]  Further, the Objecting Noteholders' purported security interest in the Debtors' assets remained unperfected at the time of the Debtors' chapter 11 filings.  Accordingly, the Objecting Noteholders have no colorable secured claim against the Debtors' estates and therefore no standing to object to the DIP Motion.

## III. ARGUMENT & AUTHORITIES

**A.       The Objecting Noteholders are not Entitled to Adequate Protection Under Section 364(d) of the Bankruptcy Code**

10.       The Objecting Noteholders are not entitled to adequate protection under section 364(d) for at least three reasons.  First, the Objecting Noteholders' have no claim against the Debtors' estates.  The Allied Fiber Notes upon which the Objecting Noteholders base their Objection were issued by Allied Fiber, LLC and were never guaranteed or otherwise agreed to by the Debtors.  As set forth above, the Allied Fiber Notes were executed and the loans were fully funded at least a year before the Debtors were even formed.  Thus, there is no underlying obligation by the Debtors that gives rise to a claim by the Objecting Noteholders that would give them standing to object to the DIP Motion.

---

[4] All of the funds loaned to Allied Fiber, LLC under the Allied Fiber Notes were provided to Allied Fiber, LLC prior to the time the Debtor entities were formed, and none of the funds borrowed pursuant to those notes were contributed to the Debtors.  Further, Strome does not believe there are any documents evidencing payment obligations by the Debtors to any of Allied Fiber, LLC's noteholders.

11.     Second, whatever claim or interest the Objecting Noteholders might assert against the Debtors is unsecured as a matter of law.  As a purported secured party seeking adequate protection, the Objecting Noteholders bear the burden of establishing the validity, extent, and amount of their alleged security interests in the Debtors' assets.  *In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012).  As set forth above, the Objecting Noteholders took no action to perfect their purported security interest in the assets of Allied Fiber, LLC, and the Objecting Noteholders' security interest remained unperfected as of the Debtors' chapter 11 filings.  *See* **Exhibits A and B**.  As a result, the Objecting Noteholders' purported security interest is subject to avoidance under section 544(a), rendering the Objecting Noteholders' interest, if any, fully unsecured.  11 U.S.C. §§ 544(a)(1)-(3); *In re Marasek*, 2013 WL 5423222, at *6 (Bankr. D.N.J. Sep. 30, 2014) (trustee may avoid liens that remained unperfected as of the petition date under section 544(a)(1)-(3)).  Accordingly, the Objecting Noteholders cannot meet their burden to prove that they have a valid security interest in the Debtors' assets and are therefore not entitled to adequate protection.  *In re Koger*, 2013 WL 4666738, at *3 (Bankr. S.D. Ill. Aug. 30, 2013) (unsecured creditors are not entitled to adequate protection).

12.     Third, the Objecting Noteholders cannot meet their burden to prove the value of their alleged interest in the Debtors' assets.  To establish that they are entitled to adequate protection, the Objecting Noteholders must prove the value of their alleged security interest.  *In re Residential Capital, LLC*, 501 B.R. 549, 590 (Bankr. S.D.N.Y. 2013).  As set forth above, Strome's security interest in the Debtors' assets was perfected prior to the Objecting Parties' alleged interest (which was never perfected).  Therefore, Strome's security interest in the Debtors' assets is senior to the Objecting Noteholders' purported security interests as a matter of

law because it was first in time to be perfected. *See* NY UCC §§ 9-317(a), 9-322(a).[5] Thus, the Objecting Noteholders' security interests, if any, are junior to Strome. The Objecting Noteholders cannot meet their burden to prove that the value of the Debtors' assets exceeds the amount of Strome's debt and the Objecting Noteholders are therefore not entitled to adequate protection under section 364(d). *See In re Levitt & Sons, LLC*, 384 B.R. 630, 341-42 (Bankr. S.D. Fla. 2008) (junior lienholder not entitled to adequate protection where value of collateral did not exceed amount of senior secured debt); *In re Shriver*, 33 B.R. 176, 181 (Bankr. N.D. Ohio 1983) (valueless junior liens are not entitled to adequate protection).

**B.      The Debtors Have Satisfied the Requirements of Section 364(d) of the Bankruptcy Code**

13.      As set forth above, the Objecting Noteholders are not secured creditors and are not entitled to adequate protection under section 364(d). Because the Objecting Noteholders cannot meet their evidentiary burden to establish that they are entitled to adequate protection under section 364(d), the Debtors are not required to show that they have complied with section 364(d) *vis a vis* the Objecting Noteholders. *Residential Capital*, 501 B.R. at 590; *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). Nonetheless, the uncontroverted evidence will establish that the Debtors have satisfied the requirements of section 364(d) with respect to all secured parties.

14.      In order to grant postpetition priming liens under section 364(d), a debtor must establish that (i) it was not able to obtain credit without providing a priming lien and (ii) any lien junior to the priming lien is adequately protected. 11 U.S.C. § 364(d)(1). As set forth in both the DIP Motion and the Declaration of Scott Drake Filed in Support of First Day Motions [D.I. 10] (the "Drake Declaration"), and as evidenced on the record at the first day hearing held by the

---

[5] The Allied Fiber Notes are governed by New York law. *See* Objection at Exhibit A, ¶ 7(b).

Court on April 22, 2016, the Debtors have not be able to obtain any alternative DIP financing despite diligent efforts. As explained in the Drake Declaration, the Debtors

> have spent months searching for a business alternative [to the DIP Facility], including additional financing options, and have been unable to do so – quite simply the DIP Facility and superpriority liens and claims associated therewith are the best options available to the Debtors given the Debtors' current financial situation.

Drake Declaration at ¶ 60; *see also* Drake Declaration at ¶¶ 30-33 (describing extensive efforts to find alternative financing). The uncontroverted evidence put forth by the Debtors satisfies the requirements of section 364(d)(1)(A), which only requires a debtor to make reasonable, good faith efforts to obtain alternative financing. *In re Showshoe*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).

15. The Debtors have also satisfied the requirements of section 364(d)(1)(B) by demonstrating that the value of the Debtors' assets does not exceed the amount of senior secured debt even absent the proposed DIP financing. As set forth in the Drake Declaration, the Debtors have spent over 18 months actively soliciting financing and marketing their assets for sale, to no avail. Drake Declaration at ¶¶ 30-33, 60-61. In addition to approximately $50,000,000 in senior secured debt, the Debtors currently incur approximately $8,500,000 in annual operating costs against $500,000 in annual revenue. *Id.* at ¶ 31. The Debtors' extensive, unsuccessful marketing efforts and unsustainable capital structure suggest that the value of the junior lienholders' interest in the Debtors' assets is zero. Because the value of the Objecting Lienholders' purported liens is zero, the value of the Objecting Noteholders' interests cannot decline as a result of the proposed DIP financing, and they are not entitled to adequate protection. *See Levitt & Sons*, 384 B.R. at 642 ("Since the junior lien holders would receive nothing had there not been post-petition superpriority financing, they are not entitled to adequate protection."); *Shriver*, 33 B.R. at 181.

Based on the uncontroverted evidence, the Debtors have satisfied their burden under section 364(d)(1) and are entitled to the relief sought in the DIP Motion.

**C.    The Objecting Noteholders' Rights to Challenge Strome's Claims and Liens are Adequately Preserved and There is no Cause to Extend the Challenge Period**

16.    The Objecting Noteholders request that 75 day challenge period provided under the proposed DIP order be extended to "at least" 180 days from the date the Debtors file their schedules and statements of financial affairs.  Objection at ¶ 13.  However, the 75 day challenge period provided in the DIP order complies with both the Court's Local Rules and standard practice in this District.  *See* DEL. BANKR. L.R. 4001-2(a)(i)(B).  The Court should not depart from the Local Rules without a showing of good cause, and the Objecting Noteholders cannot meet their burden to prove that there is good cause to increase the challenge period to 180 days in this case.

17.    The Objecting Noteholders admit that they had actual knowledge of the transfer of Allied Fiber, LLC's assets to the Debtors in 2014 and the creation of Strome's senior liens. Nonetheless, the Objecting Noteholders did not object to the transfer or the Strome financing at the time and have not done so at any point since.  Moreover, the Objecting Noteholders took no action to preserve or protect their purported security interest in the assets before, during, or after the Strome financing.  By failing to object, and consciously choosing not to perfect their security interests, the Objecting Noteholders effectively consented to the creation and prior perfection of Strome's liens.  Further, the Objecting Noteholders have already had more than a year and a half investigate or otherwise challenge Strome's liens and have chosen not to do so.  There is no reason to provide the Objecting Noteholders with any additional time beyond that prescribed by the Local Rules.

18.    The fact that the proposed DIP order waives claims against Strome and extinguishes the rights of the Debtors and third-parties to challenge the extent, validity, or

priority of Strome's prepetition liens is neither unusual nor inappropriate. The evidence presented at the final hearing on the DIP Motion will establish that the Debtors are not aware of any potential claims against Strome, that Strome's liens are duly perfected, first-priority liens that are not subject to attack or recharacterization, and that the stipulated amount of Strome's claim is correct. Under the circumstances, such stipulations are routine and integral components of nearly all DIP financing arrangements and are necessary to adequately protect Strome's prepetition interests. In addition, the Objecting Noteholders have already had more than 18 months to challenge the validity or priority of Strome's liens and are afforded an additional 75 days to do so under the proposed final DIP order. Accordingly, the relief sought in the DIP Motion, including the stipulations and waivers regarding Strome's liens, are reasonable and necessary and should be approved.

**D.      The Roll-Up is Reasonable, Limited to Emergency Bridge Funding, and Does not Adversely Affect the Objecting Noteholders**

19.      The Objecting Noteholders also object to the roll-up of certain prepetition loans from Strome into the DIP loan. Objection at ¶ 14. In the DIP Motion, the Debtors request that approximately $2,675,611 in prepetition loans to the Debtors, which were new funds provided on an emergency basis to ensure the Debtors' continued operations while preparing for this bankruptcy and sale process, be rolled into the DIP obligations. Without this additional bridge loan (while the Debtors were in default under the senior secured loan documents), the Debtors would have been forced to immediately liquidate. The proposed amount to be rolled into the DIP loan is approximately 5% of Strome's total prepetition indebtedness and can reasonably be viewed as part of Strome's DIP loan commitment.

20.      Further, the Objecting Noteholders have no valid claim against the Debtors' assets, and any claim they may assert is junior to Strome as a matter of law. Thus, whether the prepetition loans the Debtors seek to roll up are considered part of the DIP loan obligations or

the senior prepetition loans from Strome, the net effect to junior parties, including the Objecting Noteholders, is the same.  The proposed roll-up is an integral part of the proposed DIP financing and was negotiated in good faith and at arms' length.  The roll-up will not adversely affect the Objecting Noteholders and should be approved.

**E.     Unsecured Creditors at the Operating Subsidiaries are Being Paid in Full**

21.     Finally, the Objecting Noteholders object to the grant of a security interest on the proceeds of chapter 5 avoidance actions to Strome.  As set forth in the final DIP order, allowed unsecured trade claims will be paid in full in this case.  Strome has agreed to provide a significant amount of postpetition financing in order to ensure the Debtors are able to continue operating and to guarantee payment of trade creditors despite a significant risk that Strome's senior secured debt will not be satisfied in full.  Given the risk of non-payment and the guarantee that allowed trade claims are paid in full, it is fully reasonable and appropriate to provide Strome with a lien on chapter 5 avoidance actions in exchange for Strome's agreement to provide critically necessary DIP financing.

## IV. CONCLUSION & PRAYER

22.     For the reasons set forth above, Strome requests that the Court enter an order (i) overruling the Objection, (ii) granting the relief requested in the DIP Motion on a final basis, and (iii) awarding Strome any further relief the Court deems appropriate.

*[Remainder of page intentionally left blank.]*

Dated: May 10, 2016
     Wilmington, Delaware

*/s/ Mark D. Collins*

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701

-and-

Patrick J. Neligan, Jr.
John D. Gaither
NELIGAN FOLEY LLP
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone:    (214) 810-5300
Facsimile:    (214) 810-5301

*Attorneys for Strome Mezzanine Fund IV, L.P.*