ASSET AND REAL ESTATE PURCHASE AGREEMENT

Dated as of [_____ ____], 2016

By and Among

**AF-SOUTHEAST, LLC, ALLIED FIBER – FLORIDA, LLC,
AND ALLIED FIBER – GEORGIA, LLC**

and

**[BUYER]**

ACTIVE 40243749v2 05/12/2016 12:01 PM

# TABLE OF CONTENTS

Page

ARTICLE I THE ASSET SALE ..................................................................................2
    Section 1.01. The Asset Sale and the Real Estate Sale ...........................................2
    Section 1.02. Purchased Assets and Excluded Assets ............................................3
    Section 1.03. The Real Estate Sale ...........................................................................5
    Section 1.04. Assumed Liabilities and Excluded Liabilities .................................5
    Section 1.05. Assigned Contracts .............................................................................5
    Section 1.06. Closing ...............................................................................................11
ARTICLE II THE PURCHASE PRICE ....................................................................11
    Section 2.01. Purchase Price ....................................................................................11
    Section 2.02. Escrow Accounts ...............................................................................12
    Section 2.03. Transfer Taxes ....................................................................................12
ARTICLE III REPRESENTATIONS AND WARRANTIES.....................................12
    Section 3.01. Representations and Warranties of the Debtors.................................12
    Section 3.02. Representations and Warranties of Buyer.........................................14
ARTICLE IV COVENANTS RELATING TO THE CONDUCT OF BUSINESS.....16
    Section 4.01. Conduct of Business by the Debtors.................................................16
    Section 4.02. Other Actions.....................................................................................16
    Section 4.03. Advice of Changes; Filings...............................................................16
    Section 4.04. Certain Tax Matters ...........................................................................17
    Section 4.05. Certain Bankruptcy Matters ..............................................................17
ARTICLE V ADDITIONAL COVENANTS ..............................................................17
    Section 5.01. Access to Information; Confidentiality..............................................17
    Section 5.02. Commercially Reasonable Efforts .....................................................18
    Section 5.03. Public Announcements .......................................................................19
    Section 5.04. Fees and Expenses .............................................................................19
    Section 5.05. Additional Agreements ......................................................................19
ARTICLE VI CONDITIONS PRECEDENT .............................................................19
    Section 6.01. Conditions to Each Party's Obligation to Effect the Asset Sale and
        the Real Estate Sale............................................................................19
    Section 6.02. Conditions to the Obligations of Buyer ............................................20
    Section 6.03. Conditions to the Obligations of the Debtors ...................................21
    Section 6.04. Frustration of Closing Conditions......................................................21
ARTICLE VII TERMINATION, AMENDMENT AND WAIVER............................21
    Section 7.01. Termination.........................................................................................21
    Section 7.02. Effect of Termination..........................................................................22
    Section 7.03. Payment of Deposit............................................................................22
    Section 7.04. Amendment.........................................................................................23
    Section 7.05. Extension; Waiver...............................................................................23
ARTICLE VIII MISCELLANEOUS ..........................................................................23
    Section 8.01. Notices ...............................................................................................23
    Section 8.02. Definitions..........................................................................................24
    Section 8.03. Assignment.........................................................................................28
    Section 8.04. Entire Agreement; No Third-Party Beneficiaries .......................................29
    Section 8.05. Confidentiality; Return of Information........................................................29

ACTIVE 40243749v2 05/12/2016 12:01 PM

Section 8.06. Release ...............................................................................................29
Section 8.07. Governing Law ..................................................................................30
Section 8.08. Specific Enforcement........................................................................30
Section 8.09. Construction.......................................................................................30
Section 8.10. Consent to Jurisdiction......................................................................30
Section 8.11. Waiver of Jury Trial...........................................................................30
Section 8.12. Interpretation......................................................................................30
Section 8.13. Consents and Approvals ...................................................................31
Section 8.14. Counterparts .......................................................................................31
Section 8.15. Severability ........................................................................................31
Section 8.16. Survival of Representations and Warranties.............................................31

SCHEDULES

The Disclosure Schedule
Schedule A       Assigned Contracts
Schedule B       Excluded Assets

EXHIBITS

Exhibit A        Real Estate Description and Exceptions
Exhibit B        Bill of Sale
Exhibit C        Assignment and Assumption Agreement
Exhibit D        Bidding Procedures
Exhibit E        Sale Order
Exhibit F        Bidding Procedures Order

ACTIVE 40243749v2 05/12/2016 12:01 PM

THIS ASSET AND REAL ESTATE PURCHASE AGREEMENT (this "Agreement"), dated as of [_____  __)], 2016, is entered into by and between [Buyer], a [_____  _____] ("Buyer"), AF-Southeast, LLC, a Delaware limited liability company ("AF-Southeast"), Allied Fiber – Florida, LLC, a Delaware limited liability company ("Allied Florida"), Allied Fiber – Georgia, LLC, a Delaware limited liability company ("Allied Georgia," and together with AF-Southeast and Allied Florida, collectively, the "Debtors").

## BACKGROUND

WHEREAS, on April 20, 2016, the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Debtors continue to operate and manage their businesses as Debtors-in-possession in accordance with Section 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases (the "Bankruptcy Cases");

WHEREAS, each of the Debtors are limited liability companies organized in the State of Delaware.  AF-Southeast is 100% owned by its parent, Allied Fiber, LLC ("Allied Fiber"), a non-Debtor affiliate of the Debtors.  AF-Southeast is the sole member and 100% owner of Allied Florida and Allied Georgia, each of which are Debtors in these proceedings.  As such, the Debtors are "affiliates" as that term is defined in Section 101(2) of the Bankruptcy Code;

WHEREAS, the Debtors are engaged in the business of designing, constructing and operating an open access, physical layer, network-neutral colocation and dark fiber network (the "Business").  The Debtors' dark fiber network provides long-haul, multi-access points, and short-haul dark fiber network systems, coupled with its owned colocation facilities to provide control of the underlying physical assets to all network operators who subscribe to the Debtors' services.  The network is designed to link critical access points (international subsea cables) in the United States while also providing intermediate access points along the route for inclusion of local networks into the Debtors' network.  The combination of long-haul service with the capability to distribute traffic locally is intended to yield high customer demand and volume;

WHEREAS, on April 22, 2016, the Bankruptcy Court entered an order for the joint administration of the Debtors' respective chapter 11 cases for procedural purposes pursuant to Fed. R. Bankr. P 1015(b) and Del. Bankr. L.R. 1015-1;

WHEREAS, the Debtors own certain real estate generally described as (a) 0.435 Acres, Land Lot 56, 7th Land District, Lamar County, Georgia; (b) 0.17 Acres, Land Lot 89, 12th Land District, City of Hahira, Lowndes County, Georgia; and (c) 0.28 Acres, Land Lot 227, 5th Land District, City of Warner Robins, Houston County, Georgia, as more particularly described on Exhibit A attached hereto and made a part hereof (the "Real Estate"), which the Debtors use in connection with the Business;

WHEREAS, the Debtors own the Purchased Assets and the Real Estate and, upon the terms and conditions set forth in this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, each Debtor desires to transfer, sell, convey, assign and deliver to Buyer, and

-1-

Buyer desires to purchase, acquire and accept, the Purchased Assets and the Real Estate free and clear of all Liabilities (other than the Assumed Liabilities and Permitted Encumbrances);

WHEREAS, upon the terms and conditions set forth in this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, Buyer is willing to assume, and the Debtors desire to assign and transfer to Buyer, the Assumed Liabilities; and

WHEREAS, Buyer acknowledges and agrees that this Agreement shall be subject to higher or otherwise better offers pursuant to the Bidding Procedures.

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained in this Agreement, and subject to the conditions set forth herein, the parties hereto agree as follows:

ARTICLE I

The Asset Sale and Real Estate Sale

Section 1.01. The Asset Sale and the Real Estate Sale.  (a)  Pursuant to Sections 363 and 365 of the Bankruptcy Code, and upon the terms and subject to the conditions set forth in this Agreement, at the Closing the Debtors shall transfer, sell, convey, assign and deliver to Buyer, and Buyer shall purchase, acquire and accept from the Debtors, free and clear of all Liabilities (other than the Assumed Liabilities and Permitted Encumbrances), all of the Debtors' right, title and interest in, to and under the Purchased Assets and the Real Estate for (i) the Purchase Price, and (ii) the assumption of the Assumed Liabilities.  The purchase and sale of the Purchased Assets (including the assumption and assignment of the Assigned Contracts associated with the Purchased Assets) and the assumption of the Assumed Liabilities are collectively referred to in this Agreement as the "Asset Sale".  The purchase and sale of the Real Estate (including the assumption and assignment of the Assigned Contracts associated with the Real Estate) and the assumption of the Assumed Liabilities associated with the Real Estate are collectively referred to in this Agreement as the "Real Estate Sale".

(b)    The transfer, sale, conveyance and assignment of the Purchased Assets shall be effectuated by the execution and delivery at the Closing by the Debtors of one or more bills of sale, substantially in the form attached hereto as Exhibit B (collectively, the "Bill of Sale"), together with any reasonably necessary transfer declarations or other filings, and such other instruments of transfer, conveyance and assignment as Buyer shall reasonably request to vest in Buyer good and valid title to the Purchased Assets, in form and substance as Buyer shall reasonably request, including assignments regarding all Intellectual Property Rights of the Debtors (including the execution and delivery at the Closing by the Debtors of a general assignment of all trademarks to Buyer or an Affiliate of Buyer as may be specified by Buyer). Pursuant to this Agreement, the Debtors will not sell, and Buyer will not purchase, any of the Excluded Assets.

(c)    At the Closing, the Debtors shall assign and transfer to Buyer, and Buyer shall assume, the Assumed Liabilities by the execution and delivery at the Closing by Buyer and the Debtors of one or more assignment and assumption agreements, substantially in the form

attached hereto as <u>Exhibit C</u> (the "<u>Assignment and Assumption Agreements</u>").  Notwithstanding any other provision in this Agreement to the contrary, Buyer will assume only the Assumed Liabilities and will not assume any other Liability of the Debtors (or any predecessor of the Debtors or any prior owner of all or part of the Debtors' Business, assets or properties) of whatever nature, whether presently in existence or arising hereafter.

Section 1.02. <u>Purchased Assets and Excluded Assets</u>.  (a) The term "<u>Purchased Assets</u>" means all of the Business, properties, assets, goodwill, rights and claims of the Debtors, of whatever kind and nature, real or personal, tangible or intangible, owned, leased, used or licensed by the Debtors on the Closing Date, other than the Excluded Assets, including:

(i)    all leaseholds interests and all prepaid rent, security deposits and options to renew or purchase, in each case with respect to the properties set forth on Section 1.02(a)(i) of the Debtors Disclosure Schedule (collectively, the "<u>Transferred Leases</u>");

(ii)    all inventory, wherever located, including raw materials, packaging materials and supplies, work-in-progress and finished goods that are owned, leased or licensed by the Debtors, including inventory held at any location controlled by the Debtors, inventory previously purchased and in transit and any inventory paid for but not yet delivered or received by the Debtors (collectively, the "<u>Transferred Inventory</u>");

(iii)    all other tangible property and interests therein, wherever located, including all apparatus, materials, furniture, office supplies, fixtures, furnishings, equipment, vehicles, tools, tooling, machinery, manufactured and purchased parts, spare parts and accessories and other items of tangible personal property owned, leased, used or licensed by the Debtors, including the assets set forth on Section 1.02(a)(iii) of the Debtors Disclosure Schedule, and including tangible property held at any location controlled by any of the Debtors, tangible property previously purchased and in transit and any tangible property held by a customer or prospective customer of the Debtors;

(iv)    [all Intellectual Property Rights of the Debtors (including all related documentation and data in all forms and formats in which it exists), including, for the avoidance of doubt, all rights in the "AF-Southeast," "Allied Fiber – Florida" and "Allied Fiber – Georgia" names;]

(v)    all computers, computer hardware, computer support equipment and software, telephone and communication systems, security systems, accounting systems, email addresses, databases, source codes, user manuals and master disks of source codes and other proprietary information, whether for general Business usage (*e.g.*, accounting, word processing, graphics, spreadsheet analysis) or specific, unique-to-the-Business usage, in each case as owned, leased, used or licensed by the Debtors;

(vi)    all approvals, authorizations, certificates, filings, franchises, licenses, notices and permits of or with all Governmental Entities (collectively, "<u>Permits</u>") issued to, owned, used or possessed by the Debtors, including any pending

application of the Debtors to a Governmental Entity for or with regard to a Permit, in each case to the extent transferable under applicable law;

(vii)    all Contracts set forth on Schedule A hereto (as such Schedule may be amended pursuant to Section 1.05) (the "Assigned Contracts");

(viii)    all rights, claims, credits, causes of action or rights of set-off of the Debtors to the extent relating to any Purchased Asset or any Assumed Liability, whether choate or inchoate, known or unknown, contingent or non-contingent, including, to the extent transferable, all claims pursuant to guarantees, representations, warranties, indemnities and similar rights made by suppliers, manufacturers, contractors and other third parties in favor of the Debtors in respect of any other Purchased Asset or any Assumed Liability; and

(ix)    all customer, vendor and supplier lists, other distribution lists, files, documents and correspondence relating to customers, suppliers and vendors of the Business, sales and promotional literature, manuals, equipment and products drawings, blueprints and schematics and all other Business, financial, accounting and tax records, files, books and documents (including books of account, ledgers, general records, files, invoices, billing records and regulatory records), in each case, in any form or medium, of the Debtors.

(b)    The term "Excluded Assets" means:

(i)    accounts receivable and other rights to payment (including notes receivable) of the Debtors, including, but not limited to, any and all promissory notes and all other obligations to the Debtors;

(ii)    the limited liability company charter, seals, minute books, membership interest registers and transfer books and other documents relating solely to the organization, maintenance and existence of each Debtor as a limited liability company;

(iii)    any legal or beneficial interests in the membership interest capital of the Debtors;

(iv)    all tax losses and tax loss carry forwards of the Debtors and rights to receive refunds, credits and credit carry forwards with respect to any taxes of the Debtors;

(v)    subject to Section 1.05(e), any Contract that is not an Assigned Contract, including, but not limited to, all policies of insurance pertaining to the Debtors' assets and claims of every nature and description under or arising out of such insurance policies, including any refundable premiums relating to such policies;

(vi)    any leasehold interest or other interest in real property of the Debtors (other than the Real Estate) that is not in respect of the Transferred Leases;

(vii)    any property owned by employees of the Debtor, third parties, or contractors located in, on, or at any of the Debtors' real property, and the properties and assets listed or described on Schedule B;

(viii)    all assets of or relating to any individual employment, retention, indemnification, severance, change of control and consulting agreement with any employee of the Debtors to which the Debtors are a party and each "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and each severance, retention, employment, consulting, "change of control", bonus, incentive (equity-based, equity-related or otherwise), deferred compensation, employee loan, welfare benefit, fringe benefit and other benefit plan, agreement, program, policy, commitment or other arrangement, whether or not subject to ERISA, in each case sponsored, maintained or contributed to, or required to be sponsored, maintained or contributed to, by the Debtors or any other Person that, together with the Debtors, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Internal Revenue Code of 1986, as amended (each, a "Commonly Controlled Entity"), or with respect to which the Debtors or any Commonly Controlled Entity has any liability, in each case providing any compensation or benefits to any employee of the Debtors;

(ix)    all actions arising under Chapter 5 of the Bankruptcy Code, including, but not limited to, Sections 544-550 of the Bankruptcy Code, and all proceeds thereof;

(x)    all cash, cash equivalents and short-term investments as of the Closing Date;

(xi)    all accounts, pre-paid expenses, advance payments, prepayments, security deposits, deferred charges, letters of credit and other deposits included in pre-paid assets or rights of payment, in each case, of the Debtors, and any claim, cause of action, remedy or right related to the foregoing; and

(xii)    all rights of the Debtors under this Agreement and the other agreements and instruments executed and delivered in connection with this Agreement (the "Transaction Documents").

Section 1.03. The Real Estate Sale.

(a)    Title to the Real Estate.  Buyer shall have received title commitments issued by a recognized title insurance company relating to the Real Estate, and consistent with the following: Title to the Real Estate shall be good and marketable, and free and clear of all liens, restrictions, easements, encumbrances, leases, tenancies and other title objections except for the Permitted Exceptions.  Within five (5) days after the execution of this Agreement, Buyer shall order, at Buyer's election, either title reports or commitments for title policies for the Real Estate (the "Title Commitment").  Buyer shall notify the Debtors within ten (10) days after the date of this Agreement (the "Title Review Period") of any title exceptions (which are not Permitted Exceptions) identified in the Title Commitment that Buyer disapproves.  The

exceptions set forth in <u>Exhibit A</u> attached hereto and made a part hereof, and any exception, exclusion from coverage or other matter shown in the Title Commitment as of the end of the Title Review Period or otherwise not disapproved in writing within said time period shall be deemed approved by Buyer and shall constitute "<u>Permitted Exceptions</u>" hereunder.  All charges for the Title Commitment, together with the title policy to be issued pursuant thereto, shall be paid by Buyer.

       (b)    <u>Real Estate Closing Deliveries</u>.

       (i)    Deeds, duly executed and acknowledged by the Debtors, by which fee title to the Real Estate shall be conveyed to Buyer, subject to the Permitted Exceptions (the "<u>Deeds</u>"); and

       (ii)    An affidavit of title to the title insurance company duly executed and acknowledged by the Debtors in a form acceptable to the Debtors and the title insurance company (the "<u>Affidavit of Title</u>").

       (c)    <u>Real Estate Due Diligence</u>.  Buyer acknowledges and agrees that it is reasonably satisfied with any matters relating to the Real Estate.

       (d)    <u>Buyer's Access to Real Estate</u>.  Buyer shall, and Buyer shall require its representatives, contractors and subcontractors (collectively its "<u>Due Diligence Representatives</u>") to, obtain and keep in force and shall deliver to the Debtors prior to entry upon the Real Estate certificates of insurance evidencing at a minimum the following insurance coverage: (A) Workmen's Compensation, according to applicable statutory requirements; and (B) Commercial General Liability Insurance covering operations and any and all subcontractors and automobiles (including owned, non-owned or hired vehicles), with a minimum limit applicable to Bodily Injury Liability (including, but not limited to, wrongful death); and (C) Contractor's pollution liability insurance coverage of $1,000,000 single limit per incident or occurrence and in the aggregate; and (D) Property Damage Liability of $1,000,000 single limit per incident or occurrence and in the aggregate.  The certificates of insurance delivered to the Debtors as evidence of the coverages described above shall name the Debtors as additional insureds under the commercial general liability policy applicable to the due diligence investigation by means of an endorsement to the policy, a signed duplicate of which endorsement shall be furnished to the Debtors by Buyer prior to the commencement of the investigations contemplated by this Section.  All deductibles under any policies of insurance shall be reflected on the Certificate of Insurance.  All insurance shall be primary without right of contribution of any other insurance carried by the Debtors.  Each Certificate of Insurance shall provide that thirty (30) days prior written notice shall be given to the Debtors in the event of a cancellation or material change in any such policy.  Buyer's contracts with its Due Diligence Representatives shall not in any respect limit insurance coverage or liability.  Buyer agrees to be responsible for and does hereby release, hold harmless and shall indemnify and defend the Debtors from and against any and all claims suffered, incurred or brought by any person or other legal entity, which may be caused by Buyer or its representatives entering upon the Real Estate or its or their acts or omissions thereon.  The terms of this Section shall survive the Closing or termination of this Agreement.

(e)    <u>Real Estate Prorations</u>.  Real estate taxes and water and sewer rents shall be apportioned as of the date of the Closing Date.  All state, county and local realty, conveyance, recordation and/or documentary transfer taxes shall be paid by Buyer.  Any real estate taxes not known or estimated at the Closing and/or real estate taxes readjusted by municipal authorities after the Closing shall be re-prorated when the amount thereof becomes known.

(f)    <u>Damage or Destruction; Condemnation; Insurance</u>.

(i)    <u>Termination</u>.  If at any time prior to the Closing Date, the Real Estate or the improvements located thereon are destroyed or damaged as a result of fire or any other casualty whatsoever ("<u>Casualty Damage</u>") and the cost of restoring such Casualty Damage exceeds One Million Dollars ($1,000,000) in the aggregate, or if all of a parcel of the Real Estate or the improvements located thereon is condemned or taken by eminent domain proceedings by any public authority ("<u>Condemnation</u>"), then Buyer, at Buyer's option, may terminate this Agreement within fifteen (15) days after the Debtors' written notice to Buyer of such Casualty Damage or Condemnation, in which event the Deposit shall be returned to Buyer, this Agreement shall be null and void, and the parties hereto shall have no further rights, obligations or liabilities hereunder except for those rights and obligation that expressly survive Closing or termination of this Agreement. The Debtors shall give prompt written notice to Buyer of any Casualty Damage or Condemnation, and shall promptly submit proof of loss in the event of Casualty Damage and diligently thereafter pursue final adjustment of its insurance claim.

(ii)    <u>Condemnation; No Termination</u>.  If there is a Condemnation and Buyer does not elect to terminate this Agreement as permitted by Section 1.03(f)(i) above, then all Condemnation proceeds paid or payable to the Debtors shall belong to Buyer upon successful completion of the Closing and shall be paid over and assigned to Buyer at Closing, and the Debtors shall further execute all assignments and any other documents or instruments as Buyer may reasonably request or as may be necessary to transfer all interest in all such proceeds to Buyer or to whomever Buyer shall direct.

(iii)    <u>Casualty; No Termination</u>.  If there is Casualty Damage and Buyer does not elect to terminate (or is not permitted to terminate) this Agreement as provided in Section 1.03(f)(i) above, then (i) all insurance proceeds paid or payable to the Debtors shall belong to Buyer upon successful completion of the Closing and shall be paid over and assigned to Buyer at Closing, and (ii) the Debtors, shall further execute all assignments and any other documents or other instruments as Buyer may reasonably request or as may be necessary to transfer all interest in all such proceeds to Buyer or to whomever Buyer shall direct.

(iv)    <u>Disputes</u>.  In the event of a dispute between the Debtors and Buyer with respect to the cost of restoration under Section 1.03(f)(i) above, an engineer designated by the Debtors and an engineer designated by Buyer shall select an independent engineer licensed to practice in the state where that Real Estate is situated, who shall resolve the dispute, and said engineer's decision shall be final, binding and unappealable.  All fees, costs and expenses of the engineer so selected shall be paid by Buyer.  Such a selection process may be initiated by either party upon ten (10) days prior

-7-

written notice to the other given at any time during the period within which Buyer may terminate this Agreement under Section 1.03(f)(i) above, and, in the event such notice is given, the deadline for Buyer's termination of this Agreement under Section 1.03(f)(i) above and the deadline for Closing set forth in Section 7.01 below shall be extended until fifteen (15) days following the decision of the independent engineer selected under this Section.

(v)    <u>Inability to Convey Title; Other Debtors Defaults</u>.  If a Debtor is unable to convey good and marketable title and such as will be insured by any reputable title insurance company at regular rates, as above set forth, Buyer, as Buyer's sole and exclusive remedy, shall either (a) take such title as that Debtor can give without abatement of the Purchase Price, or (b) terminate this Agreement, in which latter event the Debtors shall return the Deposit to Buyer, this Agreement shall become null and void, and neither party shall have any further obligations hereunder except for those rights and obligation that expressly survive Closing or termination of this Agreement.

(g)    <u>Condition of the Real Estate; As-Is</u>.  **BUYER ACKNOWLEDGES THAT BUYER IS FULLY RELYING ON BUYER'S (OR BUYER'S REPRESENTATIVES') INSPECTIONS, EXAMINATIONS AND EVALUATIONS OF THE REAL ESTATE AND NOT UPON ANY STATEMENTS (ORAL OR WRITTEN) THAT MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY THE DEBTORS OR ANY OF THEIR RESPECTIVE REPRESENTATIVES, AGENTS OR ATTORNEYS.  BUYER ACKNOWLEDGES THAT BUYER HAS (OR BUYER'S REPRESENTATIVES HAVE), OR PRIOR TO THE CLOSING DATE WILL HAVE, THOROUGHLY INSPECTED AND EXAMINED THE REAL ESTATE TO THE EXTENT DEEMED NECESSARY BY BUYER IN ORDER TO ENABLE BUYER TO EVALUATE THE CONDITION OF THE REAL ESTATE AND ALL OTHER ASPECTS OF THE REAL ESTATE (INCLUDING, BUT NOT LIMITED TO, THE ENVIRONMENTAL CONDITION OF THE REAL ESTATE), AND BUYER ACKNOWLEDGES THAT BUYER IS RELYING SOLELY UPON ITS OWN (OR ITS REPRESENTATIVES') INSPECTION, EXAMINATION AND EVALUATION OF THE REAL ESTATE AND IS QUALIFIED TO MAKE SUCH INSPECTION, EXAMINATION AND EVALUATION. AS A MATERIAL PART OF THE CONSIDERATION OF THIS AGREEMENT AND THE PURCHASE OF THE REAL ESTATE, BUYER HEREBY AGREES TO ACCEPT THE REAL ESTATE ON THE CLOSING DATE IN ITS "AS IS, WHERE IS" CONDITION, WITH ALL FAULTS AND, WITHOUT REPRESENTATIONS AND WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THAT THE SALE OF THE REAL ESTATE IS WITHOUT ANY WARRANTY, AND THAT THE DEBTORS HAVE NOT MADE ANY, AND EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL, REPRESENTATIONS, GUARANTIES OR WARRANTIES, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW OR RELATING TO THE REAL ESTATE, INCLUDING, WITHOUT LIMITATION, OF OR RELATING TO: (A) THE OWNERSHIP, USE, INCOME, POTENTIAL, EXPENSES, OPERATION, CHARACTERISTICS OR CONDITION OF THE REAL ESTATE OR ANY PORTION THEREOF, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF**

-8-

**SUITABILITY, HABITABILITY, MERCHANTABILITY, DESIGN OR FITNESS FOR ANY SPECIFIC PURPOSE OR A PARTICULAR PURPOSE; (B) THE NATURE, MANNER, OR CONDITION (PHYSICAL, STRUCTURAL OR OTHERWISE) OF THE REAL ESTATE, OR THE SURFACE OR SUBSURFACE THEREOF, WHETHER OR NOT OBVIOUS, VISIBLE OR APPARENT; (C) THE ENVIRONMENTAL CONDITION OF THE REAL ESTATE AND THE PRESENCE OR ABSENCE OF OR CONTAMINATION BY HAZARDOUS MATERIALS, OR THE COMPLIANCE OF THE REAL ESTATE WITH ALL REGULATIONS OR LAWS PERTAINING TO HEALTH OR THE ENVIRONMENT, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL LAWS; AND (D) THE SOIL CONDITIONS, DRAINAGE, FLOODING CHARACTERISTICS, UTILITIES OR OTHER CONDITIONS EXISTING IN, ON OR UNDER THE REAL ESTATE. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.**

Section 1.04. Assumed Liabilities and Excluded Liabilities.  (a)  Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the Closing, to assume only the following Liabilities of the Debtors, in each case, except to the extent any of such Liabilities are Excluded Liabilities (the "Assumed Liabilities"):

(i)      all Liabilities under the Assigned Contracts, whether accruing prior to, at or after the Closing, including, but not limited to, any and all Cure Amounts;

(ii)      all Liabilities relating to or arising from the ownership of the Purchased Assets after the Closing Date;

(iii)      all Liabilities relating to or arising from the ownership of the Real Estates after the Closing Date, including without limitation and for the avoidance of doubt, all Liabilities with respect to environmental or related matters prior to or after the Closing Date;

(iv)      all Liabilities related to the Permitted Encumbrances; and

(v)      all Transfer Taxes.

(b)      Excluded Liabilities.  Notwithstanding any other provision of this Agreement, Buyer shall not assume or be liable for any Liabilities of the Debtors, of any kind (whether or not asserted, accrued, contingent, at law or in equity or otherwise (including any Liability based on successor liability theories), scheduled or evidenced by a filed proof of claim or other form of writing evidencing such claim filed in the Bankruptcy Cases, secured, unsecured, priority or administrative), other than the Assumed Liabilities (the "Excluded Liabilities"), including any of the following:

(i)      any Liability of the Debtors to the extent that it relates to, or to the extent that it arises out of, any Excluded Asset (including Liabilities under any Contract of the Debtors that is not an Assigned Contract), whether accruing prior to, at or after the Closing;

(ii)     all Liabilities of the Debtors for taxes, other than the Transfer Taxes;

(iii)    all Liabilities for Indebtedness of the Debtors;

(iv)     all fees, commissions, expenses and other Liabilities owing to any broker, investment banker, financial advisor, outside counsel, auditing firm or consultant retained by or on behalf of the Debtors, whether relating to the transactions contemplated by this Agreement or otherwise;

(v)      all Liabilities relating to employment or employee benefits;

(vi)     all suits, claims, actions, arbitrations, investigations or proceedings ("Litigation") and all Liabilities arising in connection therewith in respect of the conduct of the Business of the Debtors prior to the Closing (including any Litigation in respect of any workers' compensation matters and all Liabilities arising in connection therewith);

(vii)    all Liabilities of the Debtors in respect of accounts payable or trade credit;

(viii)   except to the extent expressly assumed under Section 1.04(a), all Liabilities relating to or arising from the ownership of the Purchased Assets before the Closing Date; and

(ix)     except to the extent expressly assumed under Section 1.04(a), all Liabilities relating to or arising from the ownership of the Real Estate before the Closing Date.

Section 1.05. Assigned Contracts.  (a) At the Closing, the Debtors shall, pursuant to the Sale Order, the Assignment and Assumption Agreements and other transfer and assignment documents reasonably requested by Buyer, assume and sell and assign to Buyer, the Assigned Contracts, subject to satisfaction of Buyer's obligations with respect to Cure Amounts, including but not limited to funding of the Closing Cure Liability Amount and the Post-Closing Cure Reserve Amount.

(b)     Notwithstanding anything herein to the contrary, at any time during the period commencing on the date of this Agreement and ending upon the Closing, Schedule A hereto may be amended by mutual agreement of Buyer and the Debtors to designate any (i) Contract not then listed on Schedule A as an "Assigned Contract" and/or (ii) Assigned Contract as an Excluded Asset.

(c)     The counterparty to each Contract to which the Debtors are party or by which the Debtors or any of its assets or properties are bound shall be provided adequate notice of assignment and assumption.

(d)     Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assigned Contract that, after giving effect to the provisions of Section 365 of the Bankruptcy Code, is not assignable or transferable

-10-

without the consent of any Person, other than the Debtors or Buyer, to the extent that such consent shall not have been given prior to the Closing, provided, however, that the Debtors shall use, whether before or after the Closing, reasonable efforts to obtain all necessary consents to the assignment and transfer thereof, it being understood that, to the extent the foregoing shall require any action by the Debtors that would, or would continue to, have an adverse effect on the Business of Buyer after the Closing, such action shall require the prior written consent of Buyer.

(e)     With respect to any Assigned Contract that is not included in the Purchased Assets or assigned to Buyer by reason of Section 1.05(d) (the "Nonassigned Contracts"), the Debtors shall continue after the Closing to use its reasonable efforts to obtain the requisite consents to the assignment and transfer thereof as provided in Section 1.05(d); provided that until such requisite consents are obtained and the foregoing is transferred and assigned to Buyer or until such Nonassigned Contract becomes an Excluded Asset pursuant to this Section 1.05(e), the Debtors shall cooperate in any lawful or reasonable arrangement reasonably proposed by Buyer under which Buyer shall enjoy the beneficial interest of the economic claims, rights and benefits and perform the obligations under the asset, claim or right with respect to which the consent has not been obtained in accordance with this Agreement. Upon obtaining the requisite third-party consents with respect to any Nonassigned Contracts, such Contracts shall be transferred and assigned to Buyer hereunder. Notwithstanding anything to the contrary set forth herein, to the extent that any Assumed Liability relates to any Nonassigned Contract, such Assumed Liability shall be deemed to be an Excluded Liability unless and until such Nonassigned Contract is transferred and assigned to Buyer, or unless Buyer obtains the benefit of such Nonassigned Contract under this Section 1.05(e). Notwithstanding the foregoing, if any Final Order provides that any Nonassigned Contract shall not be transferable and assignable to Buyer, such Nonassigned Contract shall be deemed to be an Excluded Asset for all purposes under this Agreement and any related Post-Closing Cure Reserve Amount shall be returned to Buyer.

Section 1.06. Closing. The closing of the Asset Sale and the Real Estate Sale (the "Closing") shall take place at 10:00 a.m., Wilmington, Delaware time, on a date to be specified by the parties hereto, which shall be no later than the second business day after satisfaction or waiver of the conditions set forth in Article VI (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), at the offices of Fox Rothschild LLP, 2000 Market Street, Twentieth Floor, Philadelphia, PA 19103, unless another time, date or place is agreed to in writing by the Debtors and Buyer. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date".

ARTICLE II

The Purchase Price

Section 2.01. Purchase Price. No later than the next business day following the execution of this Agreement, Buyer shall deposit an amount equal to the greater of (a) $750,000 or (b) three and one half (3.5%) percent of the Purchase Price (the "Deposit") by wire transfer of immediately available funds to a commercial bank account with [_____] (the "Escrow Agent") under the escrow agreement entered into by and among Buyer, the Debtors and the Escrow Agent on the date hereof (the "Escrow Agreement"). At the Closing, Buyer shall (i)

-11-

pay to the Debtors by wire transfer in immediately available funds an amount equal to (aa) the Purchase Price, less (bb) the Total Cure Amount, less (cc) the Deposit and all interest accrued thereon to the Debtors by wire transfer in immediately available funds in accordance with written instructions given by the Debtors to Buyer not less than three (3) business days prior to the Closing, (ii) direct the Escrow Agent to release the Deposit and all interest accrued thereon to the Debtors in accordance with the terms of the Escrow Agreement, (iii) deposit the Post-Closing Cure Reserve Amount by wire transfer of immediately available funds to a commercial bank account (the "Cure Payment Escrow Account") with the Escrow Agent under the Escrow Agreement, and (iv) pay to each Resolved Cure Party by wire transfer in immediately available funds the applicable portion of the Closing Cure Liability Amount payable to such Resolved Cure Party.  Buyer shall provide to the Debtors written proof of payment of the Closing Cure Liability Amounts that is satisfactory to the Debtors.

Section 2.02.  Escrow Accounts.  (a) Buyer and the Debtors have engaged the Escrow Agent to hold and distribute (in accordance with this Agreement and the Escrow Agreement) (i) the Deposit and (ii) an aggregate amount equal to the amount asserted as being required to cure all defaults under any Assigned Contract in accordance with Section 365 of the Bankruptcy Code in a writing filed in the Bankruptcy Court on or before the deadline set forth in the Bidding Procedures Order by the Cure Party to any such Assigned Contract for which the Cure Amount with respect to such Assigned Contract was not paid on or shortly following the Closing Date pursuant to Section 2.01(iv) (the amount specified in this clause (ii) being referred to as the "Post-Closing Cure Reserve Amount").

(b)    The Post-Closing Cure Reserve Amount will be held by the Escrow Agent in the Cure Payment Escrow Account as a source of payment of Cure Amounts owed by the Debtors, and the Post-Closing Cure Reserve Amount shall be released by the Escrow Agent to a Cure Party upon written direction from the Debtors in accordance with the terms and conditions set forth in the Escrow Agreement.

Section 2.03.  Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other such taxes and fees (including any penalties and interest thereon) incurred in connection with this Agreement (collectively, "Transfer Taxes") shall be paid by Buyer when due, and Buyer shall, at its own expense, file all necessary tax returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other taxes and fees, and if required by applicable law, the Debtors shall join in the execution of any such tax returns and other documentation.

ARTICLE III

Representations and Warranties

Section 3.01.  Representations and Warranties of the Debtors.  Except as set forth in the disclosure schedule (any information set forth in one section of the Debtors Disclosure Schedule shall be deemed to apply to each other Section or subsection thereof or hereof) delivered by the Debtors to Buyer at least three days prior to the execution of this Agreement (the "Disclosure Schedule"), the Debtors represent and warrant to Buyer as follows:

(a)    Organization, Standing and Corporate Power.  The Debtors have been duly organized, and are validly existing and in good standing under the laws of the State of Delaware.

(b)    Authority.  Subject to entry of the Sale Order, (i) the Debtors have all requisite authority to execute, deliver and perform their respective obligations under this Agreement and the other Transaction Documents on behalf of the Debtors; (ii) this Agreement and the other Transaction Documents have been duly and validly authorized by all necessary action on the part of the Debtors; and (iii) this Agreement has and, when executed and delivered by the Debtors, the other Transaction Documents will have, been duly and validly executed and delivered by the Debtors and constitute the valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and as limited by laws relating to the availability of equitable relief.  This Agreement and the other Transaction Documents have been duly executed and delivered by the Debtors and, assuming the due authorization, execution and delivery by each of the other parties hereto and thereto and subject only to Bankruptcy Court approval pursuant to the Sale Order, constitute legal, valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with their terms.

(c)    Litigation.  Except for the Bankruptcy Cases, to the Debtors' Knowledge there is no material Litigation pending or threatened against or affecting the Debtors or any of its assets, nor is there any material judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against, or investigation by any Governmental Entity involving, the Debtors or any of its assets.

(d)    Contracts.  Section 3.01(d) of the Debtors Disclosure Schedule sets forth a list of all material loan or credit agreements, bonds, debentures, notes, mortgages, indentures, leases, supply agreements, license agreements, development agreements, distribution agreements or other contracts, agreements, obligations, commitments, arrangements, understanding, instruments, permits, franchises or licenses, whether oral or written, including all amendments thereto, to which the Debtors are a party or bound or to which any of its properties or assets are subject (collectively, the "Contracts").  To the Debtors' Knowledge, each Contract is in full force and effect and is a valid and binding agreement of the Debtors and, to the Knowledge of the Debtors, of each other party thereto, enforceable against the Debtors and against the other party or parties thereto, in each case, in accordance with its terms.

(e)    Title to Properties and Purchased Assets.  The Debtors have good and valid title to or valid leasehold or sublease interests or other comparable contract rights in or relating to all of the Purchased Assets.  At the Closing, all the Purchased Assets shall be free and clear of all Liabilities (other than the Assumed Liabilities and Permitted Encumbrances).

(f)    Actions.  There is no Action pending or, to the Knowledge of the Debtors, threatened, against the Debtors or with respect to any Purchased Asset or the Real Estate, before any Governmental Entity that challenges the validity of this Agreement or any of the other Transaction Documents, or any action taken or proposed to be taken by the Debtors pursuant hereto or thereto or in connection with the transactions contemplated hereby or thereby.

-13-

(g)    Access to Data Room.  The Debtors have provided Buyer with access to the data room created for purposes of this transaction containing, among other things, certain financial information of the Debtors (the "Data Room").  The financial information contains certain selected revenues, operating expenses, and capital investment information that are based on the Debtors' internal management information and internal profit reporting system (the "Financial Information").  The Financial Information was extracted from the Debtors' financial and operating systems for the purposes of management information and control and is not audited and may not be construed in accordance with generally accepted accounting principles in the United States in all circumstances.  While the costs presented represent an estimate of what the Debtors believe can be attributed to its operations of the Business, the Debtors do not warrant the accuracy of any data (including the Financial Information) made available by the Debtors to Buyer in the Data Room and further the Debtors makes no representation or warranty: (i) that such data presents a complete picture of the Business or all information that might be material to Buyer's decision to acquire the Purchased Assets, the Real Estate and the Business; or (ii) as to the accuracy of any such data, including any information contained in any reports generated by third parties or of matters of opinion or any estimate or forecast (whether contained in any third party report or otherwise).

(h)    Disclaimer of other Representations and Warranties.  Except as expressly set forth in this Article III, the Debtors makes no representation or warranty, express or implied, at law or in equity, in respect of any of its assets (including, without limitation, the Purchased Assets and the Real Estate), liabilities or operations, including, without limitation, with respect to capacity, condition, design, merchantability or fitness for any particular purpose, merchantability, operation or quality, and any such other representations or warranties are hereby expressly disclaimed.  Except as and to the extent expressly set forth in this Agreement, the Debtors expressly disclaim any representation or warranty, express, statutory, or implied, as to: (i) the content, character, or nature of any descriptive memorandum, report, brochure, chart, or statement prepared by third parties and relating to the Debtors, the Business, the Purchased Assets or the Real Estate; (ii) any estimates of the value of the Purchased Assets or the Real Estate, or future revenues generated by the Purchased Assets or the Real Estate; (iii) the condition, quality, suitability, or design of the Purchased Assets or the Real Estate; or (iv) any other materials or information that may have been made available or communicated to Buyer or its Affiliates, or their employees, agents, consultants, representatives, or advisors in connection with the transactions contemplated by this Agreement or any discussion or presentation relating thereto.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT TO THE EXTENT SPECIFICALLY SET FORTH IN THIS ARTICLE III, BUYER IS PURCHASING THE PURCHASED ASSETS AND THE REAL ESTATE ON AN "AS-IS, WHERE-IS" BASIS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY REGARDING ANY ASSETS OTHER THAN THE PURCHASED ASSETS AND THE REAL ESTATE, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

Section 3.02. Representations and Warranties of Buyer.  Buyer represents and warrants to the Debtors as follows:

(a)    Organization, Standing and Corporate Power.  Buyer is a _____ duly [incorporated/organized], validly existing and in good standing

under the laws of the jurisdiction in which it is [incorporated/organized] and has all requisite [corporate/limited liability company] power and authority to carry on its Business as now being conducted.  Buyer is duly qualified or licensed to do business and is in good standing in each material jurisdiction in which the nature of its business or the ownership, leasing or operation of its properties makes such qualification or licensing necessary.

(b)    Authority.  (i) Buyer has all requisite authority to execute, deliver and perform its obligations under this Agreement and the other Transaction Documents on behalf of Buyer; (ii) this Agreement and the other Transaction Documents have been duly and validly authorized by all necessary action on the part of Buyer; and (iii) this Agreement has and, when executed and delivered by Buyer, the Transaction Documents will have, been duly and validly executed and delivered by Buyer and constitute the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and as limited by laws relating to the availability of equitable relief.  This Agreement and the other Transaction Documents have been duly executed and delivered by Buyer and, assuming the due authorization, execution and delivery by each of the other parties hereto and thereto, constitute legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms.

(c)    Actions.  There is no Action pending or, to the Knowledge of Buyer, threatened, against Buyer or with respect to any Purchased Asset or the Real Estate, before any Governmental Entity that challenges the validity of this Agreement or any of the other Transaction Documents, or any action taken or proposed to be taken by the Debtors pursuant hereto or thereto or in connection with the transactions contemplated hereby or thereby.

(d)    Approvals.  (i) Buyer recognizes and accepts that this Agreement is subject to approval of the United States Bankruptcy Court for the District of Delaware.  The Debtors covenant and agree to promptly seek and use reasonable efforts to obtain such approval as soon as practicable following execution of this Agreement.

(ii)    Except for the Sale Order, no material consent, approval, order or authorization of, action by or in respect of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Buyer in connection with the execution and delivery of this Agreement or any of the other Transaction Documents by Buyer or the consummation of the transactions contemplated hereby or thereby.

(e)    Broker's or Finder's Fees.  Neither Buyer nor any of its Affiliates has authorized any person to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such Person to any investment banking, brokerage, finder's or similar fee payable by the Debtors in connection with the transactions contemplated by this Agreement or any of the other Transaction Documents.

(f)    Disclosure.  Buyer represents and warrants that, after reasonable inquiry of its employees and agents who participated in the negotiations and due diligence investigation with respect to the matters addressed by this Agreement and the other Transaction Documents, it has no knowledge of any matter that may constitute a material breach of any representation,

-15-

warranty, covenant or condition of the Debtors contained herein.  Buyer shall immediately notify the Debtors in writing if it shall obtain knowledge of any matter that may constitute a breach of any representation, warranty, covenant or condition of the Debtors contained herein.

(g)    <u>Capital Resources.</u>  Buyer has available sufficient funding to enable Buyer to consummate the purchase of the Purchased Assets and the Real Estate on the terms set forth in this Agreement and otherwise to perform all of Buyer's obligations under this Agreement.

(h)    <u>Adequate Assurances Regarding Assigned Contracts</u>.  Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts.

ARTICLE IV

Covenants Relating to the Conduct of Business

Section 4.01. <u>Conduct of Business by the Debtors</u>.  During the period from the date of this Agreement to the Closing, except as specifically permitted or provided by any other provision of this Agreement or as required by applicable statutes, laws, ordinances, rules, regulations, judgments, orders, writs, injunctions, stipulations and decrees of any Governmental Entity applicable to it, its properties or other assets or its Business or operations (collectively, "<u>Legal Provisions</u>") or order of the Bankruptcy Court, the Debtors shall carry on their Business in the manner they are conducted as of the date hereof and in compliance with all applicable Legal Provisions.  Without limiting the generality of the foregoing, during the period from the date of this Agreement to the Closing, the Debtors agree that, except for the transactions specifically permitted or provided by this Agreement or as required by applicable law, they shall not, without Buyer's prior written consent (x) enter into an Infeasible Right of Use agreement with any third party for any fiber optic line not already subject to an Infeasible Right of Use agreement, (y) sell, lease, license, mortgage, sell and leaseback or otherwise encumber or subject to any Encumbrance or otherwise dispose of any of their assets or any interests therein (including securitizations or factoring arrangements), except for sales of inventory in the ordinary course of business consistent with past practice or (z) enter into, modify or amend any lease of property.

Section 4.02. <u>Other Actions</u>.  The Debtors shall not take any action that would, or would reasonably be expected to, result in any of the conditions to the Asset Sale or the Real Estate Sale set forth in Article VI not being satisfied.

Section 4.03. <u>Advice of Changes; Filings</u>.  The Debtors and Buyer shall promptly advise the other party orally and in writing of (i) any representation or warranty made by it contained in this Agreement or any of the other Transaction Documents that is qualified as to materiality becoming untrue or inaccurate in any respect or any such representation or warranty that is not so qualified becoming untrue or inaccurate in any material respect, (ii) the failure of it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or any of the other Transaction Documents or (iii) any material damage or material loss to any of the Debtors' properties or assets; <u>provided</u>, <u>however</u>, that no such notification shall affect the representations, warranties, covenants or agreements of the parties (or remedies with respect thereto) or the conditions to the obligations of the parties

-16-

under this Agreement or any of the other Transaction Documents; provided, however, that the failure to provide such notification shall not give rise to a failure of a condition set forth in Section 6.02(b) or 6.03(b) to the extent that (A) the failure of the applicable party to provide such notification was due to such party not having Knowledge of such breach or failure and (B) such breach or failure (and any recurrence thereof) shall have been cured on or prior to the Closing or no longer exists immediately prior to the Closing.  The Debtors and Buyer shall, to the extent permitted by Legal Provisions, promptly provide the other with copies of all filings made by such party with any Governmental Entity in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

 Section 4.04. <u>Certain Tax Matters</u>.  The Purchase Price, the Assumed Liabilities and other relevant items shall be allocated among the Purchased Assets in the manner mutually determined by Buyer and the Debtors on or before the Closing.  Buyer and the Debtors agree to report the federal, state, local and other tax consequences of the purchase and sale hereunder (including in filing IRS Form 8594) in a manner consistent with such allocation and that it will not take any position inconsistent therewith in connection with any tax return, refund claim, litigation or otherwise, unless and to the extent required to do so by applicable law.  Notwithstanding any other provision of this Agreement, this Section 4.04 shall survive the consummation of the transactions contemplated by this Agreement.

 Section 4.05. <u>Certain Bankruptcy Matters</u>.  The Debtors filed with the Bankruptcy Court a motion seeking the approval of the procedures set forth in <u>Exhibit D</u> hereto (the "<u>Bidding Procedures</u>"), including the form of this Agreement, which was approved by entry of an Order on _____, 2016.  In accordance with the Bidding Procedures, the Auction was held on _____, 2016.  Within five (5) business days after the full execution and delivery to the other party of this Agreement, the Debtors shall file with the Bankruptcy Court a motion seeking (i) the approval of this Agreement and the other Transaction Documents, (ii) the approval of the transactions contemplated hereby and thereby, including (1) the provisions of this Agreement to be performed by the Debtors prior to the Closing (including the provisions of this Article IV and Article V) and (2) Article VII of this Agreement, (iii) the approval of the timely performance by Buyer of its obligations hereunder, (iv) a finding that Buyer is a good faith purchaser under Section 363(m) of the Bankruptcy Code and (v) a finding that Buyer has provided adequate assurance of future performance of the Assigned Contracts (such motion, the "<u>Sale Motion</u>"), in form and substance reasonably satisfactory to Buyer, for approval by the Bankruptcy Court pursuant to the Sale Order.  The Debtors shall attach a true and complete copy of this Agreement (including all schedules and exhibits thereto) to the Sale Motion.

ARTICLE V

<u>Additional Covenants</u>

 Section 5.01. <u>Access to Information; Confidentiality</u>.  The Debtors shall afford to Buyer, and to Buyer's directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative (collectively, "<u>Representatives</u>"), reasonable access (including for the purposes of (i) reviewing the Business, assets, Contracts, rights, liabilities and obligations of the Debtors, including so that Buyer may more fully familiarize itself with the Purchased Assets, Assumed Liabilities and the Real Estate and assets

-17-

and properties that may become Purchased Assets and Assumed Liabilities hereunder, and (ii) coordinating integration activities and transition planning with the employees of the Debtors) during normal business hours and upon reasonable prior notice to the Debtors during the period prior to the Closing or the termination of this Agreement to all their properties, books, Contracts, personnel and records, the Purchased Assets and the Real Estate and, during such period, the Debtors shall furnish promptly to Buyer (w) all pleadings, motions, applications and judicial information, in each case filed by or on behalf of the Debtors with the Bankruptcy Court, (x) a copy of each report, schedule and other document filed by them during such period pursuant to the requirements of federal or state securities laws, (y) a copy of each material correspondence or written communication with any Governmental Entity and (z) all other material information concerning its Business, properties and personnel, as Buyer may reasonably request.  Except for disclosures expressly permitted by the terms of the Confidentiality Agreement dated [_____, ___], 2016, between Buyer and the Debtors (the "Confidentiality Agreement"), Buyer shall hold, and shall cause its Representatives to hold, all information received from the Debtors, directly or indirectly, in confidence in accordance with the Confidentiality Agreement.

Section 5.02.  Commercially Reasonable Efforts.  (a) Upon the terms and subject to the conditions set forth in this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including using commercially reasonable efforts to accomplish the following: (i) the taking of all acts necessary to cause the conditions to Closing to be satisfied as promptly as practicable, (ii) the obtaining of all necessary actions or nonactions, waivers, consents and approvals from Governmental Entities and the making of all necessary registrations and filings (including filings with Governmental Entities) and the taking of all steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Entity, (iii) the obtaining of all necessary consents, approvals or waivers from third parties; provided that neither the Debtors, on the one hand, nor Buyer, on the other hand, shall be required to make any payment to any such third parties or concede anything of value to obtain such consents (other than the making of payments required to cure all defaults of the Debtors under the Assigned Contracts to the extent required by Section 365 of the Bankruptcy Code).  The Debtors shall (1) use reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order, and (2) provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Assigned Contracts and take all other actions necessary to cause such Assigned Contracts to be assumed by the Debtors and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code.  Nothing in this Agreement shall be deemed to require Buyer to agree to, or proffer to, divest or hold separate any assets or any portion of any Business of Buyer.

(b)     The Debtors shall promptly notify Buyer in the event that any creditor, supplier, contractor, consultant, client or other customer or other Person having a material business relationship with the Debtors, after the date of this Agreement, materially changes its business relationship with the Debtors, or notifies the Debtors that it intends to materially change any such relationship with the Debtors (any such Person being referred to as a "Deviating Party").  In such an event, the Debtors shall use commercially reasonable efforts, in consultation

-18-

with Buyer, to cause such Deviating Party to reestablish its business relationship with the Debtors in a manner and on terms that are comparable to the historical business relationship between the Deviating Party and the Debtors prior to such material change or, in the event such Deviating Party has provided notice to the Debtors of its intention to materially change its business relationship with the Debtors (but has not yet taken steps to effectuate such change), the Debtors shall use commercially reasonable efforts, in consultation with Buyer, to obtain from such Deviating Party a withdrawal of such notice and reasonable assurances that it will not materially change its business relationship with the Debtors (either prior to or after the Closing Date).

Section 5.03. <u>Public Announcements</u>.  Notwithstanding anything herein to the contrary, no party shall make any press release or public announcement or communication concerning this Agreement or the transactions contemplated herein (including any formal statement or announcement to employees of the Debtors) prior to Closing without the prior written consent of the other party hereto (which consent shall not be unreasonably withheld or delayed); <u>provided</u>, <u>however</u>, that a party may make any such release, announcement or communication that is required by any applicable Legal Provision, the order of the Bankruptcy Court or the rules and regulations of each stock exchange upon which the securities of one of the parties is listed; <u>provided further</u> that if any such release, announcement or communication is so required, the disclosing party shall give the non-disclosing party, to the fullest extent permitted by applicable law, prior notice of, and an opportunity to comment on, the proposed disclosure.  The parties acknowledge that the Debtors shall file this Agreement (including all schedules and exhibits thereto except for schedules and exhibits that contain information the disclosure of which is prohibited by law) with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 5.04. <u>Fees and Expenses</u>.  All fees and expenses incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby shall be paid by the party incurring such fees or expenses, whether or not the Asset Sale and the Real Estate Sale is consummated.

Section 5.05. <u>Additional Agreements</u>.  In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement or to vest Buyer with full title to any Purchased Asset, each party to this Agreement shall use commercially reasonable efforts to take all such necessary action.

ARTICLE VI

Conditions Precedent

Section 6.01. <u>Conditions to Each Party's Obligation to Effect the Asset Sale and the Real Estate Sale</u>.  The respective obligations of each of the parties to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or, to the extent permitted by law, waiver on or prior to the Closing Date of the following conditions:

(a)    <u>No Injunctions or Restraints.</u>  No temporary restraining order, preliminary or permanent injunction or other judgment or order issued by any court of competent jurisdiction or other statute, law, rule, legal restraint or prohibition (collectively, "<u>Restraints</u>") shall be in

-19-

effect enjoining, restraining, prohibiting or preventing the consummation of the Asset Sale or the Real Estate Sale or otherwise making the consummation of the Asset Sale or the Real Estate Sale illegal.

(b)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order.

(c)    Assignment and Assumption Agreement.  The Assignment and Assumption Agreements pertaining to the Purchased Assets, the Assumed Liabilities and the Real Estate shall have been duly executed by and delivered to each of the parties thereto and all conditions to be fulfilled by the Debtors for effecting such assignments and assumptions shall have been met.

Section 6.02. Conditions to the Obligations of Buyer.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or, to the extent permitted by law, waiver by Buyer on or prior to the Closing of the following conditions:

(a)    Representations and Warranties.  The representations and warranties of the Debtors contained in this Agreement that are qualified as to materiality shall be true and correct, and the representations and warranties of the Debtors contained in this Agreement that are not so qualified shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date.

(b)    Performance of Obligations of the Debtors.  The Debtors shall have performed in all material respects all obligations required to be performed by them under this Agreement at or prior to the Closing Date.

(c)    No Litigation.  There shall not be pending or threatened any Litigation that could reasonably be expected to result in any Restraint having any of the effects set forth in Section 6.01(a).

(d)    Restraints.  No Restraint that would result in a prohibition of or material limitation on the acquisition or ownership by Buyer or any of its Affiliates of any of the Purchased Assets or the Real Estate as a result of the transactions contemplated by this Agreement shall be in effect.

(e)    Consents.  Buyer shall have received evidence, in form and substance reasonably satisfactory to it, that the Debtors shall have obtained all consents, approvals, authorizations, qualifications, waivers, orders and approvals of all Governmental Entities or third parties required in connection with this Agreement and for the consummation of the transactions contemplated by this Agreement (including consents to assignment of all Assigned Contracts); provided that no consent of any third party shall be required if, under the Bankruptcy Code, the Assigned Contract may be assigned without obtaining such consent.

(f)     Bill of Sale, Deed and Affidavit of Title.  The Debtors shall have delivered to Buyer the Bill of Sale with respect to the Purchased Assets, and the Deed and the Affidavit of Title with respect to the Real Estate, duly executed by the Debtors.

(g)     Assignments of Intellectual Property Rights.  The Debtors shall have delivered to Buyer (i) duly executed, acknowledged and formalized (as appropriate) assignments of the U.S. trademark registrations and applications included in the purchased Intellectual Property Rights, in a form suitable for recording in the U.S. Patent and Trademark Office, (ii) a general assignment of all trademarks to Buyer or an Affiliate of Buyer as may be specified by Buyer, and (iii) general assignments of all other purchased Intellectual Property Rights.

Section 6.03. Conditions to the Obligations of the Debtors.  The obligations of the Debtors to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or, to the extent permitted by law, waiver by the Debtors on or prior to the Closing of the following conditions:

(a)     Representations and Warranties.  The representations and warranties of Buyer contained in this Agreement that are qualified as to materiality shall be true and correct, and the representations and warranties of Buyer contained in this Agreement that are not so qualified shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date.

(b)     Performance of Obligations of Buyer.  Buyer shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date.

Section 6.04. Frustration of Closing Conditions.  Neither the Debtors nor Buyer may rely on the failure of any condition set forth in Sections 6.01, 6.02 or 6.03, as the case may be, to be satisfied if such failure was caused by such party's failure to act in good faith or to use its commercially reasonable efforts to consummate the transactions contemplated by this Agreement, as required by and subject to Section 5.02.

ARTICLE VII

Termination, Amendment and Waiver

Section 7.01. Termination.  This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, at any time prior to the Closing:

(a)     by mutual written consent of the Debtors and Buyer;

(b)     by either Buyer or the Debtors, by giving written notice of such termination to the other party, if:

(i)     the Closing shall not have occurred on or before [_____, ____], 2016 (the "Outside Date"); provided, however, that the

-21-

right to terminate this Agreement under Section 7.01(b)(i) shall not be available to any party whose breach of a representation or warranty in this Agreement or whose action or failure to act has been a principal cause or resulted in the failure of the Closing to occur on or before such date;

       (ii)     if any Restraint having the effect set forth in Section 6.01(a) shall be in effect under a Final Order; or

       (iii)     the Bankruptcy Court approves any agreement for a transaction or series of related transactions pursuant to which all or substantially all of the assets and real property of the Debtors will be acquired by another purchaser (whether pursuant to an asset sale, merger, stock purchase or otherwise).

       (c)     by Buyer, by giving written notice of such termination to the Debtors, if the Sale Motion has not been filed within five (5) business days following the execution hereof;

       (d)     by Buyer (i) if the Debtors shall have breached or failed to perform any of their material representations, warranties, covenants or agreements set forth in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in Sections 6.02(a) or 6.02(b) and (B) is incapable of being cured by the Debtors by the Outside Date, or (ii) if there is Casualty Damage, Condemnation or inability to convey title as provided in Sections 1.03(f)(i), 1.03(f)(ii) and 1.03(f)(v), respectively;

       (e)     by the Debtors (i) if Buyer shall have breached or failed to perform any of its representations, warranties, covenants or agreements set forth in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in Sections 6.03(a) or 6.03(b) and (B) is incapable of being cured by Buyer by the Outside Date; or

       (f)     by either Buyer or the Debtors, if (i) any Bankruptcy Cases of the Debtors are converted to cases under chapter 7 of the Bankruptcy Code or (ii) there is appointed in any Bankruptcy Case a trustee or examiner with enlarged powers under Section 1106(b) of the Bankruptcy Code.

       Section 7.02. <u>Effect of Termination</u>.  In the event of the termination of this Agreement in accordance with Section 7.01 hereof, this Agreement shall thereafter become void and have no effect, without any liability or obligation on the part of any party hereto under this Agreement, except for the provisions of Section 5.03, this Section 7.02, and Article VIII hereof, which provisions shall survive such termination, and except to the extent that such termination results from fraud or the willful and material breach by a party of any of its representations, warranties, covenants or agreements set forth in this Agreement.

       Section 7.03. <u>Payment of Deposit</u>.  The Deposit and all interest accrued thereon shall be paid to the Debtors (a) in the event that this Agreement is terminated pursuant to Section 7.01(e) or (b) at Closing as provided in clause (b) of Section 2.01.  In the event that this Agreement is properly terminated pursuant to any other provision of Section 7.01, the Deposit and all interest accrued thereon shall be refunded to Buyer.

Section 7.04. <u>Amendment</u>.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

Section 7.05. <u>Extension; Waiver</u>.  At any time prior to the Closing, the Debtors or Buyer may (a) extend the time for the performance of any of the obligations or other acts of the other parties, (b) to the extent permitted by law, waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered pursuant hereto or (c) to the extent permitted by law, waive compliance by the other party with any of the agreements or conditions contained herein.  Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.  The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.  Any extension or waiver pursuant to this Section 7.05, in any one or more instances, shall not be deemed to be nor construed as an extension or waiver of any other provision in this Agreement or in any document delivered pursuant hereto nor shall such extension or waiver be deemed to be nor construed as an extension or waiver of the same provision or of any other provision in the future.

ARTICLE VIII

<u>Miscellaneous</u>

Section 8.01. <u>Notices</u>.  All notices or other communications hereunder shall be deemed to have been duly given and made if in writing and if served by personal delivery upon the party for whom such notice or communication is intended, if delivered by registered or certified mail, return receipt requested, or by a national courier service (providing proof of delivery), or if sent by facsimile or electronic mail, provided that the facsimile or electronic mail is promptly confirmed by telephone confirmation thereof or, in the case of electronic mail, by electronic return receipt providing proof of delivery or other confirmation of receipt by the recipient, to the Person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such Person:

To the Debtors:
[●]
[●]
[●]
Telephone:
Facsimile:
Email:
Attn:

with a copy to:
Fox Rothschild LLP
2000 Market Street, Twentieth Floor

Philadelphia, PA 19103
Telephone: (215) 299-2000
Facsimile: (215) 299-2150
Email: mmenkowitz@foxrothschild.com
        mmccreary@foxrothschild.com
        plabov@foxrothschild.com
Attn:  Michael G. Menkowitz
       Mark G. McCreary
       Paul J. Labov

to Buyer:
        [●]
        [●]
        [●]
        Facsimile: [●]
        Email:  [●]
        Attn:  [●]

with a copy to:
        [●]
        [●]
        [●]
        [●]
        Telephone:  [●]
        Facsimile:  [●]
        Email:  [●]
        Attn:   [●]

Section 8.02. <u>Definitions</u>.  For purposes of this Agreement:

"<u>Affiliate</u>" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or in under common control with, such first person.

"<u>Auction</u>" means the auction of the assets and real estate of the Debtors conducted by the Debtors in accordance with Section 363 of the Bankruptcy Code and the Bidding Procedures set forth in the Bidding Procedures Order.

"<u>Bidding Procedures Order</u>" means the order of the Bankruptcy Court attached hereto as <u>Exhibit F</u>.

"<u>Closing Cure Liability Amount</u>" means the aggregate amount payable to each Cure Party (a) that has agreed as of the Closing Date as to the amount necessary to be paid to such Cure Party in order to cure all defaults under the Assigned Contract of such Cure Party to the extent required by Section 365 of the Bankruptcy Code or (b) pursuant to a Final Order of the Bankruptcy Court issued prior to the Closing setting forth the amount required to be paid to such Cure Party in order to cure all defaults under the Assigned Contract of such Cure Party to the

-24-

extent required by Section 365 of the Bankruptcy Code (each such Cure Party being referred to herein as a "Resolved Cure Party"), which agreed or ordered amount with respect to each such Resolved Cure Party shall be set forth in the Sale Order.

"Cure Amount" means, with respect to each Contract, the amount necessary to cure all defaults of the Debtors under such Contract to the extent required by Section 365 of the Bankruptcy Code.

"Cure Party" means the party to an Assigned Contract that filed a claim with the Bankruptcy Court for, or is otherwise owed, any Cure Amount under such Assigned Contract.

"Encumbrances" means any liens (statutory or otherwise), pledges, assessments, easements, rights of way, charges, defects of title, encumbrances, adverse claims of ownership or use, restrictions on transfer, security interests or other encumbrances of any kind or nature whatsoever in or upon any of the properties or other assets of the Debtors.

"Final Order" means an order, ruling, judgment, the operation or effect of a judgment or other decree issued and entered by the Bankruptcy Court or by any state, commonwealth or other federal court or other court of competent jurisdiction which has not been reversed, vacated, stayed, modified or amended in any manner that is materially adverse to Buyer and as to which (a) the time to appeal or petition for review, rehearing, certiorari, reargument or retrial has expired and as to which no appeal or petition for review, rehearing, certiorari, reargument or retrial is pending or (b) any appeal or petition for review, rehearing, certiorari, reargument or retrial has been finally decided and no further appeal or petition for review, rehearing, certiorari, reargument or retrial can be taken on granted.

"Governmental Entity" means any federal, state, local or foreign government, any court, administrative, regulatory or other governmental agency, commission or authority or any non-governmental self-regulatory agency, commission or authority.

"Indebtedness" of any Person means (a) all obligations of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (c) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance on property owned or acquired by such Person; and (d) all guarantees by such Person of Indebtedness of others.

"Intellectual Property Rights" means (a) all inventions (whether or not patentable and whether or not reduced to practice), records of inventions, test information, developments, applications, improvements, formulae, concepts, ideas, methods or processes, research property rights, all improvements to any of the foregoing, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, trademark rights, service marks, service mark rights, trade dress, logos, slogans, trade names, trade name rights, corporate names, and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights,

and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential information (including all ideas, concepts, research and development, know-how, composition information and embodiments, manufacturing and production processes, techniques and information, technical and business data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software, firmware and applications (including source code, executable code, data, databases, programming and notes and documents and other related documentation), other than commercial off-the-shelf software, (g) all advertising and promotional materials, (h) all other proprietary rights, and (i) all copies and tangible embodiments of the foregoing in whatever form or medium; in each case, to the extent owned exclusively by the Debtors.

"Knowledge" means, with respect to any matter in question, (a) in the case of Buyer, the actual knowledge of Buyer's executive officers after making reasonable inquiry of the other executives and managers having primary responsibility for such matter, and (b) in the case of the Debtors, the actual knowledge of Scott Drake.

"Liability" means any claim (as defined in Section 101(5) of the Bankruptcy Code), indebtedness, Encumbrance, lien, expense, commitment, duties, responsibilities, assessments, penalties, obligation or other liability, whether or not absolute, accrued, matured, contingent, liquidated, known, suspected, fixed or otherwise, and including all costs and expenses related thereto.

"Permitted Encumbrances" means (a) Encumbrances included in the Assumed Liabilities, (b) encumbrances waived in writing by Buyer; (c) the Permitted Exceptions; (d) all restrictions on the use of the Purchased Assets or the Real Estate arising as a result of the application of zoning and similar laws; (e) all exceptions, restrictions, easements, charges, rights-of-way, and other encumbrances that are set forth in any permit; (f) other imperfections in title, if any, or conditions, reservations, restrictions, easements, encroachments, or rights of way, if any, none of which, individually or in the aggregate, materially detracts from the value, or impairs in any significant way the use of the property subject thereto; (g) taxes (other than income taxes or taxes based on or measured by income), general and specific, not now due and payable; (h) Encumbrances arising out of deposits in connection with workmen's compensation, unemployment insurance, old age pensions, or other social security or retirement benefits legislation; (i) Encumbrances imposed by law, such as mechanics', workmen's, materialmen's, landlord's, carriers', or other like Encumbrances arising in the ordinary course of business that secure payment of obligations that are not past due; (j) Encumbrances waived in writing by Buyer; and (k) Encumbrances arising from Buyer's inspection or investigation of the Purchased Assets or the Real Estate.

"Person" means an individual, corporation, partnership, limited liability, joint venture, association, trust, unincorporated organization or other entity.

"Purchase Price" means $_____, plus the Total Cure Amount.

"Resolved Cure Party" shall have the meaning set forth in the definition of "Closing Cure Liability Amount" set forth herein.

ACTIVE 40243749v2 05/12/2016 12:01 PM

"Sale Order" means an order of the Bankruptcy Court, in form and substance acceptable to Buyer in its sole and absolute discretion and substantially in the form attached hereto as Exhibit E.

"Subsidiary" of any Person means another Person, an amount of the voting securities, other voting rights or voting partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, 50% or more of the equity interests of which) is owned directly or indirectly by such first person.

"tax" means (y) all forms of taxation or duties imposed, or required to be collected or withheld, including charges, together with any related interest, penalties or other additional amounts and (z) any liability in respect of amounts described in clause (y) hereof arising by contract, as a successor or under Treasury Regulation Section 1.1502-6 (or any similar provision of law).

"Total Cure Amount" means the aggregate amount paid by Buyer prior to, on or following the Closing Date to cure all defaults under the Assigned Contracts to the extent required by Section 365 of the Bankruptcy Code.

| Term | Defined in Section |
| --- | --- |
| AF-Southeast | Preamble |
| Affidavit of Title | 1.03(b)(ii) |
| Agreement | Preamble |
| Allied Fiber | Background |
| Allied Florida | Preamble |
| Allied Georgia | Preamble |
| Asset Sale | 1.01(a) |
| Assigned Contracts | 1.02(a)(vii) |
| Assignment and Assumption Agreements | 1.01(c) |
| Assumed Liabilities | 1.04(a) |
| Bankruptcy Cases | Background |
| Bankruptcy Code | Background |
| Bankruptcy Court | Background |
| Bidding Procedures | 4.05 |
| Bill of Sale | 1.01(b) |
| Business | Background |
| Buyer | Preamble |
| Casualty Damage | 1.03(f)(i) |
| Closing | 1.06 |
| Closing Date | 1.06 |
| Commonly Controlled Entity | 1.02(b)(viii) |
| Contracts | 3.01(d) |
| Condemnation | 1.03(f)(i) |
| Confidentiality Agreement | 5.01 |
| Cure Payment Escrow Account | 2.01 |

| Term | Defined in Section |
|------|--------------------|
| Data Room | 3.01(g) |
| Debtors | Preamble |
| Deed | 1.03(b)(i) |
| Deposit | 2.01 |
| Deviating Party | 5.02(b) |
| Disclosure Schedule | 3.01 |
| Due Diligence Representatives | 1.03(d) |
| ERISA | 1.02(b)(viii) |
| Escrow Agent | 2.01 |
| Escrow Agreement | 2.01 |
| Excluded Assets | 1.02(b) |
| Excluded Liabilities | 1.04(b) |
| Financial Information | 3.01(g) |
| Legal Provisions | 4.01 |
| Litigation | 1.04(b)(vi) |
| Nonassigned Contract | 1.05(e) |
| Outside Date | 7.01(b)(i) |
| Permit | 1.02(a)(vi) |
| Permitted Exceptions | 1.03(a) |
| Post-Closing Cure Reserve Amount | 2.02(a) |
| Purchased Assets | 1.02(a) |
| Real Estate | Background |
| Real Estate Sale | 1.01(a) |
| Representatives | 5.01 |
| Restraints | 6.01(a) |
| Sale Motion | 4.05 |
| Title Commitment | 1.03(a) |
| Title Review Period | 1.03(a) |
| Transaction Documents | 1.02(b)(xii) |
| Transfer Taxes | 2.03 |
| Transferred Inventory | 1.02(a)(ii) |
| Transferred Leases | 1.02(a)(i) |

Section 8.03. <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, in whole or in part, by operation of law or otherwise by either of the parties hereto without the prior written consent of the other party, and any assignment without such consent shall be null and void, except that Buyer may without such consent assign any or all of its rights, interests and obligations under this Agreement to one or more of its Affiliates; provided, however, that no such assignment shall relieve Buyer of any of its obligations hereunder.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.  For the avoidance of doubt, nothing in this Section 8.03 shall prohibit the execution and delivery at the Closing by the Debtors of a general assignment of all trademarks to an Affiliate of Buyer.

Section 8.04. <u>Entire Agreement; No Third-Party Beneficiaries</u>.  This Agreement (including all Schedules and Exhibits hereto), the other Transaction Documents and the Confidentiality Agreement (a) constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter of this Agreement, the other Transaction Documents and the Confidentiality Agreement and (b) are not intended to and do not confer upon any Person other than the parties hereto and their respective successors and assigns any legal or equitable rights or remedies.  Any inconsistency or ambiguity between the terms of this Agreement and those of any other Transaction Document, on the one hand, and the Bidding Procedures Order or Sale Order, on the other hand, shall be governed by and construed to give effect to the Bidding Procedures Order or Sale Order, as applicable.

Section 8.05. <u>Confidentiality; Return of Information</u>.  (a) The Debtors shall keep confidential (i) all information that is known by the Debtors to be confidential information regarding Buyer, any of their Affiliates or any of their businesses, products, processes or financings, being provided to them in connection with this Agreement and the transactions contemplated hereby or by the other Transaction Documents and (ii) after the Closing, all information relating to the Purchased Assets, the Real Estate or the Assumed Liabilities, except (A) as required by any Legal Provision, in which case notice of such disclosure shall be provided to Buyer prior to such disclosure or, if prior disclosure is not permitted by any Legal Provision, promptly following such disclosure if permitted by applicable Legal Provisions, or (B) for information that is available to the public on the Closing Date, or thereafter becomes available to the public other than as a result of a breach of this Section 8.05.  The covenant of the Debtors set forth in the immediately preceding sentence shall terminate three years after the Closing Date.

(b)      On the Closing Date, the Debtors shall assign to Buyer their rights under all confidentiality agreements entered into with any Person in connection with the Asset Sale and the Real Estate Sale to the extent such rights are assignable and relate to the Purchased Assets or the Assumed Liabilities.  Copies of such confidentiality agreements shall be provided to Buyer immediately following the Closing, except to the extent expressly prohibited by the terms of such confidentiality agreements.  Promptly following the date hereof, the Debtors shall use reasonable efforts to secure the return or destruction of all information and materials relating to the Purchased Assets, the Real Estate and the Assumed Liabilities provided to any Person.

(c)      Nothing in this Agreement shall affect Buyer's obligations under the Confidentiality Agreement.

Section 8.06. <u>Release</u>.  Other than claims pursuant to or in connection with this Agreement or any of the other Transaction Documents, effective as of the Closing, (a) each Debtor (for itself and on behalf of any Person claiming through or under it) hereby fully discharges and releases Buyer and its Affiliates, principals, agents, shareholders and representatives, past, present and future, acting in any of their capacities from any and all Liabilities and any and all claims and causes of action arising prior to the Closing Date, and (b) Buyer (for itself and on behalf of any Person claiming through or under it) hereby fully discharges and releases the Debtors and its Affiliates, principals, agents, shareholders, attorneys and representatives, past, present and future, acting in any of their capacities from any and all Liabilities and any and all claims and causes of action arising prior to the Closing Date.

-29-

Section 8.07. <u>Governing Law</u>.  This Agreement shall be governed by, and construed AND ENFORCED in accordance with, THE BANKRUPTCY CODE AND, TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE LAWS OF THE STATE OF DELAWARE, without regard to the conflicts of law rules of such state.

Section 8.08. <u>Specific Enforcement</u>.  The Debtors agree that irreparable damage would occur and that Buyer would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that Buyer shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court for the District of Delaware, this being in addition to any other remedy to which it is entitled at law or in equity, subject to the provisions of the immediately following sentence.

Section 8.09. <u>Construction</u>.  Each of the Debtors and Buyer acknowledges that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Agreement with its legal counsel.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the other Transaction Documents.  If an ambiguity or question of intent or interpretation arises under any provision of this Agreement or any of the other Transaction Documents, this Agreement and the other Transaction Documents shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement or any other Transaction Documents.

Section 8.10. <u>Consent to Jurisdiction</u>.  The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After the Debtors are no longer subject to the jurisdiction of the Bankruptcy Court, each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any federal court located in the State of Delaware or of any state court located in the State of Delaware in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court and (c) agrees that it will not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than a federal court located in the State of Delaware or a state court located in the State of Delaware.

Section 8.11. <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or other proceeding arising out of this Agreement or the transactions contemplated hereby.  Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such party would not, in the event of any suit, action or other proceeding, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement, by, among other things, the mutual waiver and certifications in this Section 8.11.

Section 8.12. <u>Interpretation</u>.  When a reference is made in this Agreement to an Article, a Section, Exhibit or Schedule, such reference shall be to an Article of, a Section of, or an Exhibit

-30-

or Schedule to, this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to "this Agreement" shall include the Debtors Disclosure Schedule. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any Contract or statute defined or referred to herein or in any Contract that is referred to herein means such Contract or statute as from time to time amended, modified or supplemented, including (in the case of Contracts) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors and assigns.

Section 8.13. <u>Consents and Approvals</u>. For any matter under this Agreement requiring the consent or approval of any party to be valid and binding on the parties hereto, such consent or approval must be in writing.

Section 8.14. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts (including by facsimile), all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

Section 8.15. <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable law in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible. Notwithstanding anything to the contrary set forth herein, the provisions hereof for entry of an order of the Bankruptcy Court approving the Asset Sale and the Real Estate Sale and authorizing the Debtors to perform all their respective obligations hereunder, are not severable to the extent they are not substantially in the form of the Bidding Procedures Order and the Sale Order, respectively, and acceptable to Buyer in its sole and absolute discretion.

Section 8.16. <u>Survival of Representations and Warranties</u>. The representations and warranties contained in this Agreement shall not survive the Closing.

*[Remainder of page intentionally left blank. Signature page follows.]*

-31-

IN WITNESS WHEREOF, the parties have executed or caused this Agreement to be executed as of the date first written above.

**The Debtors:**
**AF-SOUTHEAST, LLC**


By: _____
Name:
Title:


**ALLIED FIBER – FLORIDA, LLC**


By: _____
Name:
Title:


**ALLIED FIBER – GEORGIA, LLC**


By: _____
Name:
Title:


**The Buyer:**
[_____]


By: _____
Name:
Title:

Disclosure Schedule


Section 1.02(a)(i) –Transferred Leases

Section 1.02(a)(iii) – all other tangible property and interests therein, wherever located, including all apparatus, materials, furniture, office supplies, fixtures, furnishings, equipment, vehicles, tools, tooling, machinery, manufactured and purchased parts, spare parts and accessories and other items of tangible personal property owned, leased, used or licensed by the Debtors

Section 3.01(d) – Contracts

**Schedule A**

**Assigned Contracts**

*(Copies of all Assigned Contracts are available in the Data Room
or have otherwise been previously provided to Buyer)*

ACTIVE 40243749v2 05/12/2016 12:01 PM

**Schedule B**

**Excluded Assets**

For the avoidance of doubt, the following are not Purchased Assets:

## Exhibit A

## Real Estate Description and Exceptions

## (TO BE CONFIRMED BY TITLE COMPANY)

(a)    0.435 Acres, Land Lot 56, 7th Land District, Lamar County, Georgia:

All that tract or parcel of land lying and being in Land Lot 56 of the 7th Land District of Lamar County, Georgia, and within the City of Barnesville, containing 0.438 acres, and being more particularly described as "TRACT A" upon a certain plat of survey entitled "SURVEY PREPARED FOR: ALLIED FIBER, LLC" by Jonathan D. Smith, Ga. RLS No. 3159, dated Oct. 7, 2014, as revised Dec. 19, 2014, and recorded in Plat Book 16, Page 376, in the Office of the Clerk of Superior Court of Lamar County, Georgia. Said plat, together with the metes, bounds, courses and distances shown thereon, is hereby incorporated into and made a part of this description as if set out fully herein.

Subject to all easements of record.

This is a portion of the same property which was conveyed unto Georgia Banking Company from Georgia Banking Company as Attorney in Fact for Sunflower Communities, LLC by Deed Under Power of Sale dated November 2, 2010, and recorded in Deed Book 743, Pages 265-266, in the Office of the Clerk of Superior Court of Lamar County, Georgia.

(b)    0.17 Acres, Land Lot 89, 12th Land District, City of Hahira, Lowndes County, Georgia:

All that tract or parcel of land lying and being in Land Lot 89 of the 12th Land District, the City of Hahira, Lowndes County, Georgia, consisting of 0.17 acres depicted as Tract A on that certain plat of survey dated September 30, 2014 prepared by KCI Technologies, Inc. ("the Survey"), and being further described as follows:

Commencing at a 1/2% inch rebar found which is 400.65 feet southeasterly along the westerly right of way of South Tillman Street from the southwesterly right of way intersection of West Coleman Drive and South Tillman Street, thence along the westerly right of way of South Tillman Street, South 17 DEGREES 11 MINUTES 48 SECONDS West a distance of 232.15 feet to a % inch rebar found, thence leaving said right of way South 73 DEGREES 08 MINUTES 22 SECONDS West a distance of 104.60 feet to an iron pin set which is the TRUE <u>POINT OF BEGINNING:</u>

THENCE South 72 DEGREES 47 MINUTES 37 SECONDS West a distance of 150.00 feet to an iron pin set on the right of way of the Georgia Southern and Florida Railway: thence along said right of way North 17

-36-

DEGREES 12 MINUTES 23 SECONDS West a distance of 50.00 feet to an iron pin set: thence leaving said right of way North 72 DEGREES 47 MINUTES 37 SECONDS East a distance of 150.00 feet to an iron pin set: thence South 17 DEGREES 12 MINUTES 23 SECONDS East a distance of 50.00 feet to an iron pin set which is the <u>TRUE POINT OF BEGINNING.</u>

TOGETHER WITH a perpetual, nonexclusive easement 15 feet in width, for the purposes of ingress and egress to Tract A over the area depicted as "15' Access Easement" on the Survey.

(c)      0.28 Acres, Land Lot 227, 5th Land District, City of Warner Robins, Houston County, Georgia

All that tract or parcel of land situate, lying and being in Land Lot 227 of the 5th (fifth) Land District of Houston County, Georgia, being known and designated as Tract A, comprising 0.28, acres according to that certain plat of survey by KCI Technologies, Inc. for Allied Fiber dated October 2, 2014 and revised January 6, 2015, of record in Plat Book 76, Page 184, Clerk's office, Houston Superior Court. Said property is further described as follows: Commencing at the centerline intersection of Redmond Street and Astor Street, thence North 79 DEGREES 52 minutes 46 seconds East a distance of 32.20 feet to an iron pin set on the easterly right of way of Redmond Street, thence North 73 DEGREES 57 MINUTES 42 SECONDS East a distance of 62.89 feet to a calculated point and said calculated point is the TRUE POINT OF BEGINNING: Thence North 16 DEGREES 02 MINUTES 16 SECONDS West a distance of 150.00 feet to an iron pin set, thence North 73 DEGREES 57 MINUTES 42 SECONDS East a distance of 80.00 feet to an iron pin set on the westerly right of way of the Georgia Southern and Florida Railway; thence along said right of way south 16 DEGREES 02 MINUTES 16 SECONDS East a distance of 150.00 feet to an iron pin found; thence leaving said right of way South 73 degrees 57 MINUTES 42 SECONDS West a distance of 80.00 feet to a calculated point, which is the TRUE POINT OF BEGINNING: Said plat is incorporated herein by reference for all purposes.

This property is conveyed subject to a sanitary sewage easement in favor of the City of Warner Robins in Deed Book 764, Page 592

ALSO CONVEYED is a non-exclusive thirty foot easement for ingress and egress as shown on said plat.

-37-

**Exhibit B**

**BILL OF SALE**

**KNOW ALL MEN BY THESE PRESENTS**, that AF-Southeast, LLC, a Delaware limited liability company ("AF-Southeast"), Allied Fiber – Florida, LLC, a Delaware limited liability company ("Allied Florida"), Allied Fiber – Georgia, LLC, a Delaware limited liability company ("Allied Georgia," and together with AF-Southeast and Allied Florida, collectively, the "Debtors"), for and in consideration of the Purchase Price (as defined in the Purchase Agreement) attributable to the Purchased Assets, pursuant to and as further described in that certain Asset and Real Estate Purchase Agreement, dated as of [_____], 2016, by and among [_____], a [_____] (the "Buyer") and the Debtors (the "Purchase Agreement"), the receipt and sufficiency of which are hereby acknowledged, does hereby grant, sell, transfer and deliver unto the Buyer and its successors and assigns, all of its right, title and interest in and to the Purchased Assets (as defined in the Purchase Agreement) but excluding, in all events, the Excluded Assets (as defined in the Purchase Agreement).

**TO HAVE AND TO HOLD** the same unto the Buyer, its successors and assigns forever.

This Bill of Sale is made subject to, and with the benefit of, only those representations, warranties, covenants, terms, conditions and other provisions that are set forth in the Purchase Agreement.  This Bill of Sale shall be governed by, and construed AND ENFORCED in accordance with, THE BANKRUPTCY CODE (as defined in the Purchase Agreement) AND, TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE LAWS OF THE STATE OF DELAWARE, without regard to the conflicts of law rules of such state. The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Bill of Sale, and consent to the exclusive jurisdiction of, the Bankruptcy Court (as defined in the Purchase Agreement).

*(Page intentionally left blank.  Signature page follows.)*

ACTIVE 40243749v2 05/12/2016 12:01 PM

**IN WITNESS WHEREOF**, the Debtors have caused these presents to be executed as of the [____] day of [_____], 2016.

**The Debtors:**
**AF-SOUTHEAST, LLC**


By: _____
Name:
Title:


**ALLIED FIBER – FLORIDA, LLC**


By: _____
Name:
Title:


**ALLIED FIBER – GEORGIA, LLC**


By: _____
Name:
Title:

**Exhibit C**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This ASSIGNMENT AND ASSUMPTION AGREEMENT ("Agreement") is made as of the ____ day of _____, 2012, between and among AF-Southeast, LLC, a Delaware limited liability company ("AF-Southeast"), Allied Fiber – Florida, LLC, a Delaware limited liability company ("Allied Florida"), Allied Fiber – Georgia, LLC, a Delaware limited liability company ("Allied Georgia," and together with AF-Southeast and Allied Florida, collectively, the "Debtors"), and _____, a _____ _____ ("Assignee").

**WITNESSETH:**

WHEREAS, Assignee and Assignor are parties to that certain Asset and Real Estate Purchase Agreement dated as of [_____ ___], 2016 (the "Purchase Agreement"), pursuant to which (among other things) Assignor agreed to assign to Assignee, and Assignee agreed to assume from Assignor, certain rights and obligations;

WHEREAS, pursuant to the Purchase Agreement, Assignor desires and intends to transfer and assign those agreements, contracts and similar arrangements as identified on Schedule A hereto (collectively, the "Assigned Contracts"), but excluding in all events the agreements, contracts and similar arrangements identified on Schedule B hereto (the "Nonassigned Contracts");

WHEREAS, Assignee desires and intends to accept Assignor's transfer of all of its right, title and interest in the Assigned Contracts and is willing to assume Assignor's liabilities and obligations thereunder;

NOW, THEREFORE, pursuant to the terms and conditions of the Purchase Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.      On the date of the Closing (as defined in the Purchase Agreement), Assignor hereby assigns and transfers unto Assignee all of Assignor's right, title and interest in and to the Assigned Contracts and Assignee does hereby assume the Assigned Contracts, including all liabilities and obligations thereunder arising from and after the Closing (subject to the terms and limitations set forth in the Purchase Agreement).  Any assignment hereunder shall be contingent upon payment and satisfaction of the Cure Amount (as defined in the Purchase Agreement) applicable to such Assigned Contract, as further set forth in the Purchase Agreement.

2.      Assignor and Assignee hereby agree, from time to time, at the reasonable request of the other to execute and deliver such other instruments of conveyance, transfer and assumption, and take such other actions as the other may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

3.     This Agreement is made subject to and with the benefit and limitations of the respective representations, warranties, covenants, terms, conditions and other provisions of the Purchase Agreement, including, without limitation.  Any defined terms used herein and not defined herein shall have the same meanings as ascribed to such terms in the Purchase Agreement.

4.     This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto.

5.     This Agreement shall be governed by, and construed AND ENFORCED in accordance with, THE BANKRUPTCY CODE AND, TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE LAWS OF THE STATE OF DELAWARE, without regard to the conflicts of law rules of such state.  The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

       IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the [_____ ___], 2016, and effective as of the date of Closing.

**The Debtors:**
**AF-SOUTHEAST, LLC**


By: _____
Name:
Title:

**ALLIED FIBER – FLORIDA, LLC**


By: _____
Name:
Title:

**ALLIED FIBER – GEORGIA, LLC**


By: _____
Name:
Title:

-2-

**<u>Schedule A to Assignment and Assumption Agreement</u>**
**<u>Assigned Contracts</u>**

**<u>Schedule B to Assignment and Assumption Agreement</u>**
**<u>Nonassigned Contracts</u>**

**<u>Exhibit D</u>**
**<u>Bidding Procedures</u>**

## Exhibit E
## Sale Order

**Exhibit F**
**Bidding Procedure Order**

1