## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

_____
                                            :
                                            :          Chapter 11
In re:                                      :
                                            :
AF-SOUTHEAST, LLC, *et al.*,                :          Case No. 16-11008 (KG)
                                            :
        Debtors.[1]                         :
                                            :          Jointly Administered
                                            :
_____ :


## MOTION OF ALLIED FIBER, LLC PURSUANT TO 11 U.S.C. §363(k) TO LIMIT CREDIT BID RIGHTS OF SENIOR SECURED CREDITOR AND TO REQUIRE CASH ESCROW FOR ANY BID BY SENIOR SECURED CREDITOR IN EXCESS OF ITS UNDISPUTED CLAIM AMOUNT

Pursuant to 11 U.S.C. §363(k), Allied Fiber, LLC ("**Allied Fiber**") requests that the Court, for cause, limit the credit bidding rights of the Debtors' senior secured lender, Strome Mezzanine Fund IV, LP ("**Strome**"), to the undisputed amount of its secured claim, totaling approximately $32 million, rather than the amount of the claim as alleged by Strome, totaling approximately $52 million, which includes a disputed and unenforceable "make-whole" premium in the approximate amount of $20 million.[2]  If Strome desires to credit bid any amount of its disputed make-whole premium in excess of the undisputed portion of its secured claim, and it is determined that Strome is the winning bidder at the upcoming auction of the assets of the Debtors, Strome should be required to deposit such excess bid amount in a cash escrow account pending final resolution of its disputed make-whole premium.  In support hereof, Allied Fiber states as follows:

---

[1]  The "**Debtors**" in these cases, along with the last four digits of their federal tax identification numbers, are: (i) AF-Southeast, LLC (8002); (ii) Allied Fiber – Florida, LLC (8111); and (iii) Allied Fiber – Georgia, LLC (2935).

[2]  Amounts are taken from the motion seeking authority for DIP financing [docket no. 7].  Allied Fiber reserves all rights to contest such amounts.

## PRELIMINARY STATEMENT

Concurrently with the filing of this Motion, Allied Fiber has commenced an adversary proceeding against Strome seeking the disallowance of that portion of Strome's claim consisting of the $20 million make-whole premium which Strome has added to its undisputed claim amount (the "**Adversary Proceeding**").  This Motion requests that the Court level the playing field at the upcoming auction of the Debtors' assets and avoid chilling the bidding for any party other than the secured creditor.  The relief requested is modest and imposes a burden that is no greater than that imposed on any other bidder, and will avoid imposing a collection risk upon the Debtors' estates in the event that it is later determined through the Adversary Proceeding that the make-whole premium should not have been allowable as part of a prevailing credit bid by Strome.

The Debtors have commenced a sale process that will culminate in the auction of their assets at which Strome has reserved for itself the right to credit bid up to $52 million, which is the amount that the Debtors, controlled by Strome's hand-picked designee, have stipulated is owing to Strome.  Allied Fiber does not object to Strome's demand that it be entitled to credit bid the allowed amount of its secured claim; Allied Fiber only objects to any attempt by Strome to include in its credit bid the amount of its disputed make-whole premium until it is finally determined, through the Adversary Proceeding, whether or not such make-whole premium is properly allowable as part of Strome's secured claim.

The auction and sale hearing are scheduled to be concluded by July 14, 2016.  If Strome were to be the successful bidder at the auction by credit bidding any amount of its disputed $20 million make-whole premium, but such make-whole premium is later disallowed through the Adversary Proceeding, Strome will have been given an unfair

advantage because its credit bid should have been limited only to the undisputed portion of its secured claim, not including the make-whole premium.  Not only would that impose an unnecessary risk upon the Debtors' estates to collect the disallowed make-whole amount from Strome well after transfer of the Debtors' assets, but it would have given Strome an unfair advantage at the auction *vis a vis* other bidders and would chill the bidding on account of the increased likelihood that other bidders will either not attend the auction or will not bid in the face of Strome's improperly inflated credit bid.  The only fair remedy is to require Strome to deposit in a cash escrow account any amount of its prevailing credit bid attributable to the disputed make-whole premium pending a final determination of the Adversary Proceeding.  This requires Strome to compete at the auction on the same level playing field as other bidders, but avoids any prejudice because, if Strome prevails in the Adversary Proceeding, it will be entitled to a return of the cash escrow.  At the same time, the Debtors' estates are protected from any extraordinary collection risk because any other bidder would be required, as a condition of closing, to pay the full amount of the purchase price in cash; whereas, if Strome is allowed to credit bid its disallowed make-whole premium and close on the sale, the Debtors' estates might be forced to pursue collection against Strome on such excess credit bid after closing.

In addition to the need to ensure that the auction is conducted in a fair and balanced manner, the plain language of Section 363(k) of the Bankruptcy Code requires that Strome's credit bid rights be limited only to the undisputed portion of its secured claim.  By its express terms, Section 363(k) only permits a secured creditor to credit bid its "allowed" secured claim. By virtue of the filing of the Adversary Proceeding, a valid objection has been lodged. Section 502(a) of the Bankruptcy Code provides that, upon the filing of a valid objection, a

claim is not "allowed" until such objection is finally determined.  Accordingly, pursuant to the plain terms of Section 363(k), Strome's $20 million make-whole premium is not yet "allowed" and cannot be used to credit bid.

It is well-known that credit bidding, in general, chills bidding.  To allow credit bidding in this case based on a make-whole premium that is in dispute, which would result in giving Strome a total non-cash credit bid in an amount that is 40% greater than its undisputed secured claim amount, would be egregious.  The Debtors, which are ultimately controlled by Strome's hand-picked designee, have already attempted to chill bidding by making statements from the very outset of this case that the value of the Debtors' assets is less than the amount – once again stipulated by Strome's hand-picked designee – that is owed to Strome.  *See* "Declaration of Scott Drake Filed in support of First-Day Motions" [docket no. 10]; and "Motion of the Debtors for Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and to Grant Security Interests and Superpriority Administrative Expense Claims pursuant to 11 U.S.C. § § 105(A), 364(C) and 364(D); (B) Authorizing the Debtors to use Cash Collateral; (C) Modifying the Automatic Stay pursuant to 11 U.S.C. § 362; (D) Granting Adequate Protection pursuant to 11 U.S.C. § § 361 and 363; and (E) Scheduling a Final Hearing pursuant to Bankruptcy Rule 4001" [docket no. 7].  Giving Strome the ability to make an inflated credit bid would only exacerbate the intended effect.  Limiting Strome's credit bid rights to the undisputed amount of $32 million will at least lower by $20 million the hurdle other cash bidders will have to clear.

No unsecured creditors committee has been appointed in these bankruptcy cases and, as a practical matter, no individual creditor or party in interest, other than Allied Fiber, has the ability or the incentive to question Strome's tactics.  Left unchecked, Strome, through its control of the

Debtors and its inflated credit bid, will simply use this Court to take control of the Debtors' assets without exposing them to a fair auction process, thereby depriving creditors of the possibility of any dividend whatsoever.

## JURISDICTION & VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K), (N) and (O).

2.      Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested in this Motion are 11 U.S.C. §§ 105(a), 363(k) and 502(a), Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 2002, 3007, 6004, 7001 and 9014, and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## BACKGROUND

4.      On April 20, 2016 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**").  No trustee, examiner or creditors' committee has been appointed in these bankruptcy cases.

5.      The Debtors are limited liability companies organized in the State of Delaware. Debtor, AF-Southeast, LLC, is 100% owned by its parent, Allied Fiber, which is not a debtor. AF-Southeast, LLC is the sole member and 100% owner of Allied Fiber – Florida, LLC and Allied Fiber – Georgia, LLC, each of which are Debtors in these proceedings.

6.      The Debtors are engaged in the business of designing, constructing and operating an open access, physical layer, network-neutral colocation and dark fiber network.  The Debtors'

dark fiber network provides long-haul, multi-access points, and short-haul dark fiber network systems, coupled with its owned colocation facilities to provide control of the underlying physical assets to all network operators who subscribe to the Debtors' services.

7.      On September 24, 2014, Strome, as lender, and the Debtors, as borrowers, entered into a certain loan agreement (the "**Loan Agreement**") pursuant to which Strome agreed to lend an aggregate of $23 million (the "**Loan**") for the purpose of financing and reimbursing the costs of the development, acquisition, construction and installation of equipment relating to certain of the Debtors' dark fiber communications networks spanning from Miami, Florida to Jacksonville, Florida and from Jacksonville to Atlanta, Georgia (the "**Southeast Segment**"). A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.

8.      As part of this funding, Allied Fiber's assets pertaining to the Southeast Segment were transferred to the Debtors, and thereafter were pledged by the Debtors to Strome to secure repayment of the Loan.  Allied Fiber entered into a limited guaranty of the Loan.  In addition, as a condition to making the Loan, Strome required an intercreditor agreement with certain creditors of Allied Fiber (the "**Consenting 16% Noteholders**") that held a prior security interest in the assets of Allied Fiber that were transferred to the Debtors in order to give Strome the senior lien position on those assets.  The Consenting 16% Noteholders continue to have a second lien on the Debtors' assets and Allied Fiber is the obligor on the debt owed to the Consenting 16% Noteholders.  Therefore, any reduction in the debt owed to the Consenting 16% Noteholders as a result of the sale of the Debtors' assets will benefit Allied Fiber.[3]

---

[3] Certain holders of Allied Fiber's 16% note debt other than the Consenting 16% Noteholders (the "**Non-consenting 16% Noteholders**"), did not consent to the subordination of their first lien on the assets that were transferred to the Debtors and, thus, continue to have a first lien on such assets.  It is unclear how the Debtors intend to transfer such assets to Strome as a result of a credit bid when such credit bid will not discharge the first lien of the Non-consenting 16% Noteholders.

9.     In connection with the Loan, the Debtors executed a Senior Secured Promissory Note, dated September 24, 2014, in favor of Strome (the "**Note,**" and together with the Loan Agreement and other relevant agreements between the parties, the "**Loan Documents**"). A true and correct copy of the Note is attached hereto as Exhibit B.  The Loan Documents are governed by the laws of the State of New York.

10.     On September 3, 2015, Strome, the Debtors and Allied Fiber entered into a forbearance agreement (the "**Forbearance Agreement**") pursuant to which, among other things, the Debtors acknowledged that the Loan was in default and had been accelerated, and Strome agreed to forebear from taking remedial action against the Debtors in order to give the Debtors an opportunity to either refinance the Loan or sell their assets to repay the Loan. A true and correct copy of the Forbearance Agreement is attached hereto as Exhibit C.

11.     On March 8, 2016, at the specific direction of Strome, Allied Fiber and the Debtors elevated their Chief Financial Officer, Scott Drake, to the position of Chief Restructuring Officer, subject to the oversight and direction of Allied Fiber's board of managers.  Scott Drake did not have a membership interest in any of Allied Fiber or the Debtors.  As an employee, he owed a duty of allegiance to follow the directions of the board of managers of Allied Fiber.  Subsequently, on April 19, 2016, just one day prior to the bankruptcy filing, Scott Drake resigned without any prior notice or warning to the Allied Fiber board of managers.  Simultaneously, also without any prior notice to Allied Fiber, Strome's counsel advised Allied Fiber in writing of the immediate exercise of Strome's secured party rights under the Loan Documents by which Strome elected to vote the membership interests of Allied Fiber in the Debtors, and allegedly voted to replace each of the members of the Debtors with a single member of Strome's choosing.  Strome chose to replace the

members of the Debtors with Scott Drake, giving him sole control of the Debtors.[4]  On the day

after Drake resigned and was appointed by Strome as the sole member of the Debtors, *i.e.*, April

20, Drake simultaneously caused the execution and filing of the bankruptcy petitions, a 25-page

first-day declaration, and a motion to approve DIP financing and the use of cash collateral,

including the attachment of a 65-page loan agreement.  Within seven days thereafter, Drake caused

the filing of a motion to sell the Debtors' assets pursuant to Section 363 of the Bankruptcy Code,

including detailed bidding procedures and a form of Asset Purchase Agreement.

  12.  In paragraph 33 of Drake's first-day declaration [docket no. 10], and on the eve of

the filing of the sale motion in which Strome was granted credit bidding rights, Drake volunteers

an admission on behalf of the Debtors that, "[a]s a going concern, it is my educated and informed

belief that the Debtors' value is considerably less than the amount of [Strome's] claim."  He further

volunteers in paragraph 61 of his Declaration that the Debtors "have determined that . . . the value

of the Prepetition Collateral is less than the value of [Strome's] claims and thus, [Strome] is

undersecured . . ."

  13.  Similarly, in paragraph 21 of the motion to approve DIP financing [docket no. 7],

the Debtors volunteer an admission that:

> Given the estimated value of the Pre-Petition Collateral as
> determined by an independent third-party, it is virtually certain that
> [Strome] is likely undersecured.

  14.  The Debtors stipulated in their post-petition financing arrangement and in the final

order of this Court approving the DIP Financing (the "**<u>DIP Order</u>**" [docket no. 99]) that they owe

Strome a total principal amount of approximately $51,822,394 under the Loan Documents.  That

---

[4] The Debtors have sought the appointment of a Chief Restructuring Officer in these cases.  The summary of the
DIP financing contained on page 11 of the DIP financing motion [docket no. 7] provides, however, that the CRO's
decision-making authority is "[s]ubject to the ultimate approval of the Debtors' Manager," i.e., Scott Drake.

stipulated amount includes a make-whole premium alleged to be $19,674,757, plus accrued and unpaid interest in the amount of $610,000 as of the Petition Date.  The Debtors further stipulated that the entire $52 million claim is secured by a first priority lien in substantially all of the Debtors' assets and is guaranteed by Allied Fiber.  The DIP Order also provides that any objection to Strome's claims and liens under the Loan Documents must be commenced on or before the 75th day following the Petition Date (i.e., July 5, 2016)[5] or the asserted $52 million senior secured claim, which includes the $20 million make-whole premium, will become unassailable by any third party.

15.    The Debtors have also stipulated to broad releases in favor of Strome and each person acting for or on behalf of Strome.  Paragraph 6 of the DIP Order incorporates the expansive releases set forth in the DIP loan agreement.  Those releases extend to Strome's prepetition loan, including all claims arising under the prepetition loan agreements, and seek to bind all creditors, not just the Debtors.

16.    In summary, immediately prior to the filing of the motion seeking to sell all of the assets of the Debtors, the Debtors, through Strome's hand-picked designee, have agreed and stipulated with Strome that his make-whole is valid and enforceable, that his entire $52 million claim is entitled to a first-priority lien, that the value of the Debtors' assets is "considerably less" than Strome's stipulated secured claim, that Strome is entitled to credit bid its entire claim, including the $20 million make-whole premium, and that Strome will be entitled to broad releases for any and all conduct in the past or present.  In short, if Strome is allowed to credit bid as proposed

---

[5] Parties interested in bidding on the Debtors' assets and participating in the auction must submit qualifying bids on or before July 7, 2016.  If the Debtors receive any such bids, they will conduct the auction on July 12, 2016.  However, if no bids are received, presumably Strome will credit bid some or all of its debt in exchange for the Debtors' assets, a right Strome has explicitly reserved for itself in connection with the auction.  A hearing to approve the results of the auction is scheduled for July 14, 2016.

by the Debtors and is successful, it will own all of the assets of the Debtors and be released and insulated from any claims of any parties, including creditors.

## RELIEF REQUESTED

17.     By this Motion, Allied Fiber seeks an order of this Court pursuant to Section 363(k) of the Bankruptcy Code limiting, for cause, the right of Strome to credit bid any amount in excess of the undisputed amount of its secured debt which, according to the Debtors, is approximately $31,537,000, plus the amount of any post-petition DIP financing provided by Strome.  If Strome desires to credit bid the amount of the disputed make-whole premium and is determined to be the prevailing bidder, it should be required to deposit any such disputed amount in cash in escrow pending the final determination of the Adversary Proceeding.

## BASIS OF THE RELIEF REQUESTED

18.     The Bidding Procedures attached to the "Notice of Bid Deadline, Auction and Sale Hearing for the Approval of the Sale of Substantially all of the Assets of the Debtors Free and Clear of Liens, Claims and Interests" [docket no. 110] provide that Strome is a Qualified Bidder at the auction and that Strome "shall have the right to submit a credit bid pursuant to Section 363(k) of the Bankruptcy Code up to the full amount of its allowed secured claim".  Bidding Procedures, p.11 of 16 (emphasis added).  The Bidding Procedures also provide that "[n]otwithstanding the foregoing, nothing contained herein shall be deemed consent by . . . any parties in interest, of [Strome's] ability to Credit Bid its secured claim and all such rights to object to Credit Bidding are hereby preserved."  *Id.*  Based on this reservation of rights, Allied Fiber hereby objects to Strome's credit bid rights.

**I.    Strome Should Not Have Credit Bid Rights For The Disputed Portion Of Its Claim**

19.    Pursuant to Section 363(k) of the Bankruptcy Code, the Court, for cause, can limit the right of a secured creditor to credit bid at a 363 sale of a debtor's assets.  Cause exists in this case.  First, Strome is attempting to bid more than the allowed amount of its secured claim. Strome's credit bid rights must be limited to the undisputed amount of its secured claim.  Second, given the signal to the market place that the Debtors' assets are worth less than $52 million, the requested limitation on Strome's credit bid rights will help to foster a competitive bidding environment that would not exist without the requested limitation.  Finally, the competing rights of the parties in interest can be protected notwithstanding the limitation on Strome's credit bid rights through the requested cash escrow procedure.  Accordingly, the Court should limit Strome's credit bid rights as requested in this Motion.

**A.    Section 363(k) Limits Credit Bid Rights Only to Allowed Secured Claims.**

20.    The right to credit bid is not absolute. A secured creditor can credit bid under Section 363(k) only to the extent its lien "secures an **allowed** claim." (emphasis added)  Where the validity or amount of a lien is disputed, uncertain or limited, courts have found "cause" under Section 363(k) to limit the right of a secured creditor to credit bid at a sale.  *See, e.g., In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 61 (Bankr. D. Del. 2014) (secured creditor may not bid its lien when the amount of the claim has not been determined); *see also Morgan Stanley Dean Witter Mortgage Capital, Inc. v. Alon USA L.P.*, 2001 WL 1568332, at *3 (N.D. Tex. Dec 4, 2001) (refusing a request to credit bid where the secured creditor's lien was subject to a *bona fide* dispute that could not be resolved before the sale); *In re Old Prairie Block Owner, LLC*, 464 B.R. 337 (Bankr. N.D. Ill. 2011); *In re Daufuskie Island Props., LLC*, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (creditor was not entitled to credit bid when its mortgage was in dispute); and *Nat 'l Bank of*

*Commerce v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (secured creditor could not credit bid "because the validity of its liens and security interests are unresolved"), *aff'd*, 162 F.3d 1164 (8th Cir. 1998).

21.     As noted in the Third Circuit, a court may deny the right to credit bid "for cause," which includes modifying such rights "in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 315-16 (3d Cir. 2010). Limiting Strome's credit bid rights to the undisputed amount of its claim and conditioning Strome's bid above that amount upon escrowing cash if Strome is the prevailing bidder, is consistent with the mandate of Section 363(k) and the case law, and will help to foster a competitive bidding environment at the auction, despite the damaging admissions made by the Debtors through Strome's own designee that the value of their assets is "considerably less" than Strome's stipulated credit bid rights.

22.     Any burden placed on Strome will only arise if it is the high bidder, and such burden is far less important than the need to create a robust and fair bidding process. If Strome is correct that its make-whole premium is allowable, then such burden will only be temporary until the Adversary Proceeding is finally determined. In contrast, if the Debtors' estates are compelled to seek to collect from Strome long after the sale has closed and the assets have been transferred, the estates will be left with an unnecessary and unacceptable risk of collection that may prejudice creditors.

23.     The Adversary Proceeding has been filed in order to challenge Strome's allowed claim to the extent of the make-whole component of that claim and constitutes a *bona fide* dispute over Strome's make-whole premium. The claimed $20 million make-whole premium overstates the amount of Strome's allowable secured claim by approximately 40% and, as discussed below,

is not owed by the Debtors under the plain terms of the Loan Documents.  Pursuant to Section 502(a) of the Bankruptcy Code, a claim is not allowed when it is subject to an objection. By the express language of Section 363(k), which limits credit bidding only to "allowed" claims, Strome's credit bid rights must be limited to its undisputed claim of approximately $32 million.

24.     Section 363(k) also authorizes the Court to condition Strome's credit bid rights in order to foster competitive bidding at the auction.  Through Strome's designee, the Debtors have voluntarily admitted that their assets are worth less than Strome's stipulated claim of $52 million. If left unchallenged, it is unlikely that any third-party would bid on assets worth less than $52 million when the secured creditor has reserved for itself a right to make a $52 million credit bid. Limiting the credit bid to $32 million increases and fosters the likelihood that another bidder will be willing to engage in the bidding process, attend the auction, and bid up the value of the assets in a competitive bidding environment.

**B.     If Strome Is The Prevailing Bidder, It Should be Required to Deposit Any Credit Bid Amount Pertaining to the Make-Whole Premium In Cash In Escrow Pending Resolution of the Adversary Proceeding.**

25.     To the extent that Strome is the prevailing bidder at the auction and its bid includes any portion of the disputed make-whole premium, Strome should be required to escrow such amount in cash pending final resolution of the Adversary Proceeding.

26.     Courts have frequently required secured creditors to post security when the claim is subject to dispute. *See, e.g.*, *In re Diebart Bancroft*, Nos. 92-3744 (FHW) & 92-3745 (FHW), 1993 U.S. Dist. LEXIS, at *15 (E.D. La. Jan. 26, 1993) (affirming the bankruptcy court's decision to require the secured creditor to pay cash to purchase assets where its lien was disputed); and *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (secured creditor permitted to credit

bid only after posting an irrevocable letter of credit in order to protect the estate in the event the lien was later avoided).

27.     The proposed escrow mechanism is fair for all parties.  If Strome prevails in the Adversary Proceeding, it will be entitled to a return of the escrowed funds and will be put in the same position as if it had credit bid its alleged make-whole premium.  Conversely, if Strome does not prevail, then the Debtors and their estates are protected because the Debtors will not have to bear the risk of pursuing Strome for the unpaid cash portion of the purchase price long after the sale has closed, the assets have been transferred, and it may be impractical or impossible to undo the transaction.

## II.     Strome's Claim For a Make-Whole Premium Is Subject to a *Bona Fide* Dispute Because It Will Be Disallowed in the Adversary Proceeding

28.     Strome's claim for a make-whole premium is subject to a *bona fide* dispute and is a straight forward case of contract interpretation.  In the Adversary Proceeding, Allied Fiber seeks disallowance of the make-whole premium because liability for such amount was never triggered under the plain terms of the Loan Documents, which provide for payment of the make-whole premium (known as the "**Make Whole Amount**" in the Loan Documents) only if the Debtors voluntarily prepay the Loan.  In contrast, at this point in time, any payment to be made on the Loan will arise solely from the proceeds from the upcoming 363 sale, which is neither voluntary nor a prepayment.

29.     Governing New York law is clear: [6] "A prepayment premium will not be enforced under default circumstances in the absence of a clause which so states." *Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 836 (N.Y. Sup. Ct. 2006); *see In re MPM Silicones, LLC*, No. 14-22503, 2014 WL 4436335, at *15 (Bankr. S.D.N.Y. Sept. 9, 2014) *aff'd*

---

[6] The laws of the State of New York govern the Loan Documents.

531 B.R. 321 (S.D.N.Y. 2015) ("[T]he option [for a make-whole premium], as noted, must be specific if the parties want it to apply even after acceleration of the debt.").  As a result, "a lender is not entitled to prepayment consideration after default unless the parties' agreement expressly requires it." *In re South Side House, LLC*, 451 B.R. 248, 268 (Bankr. E.D.N.Y. 2011), *aff'd sub nom U.S. Bank Nat'l Ass'n v. South Side House, LLC*, No. 11-4135, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012). Unless the parties have clearly and specifically provided for payment of a make-whole premium, notwithstanding default and acceleration, a make-whole premium will not be owed; the contract must clearly state that a make-whole premium is owed after the debt has been accelerated.  Here, the plain language of the Loan Agreement and the Note does not even contemplate payment of the Make Whole Amount after acceleration.  The only instance when the Make Whole Amount is due is when the Debtors, in their sole discretion, voluntarily decide to prepay the Loan.  That never happened and cannot happen.

30.    To be sure, the Loan Agreement could have included clear language requiring payment of the Make Whole Amount upon acceleration, but it did not. The only section of the Loan Agreement that defines the Make Whole Amount is Section 9.1, which originally provided as follows:

> **[The Debtors] shall have the option, in their sole discretion, to prepay the Loan Payments in whole . . . or in part at any time prior to the Maturity Date** at a price (the "Make Whole Amount") equal to the greater of:
>
> (i)  100% of the principal amount of the Loan to be prepaid; or
>
> (ii)  the sum of the present value of the remaining scheduled payments of principal and interest on the Loan to the Maturity Date to be prepaid, not including any portion of those payments of interest accrued and unpaid as of the date on which the Loan is to be prepaid, discounted to the date on

> which the Loan is to be prepaid on a semi-annual basis, at the Treasury Rate [which is also defined in this section 9.1], plus 25 basis points;
>
> plus, in each case, accrued interest on the Loan to the date of prepayment.

Loan Agreement, Section 9.1 (emphasis added).  There are no other operative provisions in the Loan Documents that make the Make Whole Amount due and payable if the Debtors have not elected to prepay the Loan.   As set forth below, the Forbearance Agreement amended the Loan Agreement - but not the Note - by adding a standalone sentence to the very end of Section 9.1; however, that sentence failed to amend the definitional words appearing at the beginning of Section 9.1 which specifically define the term "Make Whole Amount."  An integral part of that defined term requires a voluntary prepayment of the Loan by the Debtors – there is no "Make Whole Amount" whatsoever unless the payment allegedly triggering the mathematical calculation in the remainder of Section 9.1 constitutes a voluntary prepayment prior to the maturity date.  In other words, the Forbearance Agreement failed to change the fact that the actual, defined term "Make Whole Amount" only refers to a voluntary, discretionary prepayment of the Loan by the Debtors prior to the maturity date.

31.    Under New York law as noted above, once Strome accelerated the Loan, it became impossible for the Debtors to prepay the Loan – they could only repay it.[7]   As stated by the plain terms of the Loan Agreement, repayment upon acceleration of the Loan does not

---

[7] It is well-settled New York law that once the debt is accelerated, it is no longer possible to prepay the debt before maturity. A borrower's repayment after acceleration is not considered voluntary. "Acceleration moves the maturity date from the original maturity date to the acceleration date and that date becomes the new maturity date." *In re Solutia*, 379 B.R. 473, 484 (Bankr. S.D.N.Y. 2007). As one court explained, and many others have held, "[p]repayment can only occur prior to the maturity date," *id.* at 488 (emphasis in original), and "acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but is instead payment made after maturity," *In re LHD Realty Corp.*, 726 F.2d 327, 330-31 (7th Cir. 1984).  *See also Solutia*, 379 B.R. at 484; *Northwestern Mut.*, 816 N.Y.S.2d at 83; *D.I.S., LLC v. Sagos*, 38 A.D.3d 543, 544 (N.Y. App. Div., 2d Dept. 2007); and *In re Ridgewood Apartments of DeKalb Cnty., Ltd.*, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994).

trigger the Make Whole Amount.  Importantly, the Note reinforces this view of Section 9.1 of the Loan Agreement.  First, the Note states that "[Debtors] may voluntarily prepay this Note in accordance with, and subject to the terms and provisions of, the Loan Agreement, including, without limitation, subject to the payment of the Make Whole Amount."  Note, Article 2(D).  This is the only reference in the Note to the Make Whole Amount, which clearly references that the Make Whole Amount is due when the Debtors "voluntarily prepay this Note."  Second, after acceleration and default, the Note requires payment of the "Debt."  Note, Article 3.  The Note defines "Debt" as "the principal of, and any accrued and unpaid interest on, this Note, including, without limitation, any payments of interest which are deferred and capitalized as set forth in Subsection (B) [of the Note]."  Note, Article 2(A).  Again, there is no reference in the defined term "Debt" that would cause the Make Whole Amount to become due upon default and acceleration.  This absence is not surprising considering that the Loan Agreement is clear that the Make Whole Amount is payable only when the Debtors voluntarily elect to prepay the Loan.  In other words, the Note and the Loan Agreement work in harmony, as they should, on this issue: if the Debtors elect to prepay the Loan, they owe the Make Whole Amount; if they must repay the Loan, they owe the outstanding principal and interest and nothing more.

32.     Strome may attempt to point to Section 8.2 of the Loan Agreement as evidence that the Make Whole Amount is due after default and acceleration.  That section provides:

> Whenever an Event of Default referred to in Section 8.1 [payment default] shall have occurred and is continuing, Lender may take any one or more of the following remedial steps:
>
> (a)     Lender may declare the Loan Payments payable hereunder for the remainder of the term of the Loan Agreement and the Make Whole Amount to be immediately due and payable, whereupon the same shall become due and payable.

Loan Agreement, Section 8.2(a).  The reference to the Make Whole Amount in Section 8.2(a) does not make it due and payable, but simply confirms that, <u>if</u> liability for the Make Whole Amount has been triggered by the Debtors' decision to prepay the Loan but the Debtors fail to do so, then such amount would be due and payable after default and acceleration – a necessary clarification given that, under Section 9.1 of the Loan Agreement, the Make Whole Amount is only due upon prepayment and does not require payment of any Make Whole Amount upon acceleration.

33.    The reference to the Make Whole Amount in Section 8.2(a) does not provide the clarity and specificity required under New York law to have a make-whole premium due in a loan agreement, especially where (i) the sole, operative section of the Loan Agreement that specifically defines the Make Whole Amount requires, as a precondition, that it only exists in a circumstance where the Loan is being voluntarily prepaid prior to the maturity date, (ii) the Loan Agreement does not otherwise require payment of the Make Whole Amount other than in connection with a prepayment of the Loan, and (iii) the Note, which was never amended by the Forbearance Agreement, does not require the payment of the Make Whole Amount after a default.

34.    Similarly, Strome cannot rely on the Forbearance Agreement to argue that the Make Whole Amount is due.  In tacit recognition by Strome that the Loan Agreement does not require payment of a make whole premium upon default and acceleration, Strome sought to amend the Loan Agreement through the Forbearance Agreement by adding the following as a standalone sentence at the end of Section 9.1 of the Loan Agreement:

> The Make Whole Amount shall become due and payable upon acceleration of the Loan in accordance with Section 8.2.

Forbearance Agreement, Section 3.3.   By inserting this amendment through the Forbearance Agreement, Strome effectively admitted that the original language of the Loan Agreement does not provide that the Make Whole Amount is due and payable upon acceleration of the Loan.

35.     Even with the added language, no Make Whole Amount is due and payable because such language is legally insufficient and, at best, ambiguous.   As noted above, Section 8.2 does not itself trigger the Make Whole Amount so it cannot be due and payable "in accordance with Section 8.2."   In fact, according to the express terms of the Forbearance Agreement, the Loan was already accelerated on or prior to the date of the Forbearance Agreement, so the added sentence providing that "The Make Whole Amount shall become due and payable upon acceleration of the Loan" ambiguously and paradoxically refers to a future event that has already occurred.   Strome could have sought to amend the definitional language of Section 9.1 (defining the term "Make Whole Amount" as coming into existence only upon a voluntary prepayment of the Loan), but it failed to do so.   Instead, it added a sentence at the end of Section 9.1 referring, in a circular manner, to the defined term "Make Whole Amount."   Because the actual defined term was never amended and, therefore, continues to refer only to a voluntary prepayment, Strome's use of the defined term in its added sentence means that the inserted language refers to an amount that, both at the time of the Forbearance Agreement and at this point in time, cannot exist,  especially since the Forbearance Agreement itself acknowledges that the Loan has been accelerated.   The term "Make Whole Amount" is not just a calculation; its explicit definition in Section 9.1 also includes the express condition that the calculation is not even applicable unless and until there is a voluntary prepayment.   Without the voluntary prepayment having occurred, one does not even get to the mathematical calculation of the premium amount.   In any event, at best, Strome's amended

language is ambiguous and, under the applicable case law, is not sufficient to cause the Make Whole Amount to be due in this case.

36.     Section 7.2 of the Forbearance Agreement also supports Allied Fiber's position. Section 7.2 only refers hypothetically to any obligation to pay a Make Whole Amount.  That section provides:

> *Confirmation of Indebtedness*.  The Guarantor and the [Debtors] hereby confirm and acknowledge that, (i) as of the date hereof, the [Debtors] are truly and justly indebted to the Lender, without defense, counterclaim or offset of any kind (a) in the aggregate principal amount of $24,196,000 plus accrued and unpaid interest and (b) the Make Whole Amount, if it were computed with respect to a repayment as of the date hereof, would be in the amount of $21,263,043 and (ii) the Guarantor is contingently liable to the Lender in respect of such amounts.

Forbearance Agreement, Section 7.2.

37.     Strome's conditional language in this section simply posits that, if a Make Whole Amount "were computed with respect to a repayment as of the date hereof," the Make Whole Amount would be a particular sum.  But, the condition was not satisfied because there was not, in fact, any payment on the Loan as of the date of the Forbearance Agreement. Nowhere in this section does the language state clearly and unambiguously that the Debtors have agreed that the Make Whole Amount should be computed and is due as of the date of the Forbearance Agreement.  Indeed, this use of hypothetical language is consistent with the remainder of the Forbearance Agreement which expressly provides that Strome was forbearing for the explicit purpose of giving Allied Fiber the opportunity to refinance the Loan.  If Allied Fiber had been able to do so, then there might have been a voluntary prepayment of the Loan, and the Make Whole Amount, consistent with the hypothetical phrasing of Section 7.2, would have been due and owing.  Because Strome chose to terminate

the Forbearance Agreement before such a prepayment ever occurred, it is not now entitled to a Make Whole Amount.

38.     Finally, the fourth recital in the Forbearance Agreement does not save the day for Strome. In general, recital paragraphs are not considered substantive under New York law, but may be interpreted to elucidate the intent of the parties if such intent is otherwise unclear in the document.   Here, there is no question but that the operative terms of the Forbearance Agreement, the Loan Agreement and the Note create no liability for payment of a Make Whole Amount upon acceleration. The language of the recital cannot as a matter of law override the operative terms of the Forbearance Agreement or the operative terms of the Loan Documents.   The recital states that "the Loans and other obligations owing under the Loan Documents, including the Make Whole Amount, are deemed to have been accelerated and are due and owing."   At the time of the Forbearance Agreement, however, nothing was owed on account of a Make Whole Amount because there had been no voluntary prepayment and the Loan Documents had not been properly amended by Strome to cause a Make Whole Amount to become owing at that time.   Therefore, there was no Make Whole Amount to be included in the "Loans and other obligations owing under the Loan Documents."   The reference "including the Make Whole Amount" is merely a clarifying clause which means that, if the Make Whole Amount were currently "owing under the Loan Documents" it, too, would be accelerated and become due and owing.   This reading of the recital is consistent with and harmonizes the operative provisions that address the Make Whole Amount in each of the Loan Documents.

39.     In summary, a plain reading of the text of the Loan Documents leads to the conclusion that the Debtors do not owe a Make Whole Amount.   The Forbearance Agreement

does not change this conclusion.  New York law requires a clear and unambiguous statement that a make-whole premium is due after acceleration.  The Loan Documents and the Forbearance Agreement fall far short of this strict standard; accordingly, the 40% make-whole premium is not due.  Even if Strome disagrees with Allied Fiber's position, at a minimum, the dispute is a *bona fide* objection to Strome's claim for a make-whole premium which, pending resolution of the Adversary Proceeding disqualifies the make-whole premium from being an allowed claim for purposes of permitting a credit bid under Section 363(k) of the Bankruptcy Code.

## **CONCLUSION**

For the foregoing reasons, Allied Fiber requests that the Court enter an order limiting the credit bid rights of Strome to $32 million plus any DIP financing, requiring Strome to escrow cash for any prevailing credit bid it attempts to make in excess thereof, and granting such further relief as is appropriate under the circumstances.

Date:  June 21, 2016
Wilmington, Delaware

CIARDI CIARDI & ASTIN


*/s/ Joseph J. McMahon, Jr.*
Daniel K. Astin (No. 4068)
John D. McLaughlin, Jr. (No. 4123)
Joseph McMahon, Jr. (No. 4819)
1204 North King Street
Wilmington, DE  19801
Telephone: (302) 658-1100
Facsimile: (302) 658-1300
jmcmahon@ciardilaw.com

-and-

Paul J. Ricotta
(NY1837467) (*pro hac* pending)
Kevin J. Walsh
(BBO No. 629984) (*pro hac* pending)
MINTZ LEVIN COHN FERRIS
 GLOVSKY & POPEO, P.C.
One Financial Center
Boston, MA  02111
Tel.:  (617) 542-6000
Fax:  (617) 542-2241
pjricotta@mintz.com
kwalsh@mintz.com

*Counsel for Allied Fiber, LLC*