## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| AF-SOUTHEAST, LLC, *et al.*, | Case No. 16-11008 (KG) |
| Debtors.[1/] | Jointly Administered |
| ALLIED FIBER, LLC, | |
| Plaintiff | Adversary Proceeding |
| vs. | No. 16-_____ (KG) |
| STROME MEZZANINE FUND IV, LP, | |
| Defendant. | |

## **COMPLAINT**

1.      Plaintiff, Allied Fiber, LLC ("Allied Fiber"), files this complaint (the "Complaint")
against Defendant, Strome Mezzanine Fund IV, LP ("Strome"), under Section 502 of the
Bankruptcy Code and Rules 3007(b) and 7001(2) of the Federal Rules of Bankruptcy Procedure
to determine the amount, extent and validity of a portion of the claim asserted by Strome consisting
of a so-called make-whole premium.

---

[1/]      The "Debtors" in these cases, along with the last four digits of their federal tax
identification numbers, are: (i) AF-Southeast, LLC (8002); (ii) Allied Fiber – Florida, LLC
(8111); and (iii) Allied Fiber – Georgia, LLC (2935).  The Debtors commenced their cases on
April 24, 2016 (the "Petition Date").

## NATURE OF THE ACTION

2.      In this bankruptcy case, Strome has asserted a secured claim in the approximate amount of $52 million.  Forty percent (40%) of that amount - approximately $20 million – consists of a make-whole premium (referred to as the "Make Whole Amount" in the applicable loan documents).  Based upon the contractual language in the applicable loan documents, the Make Whole Amount is not due and owing because the Debtors have not and cannot voluntarily prepay the loan.   Any payment to be made on the loan in this bankruptcy proceeding will come after acceleration and will arise solely from the proceeds of the Debtors' Section 363 sale, which payment is neither voluntary nor a prepayment.

## JURISDICTION AND VENUE

3.      This is an adversary proceeding brought pursuant to Bankruptcy Rule 7001.

4.      This Court has jurisdiction over the matters raised in this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157, and the Amended Standing Order of Reference, dated as of February 29, 2012, from the United States District Court for the District of Delaware.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) such that the Court may enter a final order consistent with Article III of the United States Constitution.  Pursuant to Rule 7012-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, to the extent that it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution, Plaintiff consents to the entry of a final order by the Court in connection with this Complaint.

6.      Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. § 1409 because (a) the above-captioned chapter 11 case to which this case is related is pending in

this District before this Court, and (b) none of the exceptions set forth in 28 U.S.C. § 1409 apply to this action.

## PARTIES

7.      Plaintiff, Allied Fiber, LLC, is a limited liability company organized under the laws of the State of Delaware.  Plaintiff owns 100% of the equity interests in AF-Southeast, LLC, a debtor and debtor in possession in the related bankruptcy case.  In turn, AF-Southeast, LLC owns 100% of the membership interests in the remaining Debtors.

8.      Defendant, Strome Mezzanine Fund IV, LP, is a limited partnership organized under the laws of the State of Delaware.

## FACTUAL BACKGROUND

9.      On September 24, 2014, Strome and the Debtors entered into a certain loan agreement (the "**Loan Agreement**") pursuant to which Strome agreed to lend an aggregate of $23 million (the "**Loan**") for the purpose of financing and reimbursing the costs of the development, acquisition, construction and installation of equipment relating to certain of the Debtors' dark fiber communications networks spanning from Miami, Florida to Jacksonville, Florida and from Jacksonville to Atlanta, Georgia (the "**Southeast Segment**"). A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.

10.      As part of the funding, Allied Fiber's assets pertaining to the Southeast Segment were transferred to the Debtors, and thereafter were pledged by the Debtors to Strome to secure repayment of the Loan.

11.      Allied Fiber entered into a limited guaranty of the Loan.

12.      As a condition to making the Loan, Strome required an intercreditor agreement with certain creditors of Allied Fiber (the "**Consenting 16% Noteholders**") that held a prior security

3

interest in the assets of Allied Fiber, which assets were transferred to the Debtors in order to give Strome the senior lien position on such assets.  The Consenting 16% Noteholders continue to have a second lien on the Debtors' assets and Allied Fiber continues to be an obligor on the debt owed to the Consenting 16% Noteholders.

13.    In connection with the Loan, the Debtors executed a Senior Secured Promissory Note, dated September 24, 2014, in favor of Strome (the "**Note**," and together with the Loan Agreement and other agreements between Strome and the Debtors executed in connection with the Loan, the "**Loan Documents**").  A true and correct copy of the Note is attached hereto as Exhibit B.

14.    The Loan Documents are governed by, and construed in accordance with, the laws of the State of New York, without regard to principles of conflicts of law.

15.    On September 3, 2015, Strome, the Debtors and Allied Fiber entered into a forbearance agreement (the "**Forbearance Agreement**") pursuant to which, among other things, the Debtors acknowledged that the Loan was in default and had been accelerated, and Strome agreed to forebear from taking remedial action against the Debtors in order to give the Debtors an opportunity to either refinance the Loan or sell their assets in order to repay the Loan. A true and correct copy of the Forbearance Agreement is attached hereto as Exhibit C.

16.    On March 8, 2016, at the specific direction of Strome, Allied Fiber and the Debtors elevated their Chief Financial Officer, Scott Drake, to the position of Chief Restructuring Officer, subject to the oversight and direction of Allied Fiber's board of managers.

17.    On April 19, 2016, just one day prior to the bankruptcy filing, Scott Drake resigned without any prior notice or warning to the Allied Fiber board of managers.

18.     Simultaneously, without any prior notice to Allied Fiber, Strome's counsel advised Allied Fiber in writing of the exercise of Strome's secured party rights to vote the membership interests of Allied Fiber in the Debtors, and allegedly voted to replace each of the members of the Debtors with Scott Drake, giving Strome effective control of the Debtors.

19.     On the next day, April 20, 2016 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

A.     **The Make Whole Amount Is Not Due Under the Terms Of The Original Loan Documents.**

20.     Section 9.1 of the Loan Agreement is the only section of the Loan Agreement that defines the "Make Whole Amount."

21.     Section 9.1 of the Loan Agreement, entitled "Option To Prepay Loan" originally provided that:

> The [Debtors] shall have the option, in their sole discretion, to prepay the Loan Payments in whole . . . or in part at any time prior to the Maturity Date at a price (the "Make Whole Amount") equal to the greater of:
>
> (i)  100% of the principal amount of the Loan to be prepaid;
>
> or
>
> (ii)  the sum of the present value of the remaining scheduled payments of principal and interest on the Loan to the Maturity Date to be prepaid, not including any portion of those payments of interest accrued and unpaid as of the date on which the Loan is to be prepaid, discounted to the date on which the Loan is to be prepaid on a semi-annual basis, at the Treasury Rate [which is also defined in this section 9.1], plus 25 basis points;
>
> plus, in each case, accrued interest on the Loan to the date of prepayment.

22.    Pursuant to the terms of Section 9.1, the Make Whole Amount is calculated and becomes due only if the Debtors, in their sole discretion, elect to voluntarily prepay the Loan prior to its Maturity Date (defined as September 24, 2024).

23.    The Note provides that "[Debtors] may voluntarily prepay this Note in accordance with, and subject to the terms and provisions of, the Loan Agreement, including, without limitation, subject to the payment of the Make Whole Amount."  Note, Article 2(D).

24.    The Debtors have not and cannot prepay the Loan.

25.    The Loan Agreement contains default provisions that set forth Strome's rights and remedies upon a default by the Debtors.  In particular, Section 8.2 of the Loan Agreement provides:

> Whenever an Event of Default referred to in Section 8.1 [of the Loan Agreement] shall have occurred and is continuing, Lender may take any one or more of the following remedial steps:
>
> (a)    Lender may declare the Loan Payments payable hereunder for the remainder of the term of the Loan Agreement and the Make Whole Amount to be immediately due and payable, whereupon the same shall become due and payable.

26.    By using the defined term, Section 8.2 requires the payment of a "Make Whole Amount" only if its definitional prerequisites have been satisfied under Section 9.1 of the Loan Agreement which, in turn, requires that the Debtors have elected, in their discretion, to prepay the Loan.  Because there has never been a voluntary election to prepay the Loan, Section 8.2 does not require the Debtors to pay any Make Whole Amount.

27.    The Note is consistent with section 8.2 of the Loan Agreement.  The Note provides that, after default and acceleration, the Debtors owe the "Debt" to Strome.

28.    Article 2(A) of Note defines "Debt" as "the principal of, and any accrued and unpaid interest on, this Note, including, without limitation, any payments of interest which are

deferred and capitalized as set forth in Subsection (B) [of the Note]." There is no reference in the defined term "Debt" to the Make Whole Amount being due upon default and acceleration.

29.    Article 2(D) of the Note is the only section in the Note which references the Make Whole Amount. It states that "[Debtors] may voluntarily prepay this Note in accordance with, and subject to the terms and provisions of, the Loan Agreement, including, without limitation, subject to the payment of the Make Whole Amount." The only reference to the Make Whole Amount in the Note confirms that it is only due upon a voluntary prepayment, which has not and cannot occur.

     **B.**     **The Forbearance Agreement Is Consistent With The Loan Documents That No Make Whole Amount Is Due On Acceleration.**

30.    The Forbearance Agreement supports the interpretation that the Make Whole Amount is due only upon a voluntary prepayment of the Loan and is not due after a default and acceleration.

31.    The Forbearance Agreement amended the Loan Agreement by adding the following standalone sentence at the end of Section 9.1 of the Loan Agreement: "The Make Whole Amount shall become due and payable upon acceleration of the Loan in accordance with Section 8.2." Forbearance Agreement, Section 3.3.

32.    This amendment constitutes an admission by Strome that the original language of the Loan Agreement does not require payment of any Make Whole Amount upon default and acceleration.

33.    In addition, according to the express terms of the Forbearance Agreement, the Loan was already accelerated on or prior to the date of the Forbearance Agreement; thus, the inserted sentence providing that "[t]he Make Whole Amount shall become due and payable upon acceleration of the Loan" refers to a future event that has already occurred, thereby rendering the sentence, at best, unclear and ambiguous.

7

34.      Because the sentence added at the end of Section 9.1 of the Loan Agreement uses the existing, defined term "Make Whole Amount" instead of amending the defined term as set forth in the beginning of Section 9.1, the added sentence does not change the defined term "Make Whole Amount".  An integral part of that defined term requires a voluntary prepayment of the Loan by the Debtors – there is no "Make Whole Amount" whatsoever unless the payment allegedly triggering the mathematical calculation in the remainder of Section 9.1 constitutes a voluntary prepayment prior to the maturity date.  In other words, the Forbearance Agreement failed to change the fact that the actual, defined term "Make Whole Amount" only refers to a voluntary, discretionary prepayment of the Loan by the Debtors prior to the maturity date.  The Debtors have not and cannot prepay the Loan, especially since the Forbearance Agreement contains an acknowledgment that the Loan has already been accelerated.

35.      Section 7.2 of the Forbearance Agreement confirms that any obligation to pay a Make Whole Amount is hypothetical.  That section provides:

> *Confirmation of Indebtedness*.  The Guarantor and the [Debtors] hereby confirm and acknowledge that, (i) as of the date hereof, the [Debtors] are truly and justly indebted to the Lender, without defense, counterclaim or offset of any kind (a) in the aggregate principal amount of $24,196,000 plus accrued and unpaid interest and (b) the Make Whole Amount, if it were computed with respect to a repayment as of the date hereof, would be in the amount of $21,263,043 and (ii) the Guarantor is contingently liable to the Lender in respect of such amounts.

Forbearance Agreement, Section 7.2.

36.      Strome's conditional language in Section 7.2 of the Forbearance Agreement simply posits that, if a Make Whole Amount "were computed with respect to a repayment as of the date hereof," the Make Whole Amount would be a particular sum.  But, the condition

8

was not satisfied because there was not, in fact, any payment on the Loan as of the date of the Forbearance Agreement.

37.    Nowhere in Section 7.2 does the language state clearly and unambiguously that the Debtors have agreed that the Make Whole Amount should be computed and is due as of the date of the Forbearance Agreement.

38.    The use of hypothetical language in Section 7.2 is consistent with the remainder of the Forbearance Agreement which expressly provides that Strome was forbearing for the explicit purpose of giving Allied Fiber the opportunity to refinance the Loan.  If Allied Fiber had been able to do so, then there might have been a voluntary prepayment of the Loan, and the Make Whole Amount, consistent with the hypothetical phrasing of Section 7.2, would have been due and owing.  Because Strome chose to terminate the Forbearance Agreement before such a prepayment ever occurred, it is not now entitled to a Make Whole Amount.

39.    The fourth recital in the Forbearance Agreement states that "the Loans and other obligations owing under the Loan Documents, including the Make Whole Amount, are deemed to have been accelerated and are due and owing."

40.    Recital paragraphs are not considered substantive under New York law, but may be interpreted to elucidate the intent of the parties if the intent is otherwise unclear in the document.  The language of the recital cannot as a matter of law override the operative terms of the Forbearance Agreement or the operative terms of the Loan Documents which are clear that no Make Whole Amount is due unless and until a voluntary prepayment is made.

9

41.     At the time of the Forbearance Agreement, the Make Whole Amount was not due and owing and, therefore, as stated in the recital, the "Loans and other obligations owing under the Loan Documents" did not include a Make Whole Amount.

42.     The reference in the recital to "including the Make Whole Amount" is a clarifying clause that means that, if a Make Whole Amount were currently "owing under the Loan Documents," it would be accelerated and become due and owing.

43.     Under applicable New York law, the parties have not clearly and specifically provided for payment of a make-whole premium, notwithstanding default and acceleration.

44.     Under any circumstances, neither Loan Documents nor the Forbearance Agreement constitute a clear and unambiguous statement that a make-whole premium is due after acceleration, as required under applicable New York law.

## COUNT ONE

### OBJECTION TO CLAIM
### PURSUANT TO
### 11 U.S.C. § 502
### (Disallowance of Make Whole Amount)

45.     Plaintiff repeats and re-alleges paragraphs 1 through 44 above.

46.     Strome has asserted a secured claim in the approximate amount of $52 million.

47.     Approximately $20 million of the asserted $52 million claim is attributed to a Make Whole Amount.

48.     The Loan Documents provide that the Debtors owe a Make Whole Amount only in the event that the Debtors voluntarily elect to prepay the Loan.

49.     The Debtors did not elect to prepay the Loan; therefore, they do not owe a Make Whole Amount.

50.     Strome has accelerated the Loan and, under New York law, has advanced the maturity date to the date of acceleration.

51.     Because Strome has accelerated the Loan, the Debtors cannot prepay the Loan and cannot owe a Make Whole Amount under the Loan Documents or the Forbearance Agreement.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered against Strome (i) disallowing that portion of Strome's secured claim attributable to the Make Whole Amount; and (ii) granting such further relief as the Court deems appropriate under the circumstances.


Date:  June 21, 2016
Wilmington, Delaware

CIARDI CIARDI & ASTIN


*/s/ Joseph J. McMahon, Jr.*
Daniel K. Astin (No. 4068)
John D. McLaughlin, Jr. (No. 4123)
Joseph McMahon, Jr. (No. 4819)
1204 North King Street
Wilmington, DE  19801
Telephone: (302) 658-1100
Facsimile: (302) 658-1300
jmcmahon@ciardilaw.com

-and-

Paul J. Ricotta
(NY1837467) (*pro hac* pending)
Kevin J. Walsh
(BBO No. 629984) (*pro hac* pending)
MINTZ LEVIN COHN FERRIS
 GLOVSKY & POPEO, P.C.
One Financial Center
Boston, MA  02111
Tel.:  (617) 542-6000
Fax:  (617) 542-2241
pjricotta@mintz.com
kwalsh@mintz.com

*Counsel for Allied Fiber, LLC*