IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: : | Chapter 11 |
| : | |
| AF-SOUTHEAST, LLC, *et al.*,[1] : | Case No. 16-11008 (KG) |
| : | (Jointly Administered) |
| : | |
| Debtors. : | Re: D.I. 145 |
| : | |

**STROME MEZZANINE FUND IV, LP'S RESPONSE TO THE MOTION OF ALLIED FIBER, LLC PURSUANT TO 11 U.S.C. § 363(k) TO LIMIT CREDIT BID RIGHTS OF SENIOR SECURED CREDITOR AND TO REQUIRE CASH ESCROW FOR ANY BID BY SECURED CREDITOR IN EXCESS OF ITS UNDISPUTED CLAIM AMOUNT**

Strome Mezzanine Fund IV, L.P. ("Strome"), in its capacity as the senior secured prepetition lender and the postpetition DIP lender to the above-captioned debtors and debtors in possession (collectively the "Debtors"), files this this response to the motion (the "Motion") [D.I. 145] of Allied Fiber, LLC ("Allied Fiber") seeking to limit Strome's credit bid rights under section 363(k), and in support states as follows:

## I. PRELIMINARY STATEMENT

1. Allied Fiber, the Debtors' parent and guarantor of the Debtors' secured indebtedness, remained silent for more than two months before appearing and seeking to be heard in this case. Allied Fiber received notice of the Debtors' bankruptcy, has been served with all pleadings, and members of its board of managers have appeared at hearings. When Allied Fiber finally did appear, it moved the Court to hear its Motion on an expedited basis—without conferring—citing as "good cause" for its request the urgent need for the Motion to be resolved before the long-scheduled auction on July 12, 2016. The only urgency in resolving the Motion results from Allied Fiber's own inaction, delay, and transparent gamesmanship. Rather than

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are: (i) AF-Southeast, LLC (8002); (ii) Allied Fiber – Florida, LLC (8111); and (iii) Allied Fiber – Georgia, LLC (2935).

impose upon the Court to resolve an otherwise-avoidable scheduling dispute, Strome's counsel agreed to forgo attendance at a previously scheduled hearing in another matter and have the Motion heard on less than a week's notice.

2. In the Motion, Allied Fiber seeks to limit Strome's ability to credit bid the portion of its debt attributable to a make-whole provision (the "Make Whole") in the Debtors' prepetition and DIP loan documents (collectively, the "Loan Documents"). In total, Strome is owed in excess of $57 million, consisting of approximately $31.5 million in pre-petition indebtedness, plus approximately $5.9 million in post-petition debtor-in-possession financing (the "DIP Loan"), plus approximately $19.6 million under the Make Whole.[2] Allied Fiber does not contest Strome's ability to credit bid up to the amount of its pre- and post-petition secured indebtedness (approximately $37.4 million), and only challenges the Make Whole. Accordingly, both the Motion and accompanying adversary proceeding filed by Allied Fiber will be moot unless bidding for the Debtors' assets at the July 12, 2016 auction exceeds $37.4 million.

3. The Make Whole is not subject to *bona fide* dispute. The Loan Documents unambiguously provide that the Make Whole can become due under either of two circumstances: prepayment of the loan or default by the Debtors. Specifically, Section 8.02(a) of the Loan Agreement[3] provides that, upon the occurrence of an event of default:

> [Strome] may declare the Loan Payments payable hereunder . . . **and the Make Whole Amount** to be immediately due and payable, whereupon the same shall become due and payable.

---

[2] For simplicity and ease of reference, these rounded estimates do not account for the roll-in of approximately $2.6 million in pre-petition loans to the DIP Loan, which is not relevant to the Motion. The precise amounts of pre- and post-petition indebtedness are set forth in the Court's final order approving the Debtors' post-petition financing (the "Final DIP Order") [D.I. 99] and the exhibits thereto.

[3] The Loan Agreement is attached to the Motion as Exhibit A.

Loan Agreement at § 8.2(a) (emphasis added). Further, Allied Fiber has expressly agreed and acknowledged that the Make Whole became due and owing upon the Debtors' default. In September 2015, Allied Fiber and Strome entered into an Amendment and Forbearance Agreement (the "<u>Forbearance Agreement</u>") under which Strome provided the Debtors with an additional $3.3 million and agreed to forbear from exercising its remedies while Allied Fiber pursued a sale or refinancing.[4] As an integral part of this transaction, Allied Fiber expressly acknowledged and agreed that:

> as a result of the [Debtors'] Defaults, the Loans and other obligations owing under the Loan Documents, **including the Make Whole Amount**, are deemed to have been accelerated and are due and owing.

Forbearance Agreement at p. 1 (emphasis added). In a section of the Forbearance Agreement titled "Confirmation of Indebtedness," Allied Fiber also expressly agreed and acknowledged that, as of the date of the Forbearance Agreement,

> The Debtors are truly and justly indebted to [Strome], without defense, counterclaim or offset of any kind . . . in the aggregate principal amount of $24,196,000 plus accrued and unpaid interest **and . . . the Make Whole Amount . . . of $21,263,043** . . .

Forbearance Agreement at § 7.2 (emphasis added).

4.      No further inquiry is necessary. The unambiguous language of the Loan Documents reflects the parties' express agreement that the Make Whole is due and owing as a result of the Debtors' defaults and there is no reasonable basis for dispute. Allied Fiber's strained construction of the Loan Documents contradicts both the plain language of the agreements and fundamental principles of contract law. Because the Make Whole is indisputably due and owing, there is no basis for limiting Strome's right to credit bid the amounts attributable to the Make Whole under section 363(k).

---

[4] The Forbearance Agreement is attached to the Motion as Exhibit C.

5.  Nonetheless, there is no reason for the Court to rule on the Motion until after the July 12, 2016 auction. Strome has yet to even submit a bid. If the bidding for the Debtors' assets does not exceed the amount of Strome's pre- and post-petition secured indebtedness (approximately $37.4 million), then the Motion and accompanying adversary proceeding will be moot. The Motion will also be moot if the bidding does exceed $37.4 million but Strome is not the winning bidder.[5] In the event bidding exceeds $37.4 million and Strome is the winning bidder, then the Court can decide at the July 14, 2016 sale hearing whether Strome should be required to escrow cash to cover the portion of the purchase price that exceeds its pre- and post-petition indebtedness pending the Court's ruling on the enforceability of the Make Whole. Limiting Strome's credit bid rights in advance of the auction is both unnecessary and impractical and will chill bidding by discouraging Strome from bidding above $37.4 million.[6] To maximize the value of the Debtors' assets, the Court should permit and encourage all parties to bid freely and defer ruling on the merits of the Motion until the July 12, 2016 auction.

## II. THE MAKE WHOLE IS NOT SUBJECT TO *BONA FIDE* DISPUTE

6.  The Court need not rule on the enforceability of the Make Whole in order to resolve the Motion because even a brief review of the Loan Documents reveals that the Make Whole is not subject to *bona fide* dispute. As set forth above, the Loan Documents expressly provide that Strome may declare the Make Whole due upon default. Loan Agreement § 8.2(a). Specifically, the Loan Agreement provides that, upon default, Strome "may declare the Loan Payments payable hereunder . . . and the Make Whole Amount to be immediately due and

---

[5] If Strome is not the winning bidder and the sale price exceeds Strome's pre- and post-petition indebtedness, the Court can address the distribution of any sales proceeds attributable to the Make Whole at the July 14, 2016 sale hearing.

[6] No other bidder is required to escrow cash or post security in connection with its bid.

payable, whereupon the same shall become due and payable." *Id.* That is exactly what happened.

7. When the Debtors defaulted under the Loan Agreement in 2015, Allied Fiber requested that Strome not only refrain from taking any action to enforce its remedies under the Loan Documents, but that it also loan the Debtors an *additional* $3.3 million to fund Allied Fiber's pursuit of a refinancing or sale. Strome was willing to do so on the condition that Allied Fiber expressly acknowledge that the Make Whole had become due and owing as a result of the Debtors' defaults. The parties' agreement is memorialized in the Forbearance Agreement. In the Forbearance Agreement, Allied Fiber expressly acknowledged and agreed that "as a result of the [Debtors'] Defaults, the Loans and other obligations owing under the Loan Documents, **including the Make Whole Amount**, are deemed to have been accelerated and are due and owing." Forbearance Agreement at p. 1 (emphasis added). For the avoidance of doubt, the parties also agreed that (i) the Make Whole "shall become due and payable upon acceleration of the Loan" and (ii) the loan had been accelerated. *Id.* at p. 1, § 3.3. Finally, Allied Fiber agreed that as of the date the Forbearance Agreement, the Debtors were indebted to Strome "without defense, counterclaim or offset of any kind . . . in the aggregated principal amount of $24,196,000 . . . and . . . the Make Whole . . . in the amount of $21,263,043." *Id.* at § 7.2. With these binding admissions and agreements in place, Strome provided the Debtors with $3.3 million in additional financing and refrained from exercising its remedies for more than six months.

8. Having received the benefit of the bargain under the Loan and Forbearance Agreements (*i.e.,* $3.3 million and 6 months' forbearance), Allied Fiber now seeks to shirk its contractual obligations and escape the plain meaning of its own words. To do so, Allied Fiber fills 22 pages rending a tortured, nearly unintelligible interpretation of the Loan Documents in an

attempt to convince the Court that contractual provisions expressly stating "the Make Whole is due and owing" do not mean what they say. Allied Fiber's contractual contortions defy axiomatic principles of contract interpretation and fail as a matter of law.

9. Under New York law,[7] "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* The Court "should accord [contractual] language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990). Above all, "it is axiomatic that the words and phrases used in a contract must be given their plain meaning." *Elmsmere Assocs. v. Gladstone*, 153 A.D.2d 501, 545 N.Y.S.2d 136, 139–40 (N.Y. App. Div. 1st. Dept. 1989).

10. Here, the Court's analysis must begin and end with the plain language of the Loan and Forbearance Agreements. The Loan Agreement unambiguously provides that, upon default:

> [Strome] may declare the Loan Payments payable hereunder . . . **and the Make Whole Amount** to be immediately due and payable, whereupon the same shall become due and payable

Loan Agreement at § 8.2(a) (emphasis added). In the Forbearance Agreement, Allied Fiber explicitly agreed that "as a result of the [Debtors'] Defaults, the Loans and other obligations owing under the Loan Documents, **including the Make Whole Amount**, are deemed to have been accelerated and are due and owing." Forbearance Agreement at p. 1 (emphasis added). This language is only susceptible to one interpretation: the Make Whole is due and owing as a result of the Debtors' default.

---

[7] The Loan Documents are governed by New York law. Loan Agreement at § 10.9.

11.     When viewed in the context of Allied Fiber's request that Strome forbear from exercising its remedies and loan the Debtors an additional $3.3 million, the parties' intent is even more definite. *See Thompson*, 896 F.2d at 721 (courts should give "due consideration to the surrounding circumstances [and] apparent purpose which the parties sought to accomplish"). Allied Fiber's acknowledgement that the Make Whole is due and owing served as consideration for Strome's forbearance and continued funding. The parties' language and intent regarding the Make Whole are not ambiguous; Allied Fiber's "[c]ontorted semanticism must not be permitted to create an issue where none exists." *Wards Co., Inc. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985); *see also St. Pierre v. Coburn Insuring Agency*, 1993 WL 85757, at *5 (N.D.N.Y. Mar. 22, 1993) ("The court cannot contort the language of a contract to create an ambiguity that does not exist").

12.     As Allied Fiber acknowledges in the Motion, make-whole provisions that become due upon default are enforceable according to their terms. *Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 836 (N.Y. Sup. Ct. 2006); *In re Fin. Center Assocs. of East Meadow L.P.*, 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992). Accordingly, courts routinely enforce make-whole provisions in loan agreements that unambiguously provide for payment of the make-whole upon default and acceleration. *See U.S. Bank N.A. v. Ass'n South Side House, LLC*, 2012 WL 273119, at *7 (E.D.N.Y. 2012) (listing cases). In *In re Utd. Merchants and Mfrs., Inc.*, the Second Circuit Court of Appeals held that a substantively identical provision requiring payment of a prepayment charge (*i.e.,* make-whole) upon default was enforceable under New York law. That provision read that, upon default and at the option of the lender:

> The principal of such Note forthwith become due and payable, together with the interest accrued thereon, and, to the extent permitted by law, an amount equal to the pre-payment charge that would be payable if [the borrower] were pre-paying such Note at the time pursuant to ¶ 8.2 hereof.

674 F.2d 134, 140-41 (2d Cir. 1982). The court held that the clause was enforceable according to its terms and that the prepayment amount became due and owing upon the borrower's default. *Id.* at 141; *see also In re CP Holdings*, 332 B.R. 380, 385–86 (W.D. Mo. 2005), *aff'd*, 206 Fed. Appx. 629 (8th Cir. 2006) (permitting prepayment premium claim where the note explicitly provided that default and acceleration obligated borrower to remit a prepayment premium even absent borrower's actual attempt to prepay).[8]

13.  There is nothing ambiguous about Section 8.2(a) of the Loan Agreement, which states in plain language that Strome has the right to declare the Make Whole due and owing upon the Debtors' default. Allied Fiber asserts, without citation, that this language lacks the "clarity and specificity required under New York law to have a make-whole premium due in a loan agreement" Motion at ¶ 33. The language providing that the Make Whole becomes due upon default could literally be no clearer. Upon default, "[Strome] may declare the Loan Payments payable hereunder . . . and the Make Whole Amount to be immediately due and payable." Loan Agreement at § 8.2(a). Nor is there any ambiguity in Allied Fiber's acknowledgement in the Forbearance Agreement that "as a result of the Designated Defaults, the Loans and other obligations owing under the Loan Documents, including the Make Whole Amount, are deemed to have been accelerated and are due and owing." Forbearance Agreement at p. 1; *see also*

---

[8] The cases Allied Fiber cites regarding prepayment after acceleration, Motion at ¶ 31 n.7, are inapposite because, unlike those cases, the Loan Documents in this case expressly require payment of the Make Whole upon default and acceleration. As set forth above, the contractual language providing that the Make Whole becomes due upon default is unambiguous and not subject to more than one interpretation. Loan Agreement at § 8.2.

Forbearance Agreement at § 7.2 (expressly agreeing that the Make Whole had become due and owing in the amount set forth therein).

14.    The Court need not look beyond the plain meaning of Allied Fiber's own words. The unambiguous language of the Loan Documents, which must be enforced according to their terms, provides that the Make Whole became due and owing as a result of the Debtors' default. No amount of linguistic or contractual torture can make Allied Fiber's agreement that "the Make Whole . . . [is] due and owing" mean anything other than "the Make Whole is due and owing." Because the Make Whole is due and owing under any permissible interpretation of the Loan Documents, there is no basis on which to limit Strome's right to credit bid at the July 12, 2016 auction.

### III. THERE IS NO OTHER REASON TO LIMIT STROME'S CREDIT BID RIGHTS

15.    Allied Fiber also implies that Strome should not be able to credit bid because the Debtors, and Strome, have acted to chill bidding in an effort to permit Strome to gain control of the Debtors. As an initial matter, Strome never sought to control the Debtors but was forced to act when Allied Fiber abruptly fired all of the Debtors' employees, shut down the Debtors' operations, and walked away, consciously abandoning Strome's collateral and imperiling its value. Faced with a total loss, Strome was left with no option other than to exercise its right to appoint replacement management to resume the Debtors' operations and preserve the Debtors' value. Immediately after Strome appointed new management, the Debtors retained an independent third-party CRO to oversee the Debtors' operations and conduct an orderly marketing and sale process designed to maximize the value of the Debtors' assets. The Debtors, and their independent CRO, are subject to the Court's supervision and have acted at all times in

the best interest of their estates. Any implication that either the Debtors or Strome have taken any action other than to protect and preserve the Debtors' value is specious.[9]

16. Allied Fiber also contends, without any evidence, that permitting Strome to credit bid the full amount of its debt will chill bidding. According to Allied Fiber, it is "well known that credit bidding . . . chills bidding." Motion at p. 4. As the movant, however, Allied Fiber bears the burden of proving, by a preponderance of the evidence, the existence of cause to limit Strome's credit bid rights under section 363(k). *In re The Free Lance-Star Publishing Co. of Fredericksburg, VA*, 512 B.R. 798, 801 (Bankr. D. Va. 2014). Absent a finding of cause, "[a] secured creditor should be entitled to credit bid the full amount of its claim at any sale of its collateral outside the ordinary course of the debtor's business." *Id.* at 804 (citing *In re SubMicron Sys. Corp.*, 432 F.3d 448, 459–60 (3d Cir. 2006)). Beyond its own *ipse dixit*, Allied Fiber has presented no evidence whatsoever to support its claim that permitting Strome to credit bid will chill bidding.[10] To the contrary, it is equally conceivable that limiting Strome's ability to bid at the auction will discourage it from bidding and artificially depress the price of the Debtors' assets. Allied Fiber has made no showing that permitting Strome to credit bid will do anything other than *encourage* bidding at the auction, and it has therefore failed to meet its burden under section 363(k).[11]

---

[9] Allied Fiber's assertion that Strome intends to "simply use this Court to take control of the Debtors' assets without exposing them to a fair auction process, . . . depriving creditors of the possibility of any dividend whatsoever" is contradicted by the entire record in this case. Motion at p. 5. Not only is the the sale process being run by an independent third party subject to the Court's oversight, but Strome has agreed, as part of its post-petition financing, to pay all allowed unsecured trade claims in full. Allied Fiber's allegations are as baseless as they are uninformed.

[10] This case stands in stark contrast to *Fisker*, in which the Court was presented with "express and unrebutted" evidence "that there will be *no* bidding—not just the chilling of bidding—if the Court does not limit the credit bid." *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del. 2014). There is no such evidence in this case.

[11] Allied Fiber's unsupported assertion that bidders will not bid simply because they know Strome can credit bid up to $52 million does not stand to reason. The amount a bidder is willing to bid is

17. Finally, Allied Fiber's assertion that no other party in interest has the "ability or the incentive to question Strome's tactics" is both patently false and contradicted by Allied Fiber's own pleading. According to Allied Fiber,[12] a group of noteholders hold a second lien on the Debtors' assets. Motion at ¶ 8. As the holders of a purported second lien on the Debtors' assets, these noteholders have an even greater incentive than Allied Fiber to challenge the Make Whole and, to date, have not done so.[13] Their silence is telling.

## IV. CONCLUSION

18. Allied Fiber has made no showing that there is any reason to limit Strome's right to credit bid. First, it is beyond reasonable dispute that, under any permissible interpretation of the Loan Documents, the Make Whole is due and owing. Further, Allied Fiber has wholly failed to meet its burden to show any "cause" for limiting Strome's credit bid rights under section 363(k). Limiting Strome's credit bid rights on this record will not create a fair auction or level playing field. Instead, it will impermissibly strip Strome of its bargained-for rights and arbitrarily chill bidding without any legal or equitable basis for doing so. By filing a last minute, baseless objection to Strome's claim that is contradicted by Allied Fiber's own prior actions, that is exactly what Allied Fiber seeks to do.

19. To avoid this unfair and inequitable result, the Court should refrain from ruling on the Motion until after the July 12, 2016 auction. The Court should not impose any constraints on

---

determined by its own subjective valuation of the assets at auction and not by its wealth or the respective bidding power of competing bidders. Otherwise, no party would ever bid against a competing bidder with more buying power and the wealthiest bidders, often secured lenders, would prevail in every auction.

[12] Strome takes no position on the validity or extent of these noteholders' purported liens.

[13] Allied Fiber also contends that certain "non-consenting" noteholders hold a first lien on the Debtors' assts. They do not. Among other things, these noteholders failed to perfect their liens prior to the Debtors' bankruptcy. As a result, counsel to some or all of these noteholders acknowledged on the record at a hearing before the Court on May 13, 2016 that "we do not have, to the best of []our knowledge and by any record that we can produce, a perfected prepetition lien on these assets that are the subject of these proceedings." May 13, 2016 Hearing Transcript, 35:9-12. Moreover, Allied Fiber has no standing to assert other parties' purported lien rights.

---

Strome's (or any other bidders') right and ability to bid freely for the Debtors' assets. If the bidding does not exceed the amount of Strome's pre- and post-petition indebtedness, then the Motion will be moot. If the bidding does exceed Strome's pre- and post-petition indebtedness and Strome is the winning bidder, then the Court can determine whether Strome should be required to escrow the portion of the purchase price attributable to the Make Whole at the July 14, 2016 sale hearing.

Dated: June 27, 2016
      Wilmington, Delaware

                                  Mark D. Collins (No. 2981)
                                  Robert J. Stearn, Jr. (No. 2915)
                                  Jason M. Madron (No. 4431)
                                  RICHARDS, LAYTON & FINGER, P.A.
                                  One Rodney Square
                                  920 North King Street
                                  Wilmington, Delaware 19801
                                  Telephone:   (302) 651-7700
                                  Facsimile:    (302) 651-7701

                                  -and-

                                  Patrick J. Neligan, Jr.
                                  John D. Gaither
                                  NELIGAN FOLEY LLP
                                  325 N. St. Paul, Suite 3600
                                  Dallas, Texas 75201
                                  Telephone:   (214) 810-5300
                                  Facsimile:    (214) 810-5301

                                  *Attorneys for Strome Mezzanine Fund IV, L.P.*